

THOMAS J. RUSSO, SR., C.F.I.
MICHAEL W. RUSSO, C.F.I.

PAMELA J. RUSSO
OPERATIONS MANAGER

RICHARD R. BLOETH, C.F.I.
PETER M. CATAL, C.F.I.
MICHAEL K. CUMMINGS, C.F.I.
DOUGLAS E. LEIHBACHER, C.F.I.
VINCENT PALMIERI, C.F.I.
KEVIN S. PARRETT, C.F.I.
GENE PIETZAK, C.F.I.
SALVATORE J. SALVATO, C.F.I.
STEPHEN M. WENK, C.F.I.

HARRY T. HANSEN, C.F.E.I.
DIRECTOR NEW JERSEY
REGIONAL OFFICE

GERARD E. LEDWITH, C.F.I.
DIRECTOR HUDSON VALLEY
REGIONAL OFFICE

DOUGLAS J. MOLLO, ESQ

NEW JERSEY REGIONAL OFFICE
344 LAFAYETTE ROAD
HARRINGTON PARK, NJ 07640
TEL: 201-750-1948 - FAX: 201-750-8789

HUDSON VALLEY REGIONAL OFFICE
3590 ROUTE 9
COLD SPRING, NY 10516
TEL: 845-809-5245 – FAX: 845-809-5098

**99 HILLSIDE AVENUE**
**WILLISTON PARK, NY 11596**
TEL: 516-294-8644
FAX: 516-747-1009

E-MAIL: OFFICE@TJRUSSO.COM
WWW.TJRUSSO.COM

OUR FILE NO.: FR-3143-14

August 20, 2015

**Loss:** 107-109 Port Richmond Avenue
Staten Island, NY

**Date of Loss:** February 24, 2014
Monday

**Claim No:** SIBP408182

**Insured:** S I Meat Village Inc.

Yale Glazer, Esq.
Lazare Potter & Giacovas, LLP
875 Third Avenue, 28th Floor
New York, NY  10022

Dear Mr. Glazer:

Pursuant to your request, enclosed please find our final report and an invoice for services rendered regarding our examination and investigation pertaining to the above-captioned loss.

Although our file is in closed status, we remain ready to reactivate upon request from your office to render any further assistance you may require in your ongoing analysis of this case.  Thanking you for the opportunity of being of service to you, I remain,

Very truly yours,

T. J. RUSSO CONSULTANTS INC.

*Vincent Palmieri*

Vincent Palmieri, CFEI
Fire Investigator

*Michael W. Russo*

Michael W. Russo, CFI
Fire Investigator (Assisting)

MWR/cg
Enc.

**107-109 PORT RICHMOND AVENUE**
**STATEN ISLAND, NEW YORK**

**CASE NO.:**

FR-3143-14

                                                    **POLICY NO.:**

**CLAIM NO.:**                                       SIBP408182

SIBP408182-001-001-001

                                                    **ADDRESS:**

                                                    107-109 Port Richmond Avenue
                                                    Staten Island, New York

**DATE OF LOSS:**

February 24, 2014
Monday

                                                    **DATES OF EXAMINATION:**

                                                    Monday, February 24, 2014
                                                    Thursday, February 27, 2014
                                                    Friday, February 28, 2014
                                                    Saturday, March 1, 2014
                                                    Sunday, March 2, 2014
                                                    Tuesday, March 4, 2014
                                                    Wednesday, March 5, 2014
                                                    Thursday, March 6, 2014
                                                    Friday, March 7, 2014 and
                                                    Sunday, March 9, 2014

**CONSENT FOR EXAMINATIONS:**

 The insured as well as representatives of
  New York Adjustment Co., the
  public adjuster

                                                    **EXAMINATION REQUESTED BY:**

                                                    Chris Ryan
                                                    Guard Insurance Group
                                                    P. O. Box 1368
                                                    Wilkes Barre, PA  18703

**TABLE OF CONTENTS**

**Page**

Surrounding Properties                                                 1

Exterior Examination                                                   1

Interior Examination                                                   2

Cellar Examination                                                     4

Electrical Service                                                     5

Alarm System                                                           5

Surveillance System                                                    5

Heating Service                                                        6

Origin                                                                 6

Opinion and Conclusion                                                 6

Qualifications                                                        27

Transcriptions of Recorded Statements

    Ziad Abdelayem and Mohammad Jaber (First Statement)        29
    Ziad Abdelayem (Second Statement)                          116
    Alex Choy                                                  234
    Gloria Hua Chamber                                         247
    Mohammad Jaber (Second Statement)                          271
    Tammy - Central Station                                    334
    Zuleika Lowe and Allison Bakal                             342
    Associated Produce (Demetri)                               420
    Consolidated Supermarket                                   428
    Father and Son Produce (Mohammed)                          433
    Julie Cestaro – Foodnation (2 interviews)                  438
    Porky's                                                    453
    Rancher's Best                                             454
    Richmond Town Provisions                                   456

Interview with Manhattan Beer representative                          460
Interview with Vel-Mac Foods representative                          460

<u>EXHIBITS</u>

| | |
|---|---|
| Scene Illustration - Cellar (2D) | Exhibit "A" |
| "        "        - Cellar (3D) | |
| "        "        - First Floor (2D) | Exhibit "B" |
| "        "        - First Floor (3D) | |
| New York City Fire Department Incident Report | Exhibit "C" |
| New York City Fire Marshal's Report | Exhibit "D" |
| Additional Information Request **#1** (April 4, 2014) | Exhibit "E" |
| Insureds' Response and Documents Provided (April 21, 2014) | Exhibit "F" |
| Additional Information Request **#2** (May 5, 2014) | Exhibit "G" |
| Insureds' Response and Documents Provided (May 6, 2014) | Exhibit "H" |
| Additional Information Request **#3** (May 13, 2014) | Exhibit "I" |
| Insureds' Response and Documents Provided (June 2, 2014) | Exhibit "J" |
| Additional Information Request **#4** (August 22, 2014) | Exhibit "K" |
| Copy of the Alarm Monitoring Service Agreement "Handed to Us" during the Statement of Mr. Abdeldayem | Exhibit "L" |
| Copy of the Email Chain and Alarm Service Agreement Provided by the Central Station | Exhibit "M" |
| DVR - Time Line #1 | Exhibit "N" |
| DVR - Time Line #2 | Exhibit "O" |
| Email Chain from "Foodnation" with a Statement and Copy of a "Bounced" Check | Exhibit "P" |
| Various Invoices, Statements and Notices Found in the Grocery (Many Past Due Invoices) | Exhibit "Q" |
| Evidence Technician Collection Summary | Exhibit "R" |
| CVs for Vincent Palmieri and Michael Russo | Exhibit "S" |

Digital Photographs with Descriptions

FR-3143-14

## 107-109 PORT RICHMOND AVENUE
## STATEN ISLAND, NEW YORK

In accordance with your instructions on Monday, February 24, 2014 at approximately 1:07 p.m., this firm conducted an examination and investigation at 107-109 Port Richmond Avenue, Staten Island, New York on Monday, February 24, 2014 at approximately 2:30 p.m. (initial inspection date).

**NOTE:** Several additional inspections were conducted on the site, specifically on Thursday, February 27, 2014; Friday, February 28, 2014; Saturday, March 1, 2014; Sunday, March 2, 2014; Tuesday, March 4, 2014; Wednesday, March 5, 2014; Thursday, March 6, 2014; Friday, March 7, 2014 and Sunday, March 9, 2014.

The purpose of our investigation was to ascertain the origin and cause of a fire which occurred on **Monday, February 24, 2014** and reported to the Fire Department at approximately **3:05 a.m.**

**NOTE:** Initially our access "was limited" due to the Authorities investigation; however, when access was eventually obtained, it was conducted with the prior consent of the public adjuster's office and the insured.

## SURROUNDING PROPERTIES

To the North   :   a two story, attached (103-105 Port Richmond Ave.)
To the South   :   Bennett Street
To the East     :   driveway
To the West    :   Port Richmond Avenue

**NOTE:** The compass directions to be approximate and for the purpose of this report.

## EXTERIOR EXAMINATION

Exterior examination of the fire building disclosed it to be a one story, non-fireproof, commercial structure containing three commercial spaces, specifically a C-Town Supermarket, the "Gyrolicious" take-out restaurant and the Iglesia DeEvangelizacion Misionera Church.   The gyro take-out establishment and Church were accessed off Bennett Street and situated in the rear half of the building.   The C-Town Supermarket is located on the corner of Port Richmond Avenue and Bennett Street and encompasses the majority of the building.

1

FR-3143-14

**NOTE:**     Our investigation disclosed that the fire originated within the supermarket and extended through the "open cockloft space" to the other occupancies within the building.

The ordinary means of access and/or egress for the grocery store was gained by means of double, metal frame, glass paneled sliding doors which faced west out onto the sidewalk of Port Richmond Avenue. These doors were electronically controlled, contained a deadbolt lock assembly and disclosed the glass sections to have been broken. These doors as well as the front display windows were further protected by means of a roll down gate (and metal covers) secured with padlocks and pins. An analysis of the gate, metal covers and framing assemblies disclosed the physical evidence of forcible entry (consistent with that of Fire Department forcible entry).

A secondary means of egress for the supermarket was gained by means of a metal constructed door which faces south out onto the sidewalk of Bennett Street. This door contained an interior panic bar and disclosed the evidence of forcible entry. This door is situated opposite a small hallway separating the bathroom as well as the stairs leading down to the cellar.

Another means of access and/or egress for the grocery store (cellar level) was gained by means of double, metal constructed, sidewalk covers which face south out onto Bennett Street (Bennett Street sidewalk covers). These doors were secured by means of an interior slide bolt and disclosed the evidence of forcible entry.

**NOTE:**     Our investigation disclosed that the responding Fire Department found all the gates and doors into the building "closed and secure" (upon their arrival); requiring them to force entry into the premise.

The roof of the building was flat and constructed of "rubberized roof material" over tarpaper over wood roof planking; and the various windows of the grocery store were constructed of aluminum containing fixed glass.

## INTERIOR EXAMINATION

Proceeding east through the ordinary means of access and/or egress brings you to the "check-out area" of the grocery store. The first floor of your insured's space consists of a check-out area, an "open retail space", a deli counter with walk-in box, an office and a half bath. The floors of the first floor are constructed of wood with various floor coverings, and the sidewalls were constructed of a combination of slot board, sheetrock and plaster over wood frame. The ceilings of the space, per our examination (limited due to the degree of damage) as well as our investigation (per the owners), were

2

FR-3143-14

constructed of a combination of a suspended metal grid containing ceiling tiles and sheetrock over wood frame.

Situated to the north of the check-out area is the office and to the east is the open retail space. The delicatessen with a walk-in box as well as the bathroom spaces are located to the east of the retail space (northeast and southeast corners of the grocery store).

**NOTE:**      For a lay-out of the first floor, see our "Scene Illustrations" section of this report.

An overall analysis of the retail space revealed that it contained six aisles approximately 24' in length (running east and west) with an estimated ceiling height of approximately 13'. An examination of the various aisles disclosed that they varied in width configurations (between four and eight feet) and to have sustained varying degrees of fire damage, as illustrated in the "Photograph" section of this report.

The office of the grocery was accessible by means of a wood constructed door and contained the switches for the first floor lighting (off at the time of the fire), a safe, the equipment for the surveillance system as well as the panel for the burglar alarm system (mounted at ceiling level).

**NOTE:**      The DVR (Digital Video Recorder) for the surveillance system had been removed by the responding Authorities subsequent to the fire and prior to us gaining entry into the premise.

In addition, the office contained a computer as well as various other contents consistent with that of an office, i.e. a printer, files, etc.

An overall analysis of the first floor disclosed the physical evidence of extensive fire damage (from floor to ceiling) within the northeast corner of the space and in proximity to the deli aspect of the grocery, with fire extension through the east side of the roof assembly. In addition, during the course of our analysis, we uncovered the physical evidence of several "irregular burn patterns" to the flooring of the grocery with "lateral extension of fire" to the various structures (and contents) in close proximity. The patterns were identified in proximity to the deli aspect of the grocery (within the northeast corner), the dairy aisle and front check-out space (within the northwest quadrant) as well as the produce aisle along the south wall of the space (the west side of the aisle).

**NOTE:**      The irregular patterns observed throughout the first floor are "consistent with that of a burning liquid."

3

FR-3143-14

**NOTE:** Our investigation disclosed that the responding Authorities had retained various samples of flooring (when they processed the scene) which were sent out for laboratory analysis. As per investigators, the samples "were inconclusive."

**NOTE:** For specifics pertaining to our observations relating to the first floor, see the "Photograph" and "Scene Illustrations" sections of this report.

## CELLAR EXAMINATION

Access to the cellar (from the first floor space) is gained by means of a steel constructed staircase "with open risers" situated in the southeast corner of the first floor (opposite the bathroom and side exit door). The stairwell is "enclosed" and contained sheetrock wall and ceiling coverings (below the ceiling height of the first floor space) and disclosed no physical evidence of fire extension into the space. Mounted to the north wall of the stairwell were the switches for the cellar lights disclosing the physical evidence of being in the "off position" at the time of the fire.

The cellar level contains various storage rooms, a utility room containing the main electrical service (electric room), a meat preparation space (meat room), a meat packing room (where a fire originated) as well as a walk-in refrigeration and freezer unit. The floors of the cellar level are constructed of poured concrete, and the sidewalls are constructed of a combination of brick and mortar, block and mortar as well as sheetrock.

An overall analysis of the cellar level disclosed the physical evidence of "a separate and distinct fire" to have occurred along the south wall of the meat packing room, as illustrated in the "Photograph" and "Scene Illustrations" sections of this report.

The floor of the meat packing room is constructed of poured concrete, and the sidewalls are constructed of block and mortar as well as brick and mortar. The ceiling of the room was constructed of ½" sheetrock over horizontal wood joists over sub-wood flooring.

The meat packing room contained two metal constructed shelving units, a garbage pail, the storage of canned goods as well as "a clothing rack". Our burn pattern analysis disclosed compelling physical evidence of the fire to have occurred in proximity to the "two-tier" shelving unit along the south wall of the space.

**NOTE:** For further particulars pertaining to our observations and our scene analysis, see the "Photograph" and "Scene Illustrations" sections of this report.

4

FR-3143-14

## ELECTRICAL SERVICE

The service supplying the wiring, fixtures, appliances and lighting enters the building via underground conduit where it is connected to the main service panels located in the southwest corner of the cellar. The wiring is of copper conductor, armored clad Bx cable and conduit and protected by circuit breaker switches.

An inspection of the two circuit breaker panels protecting the service in the space disclosed the breakers to be in "varying positions" at the time of our inspection (numerous circuit breakers to have been in the "tripped" position).

An analysis of the switches for the lighting of the occupancy (first floor and cellar) disclosed the physical evidence of being "off" at the time of the fire.

## ALARM SYSTEM

Our investigation disclosed that your insured's occupancy was protected by means of a burglar alarm system consisting of contact and motion protection (contact and motion hardware). A touchpad to arm/disarm the system was mounted adjacent to the entranceway into the office space at the front of the grocery store, and the alarm panel was mounted "at ceiling level" within the office.

**NOTE:** For further particulars pertaining to the burglar alarm system, see the alarm consultant's report sent under separate cover.

**NOTE:** The alarm consultant retained on your behalf collected components for the system and determined that there was no hardware for a fire alarm system.

**NOTE:** An analysis of the findings of the burglar alarm expert retained on your behalf, in conjunction with the information provided by the alarm company's central station, disclosed compelling evidence that the alarm system was "off" at the time of the fire.

## SURVEILLANCE SYSTEM

Our investigation revealed that your insured's space contained a video surveillance system, with cameras covering the entry points into the premise; the roof of the structure; throughout the first floor of the space and within the cellar of the occupancy (including the area where the fire originated within the cellar).

5

FR-3143-14

**NOTE:** The DVR was removed as physical evidence by the Authorities as part of their criminal investigation.

**NOTE:** The data retrieved off the DVR uncovered Mohammad (one of the owners) turning off the camera system prior to the fire.

## HEATING SERVICE

Our investigation revealed that your insured's space was heated via a combination heating/air conditioning system with the unit situated on the roof of the structure (north side).

## ORIGIN

The origin of the fires which occurred on **Monday, February 24, 2014** and reported to the Fire Department at approximately **3:05 a.m.** caused actual burning and charring throughout the first floor of the building and within the cellar of your insured's space. In addition, the evidence of heat, smoke and water damage was observed throughout the structure.

After having conducted a careful and thorough examination in conjunction with our investigation, we ascertained that **"at least one" fire originated within the retail space of the first floor of your insured's occupancy.** This fire extended to the contents throughout the first floor, sidewalls and ceiling; and eventually extended into "the open cockloft space" and to the underside of the roof. This fire eventually extended through the roof at the rear of your insured's space as well as to and through the roof of the other occupancies within the building (to the east and towards the rear).

In addition to the fire(s) on the first floor, **a separate and distinct fire originated along the south wall of the meat packing room in the cellar of the space.** This fire extended to the contents in the area, sidewall behind and ceiling above where it was basically confined and extinguished.

********************

## OPINION AND CONCLUSION

After having conducted a careful and thorough examination and investigation, to date we have ascertained the following:

1. According to the New York City Fire Dept., Bureau of Fire Investigation, they conducted an investigation pertaining to the fire which occurred at **107-109 Port Richmond Avenue, Staten Island, New York** on **Monday, February 24, 2014** and reported

FR-3143-14

to the Fire Department at approximately **3:05 a.m.** under **Job No. 50030**.

During the course of the Authorities' investigation, they concluded that at least two separate and distinct fires occurred within the C-Town occupancy, specifically a fire in the center storage room at the cellar level and a fire on the first floor within the retail space.

In view of their physical findings in conjunction with the totality of the evidence developed during the course of their investigation, they have classified the cause of the fire as **incendiary** (photographs and evidence taken).

According to the Authorities, the fire was discovered and reported via "911" by a woman, Kionna Wheeler, who resided at 105 Port Richmond Avenue. Investigators related that Ms. Wheeler was asleep at the time of the incident and discovered the fire when she awoke to an "odor of smoke." She reported to investigators that "she looked out her window" and observed white-ish smoke coming from the rear of the C-Town occupancy (could not specify where the smoke was coming from).

As per the responding Fire Marshals' Office, upon arrival the Fire Department observed smoke coming from C-Town (107-109 Port Richmond Avenue) as well as Gyrolicious (131 Bennett Street). The Authorities were told by Firefighters (and confirmed same through their inspection) that "all doors and locks" accessing C-Town, Gyrolicious and Iglesias DeEvangelizacion Misionera were found "locked and secure." The Firefighters operating informed investigators that they simultaneously forced entry into Gyrolicious and C-Town and discovered that the fire was "coming from inside the C-Town occupancy."

According to the Fire Marshals' Office, immediately upon gaining access into the C-Town space, the operating units reported what "appeared to be a backdraft condition", at which time they repositioned the hose line from in front of Gyrolicious to the entrance of C-Town. Additionally, the Authorities related that Firefighters were unable to enter the interior of the C-Town space due to the "heavy fire condition" inside the store and as a result set up tower ladders and multiple exterior hand lines in their efforts to extinguish the fire.

As per the Fire Marshals' Office, as part of their investigation, they interviewed Tina Chen who is a Supervisor with Escort Century Security (the alarm company central station for C-Town). She

7

FR-3143-14

related to investigators that C-Town "only has a burglar alarm system" and that the system must be turned on (armed) for the central station to receive an alarm (stating that they do not monitor when the system is armed or disarmed). Ms. Chen reported to the Authorities that she checked the "event log" for the location and did not find any alarms recorded for the day of the incident, stating that it never transmitted a signal (as if the alarm system was off).

As per the responding Authorities, during the course of their site inspection, they observed physical evidence consistent with that of an ignitable liquid being introduced into the C-Town occupancy, removing several samples for laboratory analysis. As per the Fire Marshals' Office, the samples retained tested "inconclusive" for the residue of an ignitable liquid.

With regards to the DVR for the C-Town surveillance system, the responding Authorities retrieved the data off the device which "captured" Mohammad turning off the camera system on the evening prior to the fire.

> **NOTE:** During the course of our analysis of the DVR data, we created a time line of events, as indicated in the "Exhibit" section of this report.

> **NOTE:** As per the responding Authorities, during the course of their criminal investigation, your insured "was considered suspect" and on several occasions the Staten Island District Attorney's Office was presented with evidence that "several crimes had been committed"; however, to date there have been no arrests made.

2. As per **Ziad Abdeldayem**, he is the sole principal "on paper" for SI Meat Village; however, he has a "verbal partnership agreement" with Mohammad Jaber. Mr. Abdeldayem related that Mohammad invested $100,000.00 into the company that went towards "the build-out of the space" (upon taking occupancy in November 2011), for which he was a partner in the business. Regarding any loans or line of credit, he related that they took out a loan "for merchandise" through C-Town in the amount of $200,000.00 when they formed the business. He related that at the time of the incident, there was a balance on the loan of approximately $75,000.00.

Mr. Abdeldayem reported that C-Town does not conduct any sort of quality control or inspections at the location, and that they have had no issues with the franchise (with C-Town).

8

FR-3143-14

**NOTE:**    We were informed by Marc Mandelkorn (Director of Lending) for Consolidated Supermarket Supply LLC (for C-Town) that at the time of the fire SI Meat Village dba C-Town owed them $85,548.14.

Mr. Abdeldayem went on to state that the landlord of the building is 109 - 111 Port Richmond LLC who, to his knowledge, has owned the building for the past 13 months. He explained that they pay $4,100.00 a month in rent and reported that they owe the landlord for two months' rent; claiming he "withheld payment" due to the landlord's inaction with several roof leaks into the space.

**NOTE:**    As per Gloria Hua Chamber, the property manager, your insured was past due for three months' rent; their last check received in December 2013 had "bounced", and they never complained, sent notice or informed her of any roof leaks.

**NOTE:**    According to Ms. Chamber, she had communicated to your insured that they were "forcing her hand" to commence legal action for "non-payment" as well as their failure to provide proof of water and sewage payments (stating it was their responsibility; contrary to Ziad's statements). Ms. Chamber stated that "sometime after" her communications with your insured, the fire occurred.

Regarding the electrical service, Mr. Abdeldayem related that it was his responsibility, and that the bill was in their company name. When questioned if the electric was paid to date, he stated, "Yeah, we have an agreement with a payment plan with them." He explained that they fell behind in about January 2014 and went on a payment plan. He reported that "he does not remember" the amount owed to the utility or when they went on the payment plan.

**NOTE:**    Although requested, the insured failed to provide any documentation pertaining to the Con Edison payment plan or any notices received for service termination and/or non-payment.

**NOTE:**    The insured eventually provided us with two Con Edison "statements", one for the lights account and one for the refrigeration. The lights account showed a

9

FR-3143-14

balance of $11,154.92 on 5/15/14 and the refrigeration account showed a balance of $20,987.13 on 4/10/14.

**NOTE:**    As per the investigator on behalf of Con Edison (Jim Kelty of a company, FIRE Core), your insured's last check to Con Edison for $6,000.00 had "bounced" (specifics unknown).

The insured related that they commenced a five or six month payment plan, and at no time did the utility company turn off service.  When questioned if they ever sent them notice that they were going to be turned off, he stated, "I don't recall."

**NOTE:**    During our scene examination, we found a notice from the electric company of service termination for non-payment dated December 6, 2013 showing a total amount due of $4,873.94.

**NOTE:**    The gas bill provided by the insured from National Grid (dated 5/19/2014) indicated that they were in "arrears" for $2,425.14.

Mr. Abdeldayem informed the undersigned that he, his partner Mohammad and the girl "Zuleika" who opens the store in the morning are the only key holders to the front door lock and padlocks for the gates (protecting the front door and windows of the space).  He stated that no sets of keys have been lost, and the locks had been changed in 2012, following a break-in through the front doors of their space.

As per Mr. Abdeldayem, they had approximately 26 cameras inside the store as well as cameras covering the outside of the property (entry points), all of which recorded onto a DVR maintained in the office of the grocery store.  He indicated that he does not recall when the cameras were installed; however, mentioned that the DVR had been replaced in 2012, following the break-in (indicating that the perpetrator had pulled the wires out of the device).

Mr. Abdeldayem went on to state that the alarm system consisted of contact, motion and, to his knowledge, glass protection and that the system is armed at the end of each day (requiring him to turn off the alarm system as part of his routine when he opens the store in the morning).

10

FR-3143-14

**NOTE:**   Our investigation disclosed that the alarm system "was not armed" (off) at the time of the incident.

**NOTE:**   After the insured confirmed that the alarm system is always set, his public adjuster (who was sitting with Ziad) handed Michael Russo of our firm a copy of what they represented as a copy of the "alarm monitoring service agreement". The document was a photocopy with indication of the system "containing fire protection" (a reported requirement of the insurance contract). An analysis of the document "in comparison to a scanned copy of the original agreement provided to our firm by the central station" disclosed physical evidence of the one provided by the insured to have been "altered and falsified" (would require expert analysis to determine if the addition/alteration was made to the "photocopied document").

When questioned regarding Lotto in the premise, the insured stated that they had it in the beginning but "it just wasn't feasible for us." He elaborated reporting that it was "too much of a headache with the traffic" because it was a small store, and the machine was blocking the regular customers from shopping. He claimed that the machine was a free standing unit situated at the front of the store (by the entranceway) and that it was taking up too much space in their occupancy.

**NOTE:**   Mr. Abdeldayem stated and reiterated that the reason they got rid of the Lotto service was due to the machine being bulky and blocking the shopping traffic.

**NOTE:**   Joe Cerciello, a representative of New York State Lotto, informed the undersigned that the Lotto machine located within SI Meat Village (C-Town) was removed for "non-payment" in January 2013 and that the amount owed to date has not been received (reporting that he was unable to disclose the specific amount owed).

According to the insured, he could not specify an estimate of their weekly gross; however, commented that they grossed approximately $160,000.00 a month. He remarked that the first two weeks of each month were busy because "it is a food stamp area" (encompassing a large percentage of their revenue).

**NOTE:**   Our investigation disclosed that during the month of and prior to the fire, there was a $8.7 billion cut in food

11

FR-3143-14

stamp benefits over "the next ten years" (the second cut in a six month period).

**NOTE:**    For specifics pertaining to the News coverage of the cuts, go to www.msnbc.com/msnbc/obama-signs-food-stamp-cut.

Mr. Abdeldayem related that his original agreement to open the C-Town was that he would purchase the merchandise through the franchise (reporting that there were no fees or gross revenue percentages to be paid to C-Town).

**NOTE:**    The Security Agreement with C-Town (produced by the insured) indicates that if SI Meat Village does not pay, they can seize all the contents of the store.

When questioned regarding vendors, Mr. Abdeldayem stated that he does not buy everything through C-Town, relating that he purchases merchandise from other vendors if he can "get a better price."

**NOTE:**    This firm is unclear as to the specific agreement and whether the insured was meeting the franchise requirements.

**NOTE:**    Although requested, the insured did not provide the "full documents" relating to the loan agreement with C-Town (Krasdale).

As per Mr. Abdeldayem, they had "no outstanding balances" (past due) with C-Town other than the remaining loan balance when the company was formed. He stated that they had no "outstanding balances" (past due) with any of their vendors.

**NOTE:**    During the course of our investigation, we contacted and spoke with about eight vendors, all of which stated that they had past due balances with your insured. In addition, many of the vendors stated that your insured had "bounced" checks for payment, one of which stated that the past due balance was being handled "legally" (through collection efforts).

**NOTE:**    One of the vendors, Foodnation, stated that they made a delivery of meat and chicken to the insured on the Friday before the fire (approximately three days before the incident) and that the insured "postmarked" the

12

FR-3143-14

check for a date after the fire. As per the vendor, when they attempted to cash the check "following the insured's postmarked date", it bounced (see the statement and check provided by the vendor in the "Exhibit" section of this report).

**NOTE:** This firm requested the full names and account information for the insured's vendors in four separate correspondences; and to date the requested information and/or documentation has not been provided (reporting that the documentation was lost in the fire).

Mr. Abdeldayem went on to state that their largest and sole meat vendor is a company, Ranchers, who he reported they were current with, stating that anything over four weeks is considered past due.

**NOTE:** During the course of our examination, we uncovered correspondence from Ranchers, contacted them and were told that the insured had invoices dated back to January 21, 2014 with a balance owed of $9,300.00 (over four weeks).

**NOTE:** The insured stated that Ranchers was their sole meat vendor; however, our investigation uncovered that the insured placed a meat "delivery order" with a separate vendor, Foodnation, three days before the fire (the same company which they postmarked the check for a date following the fire; which bounced)

In closing, when questioned regarding any notices from the insurance company that his coverage was expiring (when questioned specifically relating to receiving a notice of expiration), Mr. Abdeldayem stated and reiterated that he does not recall.

**NOTE:** Our investigation disclosed that Guard Insurance Co. notified the insureds via a letter (approximately one month before the fire) that the insurance premium was due and without payment, their insurance coverage would terminate on Sunday, March 2, 2014.

When questioned regarding surveillance cameras in the area of his property, Mr. Abdeldayem stated that the furniture store down the road of Port Richmond Avenue (to the south) had a camera that captured the front of his store, relating that he had such knowledge due to the camera picking up the perpetrator of a previous burglary in their space (about a year earlier).

13

FR-3143-14

**NOTE:** During the course of our investigation, we spoke with the owner of the furniture store (Dennis Alestra of Devine Woods) who showed this firm coverage from his DVR surveillance system. As per the owner of the store, one of the cameras with his system failed to operate at the time of the incident, specifically the one camera that captured the front of the insured's occupancy.

**NOTE:** As per the furniture store owner (Dennis Alestra), he had the camera repaired on the morning of and prior to our firm stopping at his store, relating that "he was told by his camera person" that it was some sort of failure with the wiring to the camera (located under his exterior canopy).

**NOTE:** Of the cameras located at the furniture store, the camera that failed to operate on the day of as well as days prior to the incident is the camera that the insured had knowledge of which "covered the front of his store."

**NOTE:** For further particulars pertaining to Mr. Abdeldayem's statement, please see the "transcription" of his recorded statement contained within this report.

3. As per **Mohammad Jaber**, he is the partner that "deals with all the bills", and Mr. Abdeldayem takes care of the business. He stated that he has a verbal agreement with his partner for 1/3 of the business, reporting that he invested $100,000.00 for his share in the company. He explained that he comes into work at 3:00 p.m. daily (except Sundays at which time he comes in at 12:00 p.m.) and how he worked on the evening prior to the fire, closing the store.

Mr. Jaber informed the undersigned that they typically close between 7:30 p.m. and 8:00 p.m. on Sundays; however, reported that due to the work being conducted on the refrigeration units, he closed the grocery store sometime around 8:30 p.m. He explained that prior to leaving, he shut off the lights (confirmed by our examination) and set the burglar alarm system, stating that "he always sets the burglar alarm system upon closing."

**NOTE:** Our investigation disclosed that the burglar alarm system was "off" (not armed) at the time of the fire; meaning that Mr. Jaber either did not set the alarm or

14

FR-3143-14

that someone with knowledge of the alarm code (and access to a key) turned off the system sometime after closing (and prior to the fire).

Regarding cash being left in the cash register upon closing (for change the following day), Mr. Jaber initially stated that they leave $200.00 cash in the register; however, commented that since they have been robbed, he puts the cash into the safe.

**NOTE:**     During his deposition, Mr. Jaber stated that each of the cash registers (three registers) contained $200.00 cash for change prior to the fire.

**NOTE:**     During one of our site inspections, we forced open the cash register drawers and discovered that two of the three registers had no money and the third had $110.00 cash (versus the $200.00 reported by Mr. Jaber)

When questioned if he has any thoughts on what caused the fire, Mr. Jaber stated that they had leaks in the roof "all the time"; that they informed the landlord and how they want to collect rent but do not fix the issue (volunteering specific information of problems with the landlord, although not asked).

**NOTE:**     Mr. Jaber's statements relating to the water leaks are contrary to the statement of Ms. Chamber, the property manager.

In closing, this firm asked Mr. Jaber if he ever experienced any problems with the DVR in the office, He stated that it resets "from time to time on its own"; however, stated that he does not touch the unit.

**NOTE:**     Mr. Jaber stated and reiterated at his deposition that he did not touch the DVR.

**NOTE:**     Our investigation uncovered that Mr. Jaber is "captured on video" turning off the DVR (the camera system inside the store) on the evening prior to the fire.

4. **Zuleika Wallace Lowe** related that she was the front end manager for C-Town. She stated that she was hired and began working a week and a half prior to the store's "Grand Opening" (approximately two years before the fire). She further stated that her hours are from between 7:00 a.m. and 8:00 a.m. until 12:00 p.m. (and some days until 3:00 p.m.). She reported that she

15

FR-3143-14

started opening the store approximately two months after she began working there (possessing the key for the locks as well as the alarm code). She related her opening routine as opening the gates, opening the door, "running to the alarm and entering the code" and turning on the store lights and computers. She went on to state that the cashiers' drawers are set from the night before and she counts them to be sure they are right (the drawer contains $200.00).

According to Ms. Lowe, she opened on Sunday (the morning of the fire), and it was her first day back to work from vacation. She explained that she opened at 8:00 a.m. with a "teenager" who comes to the store "sometimes" to her knowledge named Mohammad (relating that they call him Mike). She related that she has no knowledge of whether or not the store contained a fire alarm system, reporting that during the time she has been employed at the location, "if there was an alarm, it never activated." She stated that, to her recollection, the burglar alarm system had activated during the night while the store was closed (once was during the burglary when the safe was taken and the second time due to a false alarm).

Ms. Lowe went on to state that she does not know how to operate the DVR system; however, reported that she watches the monitors as part of her duties (relating that it was operating on the day prior to the fire).

As per Ms. Lowe, she paid the smaller vendors cash on delivery out of the cashier's drawer and that the meat vendors were paid by the owners (unaware of any balances owed). She mentioned that the owner, "aka Mike, Mohammad" came in at 11:45 a.m. as well as Allison who took over her register (allowing her to leave). She further related that there were no unusual odors or spills throughout the store that day, adding that there were no problems with any of the overhead lights, outlets or appliances in the store (that day or since she has worked at the grocery). She reported that smoking is not permitted in the store and that no portable heaters are used in the space.

5. As per **Allison Bakal**, she has worked at the store since December 2013 and on the day of the fire came in to work the register at around 11:45 a.m. She related that some electricians arrived sometime in the afternoon and were the only ones left in the store with Mohammad when she left at 7:30 p.m. She stated that she is a smoker; and when she does smoke, she goes outside

16

FR-3143-14

the store by the corner (reporting that there is a "no smoking" policy in the store).

6. As per **Jerry Nelis**, the alarm expert retained on your behalf, the system contained hardware for contact and motion detection (burglary protection) and that there were no devices, wiring or components related to any "fire alarm system".

During the course of the alarm expert's investigation, he retained the hardware for the alarm system as physical evidence and attempted to download the data from the panel to ascertain "any prior events" with the system.

**NOTE:**    Due to the degree of damage, the consultant was unable to retrieve any data from the alarm panel.

According to the expert, based on the totality of the evidence developed during the course of his investigation, he opined that the alarm system was "off" (not armed) at the time of the incident.

**NOTE:**    Our firm confirmed with the central station that there was no alarm activity at the time of the fire and that the system was for "burglary only" (no fire protection).

**NOTE:**    For further particulars pertaining to the alarm expert's findings, please see his report sent under separate cover.

7. As per the alarm system installer as well as the central station monitoring company (see "transcriptions" of recorded statements), since the alarm system's initial installation in 2012, it consisted "solely of burglar protection" and never contained fire alarm provisions.

**NOTE:**    On Thursday, March 13, 2014, during our re-interview of Ziad, the public adjuster handed us what they represented as "the alarm monitoring service agreement" (an altered document; when compared to the agreement forwarded to us by the alarm company).

**NOTE:**    The document provided to us by the insured represented that the alarm system consisted of Fire Protection; a reported provision of the insurance contract (contrary to what was provided to us by the alarm company central station).

FR-3143-14

8. On Tuesday, March 4, 2014 at approximately 10:00 a.m. a joint scene examination was conducted with Michael Fiensold of Plick and Associates, the electrical engineer retained on your behalf, at the loss location. During the inspection, he examined the electrical wiring within the "reach-in" refrigerated cases of the first floor (whose lighting and associated wiring had been replaced the evening of the fire) as well as the cordage in the area of the deli counter (northeast quadrant of the store).

Mr. Fiensold examined the fluorescent lighting and circuitry on the first floor and cellar. According to Mr. Fiensold, he eliminated an electrical source of ignition to have caused this fire.

**NOTE:** In addition to Mr. Fiensold, two other independent electrical engineers conducted an analysis of the electrical service within the occupancy, specifically James Pryor of LGI Forensic Group, Inc. and Joe Caggiano of Center Engineering (representing other interests relating to the loss).

After having reviewed all of our data gathered to date which encompassed our scene examinations, Authorities research, interviews as well as our conferral with the burglar alarm expert and electrical engineer retained on your behalf, we concluded that at least two separate and distinct fires occurred within your insured's occupancy, specifically **at least one fire within the retail space of the first floor and "a separate and distinct fire" along the south wall of the meat packing room in the cellar.**

During the course of our investigation, we determined that there was **no** evidence as to a legitimate source of heat and/or ignition to have caused these fires. In view of same, in conjunction with the totality of the evidence developed during the course of our investigation, we concluded that these fires were **intentionally set** and have rendered a cause as **incendiary**.

In addition to our analyses relating to the cause of this fire, during the course of our investigation, we uncovered physical, circumstantial and direct evidence relating to potential motive as well as opportunity (by the insured).

The evidence to date, includes but not limited to, the following:

- Mohammad is captured on video turning off the store surveillance system on the evening prior to the fire

- Mohammad stated and reiterated during his recorded statement and at his deposition that he never touched the surveillance system and that the cameras run "24/7" (are never turned off

18

FR-3143-14

for any reason; contrary to his actions on the evening prior to the fire)

• The surveillance cameras on the exterior of the property would have captured "the perpetrator(s)" entry into the premise

• The surveillance cameras on the inside of the premise would have captured "the perpetrator(s)" starting the fires

• The video capturing Mohammad's actions of turning off the cameras also captures a second person "watching his actions"; identified by the Authorities as an individual, Joe Angelet

• As per the Authorities, they interviewed Allison Bakal who reported to them that Joe Angelet "went on a shopping spree" on the evening prior to the fire and did not pay for the groceries; with the largest "purchase on credit" she has ever rung-up

• A burglary occurred in your insured's premise a year earlier, which was captured by a neighboring surveillance system camera (known by the insured to have captured the incident); the same camera was discovered to have been "inoperable" (failed to record) at the time of this fire

• As per the owner of the neighboring building, out of the over 20 cameras on premise, the single camera facing the insured's grocery store is the only camera that failed to record at the time of the fire

• As per the neighboring owner, he was told by his camera company that the camera failed to record due to "an issue" with the wiring (accessible from the exterior of the building)

• The Fire Department found the gates, covers and entry points into the premise secure

• The gates and doors into the premise disclosed the physical evidence of "Fire Department forced entry"

• The perpetrator needed a key to gain access into the space

• Only three people had keys into the space, including Mohammad and Ziad

19

FR-3143-14

- The alarm system was "disarmed" at the time of the fire (confirmed by your alarm expert and the central station)

- The alarm system is "always armed" at closing (confirmed by all three key holders and by those who open the store in the morning)

- Mohammad stated and reiterated that he "armed" the burglar alarm system at closing on the evening prior to the fire

- The alarm system was either "never set" or the perpetrator had knowledge of the alarm code to disarm the system (as well as a key to gain access)

- Only three people have a key as well as knowledge of the alarm code to disarm the system, including Mohammad and Ziad

- As per Ms. Chamber, the property manager, your insured owed three months' rent (past due) at the time of the fire

- Ms. Chamber stated that the last rent check received in December 2014 (three months prior to the fire) had "bounced"

- Ziad and Mohammad indicated that they "withheld the rent payments" due to roof leaks into their space, which Ms. Chamber stated that it "was not true"

- As per Ziad, they paid $4,100.00 a month in rent, and an analysis of the banking documents provided by the insured (although incomplete) state that a check for $4,107.00 had bounced due to "insufficient funds" during the first week of December 2013 (consistent with the statement of Ms. Chamber and inconsistent with that of the insured)

- An analysis of the "banking documents" produced by the insured indicate approximately 18 checks to have bounced for the month of December 2013 "due to insufficient funds"

- An analysis of the "banking documents" produced by the insured for the month prior to the fire (January 2014) indicate approximately 26 checks to have bounced due to "insufficient funds"

20

FR-3143-14

- An analysis of the "banking documents" produced by the insured indicated approximately 40 checks to have bounced during the month of the fire "due to insufficient funds"

- Although requested, the insured did not produce the copies of the bank statements, which would have detailed who the bounced checks were written to, included copies of the actual checks, the account balances, etc. (discovered after our follow-up additional letters of request were sent out).

- Although requested in four separate correspondences, the insured did not provide the requested information relating to their vendors

- Ziad reported that they were "not past due" with any vendors

- During the course of our site inspections, we observed several documents (letters and invoices) from vendors with indication that the insured was "past due" (see examples of the documents in the "Photograph" and "Exhibit" sections of this report.

- As per a vendor, Porkys, the insured had a balance owed of $7,215.37

- An analysis of the bank documents produced by the insured disclosed that "at least three checks payable to Porky's" had bounced prior to the fire (between December 2013 and February 2014)

- As per a vendor, Foodnation, the insured had a balance owed of $3,053.98

- As per Foodnation, their last delivery was the Friday before the fire, which upon delivery they received a check "postmarked" a date after the fire

- According to Foodnation, the check was processed as requested by the insured (following the fire) and bounced

- As per a vendor, Manhattan Beer, the insured was past due and their account was "submitted for collections" in January 2014

- As per a vendor, Ranchers Best Wholesale Meats, the insured had a balance owed of $9,348.37

21

FR-3143-14

- As per a vendor, Associated Produce, the insured had an outstanding balance of approximately $3,000.00

- According to the vendor, Associated Produce, the insured bounced checks, was placed on C.O.D. and on the last delivery "put a stop on the check" after the delivery and before they were able to deposit the check

- Associated Produce reported that following the "stop check incident", they were given checks for partial payment which also bounced

- As per a vendor, Vel Mac, the insured had an outstanding balance of approximately $3,500.00

- The insured reported that they were put on "a payment plan" with Con Edison, however failed to provide any of the requested documentation

- The Con Edison "summary statement" produced by the insured (for their lighting account) indicates a partial payment was made in January and that "no payment" was made for the month of February (the month of the fire)

- The Con Edison "summary statement" indicates that the insured (for their lighting account) had an outstanding balance with the utility of over $6,000.00 at the time of the fire

- The Con Edison "summary statement" produced by the insured (for their refrigeration account) indicates two partial payments were made in January and that "no payment" was made for the month of February (the month of the fire)

- The Con Edison "summary statement" indicates that the insured (for their refrigeration account) had an outstanding balance with the utility of over $15,000.00 at the time of the fire

- As per the fire investigator retained on behalf of Con Edison, the last check received by the utility company for $6,000 had bounced

- Although requested, the insured did not produce any notices from Con Edison relating to service termination, non-payment, etc.

22

FR-3143-14

- During our site inspection, we found a service termination notice from Con Edison dated December 2013 due to a balance of over $4,000.00

- As per the National Grid "summary statement" produced by the insured, they were "in arrears" $2,425.00 (as of May 2014)

- According to Ziad, they had Lotto removed from the store due to the machinery "being in the way" of customers; however, as per Joe Cerciello of Lotto, the machinery was taken out due to "non-payment"

- Mohammad stated during his deposition that there was $200.00 kept in each of the cash registers; however, during one of our site inspections, we forced open each of the cash register drawers and uncovered that two of the three were empty (contained no money) and the third contained $110.00 (versus the $200.00 he stated he kept in the drawers for change to open)

- Our investigation disclosed that the federal government had enacted a cut in the food stamp program during the month of and prior to the fire (a large percentage of the insured's revenue).

- Our investigation disclosed that the insured was sent a notice of "insurance cancellation" approximately two weeks prior to the fire for non-payment of premium

- As per Guard Insurance Company, they never received payment (after sending the notice) and the fire occurred

- SI Meat Village's insurance coverage was expiring within one week of the fire

During the course of our investigation, specifically while obtaining a recorded statement with Ziad, we were "handed" what was later determined to be "an altered document" relating to the insured's alarm system. In addition, throughout the course of our investigation, we ascertained the following relating to the system:

    a. The alarm system containing a central station monitored fire alarm system is a "protective safeguard relating to the insurance policy" (required under the policy and without such a system "grounds for a claim denial")

23

FR-3143-14

b. The insured provided our firm with "an altered alarm system service agreement"; when compared to the document obtained directly from the alarm company central station

c. The document handed to the undersigned investigators represented that the system included "fire" alarm monitoring (as well as other services); while the initial agreement sent to this firm by the central station indicates that there was no such service (no fire alarm monitoring)

d. The document handed to the undersigned investigators is a "photocopy" with the "Office Use Only" section marked within specific boxes, representing additional services (markings that were not on the initial document)

e. The additions to the photocopied document appear to be "added in pen" (pen over the photocopy; however would need to be analyzed "by an expert" for confirmation)

f. As per the alarm installer as well as the alarm company central station, the system was "burglary only" (no fire alarm system or monitoring)

g. As per the alarm expert retained on your behalf, the alarm did not contain any hardware for a "fire alarm system"

As a result of this incident and the absence of an automatic central station monitored fire alarm system, we conducted an investigation into "fire spread" and considered the following data for analysis (to include, but not limited to) the layout and content configuration of the grocery store; the physical burn patterns and direct evidence pertaining to "fire travel"; the observations of the discoverer of the fire; the response time by the New York City Fire Department and the geographical location of the "closest fire house."

As per our investigation, the fire was discovered by a woman in a neighboring building who "awoke to an odor of smoke." Per the Authorities, the witness proceeded to investigate and eventually discovered smoke extending through the roof of the C-Town building; prompting her to call "911".

NOTE:     A "911" call in New York City is answered by a unified (general) "call taker" who gathers pertinent information, i.e. type of emergency, location, etc. before transferring the call to the appropriate dispatcher (in this case the call would be transferred to

24

FR-3143-14

a Fire Dispatcher).   As opposed, when a central fire alarm monitoring company receives an "automatic alarm", they contact Fire Dispatch directly (no delay in dispatching).   Also there is a delay in the discovery of a fire when it is unknown how soon a passerby, etc. will observe smoke/fire and contact "911" versus a smoke alarm activating and notifying to a central station.

Our investigation disclosed that the first arriving fire company's "fire house" is located about three blocks from your insured's grocery (2/10's of a mile).   In addition, as per the Fire Department Incident Report, the first due truck company responded in "less than three minutes" (which is considered a fast response time).

According to the various members of the Fire Department as well as the official Fire Department Incident Report, upon arrival they were confronted with "heavy smoke pushing out from all openings in the building" (all three businesses of the building); and, upon forcing entry, encountered what is known as a "backdraft condition" within your insured's space followed by fire extending through the roof of the building (over both C-Town and the adjoining business).

**NOTE:**   A backdraft is a phenomenon that occurs when an advanced fire consumes all the available oxygen within a compartment and "explodes" when more oxygen is made available (occurred in this case when the Fire Department forced open the doors into your insured's space), one of the most dangerous conditions a Firefighter can encounter.

As a result of the backdraft, the Firefighters "repositioned" their hose lines to the front of the C-Town store to "protect members operating" and were forced to conduct "an exterior attack" on the fire (extinguishing the fire from "outside the building" due to the amount of fire and safety concerns for the Firefighters).

**NOTE:**   As a result of this incident, four firefighters suffered injuries.

After considering and analyzing the various data, we concluded with a reasonable degree of fire investigation certainty that if your insured had "an automatic central station monitored fire alarm system", this fire would not have occurred (the fire would have been confined and significantly less damage would have occurred).   Specifically, had such a system been in place, the alarm would have transmitted to central station during an "early stage of fire" (as intended by such a system), which, in turn, would have directly notified the Fire Department of the alarm (direct notification to the appropriate dispatch).

25

FR-3143-14

Lastly, had the alarm system in place been "automatic", even though the alarm system was turned off, the system would have operated (no matter what the hardware in place).

**NOTE:** The purpose of an automatic alarm is to afford protection during operating hours (when the system is turned off) and, as in this case, if the alarm system is turned off when the business is closed.

As of the date of this report, we have sent four separate requests "for additional information and/or documentation" to the insured in the furtherance of our investigation (48 requests). As of this date, we have not received the majority of the materials and/or information requested.

An analysis of the documentation missing and/or sent incomplete include, but not limited, to the following:

- Copies of any and all documents relating to the loan with C-Town (Krasdale)

- Copies of any and all documents relating to the loan with Resnick

- Any and all documents relating to the litigation with the prior landlord

- Copies of the electric bills with Con Edison from September 2013 through February 2014 (what was received was a summary); any paperwork relating to the payment plan with Con Edison and/or copies of any notices for service termination or non-payment

- Copies of the phone bills for the business telephone, the LUDs (Local Usage Details) and TOLLs (long distance) records; for all telephone and fax lines in the store

- Any and all paperwork relating to the hardware, installation and maintenance for the surveillance camera system

- Copies of the alarm print-outs from the time of the alarm installation until the time of our initial request (after the fire)

- Copies of paperwork pertaining to repairs and additions to the alarm system prior to the previous break-in

- Copies of the alarm company central station monitoring bills from September 2013 until February 2014

- A copy of the 2013 tax return

26

FR-3143-14

- Copies of the bank statements for the business account with copies of checks (what was sent was a summary which does not include checks, dates with balances, who payments and bounced checks were made payable to, etc.)

- List of vendors with full names, addresses, account numbers and contact information

- Copies of last three invoices with all the vendors (no invoices or vendor information was provided)

- The home telephone bills (LUDs and TOLLs) for Mohammad and Ziad

- The cell phone bills with call detail for both Ziad and Mohammad for the months of December 2013 through February 2014 (the date of the fire)

- The EZ Pass statement for Ziad for the time period encompassing the date of the fire

**NOTE:**   For specifics of what was requested and the insured's responses, see the letters with responses in the "Exhibit" section of this report.

********************

## QUALIFICATIONS

Neither Vincent Palmieri nor Michael Russo have testified as an expert at trial or deposition during the last four years, and they have not authored any publications during the past ten years. The curriculum vitae of Messrs. Palmieri and Russo are included in the "Exhibit" section of this report.

The billing rate for our firm is $165.00 per hour for investigative work and $250.00 per hour for court appearance.

********************

27

FR-3143-14

Although our file is in closed status, we remain ready to reactivate upon request from your office to render any further assistance you may require in your ongoing analysis of this case.

Respectfully submitted,

T J RUSSO CONSULTANTS INC.

*Vincent Palmieri*

Vincent Palmieri, CFEI
Fire Investigator

*Michael W. Russo*

Michael W. Russo, CFI
Fire Investigator (Assisting)

VP/MR/cg
August 20, 2015

28

FR-3143-14

**TRANSCRIPTIONS OF RECORDED STATEMENTS**

| **RECORDED STATEMENT** |
|:---:|

| RE:  INTERVIEWEE: | ZIAD ABDELAYEM and MOHAMMAD JABER |
|---|---|
| DATE OF LOSS: | 03-04-2014 |

Today is March 4th, 2014.  It is approximately 11:00 a.m.  My name is Vinny Palmieri.  I'm a fire investigator for T.J. Russo Consultants, T.J. Russo file number FR3143-14.  It's for Guard Insurance Group on behalf of their insured, SI Mead Village, Incorporated, DBA C-Town.  The location of the fire is 107-109 Port Richmond Avenue.  Guard Insurance claim number SIBP ad in Peter 408182, and I am in a restaurant around the corner present with the two owners of the corporation, Mohammad, M O H A M M A D is his first name, last name Jaber, J A B E R, date of birth ███-67.  He produced a New York State driver's license number 900125650.  Uh, contact phone number 917-335-0180.  He resides at 366 Van Name Avenue, Staten Island, New York  10303, and his partner, did I say… yeah, his partner is Ziad, Z I A D is his first name, last name I'll spell it, A B D E L A Y E M.  Date of birth ███-79.  Contact phone

29

FR-3143-14

number 646-420-7126.  He resides at 843 53rd Street, Brooklyn, New York.  It's a private home, and the zip code is 11220.  Also present is their public adjuster representative of the office of New York Adjustment, Joe Riggio if you hear his voice on the tape.

VP:      Okay, when did you guys form the corporation?  When did you incorporate?

ZA:      It was November 2011.

VP:      November 2011, and it's SI Meade Village?

ZA:      Yes.

VP:      Okay.  And, uh, you guys are the only two owners of the corporation?

ZA:      Yes.

VP:      One's a president and one vice president? What are the titles?

ZA:      Well, no, I'm just part of the corporation as president.

VP:      You're just part of the corporation?

ZA:      I'm sole… the corporation is just me.

VP:      So the corporation is solely in the name of Ziad, and I can't say your last name.

ZA:      Abdelayem.

VP:      Abdelayem?

30

FR-3143-14

ZA:      Yes.

VP:      Okay, so it's your corporation?

ZA:      Yes.

VP:      So Mr. Jaber is an investor or is he…

ZA:      He's a partner, but he's not listed on the corporation.

VP:      He's not listed on the corporation, but he's a partner.  So is there an agreement as to when you incorporated, as to if you would put X amount of money, he would put up X amount of money, like that kind of…

ZA:      Yeah.

VP:      An agreement?

ZA:      Yeah.

VP:      Okay, so how much was your percentage of the corporation?   What did you put into the business, what did he put into the business?

ZA:      I have two-thirds, he has a third.

VP:      Alright.    And   when   you   formed   the corporation, was it with intentions of opening a C-Town Supermarket?

ZA:      Yes.

VP:      No other businesses?

ZA:      No.

31

FR-3143-14

VP:      Alright, so you formed the corporation, SI Meade Village, Inc. doing business as C-Town and it's at this location, 107-109 Port Richmond Avenue.

ZA:      Yes.

VP:      Was it a pre-existing supermarket when you formed the corporation?

ZA:      No.

VP:      What was in the space where that supermarket was?

ZA:      Uh, it was basically… it was an empty space.

VP:      Oh, okay, so it was not rented at the time?

ZA:      No.

VP:      There was no other business in there?

ZA:      No.

VP:      How did you find the location?

ZA:      Just driving by the area.

VP:      So you were looking to open this business in this area?

ZA:      Yeah, I was driving by and I seen this space, and I noticed that there was no supermarkets in the area.

VP:      Okay.

32

FR-3143-14

ZA:      So you know, then we approached the landlord and, uh, we worked out a deal with them.

VP:      To set up the business?

ZA:      Yes.

VP:      Do you own any other supermarkets?

ZA:      No.

VP:      And do you own any… are you involved in any other delis?

ZA:      No.

VP:      Any other types of businesses?

ZA:      No.

VP:      Okay.  And Mr. Jaber, how about yourself, have you been involved in supermarkets or do you have another supermarket?

MJ:      No.  No, no other.  Right now zero.

VP:      So neither one of you has had a supermarket or how about a deli or any type of market before?

MJ:      Before, yeah, I had a deli, yes.

VP:      You had a deli?

MJ:      Yeah, and I sold it to my partner.  I used to have a partner, and I sold my share to him.

VP:      Okay.  And where was that deli?

33

FR-3143-14

MJ:        Right   here   down   the   block,   west   of (INAUDIBLE) Avenue.

VP:        West of (INAUDIBLE) Avenue?

MJ:        Yeah.

VP:        So you're somewhat familiar with the type of business?

MJ:        Yeah,  it's  a  small  building,  but  not  a supermarket.

VP:        Nothing of this size?

MJ:        Naw.

VP:        Okay.  And then how did you guys meet or how do you know each other?  How did you decide to incorporate and set up the supermarket?

MJ:        We're from the same town.

VP:        Oh, okay.

MJ:        From the same country.

VP:        What… where are you from?  What is it?

MJ:        Palestine.

VP:        So you're Palestinian?

MJ:        Right.

VP:        And what town?

ZA:        His  father  and  my  father  and  him,  you know, they knew each other.  That's how I knew him.

VP:        Oh, okay.

34

FR-3143-14

MJ:    We were friends with his father before he passed away.  His father passed away.

VP:    Oh, I'm sorry to hear that.  So are you… you came to this country from Palestine?

MJ:    Yeah.

VP:    With his dad, so he's…

MJ:    No, no.

VP:    **(INAUDIBLE)** generation?

MJ:    We came at different times, I'm sorry.

VP:    Okay.

MJ:    There goes my phone.

VP:    Alright, I'll stop this.  Okay, so basically you and his dad were very good friends, you're from the same town in Palestine…

MJ:    Same town, yeah.

VP:    And then either his dad came here and then you came here?

MJ:    We came at different times.

VP:    Different times?

MJ:    Yeah, sure.

VP:    What town are you guys from?

MJ:    They call it Beit Hanina.  I don't know how to spell it?  Do you know how to spell Beit Hanina?

35

FR-3143-14

ZA:     Uh, B E I T   H A N I A, Beit Hanina.

MJ:     Right.

VP:     It's not that big of a town?

MJ:     It's a big town, yes, in Jerusalem.   It's in Jerusalem.

VP:     I don't know.   I don't know.

ZA:     It's next to the dome.   Do you know it?

VP:     No.

MJ:     If you've never been there, how you going to know it?

ZA:     It's not a known town, but it's in east Jerusalem.

VP:     Interesting.

MJ:     Uh-huh.

VP:     Someday I hope to get there and see some of the… some of the sites.

MJ:     Bethlehem, yeah.

VP:     Yeah.

MJ:     Jesus, where he's born and died…

VP:     Yeah.

MJ:     He buried, it's nice.

VP:     I saw it on the chapel channel, they had taken…

FR-3143-14

MJ:        If you want to see real Christmas, you go over there.

VP:        That's what they say.

MJ:        Yeah.

VP:        Okay.  Alright, so you come here and then at some point you have a deli.  You sell that interest to the partner that you were in business with and then naturally, your friend's son, he approaches you, "Let's do a business, let's do a supermarket," and he finds the location and you guys set up a corporation.

MJ:        Yeah, that's what happened.

VP:        Okay.  Did… did you put up the same amount of money?  Like let's start out this way.  You find the property, you lease it.  How much and how long was the lease for?

ZA:        The lease was for 15 years.

VP:        A 15 year lease?

ZA:        Yeah.

VP:        At some point would you be able to get us a copy of that lease?

ZA:        Yeah, no problem.

VP:        And by us I mean if you get it to the public adjuster's office or myself.

37

FR-3143-14

ZA:         No problem.

VP:         I'll give you my business card.  It's not critical today.  Uh, okay, so a 15 year lease.  It starts in November of 2011?

ZA:         Yes.

VP:         And then it goes out to '26?

ZA:         2026, yeah.

VP:         Okay.  And how much do you pay for the monthly lease?  Is it a monthly lease, an annual lease?

ZA:         No, monthly we pay.

VP:         Okay, how much do you pay monthly to the landlord?

ZA:         Uh, right now, currently?  It's $4,100.

VP:         $4,100.  And it's got some sort of built-in increases, right?

ZA:         Yes.

VP:         I've seen these.

ZA:         Three percent.

VP:         Three percent annually?

ZA:         Yeah.

VP:         Okay.  So there's really no business in there before?  Somebody has to build out the space to make it a supermarket.  Who bore that cost, was

38

FR-3143-14

it you guys?  Was it the building?  How was that worked out?

ZA:      We basically… the landlord, uh, owed for the construction.

VP:      The landlord?

ZA:      He owed the electrician and, uh, HVAC guy.

VP:      So the landlord did the construction?

ZA:      No, no, no, he did partially the construction, and we took it over.  Like he owed those two guys money that he couldn't finish it up, so we took over their contracts.

MJ:      They started the work there.

ZA:      They started the work, yeah, and we just took over for them.

VP:      The landlord, they couldn't pay them off, so you…

ZA:      Yeah.

VP:      Took over the…

ZA:      I took over the payments.

VP:      The **(INAUDIBLE)** had them do the work first?

ZA:      Yes.

MJ:      Yeah.

FR-3143-14

VP:        Okay, what was the landlord's construction consisting of?    Were they building it out as a supermarket for you?    Were they doing other repairs to the building?

ZA:        Uh, a vanilla box.    They were going to make it a vanilla box.

VP:        Just a vanilla box?    I don't know what that means.    Just…

MJ:        It's basically just the walls up.

VP:        Okay.

MJ:        Not everything else.

VP:        Well…

ZA:        Floors, ceilings…

MJ:        Uh-huh, nothing fancy.

VP:        But they never completed that process under the owner of the building?

ZA:        No.

VP:        Alright, so you don't owe them money.    You guys took over those contracts and had the space built out.

ZA:        It was an agreement where he gave us six months free rent to finish the repairs.

VP:        These are the same guys as the landlords?

40

FR-3143-14

ZA:    These are the same guys, yeah.   The same guys as the landlord.

VP:    Who is the landlord?

ZA:    Well, he sold the building.   That was the old landlord.   The old landlord…

VP:    So when you set up the lease it was a different landlord?

MJ:    Yeah.

ZA:    Yeah.

VP:    Okay, who was the original landlord you had the agree…

ZA:    Uh, Debjco.

VP:    Who is it?

ZA:    Debjco, D E B J C O Realty.

VP:    Alright, and then that's when Debjco sells it?  Sells the property?

ZA:    No, they sold it, uh, I believe last…

MJ:    2012.

ZA:    January of 2012.  No, no, no, last year. January of last year.

VP:    January of 2013?

ZA:    Yeah.  Either December of 2012 or January of 2013, they took over.

VP:    And Debjco sells it?

41

FR-3143-14

ZA:        Well, he was… 'cause we got… we got served with some papers.  All the businesses got served with papers.  He was going under foreclosure, Debjco Realty.

VP:        Okay.

ZA:        And he sold it over to, what is it?  109-111 Port Richmond, LLC.

VP:        Alright, so then there's a new property manager that gets involved?

ZA:        Yes.

VP:        Who was that?

ZA:        Uh, Gloria her name is.  Well, I didn't meet her exactly.  I met someone named David who was, uh… I found out to be… who I just found out it was just a broker.

VP:        Alright.

ZA:        Yeah, because he's the one who came in with the ex-landlord and said, "We're the new building owners," you know.  In January he came in and said, "I'm the new building owner.  If you need anything, just give me a call.  Let me know if you guys need anything."

VP:        And then Gloria is like the property manager?

42

FR-3143-14

ZA:      She's the property manager, yes.

VP:      Alright.    So   you   guys   finished   the buildout?

ZA:      Yes.

VP:      Do  you  know  the  names  of  the  companies, the construction companies?

ZA:      Uh,  I  believe  it's  M&M  Electrical.    I'm trying  to  think  of  the  HVAC  guy.    I  don't  remember the exact… I can't remember his name.

VP:      Alright.   Do  you  have  paperwork  for  those companies, M&M Electrical, HVAC company, and whoever the GC was?

ZA:      I  don't  know  if  I  still  have  the  paperwork or not for that.

VP:      So  at  what  point  do  they  finish  all  of that  work  and  you're  ready  to  start  stocking  your shelves and open for business.

ZA:      I  don't  recall  exactly  when  they  finished it.  I know we opened the store in March.

VP:      In March of '12?

ZA:      2012.   March… to be exact, March 30th.

VP:      And  how  much  did  each  of  you  put  into  the business?   Like one-thirds, two-thirds, so how much is each person's share?

43

FR-3143-14

ZA:        Well, I also took a loan.  I took a loan from C-Town.

VP:        Okay, how much was the loan?

ZA:        Uh, it was for 175.

VP:        $175,000?

ZA:        Yes, $175,000 to $200,000.

VP:        Okay.

ZA:        I don't know the exact amount.

VP:        So that's your portion of setting up the business?

ZA:        Yes.

VP:        And Mohammad, how much did you put into the business?

MJ:        Uh, $100,000.

VP:        As far as the business is concerned, are there any other loans?

MJ:        Yeah, we have to pay a loan for **(INAUDIBLE)** finish.

VP:        Alright, so…

ZA:        We paid for the refrigerations.

VP:        So **(INAUDIBLE)**.

ZA:        When you…

44

FR-3143-14

VP:        I   was   gonna   get   into   that.     The refrigeration   units,   you   purchased   those   new   or those used?

MJ:        No, no, those are used.

VP:        They're all used?

MJ:        Not all of them.   Some of them are new, some are used.

VP:        Some used, some new.   Do you know, which ones are used and which ones are new?

ZA:        I  don't  remember  exactly  which  ones  they were.   Uh…

VP:        What company did you purchase them from?

ZA:        It was the refrigerator guy who brought us the equipment.   I don't know where he is.   He went… he went back to the Dominican Republic.   This was back in 2012 when we called him for service, so I don't know exactly where he got them from.

VP:        Do you remember the name of the company that you purchased them from?

ZA:        I think it was, uh… it started with a T. I don't recall.   I don't recall exactly.

VP:        Okay.   And they're no longer in business?

ZA:        No.

45

FR-3143-14

VP:     Alright, so some of your refrigeration is new, some of it is old.

ZA:     The shelving, I got it from, I think it's called The Resident.  Resident Equipment.

VP:     Where are they located?

ZA:     Uh, in the Bronx.

VP:     Alright.  Did you have a service company for your refrigeration units?

ZA:     Yes.

VP:     Who was that?

ZA:     ABC, 123 I think it was, Refrigeration Company.

VP:     And have they been out and serviced the mach… uh, the cases?

ZA:     Yeah.  I don't exactly remember when they came out, but they came out and they serviced it.

VP:     Any ongoing problems with any of the cases or…

ZA:     Originally when we opened, we had problems, but other than that, last year we had no problems with any of the refrigeration, thank God, everything was good.  **(INAUDIBLE)**.

VP:     You remember?  A lot of problems with the cases in the past?

46

FR-3143-14

MJ:      Two years ago, right, there was the…

ZA:      2012, we had the problems with the cases. The meat case went out.  Uh, you know, and the freezer, right?

MJ:      Yeah, but that had nothing to do with it. It had to do with the motor.

ZA:      The motor, yeah.   It wasn't the refrigeration unit, the motor **(INAUDIBLE)**.

MJ:      It was the motor.

VP:      Do, uh… the engineers were asking, where's the compressors for the cases, are in the case?

ZA:      No.

VP:      On the roof?

ZA:      Yeah, the compressors I think are on the roof.

VP:      And that's all of your cases?

ZA:      And then you have the two downstairs?

VP:      So for the past year, your refrigeration has been good, no problems.

ZA:      No.

VP:      Everything is going along nicely?

ZA:      Yeah.

VP:      Alright.  Uh, there was a loan taken out to purchase the refrigeration cases as well?

47

FR-3143-14

ZA:      Well, they set up a plan with us where we used to pay him.

VP:      A payment plan?

ZA:      Yeah.

VP:      Who do you pay that to now if he's out of business?

ZA:      No, we had finished paying it off to him.

VP:      Oh, okay.

ZA:      Yeah.

VP:      Alright, so you paid for the cases?

ZA:      Yeah.

VP:      Are there any other loans for the business to get everything going?

ZA:      No.

VP:      Product?

ZA:      No, that's it.  That was from…

VP:      That's C-Town?

ZA:      Yeah.

VP:      Alright.  Uh, are you current to date on the monthly rent payments?

ZA:      Uh, just two months I owe.

VP:      You owe two months?

ZA:      Two months, yeah.

VP:      So that's about $8,000?

48

FR-3143-14

ZA:      Eight thousand, yeah.

VP:      And has the landlord begun any process for eviction or…

ZA:      No.

VP:      Anything like that over the nonpayment…

ZA:      No.

VP:      Of rent?

ZA:      No, 'cause I had spoken to them regarding the… there was leaks in the roof.

VP:      Okay.  Where was the… so was it some sort of agreement where you're not going to pay rent and then you're going to fix the leaks or were you just waiting for them to do something?

ZA:      Yeah, I was waiting for them to send somebody out to repair it.  You know…

MJ:      The leak was big leaks, not **(INAUDIBLE)**.

VP:      Big leaks?

MJ:      Yeah.

VP:      When did it start leaking?  How about we start there.

ZA:      It started off with the first landlord, okay?

VP:      Okay.

FR-3143-14

ZA:     He refused to fix it.  He said, "You're responsible for half of the roof," which I never heard of, you know, so…

VP:     I don't know much about those agreements.

ZA:     Yeah.

VP:     And disagreements, I mean… **(INAUDIBLE)** right?

ZA:     So we basically, you know, we took care of it and then still there was in the back of the… the back of the… I guess the back of the **(INAUDIBLE)** or the church or whatever it was coming from because, you know, the way that the building sits, it's like this.

VP:     Yeah.

ZA:     And it keeps coming towards the front.  So we kept complaining and kept complaining.  He's actually… I refused to pay him the water bill to the old landlord.

VP:     The original landlord.

ZA:     Until he fixed it, so now he's taking me to small claims court.

VP:     Over the leak and the nonpayment?

FR-3143-14

ZA:      Over the nonpayment of the water bill. And I always complained to David—his name is David—I told him, "Listen, the roof keeps leaking."

VP:      Where is it leaking now?

ZA:      It was leaking in the office, it was leaking in the front.  In the back on top of the meat case it was leaking.

MJ:      Under the **(INAUDIBLE)**.

ZA:      In the produce area.  And over there on top of the dairy case.

MJ:      The dairy case where the Bounty and the tissues…

ZA:      The Bounty and tissues and stuff.

VP:      **(INAUDIBLE)** where?

ZA:      The door in front of the store.

VP:      Yeah, I saw that.  Yeah, on the left hand side **(INAUDIBLE)**.

MJ:      It leaked in the office, too.

ZA:      If you're coming into the office from the front, the first leak is right there by counter three.  It used to come down from over there in the front.

VP:      Counter three?

ZA:      Yeah.

51

FR-3143-14

VP:      Alright, so this is the entrance, alright?

ZA:      Yeah.   Okay.   This right here is… put three registers here.   The third register, it was leaking on it.   This is the office.

MJ:      It used to leak in the office.

ZA:      It used to leak in the office.

MJ:      Right.

ZA:      Over here on this side is the dairy cases, paper towels and stuff.   It used to leak over there. In the back over here…

MJ:      Was the meat.

ZA:      Was the meat case.   It was leaking right…

MJ:      In the corner.

ZA:      In the corner here, yeah.

MJ:      Yeah, by the bathroom.

ZA:      And then on top of there there's a staircase.   As you go down to the basement, there's a landing on the very top of it, where it used to leak on top of that.

MJ:      We've got a lot of leaks.

ZA:      And in the produce aisle, the first aisle.

MJ:      Yeah.

ZA:      Over here and like in the center and then on the side of the window over there.

52

FR-3143-14

VP:        So right here over the meat cases in the back?

ZA:        Yeah.

VP:        Is a big leak as well?

MJ:        Big leak, yeah.

VP:        And then from there it goes downstairs?

ZA:        Yeah.

VP:        Okay, and when did that start, all those leaks?  Was that…

MJ:        Those were **(INAUDIBLE)**.

ZA:        It's been like that for a while.

VP:        On and off?

ZA:        On and off, yeah, you know.

VP:        So the original owner really didn't take care of the property, then the new owner buys the building and the same amount of leaks, still the same problem, nobody cares?

MJ:        Yeah, they…

ZA:        They didn't send anybody out to repair it.

MJ:        Nobody give a damn.

ZA:        I was under the assumption that the guy named David was part of the owner because when he came with the ex-landlord, he goes, "I'm the new

FR-3143-14

landlord," so I was under the assumption that he was part of the landlord.

VP:      Right, right.  **(INAUDIBLE)**?

ZA:      No, I just found out the other day from Gloria that he is just a broker.

VP:      Okay.

ZA:      So.

VP:      What kind of stock?  I know above the dairy case you said you had paper towels or something?

ZA:      We had tissues, paper towels, yeah.

VP:      And did that run the whole length of these cases…

ZA:      Yes.

VP:      Along that wall?

ZA:      Yes.  And on top of the meat case… o

ZA:      On top of the meat case we had charcoal and pots and pans.

VP:      How many bags of charcoal?

ZA:      I don't know off the top of my head.  It was…

VP:      Two, 15, 100?

ZA:      It was stacked up.  It was stacked up.  I can't give you an exact number.

54

FR-3143-14

VP:       Okay.  How long had that been there?

ZA:       After the… after the summer where we usually keep it in the front and then the excess we put it on top, we lift it on top of the meat so that…

VP:       And so in the summertime it's out, easily accessible?

MJ:       Yeah, in the front.

VP:       People are buying it in the front?  Later, at the end of the season, you take it and you put it up on top of your meat cases?

ZA:       Yeah.

VP:       Nobody really buys it anymore.

MJ:       Just in case anybody wants it.  Some people buy it.

ZA:       You know, sometimes when you have… when it's warm out, people will still go buy it.

MJ:       **(INAUDIBLE)** backyard.

VP:       Right, right.

ZA:       This area is all barbecues they do.

VP:       Okay.

ZA:       You know, it's a lot of meat.

VP:       So we have charcoal, pots and pans on top. What else?

55

FR-3143-14

ZA:        That's it for that.

VP:        Okay.

ZA:        Uh, on top of the…

VP:        This whole case?

ZA:        Yeah.   On top of the produce we had baby wipes…

VP:        This is the produce here?

ZA:        The produce will be against that wall over there.

VP:        This wall?

ZA:        Yeah.

VP:        Above the stairs?

ZA:        No, no, no, on the side of it.

VP:        On the side of the stairs?

ZA:        Yeah.

MJ:        Like this.

VP:        Right here?

ZA:        Yeah.   It was against the wall though.   We had baby wipes, uh, diapers and adult diapers.

VP:        And that's sitting on top of the produce cases?

ZA:        Yeah.

VP:        Over this, anything on top of these cases here?

56

FR-3143-14

ZA:        That's what I just told you.    There are the charcoal and pots and pans.

VP:        All of that?    That's a pretty big wall there.    That's a lot.

MJ:        **(INAUDIBLE)** you know, the batches.    The big size… different sizes.

VP:        Paper plates?

ZA:        No, no, no, pots and pans.

VP:        Pans?

MJ:        Okay, there's like a bit mountain of stainless steel pans and stuff like that.

VP:        Alright, so like regular chafing dishes?

MJ:        Yeah.

VP:        Half trays, full trays, that kind of stuff?

ZA:        Yeah.

VP:        Okay.

ZA:        Because on top of the meat we had this wooden thing go straight across where you hang up things on pegs.

VP:        Right, right.

ZA:        And on top of it was the pots and pans and the charcoal.

VP:        How many aisles do you have in the store?

57

FR-3143-14

ZA:        Uh, six.

VP:        So that's six shelving spaces on both sides?

ZA:        Yeah.  Except for the last aisle, you have the refrigerator and the freezer.

VP:        So when you walk down one side is freezer, one side is refrigerator?

ZA:        One side is dairy and one side is the freezer.

VP:        The right side is freezer, and the left side is the, uh…

MJ:        It depends how you walk in.

VP:        Yeah.

MJ:        If you walk in from the front…

VP:        That's right.  From the front, the left **(INAUDIBLE)** and the right is the freezer?

ZA:        Yeah.

VP:        Alright.  Uh, any lighter fluid on top of your cases here for the barbecues or…

ZA:        Yeah.

VP:        The barbecues?

ZA:        Yes.

VP:        Barbecues for sale as well?  Charcoal type barbecues?

58

FR-3143-14

MJ:        Sure, everything's for sale.

VP:        Okay.    Any  problems  with  any  of  the utilities?  Any problems with your electric?  Lights flashing or circuit breakers popping?

ZA:        No.

VP:        Are there any circuit breakers on the first floor?

ZA:        No, everything is in the basement.

VP:        Are you current to date with your gas bill, your electric bill, the water bill?

ZA:        Yeah, everything  is  up  to  current.    The electric bill I have a payment plan set up with them. I pay them off.

VP:        Payment plan with electric?

ZA:        Yeah.

VP:        You had fallen behind?

ZA:        Yeah, we fell behind, but I paid them.    I sent them a payment in of $6,000, $6,700, something like that.    And then the balance of it, I think it was like $4,000 or $5,000, they put it on a payment plan.

VP:        When did you send $6,000 or $7,000?

ZA:        This was in January?   January or December, I don't remember.

59

FR-3143-14

VP:      December or January?

ZA:      Yeah, I don't recall exactly when.

VP:      And you mean '13 to '14?  Just 2013…

MJ:      Yeah, yeah.

VP:      This past…

ZA:      2013 **(INAUDIBLE)**.

VP:      And then whatever the balance was, another $4,000 or something, you're sort of paying…

ZA:      It six months they give you to pay your regular bill plus on top of that whatever the difference is.


VP:      Alright.  How many employees do you have?

ZA:      Seven.

VP:      Anybody recently fired or any problems with employees?

ZA:      No.

VP:      Have most of them been with you for some time?

ZA:      Uh, yeah.

VP:      Do you have any managers or do you run the businesses day to day?

ZA:      We run it day to day.  I have the morning shift, and my partner has the afternoon shift.

FR-3143-14

VP:      So what are the hours of the business?

ZA:      Uh, 7:00 a.m. to 9:00 a.m.   I mean 7:00 a.m. to 9:00 p.m. Monday through Friday, Saturday 8:00 to 9:00 and Sunday 8:00 to 8:00.

VP:      So what are your hours that you cover morning?  What would you consider morning?

ZA:      Uh, I come on at eight o'clock, seven or eight o'clock.

VP:      Well, who opens for you in the morning if you're not even there?

ZA:      I have a girl that opens up in the morning.

VP:      Who is that?

ZA:      Her name is Zulieka, Z U L I E K A.

VP:      Do you know her last name, or is that her last name?

ZA:      Lowe.  Lowe is her last name.

VP:      L O W?

ZA:      L O W E.

VP:      So z" Lowe opens for you if you're not here?

ZA:      Yeah.

VP:      So she has a set of keys?

ZA:      Yes.

61

FR-3143-14

VP:     Alright, so you will arrive at 7:00 or 8:00 or so, and how late do you usually stay?

ZA:     Until 3:00 or 4:00 in the afternoon.

VP:     And then Mohammad comes?

ZA:     He comes about 3:00.

VP:     About 3:00 p.m.?

ZA:     Yeah.

VP:     And then you close?

ZA:     Yeah, we close every day.

VP:     The girl doesn't close for you?

ZA:     No.

VP:     Zulieka?

ZA:     No.

VP:     So you close yourself?

ZA:     Yeah.

VP:     Alarm systems?

ZA:     Yes, yes.

VP:     Uh, what is the… do you have like a central monitoring station or is it just a ringing alarm?

ZA:     **(INAUDIBLE)**.

VP:     Central monitoring, okay.

MJ:     Monitoring codes.

VP:     What company does the monitoring for you?

ZA:     Uh, I think it's called Sky CC TV.

FR-3143-14

VP:      Sky CC TV?

ZA:      Yeah, it's a Korean company.

VP:      Okay.   And does that include… it's a burglar alarm system where you have to set a key pad?

ZA:      Yeah.

VP:      Does it have a fire alarm system?   Any smoke alarms that are attached to that system?

ZA:      Not that I… I don't know.   I don't know how the system works, but…

VP:      Okay.   Did that company install it, Sky CC TV?

ZA:      Yes.

VP:      So for access to the building, it's both owners and Zulieka?

ZA:      Yeah.

VP:      Does anybody have the codes to open or close?

ZA:      No.

VP:      Do you have separate codes or do you use just one code?

ZA:      We use that one code.   If the alarm goes off, they usually… the ask you your name and the… and the password.

FR-3143-14

VP:        Okay.   And they could contact Ziad first or…

MJ:        Either me or him.

VP:        Okay, so they have both of you down as a contact?

ZA:        They have three of us actually, me, him and Zulieka.

VP:        Okay, and have you had any problems with the alarm system setting or not setting properly?

ZA:        No, we have no problems.

VP:        Middle of the night you get a call, nothing's going on?

ZA:        No.   Usually when I'm opening, if I don't make it in time to turn it off, it goes off, they'll call me at the store.

VP:        Okay.   Give them your name and then the pass code.

ZA:        You know, how in the code we have 30 487?

VP:        Yeah.

ZA:        If you give her the right code, she says you're the right person.

VP:        Okay.

64

FR-3143-14

ZA:       But sometimes these systems are faulty and people get annoying alarms all the time, and you get called all the time.

MJ:       **(INAUDIBLE)** many times.

VP:       So the system seemed to work properly?

ZA:       Yeah.

VP:       Okay, and you're not sure if there was any fire alarm system tied into that at all?

ZA:       No.

VP:       You're not sure of that stuff.  Did you have any smoke alarms in the store anywhere?

ZA:       We had…

VP:       Or a problem with outside detectors?

ZA:       No.  We had the motion detectors.

VP:       And that's part of the alarm system right?

ZA:       Yeah, that's part of the alarm system.

VP:       Okay, so you had motion detection.  Were all of the entrance points alarmed?

ZA:       Yes.

VP:       The front doors, the doors to the basement, the side door?

JR:       And then in the top of that, you had motion detection?

MJ:       Yeah.

65

FR-3143-14

ZA:        We had a wireless alarm system.

JR:        A wireless system?

MJ:        Yeah.

VP:        I noted that there was some cameras in the store?

ZA:        Yes.

VP:        Did you also have cameras?  Okay.  Was that part of the same system or a different?

ZA:        It's the same guy that installed the cameras, he's the alarm guy.

VP:        And was that information stored onsite, the video images, or is it stored offsite?

ZA:        Onsite in the DVRs.

VP:        That's the camera, right?

ZA:        Yeah.

VP:        Onsite in DVRs then.  Does that run 24/7 or…

ZA:        Yeah, it runs on motion detection.

VP:        So the cameras only activate on motion detection?

ZA:        Yeah.

VP:        On the interior of the store, or do you have cameras on the exterior as well?

FR-3143-14

ZA:        Exterior also.  One facing up Bennett this way and one facing down Richmond.

MJ:        The front of the store and the side of the store.

VP:        Front of the store and side of the store?

JR:        So outside on the street?

ZA:        Yeah.

JR:        And then how many cameras are inside the store, ten or 20?

MJ:        Oh, **(INAUDIBLE)**

JR:        A lot?

ZA:        We have a lot.  We have like maybe… I want to say 26.  We had one on the roof.

VP:        So you have an extensive amount of cameras?

ZA:        yeah.

VP:        And any problems with the store?  Did you have any issues with break-ins or burglaries?

ZA:        No, we had…

MJ:        We have burglaries?

VP:        Oh, you have had burglaries?

MJ:        Yeah, in 2012 in the summertime.

ZA:        The first year we opened and, uh…

MJ:        August.

ZA:        August.

67

FR-3143-14

VP:       What happened on that burglary?

ZA:       They basically… the fellow it showed on the cameras is they clipped the locks on the front, broke the door.

VP:       The front door on Richmond Avenue?

ZA:       Yeah.

VP:       Okay.

ZA:       And they basically walked out with the safe.

VP:       What time did that happen?   Like your system caught that?

ZA:       It recorded them coming in and then he went in the office, I guess, pulled everything down and broke it, but the camera from across the street saw him leaving with the safe.

VP:       In the middle of the night?

ZA:       Yeah.   The cops were passing by as he was clipping the locks.  He saw the video, holy crap.

JR:       Unbelievable guts.

VP:       That's why when you said they cut the locks, I'm like, "On Richmond Avenue?"   If anything that's the busiest street **(INAUDIBLE)**.

FR-3143-14

ZA:        That's why I installed the wireless one because they went on the roof and cut the wire from the phone.

VP:        Okay.

ZA:        On the roof, they cut it.  So after that, that's why I installed the wireless alarm.

VP:        Okay.   So they circumvented the alarm system from activating.

ZA:        Yeah.

VP:        And they forced entry, but the video system was still working and was able to capture them.

ZA:        Captured them going…

VP:        Did the police end up arresting the person?

ZA:        I believe so.

VP:        Okay.

JR:        Well, you would know.   If they arrested them, you probably would have to testify in court.

ZA:        Well, they never… they never told me to go testify or anything.

VP:        Okay.  What was lost, the whole safe?  They took the whole safe?

ZA:        They took the whole safe.   They took cigarettes.

VP:        Usually the safe is pretty heavy, I mean…

69

FR-3143-14

ZA:        He had a hand truck.

VP:        Are you kidding me?

ZA:        He had a hand truck.   Walked out of the store with the hand truck.

VP:        Alright, so some cigarettes were taken.

MJ:        Baby formula, cigarettes.

ZA:        Baby formula, cigarettes.

VP:        Baby formula?

MJ:        Right, and whatever was in the safe, the cash that was in the safe.

VP:        Approximately how much did you lose in the safe at that time?

ZA:        I don't recall how much it was.

JR:        I know you've got the exact, uh, for the money you got back about $20,000?

ZA:        It was like 20 some odd thousand.

VP:        Alright.   Alright, then let's get to like the… was that the only burglary?

ZA:        Yeah, that's the only burglary.

VP:        Any other burglaries or anything like that?

ZA:        No, no.

VP:        Any other prior…

ZA:        You get… no, you get like shoplifters here and there.

70

FR-3143-14

VP:        Shoplifting throughout the establishment?

ZA:        Yeah.

VP:        Yeah.

ZA:        Like a week before that, I caught this man. Well, I didn't catch him.  The girl caught him and she told me, you know, when he came in the morning, he was taking tuna and putting it in his pocket.  He went around the store and he came up to the register to pay for one item, and she told him to take the tuna out of your pocket.  He goes, "Are you kidding me?  Come on, you know, nobody knows.  Let me just walk out with it."

VP:        Right, right, right.

ZA:        She said no, you know, and then when I came in, she told me who it was and, you know, I confronted the buy because this is like his third time doing it.

VP:        How long ago was that?

ZA:        That was like a week before the incident happened.

VP:        Before the safe was taken?

MJ:        No, no, no, I'm talking about recent.

VP:        Oh.  So like a week before the fire?

ZA:        yeah.

71

FR-3143-14

VP:      You caught someone shoplifting for the third time?

ZA:      Yeah.   This is a person that we used to help out every time… any time he was hungry, I needed a sandwich, I gave him a sandwich.   You know, I used to always help out the community.

VP:      Do you have his name?   You have that person's name or any contact info?

ZA:      Uh, no.   I know he lives somewhere down the block on Richmond Terrace.

VP:      Does he go by a name like Joey, Petey or…

ZA:      No, I don't know.   I don't know his name.

VP:      **(INAUDIBLE)** you've seen.

ZA:      Why would you take one little can of tuna fish?

VP:      Yeah, right.   Okay.   Uh, the day of the fire it's she understood.   That Sunday morning, who opened?

ZA:      Uh, Zulieka opened.

VP:      Zulieka.

ZA:      Yeah, I'm off on Sundays.

VP:      Alrighty.   You didn't come in at all that day?

ZA:      No.

72

FR-3143-14

VP:       And then at some point, Mohammad, you come in that day?

MJ:       Yeah, I came at 12:00.  Twelve noon because the lady go home early on Sunday.

VP:       Zulieka.

MJ:       Zulieka,  yeah.

VP:       So then the store is your responsibility for the day?

MJ:       Yeah, from 12:00, yeah, to 8:00.  But this day I close 8:30 because the **(INAUDIBLE)** came, changed **(INAUDIBLE)** lights.

VP:       So that Sunday, you closed at 8:30 because you had light work?

ZA:       No, they were… okay, it's a program by Con-Edison…

VP:       Alright.

ZA:       Where they try to save on electric bills, so this company called Global Efficiency.

VP:       Alright.

ZA:       What they do is they tell you you can save this much amount on your electrical bill.  Con-Edison pays 70 percent and we pay… we're responsible for 30 percent.

VP:       So Con-Ed funds the program 70 percent?

73

FR-3143-14

ZA:        Yeah.

VP:        And you pay 30 percent?

ZA:        Thirty percent.

VP:        Towards this program?

ZA:        Yeah.

VP:        And Global efficiency is the name of the company doing…

ZA:        Yeah.

VP:        The work?

ZA:        Yeah.

VP:        When did they start doing this work?

ZA:        They started Sunday.

VP:        That was their first day?

ZA:        That's the first day.

MJ:        And it was at three o'clock.  They came at three o'clock and left at 8:30.

ZA:        They came a week before that, and they worked on the… the downstairs inside, they put a timer where the fan doesn't keep running all the time to save you energy.  Once the door opens, like the fan stops.

VP:        On what, a walk-in freezer?

ZA:        Yeah, the walk-in freezer.

74

FR-3143-14

JR:        Are you going to explain to him which floor?

ZA:        Oh, okay.   No, the walk-in cooler downstairs.

VP:        Alright, so the week before Global Efficiency?

ZA:        Yes.

VP:        Was here just to put a walk-in timer on the freezer… walk-in freezer in the basement just to what, keep…

ZA:        Keep the fan from, you know, going on. When you have the door open…

VP:        Okay.

ZA:        It just saves the… it shuts it down and then instead of having three fans running, it has only one fan running.

VP:        Okay, so that's the only work they did the week before.

ZA:        Yeah.

VP:        The work… this program you're talking about, they do that Sunday?

ZA:        They came… yeah, Sunday they came to change the lights.

FR-3143-14

VP:      Where are the lights that they needed to change?

ZA:      In the refrigeration open cases.

VP:      Open cases?

MJ:      Yeah.

VP:      Meat case and dairy case?

ZA:      Meat case, the dairy, the produce case.

VP:      You said they put the night covers, too?

MJ:      Yeah, the plastic covers.

ZA:      And they also installed night covers. Night covers are to… you pull down like a curtain. It keeps the cold inside the refrigerator, so it saves on the energy.

VP:      And this switching it over from… is it an older fluorescent type fixture to…

ZA:      It's a fluor… it's a fluor… I don't know what type of light it is, but…

VP:      Okay.

ZA:      They put LED lights.  They installed LED lights.

VP:      And so how many fixtures did they change?

MJ:      I don't know.  Like he said…

JR:      They just changed… wait, can I interrupt for a second?

76

FR-3143-14

VP:       Go ahead, I'm trying to get…

JR:       Did they change the whole fixtures or just the lights?

MJ:       No, the fixtures and the lights.

JR:       The fixtures, too, okay.

MJ:       Yeah.

VP:       How many fixtures did… they came in with boxes of fixtures?

ZA:       Boxes.

MJ:       Yeah, in a van.   We saw the garbage, the dumpster.

ZA:       All the lights were in the dumpster.

MJ:       Even the Fire Department saw it, the police saw it, everybody saw it.

VP:       And these are all in the front of the cases, these lights?

ZA:       You have some on the bottom, the top.

VP:       And just a lot.   You don't know how many, so it's all your refrigeration.   You open the refrigeration on the backs, two sides?

ZA:       I don't know, did they change the freezer lights also?

MJ:       No, he did the produce, the meat.   He put the dairy and the case with the yogurt.

77

FR-3143-14

ZA:        And the beer case also?

MJ:        No, the beer case he never touch.

ZA:        No?

ZA:        No.

VP:        Okay, where's the yogurt and dairy, on the left side, right?

MJ:        Yeah, like across from the frozen.

VP:        Okay.

ZA:        If you look at our diagram, it would be this right here.

VP:        That's right.   Okay.   And you've got the frozen **(INAUDIBLE)**.

ZA:        You have…

VP:        Your frozen.

ZA:        Okay, look, you have a case… you have a case coming like this, which is the milk, okay?   Then you've got a case going like this, which is juices.

MJ:        Then yogurt.

ZA:        Then you've got yogurt.   Then you have another ca… there's a split in between.   There's a shelf, a black shelf that beyond that shelf is where the cheeses are and, you know, like the eggs, sour cream and stuff like that are all across.   And then next to that is…

78

FR-3143-14

MJ:        **(INAUDIBLE)**.

ZA:        All this area here and next to this, there is a freezer next to the deli, a four-door freezer seafood… for all the seafood stuff.

MJ:        But he never touch that.

VP:        Did they change all the lights from here?

ZA:        Yeah, they changed **(INAUDIBLE)**

MJ:        **(INAUDIBLE)**.

VP:        All the open cases?

MJ:        Only the open cases:   One, two, three, four, the produce is one case, the meat two, the cheese three, the yogurt four, and the milk five. Five open **(INAUDIBLE)**.

VP:        So basically everything against the walls that were open cases except for the… he said except for the beer… the beer case.

ZA:        Except for the beer case.

VP:        Which is next to the… next to the…

JR:        So there was a pretty extensive amount of electrical work going on.

MJ:        Yeah, those people do four hour and a half, like six or seven guys.

VP:        Okay.

FR-3143-14

ZA:        Not like a five minute job.   This is four hour and a half.

VP:        Right, right.

ZA:        Four, six, seven, nine.

VP:        Were they shutting the power to the units while they worked on it?

MJ:        Well, he asked me, "Where's the box?"

VP:        Right.

MJ:        One of the guys, he's in charge, and he have a sign like he say he want **(INAUDIBLE)** where's the box.   You know, there's a sign?

VP:        Uh-huh.

MJ:        So I told him, "Go downstairs and show him."   Straight down and it's the boxes for the… well, I never see him shut down anything, I'll be honest with you.

VP:        No, I was just wondering.   I mean I don't see how you replace a whole light fixture while it's still live, you know.

MJ:        Yeah.

VP:        But he didn't say anything to you as far as your dairy in here might go warm, it  might spoil or anything like that?

MJ:        No, no, no, no.

80

FR-3143-14

VP:     So you didn't shut any of that power off?

MJ:     No, no, no.

VP:     Maybe he was able to isolate the light switches?

MJ:     No, I don't see **(INAUDIBLE)**.

ZA:     I gave the fire marshal their number if you want it.

VP:     The company?

ZA:     Yeah.

VP:     Do you have a… when you contracted them…

MJ:     It was in the store.

VP:     Well, did you contract them to do the work or Con-Ed…

ZA:     Con-Ed **(INAUDIBLE)**.

VP:     Suggested them?

ZA:     Yeah, they're under Con-Ed's…

VP:     So what was your cost, the 30 percent of it, what would that have been to you?

ZA:     It was only like $3,000, something like that.

JR:     That's your cost or the whole bill?

ZA:     My cost.

VP:     So Con-Ed is putting up more.

JR:     Almost double that, yeah.

81

FR-3143-14

MJ:        Yeah, 70 percent.

VP:        Con-Ed allows you to pay that over time or you have to come up with that money up front?

ZA:        No, you pay that… you pay that to the company…

VP:        Okay.

ZA:        That installs it and you pay them monthly.

JR:        Not one shot.

VP:        What was the expected timeframe that you would make that money back with these new lightings?

ZA:        I think he said a year and a half.

VP:        And was it… you were saying earlier LED. Is that the kind of lighting they were putting in?

ZA:        That would be a guess.

VP:        Is there separate switches for you to turn that lights on and off in your cases?

MJ:        I don't even know.

JR:        Inside the case, yes.

VP:        Inside the case there are switches?

MJ:        Oh yeah, switches.  We've got switches.

ZA:        Except for the meat case doesn't have a switch.

VP:        So when you close up at night, do you usually shut the light off in the cases?

82

FR-3143-14

MJ:         Yeah, yeah.

ZA:         Yeah, you go to each case and you turn off the switches.

VP:         So that night would you have shut the light off with…

MJ:         Yeah.

VP:         The switch inside of each case?

ZA:         Except for the meat case.   The meat case doesn't have a switch.

MJ:         Yeah, the meat case is on.

ZA:         The meat case stays on.

MJ:         All the frozen had, all the deli case…

ZA:         All the dairy have it except for the meat case doesn't have a switch.   That stays on.

VP:         So the light in the meat case stays on because there is no switch.

MJ:         Yeah.

VP:         All the other cases…

ZA:         They have switches in them.

JR:         All you do, you pull down the curtains on the cases to keep the cold air inside.

VP:         The curtains, is it like a plastic?

JR:         Plastic, yes.

MJ:         Plastic.

83

FR-3143-14

VP:        And then do they roll down?

MJ:        Yeah, they roll down.

VP:        Manually?

ZA:        No, no, no, you just pull it up like this, put it down.

VP:        Like a shade?

ZA:        Yeah, then a shade goes right up.

VP:        Okay.   Alright, so it's a plastic shade that you pull down.  It keeps the refrigeration in.

ZA:        Yeah.

JR:        Cool inside, yeah.

VP:        Was that part of the case originally or was that something Con-Ed installed as part of (cross talk)?

MJ:        They installed it, too, yeah.

VP:        Okay.   Was that installed on Sunday as well?

ZA:        We had that before, but I don't know if they changed it.  Did they change the…

JR:        Shades.

ZA:        Shades?

JR:        Shades.

MJ:        For what?

JR:        For the cases?

84

FR-3143-14

VP:      When did they put those on?

MJ:      Yeah, the **(INAUDIBLE)** and the produce. **(INAUDIBLE)** shade on the produce, **(INAUDIBLE)** shade on the cheese one and the one for the yogurt.

VP:      Alright.

MJ:      Three cases they put shade on it.

ZA:      They added more shades.   We had shades before on the meat case.

MJ:      On the **(INAUDIBLE)** and the meat cases, but he never put shade on the milk case and the…

VP:      The milk?

MJ:      And the meat, no.  No shade.

JR:      Are some of your cases padded?

VP:      Yeah.

JR:      Some of them and the ones that…

VP:      Con-Ed put them on for you.

ZA:      Yeah.

MJ:      Yeah, two have them, let's say two.

ZA:      The meat case already had it, and the milk case had it.

JR:      Yeah.

ZA:      They just install the produce and the… the other dairy cases that they're having.

FR-3143-14

VP:        Okay.  So at 8:30 or so they say to you that they're done?

MJ:        Yeah, he say, I tell him, "You're done?" He say yeah.  I say, "Do me a favor, clear all your garbage like your cardboard, all the pieces.  The old light, the old thing, fixture."  He said okay.  The **(INAUDIBLE)** section, he took it with him.  He took it to the truck, like two milk tray.  He put it on two milk tray and the extra light he bring, he took it back, and the **(INAUDIBLE)** the rest the glass of the light, he throw it in the garbage and the container. Well, the police saw it, the Fire Department saw it.

VP:        Into your containers outside (cross talk)?

ZA:        Yes, sir.

VP:        On the side of your business?

ZA:        Yes.

VP:        Okay.

MJ:        And after that, it took me three to five minutes… when they left, it took me three to five minutes to shut down the register, shut off the light, put on the alarm, and I left **(INAUDIBLE)**.  It took me I would say maximum three to five minutes, that's it.  I was out of the door.

86

FR-3143-14

VP:      Alright, so you shut all of the lighting and all of the cases except for the meat case.

MJ:      Yeah, all the lights.  All the lights, yeah.

VP:      How about the overhead lighting in the store, do you shut that or do you leave that on?

MJ:      No, we shut down.

ZA:      We shut it down, but some of them stay on.

MJ:      A couple of them.

ZA:      Like one or two of them say on.

VP:      So one or two of them are like a nightlight kind of thing?

ZA:      Sort of like that, yeah.

VP:      Alright.  And then you leave the store.  Do you leave from the Port Richmond Avenue or do you leave from…

MJ:      Yes, from Port Richmond.

VP:      The side?

ZA:      No, no, no.

VP:      Okay.

ZA:      That side door, there is no…

MJ:      Only for deliveries, this side.

ZA:      Only… you can't open it from the outside.

MJ:      You can't open it.

87

FR-3143-14

ZA:        It has a push bar on it.

VP:        Okay.

MJ:        You can't leave it from the side because the alarm in the front, so you have to… the alarm is by the office and the light by the office.  So what the hell you want to go from there to all the way there?  That's no **(INAUDIBLE)**.

VP:        I don't know.  I mean it's not my business and some people do that, you know.

MJ:        No, no.  I don't know…

VP:        They won't use the front door.  They'll lock up, they'll lock up the other doors and sometimes they'll come out the side door.

JR:        Maybe because they thought…

VP:        Walk there, you know.

MJ:        It's easy for me to get off from here.

VP:        Okay.

MJ:        Because the switch is in the office and the alarm, and then put the switches down, the alarm, and I hit the door, two seconds.  Close the door, the gate, to lock, and I am out of there.

VP:        After you closed up, you went home?

MJ:        Home straight.  I didn't… straight.  I didn't even went nowhere.

88

FR-3143-14

VP:     And like you said earlier, you're not even a mile from the store.

MJ:     Yeah, not a mile away from the store.  This is the truth.  This is Van Name Avenue, this is Port Richmond Avenue.

VP:     I don't know the area at all, I guess.

MJ:     Okay, you go down all the way down to Forest?

VP:     Yes.

MJ:     Alright, when you go down Forest you make a right, go straight Forest and then…

VP:     I go down Forest, I've got to make a left. If I make a right…

MJ:     No, no, make a right to my house.

VP:     I'm on Forest Avenue, when I hit Van Name, I make a right.

MJ:     Right.

VP:     Gotcha.  **(INAUDIBLE)**

MJ:     **(INAUDIBLE)**.

ZA:     No, you can still make a right.  You know, Port Richmond and Forest.

VP:     Yeah, yeah.

FR-3143-14

ZA:        Make a right and go straight past the McDonald's. I think there's a Walgreens. You'll pass McDonald's and **(INAUDIBLE)**.

VP:        Yeah, yeah.

MJ:        There's a **(INAUDIBLE)** store, too, and Walgreens on the corner by my house.

VP:        Oh, I see.

ZA:        Yeah, there's a **(INAUDIBLE)**. There's like a Pep Boys over there.

MJ:        Right.

VP:        Yeah, okay.

MJ:        One mile exactly.

VP:        Okay. Alright. How did you become aware of the fire?

MJ:        He called me.

VP:        You got the call first?

ZA:        I got the call from my brother at seven o'clock in the morning. He said he saw it on the news. He saw it on Channel 7 news.

VP:        And he said that's my brother's business?

MJ:        No, he called him.

ZA:        He called me. No, my brother was home.

VP:        Right.

FR-3143-14

ZA:        You know, he was watching the news and then he called… he texted me, he said, "Were are you?" And I called him, I said, "What's wrong?"  He goes, "Are you at the store?"  I said, "No, I'm headed there right now."  He said, "Your store is on fire." I said, "What do you mean, my store is on fire."  He goes, "It's on the news."

VP:        Right, you didn't get any phone calls from the alarm company or nothing?

ZA:        Nothing.

JR:        And then you come over here and then you see everything, you know, you're in shock.

VP:        Yeah, when we get here, the Fire Department's already here.

ZA:        The Fire Department's already here, everybody's already on the scene **(INAUDIBLE)**.

VP:        At some point do your employees start to show up that day?  You tell them what was going on, they see what's going on?  You notify your insurance company.  I mean I got here Monday afternoon about 1:30.  I didn't see anybody.  I saw Gloria.

MJ:        One-thirty Monday?

VP:        One-thirty, two… no, I'm sorry, 2:30 Monday I got here.

91

FR-3143-14

MJ:      No, I was here until 5:30, six o'clock **(INAUDIBLE)**.

VP:      I didn't see you.  I saw Gloria.

MJ:      Maybe I was in the truck.

VP:      You might have been in your car because I saw Gloria and then she didn't know who our insurance company was.  I gave her my card.  She thought that she had Tower Insurance.  I'm like, "I'm here for Guard."  She goes, "I don't know, I'm not sure."  I took whatever pictures I could.

JR:      Maybe you were in the truck **(INAUDIBLE)** the Fire Department truck.

JR:      Maybe you were in your truck.

VP:      Maybe.  You know, the scene was pretty secure at that time.  There was nothing that I was going to be able to do.  I just called Buildings Department was holding the scene to make sure it was safe before we could go in.  I understand there was water in the basement that had to be pumped out.

ZA:      Oh yeah.

VP:      And then, you know, we're still waiting. As far as like your stock and your stuff like that, where do you keep all of your stock?

92

FR-3143-14

ZA:     We hired… all we had in the basement was we had a lot of beans, **(INAUDIBLE)** beans.

VP:     Okay.

ZA:     And we kept the meat supplies there, the wrapping.  You know, the paper plates and the wrapper they use for the meat.  Uh, we have pallets of Poland spring water.  Miscellaneous other stuff like cereal, you know, seasonal stuff.

JR:     You've got the meat **(INAUDIBLE)**, too, right?

ZA:     Yeah, downstairs was the meat area.  We had milk, the meat and the walk-in box.  And in the freezer, there was some stuff in the freezer also.  I think we had just gotten our order in on I think Friday or Saturday, our meat order for $5,000.

VP:     All that kind of stuff is the stuff you want to make sure he's got documentation for for the claim.  So the cellar you have a meat prep area, is that why you had the wrap down there and…

ZA:     Yeah.

VP:     Stuff like that?

ZA:     Yeah.

VP:     Styrofoam containers or anything?

93

FR-3143-14

ZA:        Yeah.   That's what they are, the Styrofoam plates.

VP:        Where are those stored?

ZA:        Right across from the meat department.

JR:        The meat department is in the second room? The meat department is on the left and on the right was their supplies.

VP:        On shelving?

JR:        On shelving, yes.

VP:        And that would be all three shelves, five shelves?

JR:        It's a rack.  I don't know how long it was, but they had all their supplies on it.

VP:        All the meat supplies, the wrap and stuff like that?  Uh, so all that stock is lost?  All the stock in the store?  How much do you estimate you had in stock in the store?

ZA:        Off the top of my head I don't know an exact amount.

VP:        How are your daily receipts?   Business-wise, how do you do?  Do you mostly…

MJ:        We were doing good, you know.

VP:        Like I say, I don't know if you do $5,000 and Tuesday you do $1,000?  I mean…

94

FR-3143-14

ZA:        Yeah, you know.   Well, you go towards the end of the month it gets a little slower because this is a low income area.

VP:        Okay.

ZA:        So they basically get their food stamps. It's a high food stamp area.

VP:        Alrighty.

ZA:        A lot of food stamps, WIC.

VP:        So most of your sales are some sort of government program…

ZA:        Yes.

VP:        Whether it's food stamps or where…

ZA:        Yeah.

VP:        You don't do a lot of cash business or credit card business?

ZA:        We do a lot of… we do credit cards.  We do credit cards also.

JR:        What would you say your percentages of your business are?  Like are you government programs 50 percent, 70 percent?

MJ:        No more than 50 percent.

VP:        What is your cash, what is your credit card?

95

FR-3143-14

ZA:       In the beginning of the month, it's mostly, you know, the government program.  The first to the 15th, that's when they get their food stamps.  And then towards the end of the month, you have cash.

JR:       Cash, credit cards.

ZA:       Cash, credit cards, stuff like that.

VP:       So on a monthly basis of your monthly income, what is your percentage of government program, is it 70 percent, 80 percent?

ZA:       On a monthly, I would probably say maybe 70 percent.

VP:       And the rest credit card, cash or whatever?

ZA:       Cash, yeah.

VP:       And have you had any problems with the government benefit programs?

ZA:       No.

VP:       Not any issues where they're looking into it…

ZA:       No.

VP:       Or they want to take it away or anything like that?

ZA:       No, no, no.

VP:       Okay, so you've had that from day one?

ZA:       Yes.

96

FR-3143-14

VP:      And when you went into the business, did you know that you would be that type of supermarket in a low income area where a good percentage of your proceeds would be from these programs?

ZA:      Yeah.  Well, it's just the area.

VP:      I don't know the business is what I'm saying.

ZA:      Oh, you can tell what the area is, you know, when you see what the area is like, you know.

VP:      So, so far into the two years of the business, has it been profitable?  Have you been able to pay your loans to C-Town?

ZA:      Yeah, yeah.

VP:      Okay.  So you don't owe anything to C-Town as far as…

ZA:      No, we do.  We have left on the loan $75,000.

VP:      So you've paid off quite a bit of the loan already.

ZA:      Yeah.

VP:      There's not much left.

MJ:      That's it, that's all we left.  Everything.

ZA:      I mean we were almost done with C-Town, then…

97

FR-3143-14

MJ:        That's why I was very happy, excited.

VP:        You expected to have that paid off within the next year or two and you'd be free of C-Town?

MJ:        Yeah.

ZA:        Yeah.

VP:        Okay.  So then after that, you guys would have been on your own.  Sorry.  Did you have any problems with any of the other businesses in the area?

ZA:        No.

VP:        Any of the neighbors?

ZA:        I'll tell you, the only problem I had, which I see right now what type of person is the guy, the old landlord.    You know, he's into every business.

VP:        The old landlord is here?

ZA:        Yeah, he's right across the street.

VP:        Who is the old landlord?

ZA:        Uh, his name is Dennis, Dennis Silestro. He owns…

VP:        Okay, okay.

ZA:        The **(INAUDIBLE)**.  You probably know him.

VP:        I don't know him.

98

FR-3143-14

ZA:        He's an auctioneer.    He does auctioneer business.

VP:        So you mean the guy in the furniture store?

ZA:        Yes.

VP:        The old landlord is Dennis Silestro in the furniture, so he's here because he's kind of across the street.  He's not just showing up.

ZA:        No, no, no, he's just across the street.

VP:        Okay.

ZA:        But…

VP:        He's into the business.

ZA:        You know, he gives us… he used to give us a lot of problems.  He used to call up the trash police about our… the sanitation police, they used to come and give us tickets for our garbage, you know.  He used to call the… I just got a call maybe three weeks ago, four weeks ago.  At the end of December or January, the Health Department showed up.  They said they got someone who called up…

VP:        Around here?

ZA:        Yeah.  And the lady said it, she said, "You're clean in here.  There's nothing wrong in here."

VP:        Yeah, right, right.

99

FR-3143-14

ZA:     So it's like all kinds of…

MJ:     This is a brand new store.

VP:     And (cross talk).

MJ:     Two years old.  Brand new.

ZA:     **(INAUDIBLE)** because he just…

VP:     But he's not a competing business.   He sells furniture, you sell food.

MJ:     No, no, no, he used to own the building. He lost it.  He lost the building.

VP:     He lost the building or…

MJ:     Yeah.

VP:     He sold the building?

MJ:     No, no, he…

ZA:     He sold it.   He said it was going into foreclosure, so he sold it.

JR:     He sold it just in time.  He was probably getting foreclosed.

VP:     So he probably didn't get any money out of the deal.  He's lucky he got out of the deal?

MJ:     He's pissed off.  Yeah, he's pissed off.

ZA:     We got served with papers.    All the businesses **(INAUDIBLE)** church, we got served.  So you know, I took it to my attorney and I said, "What is

100

FR-3143-14

this pay by?   What is this?"   He said, "Basically your landlord is being foreclosed on."

JR:        And then I don't know **(INAUDIBLE)**.

ZA:        See, but I was here on Monday.   I saw him. He was getting or looking at his truck that were parked behind the building.

MJ:        Yeah.

ZA:        Yeah, and that's another thing.   He had his trucks behind there and people used to go on top of his trucks to get on the roof, and they used to throw stuff on top of the roof.   And I complained to David about this, and David says he pays us rent for the space.   He pays the land… our land… the new landlord rent for the space.   Gloria tells me no, he wasn't authorized to park there.   The landlord himself, Isaac, says, "Yeah, he used to pay me $100 a month for…" so I don't know.

VP:        What kind of debris would you find on the roof?   What kind of debris, like beer, food?

ZA:        Garbage.

VP:        But is it like kids going up there hanging out or was it…

ZA:        It was bags of stuff on top of the… we used to have to go on top of the roof just to clean it all

101

FR-3143-14

up.    They tried to take the… one time they… 'cause the only reason why we put a camera up there on the roof is because they were trying to steal the copper pipes, you know.    So it's all different kinds of people, whether they're homeless or whatever.

MJ:        Yeah, yeah.

ZA:        They're throwing stuff up on the roof by climbing up on his trucks, tossing it up there.

JR:        I think he did it intentionally, he was throwing stuff on the roof because one time even **(INAUDIBLE)** had a problem with his, uh…

VP:        Vents?

JR:        Vent system.

VP:        What would he be…

MJ:        He's crazy.

ZA:        He saw me and the gyro guy for the water bill.    How much water does the gyro guy use?    His **(INAUDIBLE)** is two by ten.    Not that much.

JR:        I mean what he did was he installed sub meters for each occupant.

VP:        For each occupant.

ZA:        Okay?    He wanted us to pay for the installation.    In my lease, it doesn't say I have to pay for that.    The water meter is already there, so

102

FR-3143-14

why should I have to pay for that.  You decide to put that, so…

VP:      Right.

ZA:      You pay for it.

VP:      Right.

ZA:      You know?  He fixed the sidewalk before he sold the building.  He fixed the sidewalk and now he's suing me for that, for repairs done to the sidewalk.

VP:      Before he lost the building.

ZA:      Right before he lost the building, right before he sold it.  He added the repair for the sidewalk after he sold the building.  He's trying to put it on me for me to fix it.

JR:      And you don't own the building.

ZA:      I don't own the building.  I'm not responsible for that.

VP:      I know **(INAUDIBLE)** it's on you, some it's not.  Again, right?  That's an old repair, that's an old repair.

ZA:      That's a violation he had before I even got to the building.

JR:      Was any other part of the building being worked on?

103

FR-3143-14

ZA:      Well…

JR:      **(INAUDIBLE)** the gyro place?

ZA:      Well, one guy.  One of the neighbors said on Sunday he witnessed… well, you also said you saw the gyro guy in there.

VP:      I spoke to the gyro guy.  He said he was doing some tile work on his counter on Sunday.  He **(INAUDIBLE)** by the time you left, but he said he was there.

MJ:      No, I left exactly 8:35.

VP:      'Cause I saw the gyro guy.  Thursday, I saw the gyro guy came by like **(INAUDIBLE)**.

MJ:      No, he was there and his…

VP:      One o'clock in the morning I saw the gyro guy.

ZA:      One of the neighbors… well, he's afraid to say because I don't know, maybe he doesn't have any papers or whatever, right across the street from the building, he told my manager, Zulieka, he told her, you know, the gyro guy was doing some work and also the church was doing some work **(INAUDIBLE)** and I think she said he said he left around 11:30 or something like that.

104

FR-3143-14

MJ:         They both was open.  The gyro and the church, both of them.

VP:         But you don't know what kind of work they were doing?

MJ:         Oh, no, no.

VP:         Like I said, I spoke to the gyro guy early on Thursday morning.  He told me was there.  He's not open for business on Sunday.  He came in in the early afternoon.  He was fixing his counter.  He has a background in tile work, and that's the kind of work he was doing.  I mean it's not a big enough store to where I could see him doing anything other than that. He said he doesn't have any natural gas, it's all electric in his business, what he… I don't know, what people were saying, his grill wasn't working.

ZA:         Okay.

VP:         So I don't know.  And he was… I know he was having some electrical problems.  Maybe he didn't mention to me, you guys having any electrical problems because some his light in his basement went out or something like that.

JR:         Okay.

105

FR-3143-14

VP:      You know, that's about it.   If he had trouble with the electric, did he have to come into your business for circuit breakers?

ZA:      No.

VP:      Or did he have his own circuit breakers?

ZA:      His circuit breakers…

VP:      Okay.

ZA:      Is **(INAUDIBLE)**, but the main box is in my building.

VP:      How about like any problems with any of the other supermarkets?   I noticed there was a, uh…

ZA:      Oh no, he never fucked us.

VP:      Key Food up the block?   Was he…

ZA:      No, he opened up.

VP:      Open after you or before you?

ZA:      No, after us.

MJ:      After, but he never **(INAUDIBLE)**.

ZA:      He opened up I think last August, he opened up.

MJ:      Yeah.

VP:      No effect on your sales?

MJ:      No, no.

FR-3143-14

ZA:        Well, the first month he opened, of course, the grand opening, everybody goes in there to see what's in there.  Well, after that it was normal.

VP:        It was?  Okay.  What about the place across the street?  There's like a Food Emporium?

ZA:        Oh no, that's a small store.  That's not a…

JR:        He doesn't sell meat.  He doesn't sell nothing.  He's been there a long time, that guy.

VP:        So he's not really a direct competition for you.

MJ:        No, uh-uh.

VP:        You're more of a supermarket, he's like a local deli almost, a bodega?

MJ:        Bodega, yes.

VP:        Maybe a little bigger than that?  He has some…

MJ:        I've never been there, I'll be honest with you.

VP:        No fresh meat?

ZA:        No.

VP:        Nothing like that?

ZA:        I've been in there.  He serves like, you know, sandwiches and stuff like that.

FR-3143-14

VP:      Right, okay.  Alright.  Uh, I've just got a bunch of… any other insurance claims?  I guess obviously the robbery.  Any other claims?

ZA:      No.

VP:      **(INAUDIBLE)** business or whatever.  Would you be able to get a printout of the alarm from that day?  I'd be interested to see the alarm company on how they didn't get any activation on this.  I mean if there's no smoke alarms attached to the system, at least when the Fire Department forced entry, I would have thought they would have gotten an alarm.

ZA:      There wasn't.

VP:      Not even that.

ZA:      **(INAUDIBLE)**.

VP:      Not even… the smoke should have just… with the motion detector should have just set it off.

ZA:      Yeah, you know, I find that odd, you know.

VP:      What's the alarm company again?

ZA:      It's Sky CC TV.

VP:      Sky CC TV.  Do you have a phone number for them?

ZA:      Uh, I have it **(INAUDIBLE)**.  The fire marshal has it.

VP:      Okay.

108

FR-3143-14

ZA:        Yeah.

JR:        I just find it odd that they didn't get a call from the alarm company.

VP:        Unless the fire was in the back and it takes out…

JR:        Traveled this way, you know what I mean? In the back **(INAUDIBLE)**.  I don't know.

VP:        At some point it still gets into their store, and the doors get forced.  He's got a wireless system.  I mean they had wireless boxes inside the office.

JR:        I guess it could happen.  And the office didn't even get affected that much.

VP:        Yeah, but doesn't it have to **(INAUDIBLE)**?

JR:        It's not electric **(INAUDIBLE)**.

MJ:        Or maybe the switch went off, maybe, I don't know.

VP:        Yeah.

MJ:        From the small, for the electric **(INAUDIBLE)**.  Maybe it shut the switch out.

JR:        Even if you lost power, your battery backup…

VP:        The battery and the cell service should have generated a call, right?

109

FR-3143-14

JR:        Yeah, the battery…

VP:        I mean…

ZA:        I don't know anything about **(INAUDIBLE)**.

VP:        I'm not an expert.  I'm not an expert.  You said he set up a wireless system.

JR:        If it's wireless, even if it's a blackout…

VP:        Here, let me ask you, during Hurricane Sandy did you get flooded?

ZA:        Not that much.  A little bit of stuff in the basement.

VP:        Did you have power?

ZA:        No.

VP:        Throughout the whole storm?

ZA:        No.

VP:        What happened to your alarm system during Sandy?

ZA:        Nothing.

VP:        You couldn't use it?

ZA:        Nothing.

VP:        Did it at least generate an alarm to the alarm company?

ZA:        No.

VP:        So maybe the alarm system wasn't working right.

110

FR-3143-14

JR:      No, it worked because Saturday when I walked in…

MJ:      Saturday…

JR:      I didn't make it, it went off.

ZA:      It went off.

MJ:      You know what happened?   When you **(INAUDIBLE)**.  Look, when you were 3487, it give me the green light.  The green light means good.

ZA:      I don't even know **(INAUDIBLE)** light.

VP:      So you had a chance to speak with fire marshals?

ZA:      Yeah, the first day and on Sunday I spoke to them again.

VP:      Any problems with the plumbing?  I know there's a bathroom right there.  Like do you have a plumber in recently doing any work?

ZA:      Uh, we had… not recently.  It was probably what, two months ago?

MJ:      We had a sewer backup.

ZA:      It was a sewer backup.

VP:      Sewer backup problem is fixed, no other issues?

ZA:      No.

111

FR-3143-14

VP:      Hmm… no previous fires, right, the claim with the burglary or whatever?

ZA:      No.

VP:      Any, uh… with the big snow this winter, do you have a snow blower…

ZA:      No.

VP:      Or anything like that?  Shovel by hand?

ZA:      Shovel by hand.

VP:      Any flammable liquids for gasoline or anything on the site?

ZA:      No.

VP:      Lighter fluid, do you have lighter fluid for the barbecue?

ZA:      Lighter fluid for the barbecue, yeah.

VP:      And that's all upstairs?

ZA:      Yes.

VP:      I don't really have any other questions, guys.  So basically your insurance company hires us to come out and determine how the fire started and then to see if there is any subrogation, if they could go after someone.  Maybe the Con-Ed guys, the subcontractors did something wrong, but when you left, the lighting on the cases was shut, it appeared

112

FR-3143-14

to have worked okay.  They didn't say anything to you as far as…

MJ:      No, they said everything is good.

VP:      Everything is good?

MJ:      He said, "You're good to go."  I said, "Okay."

VP:      Yeah, if you could get copies of that contract to us if you have it.

MJ:      Yeah, even I sign on it.

JR:      I have a question for you.  Did they change the fixtures themselves?

MJ:      Yeah.

ZA:      Yeah, they did all the work.  We didn't…

VP:      Because you have a lot of fixtures.

MJ:      Yeah, a lot.  It's two big boxes.

VP:      I guess they changed the ballots and the lighting.  Because what he showed me when he first came, when he showed me the… he brought one of the fixtures with him.  He plugged it into the wall.  He says, "Look, this is how it works," you know.  Was the old owner trying to buy the building back or anything?

MJ:      I don't know about that.

113

FR-3143-14

ZA:       Not that I know of, no.  I don't know, he has a problem with everybody in the neighborhood, you know.  He has a problem with the guy next door that has the Family Dollar.

VP:       Why would he have a problem with that guy?

ZA:       Huh?

VP:       Why would he have trouble with the guy in Family Dollar?

ZA:       I don't know, he called…

VP:       Does he own that building?

ZA:       No.

VP:       Does he… alright.

ZA:       He's like, uh…

JR:       **(INAUDIBLE)** what do you call it, **(INAUDIBLE)**?

VP:       **(INAUDIBLE)** the name of it.

MJ:       Yeah, he is.  It's like he sticks his nose where it does not belong.

ZA:       Last year… last year, his building almost went on fire.

VP:       Okay, what was that, do you remember?

ZA:       I don't remember when it was.  I think it was during the summertime.  They came out twice, the Fire Department.  The first time they came, there was

114

FR-3143-14

none. They came back again. I don't understand why…
I don't understand why he **(INAUDIBLE)** this business.

JR:          Can we get a copy of that contract with the Con-Edison people?

VP:          The lease agreement, a copy of the contract. Guys, thank you for your time. I'm sorry we met you under these circumstances. All of this is routine stuff.

JR:          I'll get a contract going **(INAUDIBLE)**.

VP:          If you could fax it to me, we'll get it to your public adjuster and they can fax it to us however…

JR:          I can call the company up and ask them for a copy. That's not a problem.

VP:          Do they have **(INAUDIBLE)** anybody else have to speak to them?

VP:          I don't think so. Nobody told me. You don't need to speak with any of the building representatives unless you want to.

ZA:          Unless the fire marshals.

VP:          The fire marshals are here. If they want to… you might want to check with them to see if they want to talk to you again before you leave. I mean

115

FR-3143-14

you are local, but he's back in Brooklyn, just to

make it…

END OF STATEMENT

TRANSCRIBED BY: CM\WWD
                MAY 15, 2014

*This is to certify the above statement is a true
transcription to the best of my ability.*

**********************

| RE:   INTERVIEWEE:     ZIAD ABDELDAYEM |
| :--- |
| DATE OF LOSS:   02-24-2014 |

MR:        Let me start with an informal heading on this.
           It's going to be a recorded interview on File
           No. 3143-14.  It's with Ziad, right Ziad.

ZA:        Yes.

MR:        And whose the owner of the business.   All
           right.  Let me make a formal heading.

        This is Mike Russo, of T. J. Russo Consultants.
Today's date  is -- 3/13, that is Thursday the 13th of
March 2014.  The time is approximately 1:15 pm.  I'm the
Fire Investigator or one of the Fire Investigators
relating to a fire which occurred at 107-109 Port
Richmond Avenue, Staten Island, New York.  I have it
about Monday, the 24th.

MR:        Is that about right, Ziad, Monday, the 24th?

ZA:        Yes.

MR:        Okay, Monday, the 24th.  I'm actually parked
           in my vehicle.  I'm the Fire Investigator on
           behalf of Guard Insurance Company in front of

116

FR-3143-14

> the loss location; I should say a vehicle, and present in the car with me is Ziad -- Ziad this is your attorney, Lance?

ZA:     Yes.

LR:     Lance Lazzaro.

MR:     Lance, how am I spelling that?

LR:     L-A-Z-Z-A-R-O.  First name, Lance.

MR:     And the law firm Lance?  I don't have a card.

LR:     Lazzaro Law Firm, L-A-Z-Z-A-R-O Law Firm.

MR:     Excellent.  Before I get started, just give me your phone number now so I don't forget, Lance.

LR:     Lance Lazzaro, Lazzaro Law Firm, 718-488-1900.

MR:     Do you have an email address in case I need that?

LR:     lazzarolaw@aol.com

MR:     Also present is Pertiento Miento (SP?), the Public Adjuster as well as Vinny Palmeri, another Investigator from our firm. All right, let's get started, if I could.  Ziad, spell your -- I'm going to put the recorder right up here.  Spell your first and last name for the recorder, if you could?

ZA:     First name is Z-I-A-D.  Last name is A-B-D-E-L-D-A-Y-E-M.

MR:     Y-E-M.  Ziad, do you have a nickname or is Ziad what they call you?

ZA:     Ziad.

117

FR-3143-14

MR:     All right.  I may call you "Z" at times because I'll probably mispronounce your name, and I apologize if I do in advance.  Ziad, it's my understanding that the business is SI Meat Village?  Is that the Corporation?

ZA:     Correct.

MR:     Who are the principals of that corporation?

ZA:     That would be me.

MR:     So are you the sole principal?

ZA:     Yes.

MR:     When was the company formed or when was it incorporated?

ZA:     In November of 2011.

MR:     I know you've spoken with Vinny on this a little before so I'm not going to revisit everything, but I understand that Mohammed is your partner?

ZA:     Yes.

MR:     But he's not on paper, is that it?

ZA:     No.

MR:     Okay.  Do you have any sort of agreement with him?

ZA:     Yes.

MR:     Was it a written agreement?

ZA:     No.

MR:     Did you guys know each other before?  Are you related?

ZA:     `He knew my father.

118

FR-3143-14

MR:    Oh, okay.   Did you have what, a verbal agreement with him that you're partners?

ZA:    Yes.

MR:    We'll get back to that in a minute.   Let's talk about the Sea Town.   I know little about Sea Town in the sense that I know there's many locations.   Is it a franchise?

ZA:    Yes.

MR:    Sea Town is a franchise.   Now what does it cost to buy into the franchise?

ZA:    There's no cost to buy in.   I just have to order merchandise from them.

MR:    So that's the agreement?

ZA:    Yeah, and you have to pay their weekly for advertising and stuff like that.

MR:    Okay, so order merchandise and pay weekly you said?

ZA:    Yeah.

MR:    What do you got to pay a week to them?

ZA:    I don't know the exact amount.

MR:    Approximately?   Is it $200, $2,000?

ZA:    $250 a week, I think.

MR:    Yeah, okay.   Are there any other fees?   Do you have to pay a percentage of your gross to them?

ZA:    No.

MR:    That's not bad.   That's not a bad deal.   So no percentage, no money up front, just a weekly thing for the advertising.

119

FR-3143-14

ZA:     That's it.

MR:     Is there like an application process to become a franchisee?

ZA:     Well, they come and take a look at the location.

MR:     Okay.

ZA:     If they like location, they okay it.

MR:     Is it the kind of thing where you can't be within a certain amount of distance from another Sea Town.

ZA:     Yeah, but there's no other Sea Towns in Staten Island.

MR:     Oh, okay, I don't know.

ZA:     This was the first one.

MR:     Oh, is that right, this is the first one?

ZA:     Yeah.

MR:     Well, Sea Town has been around a long time, I believe.

ZA:     Yeah.

MR:     Who's the person you deal with from Sea Town?

ZA:     Frank Bohmio.

MR:     How am I spelling that last name here?

ZA:     I think it's B-O-H-I-M-O.

MR:     I-M-O.  Oh, do you have a phone number for Frank?

ZA:     No, I don't have it on me.

MR:     Who is Frank?  Is he like an office guy for Sea Town?

ZA:     Yeah, he's a VP for Sea Town.

120

FR-3143-14

MR:     A VP.  And where is there office located; do you know?

ZA:     In Westchester.  I don't know the exact address.

MR:     He's the guy you would deal with as a Franchisee?  You deal with this guy, Frank?

ZA:     Yeah.

MR:     Okay.  Now, does Sea Town as Franchise, do they ever come here and do any inspections or anything?

ZA:     No.

MR:     Like quality control or anything like that?

ZA:     No.

MR:     Do you own any other Sea Town Franchises?

ZA:     No.

MR:     This is it?

ZA:     Mm hmm.

MR:     I understand when you moved in here -- when was that?  Was that in November 2011 after you incorporated?

ZA:     When we signed the lease, yeah.

MR:     When you signed the lease, is that when you signed the lease, November of 2011?

ZA:     Yeah.

MR:     I understand it was a Shell, right; that you had to build this space?

ZA:     Yeah.

MR:     How many square feet is the space; do you know?

121

FR-3143-14

ZA:     I believe it's 4,200 or 5,000.

MR:     Is that just the first floor or is that first and second?

ZA:     No, it's just the first.

MR:     And the basement; is it about the same amount?

ZA:     The same; still about the same amount.

MR:     I see there's a couple of tenants here.  It's yourself -- I think you told me before, the Church --

ZA:     and Gyro.

MR:     And the Gyro place, and they're in the back there?

ZA:     Yeah.

MR:     So 4,200 square you built out.  When you have a franchise, I know a little bit.  I apologize if I'm green in advance.  Do you have to do a build out to their specs?  Do they give you something you have to build out as; you know like Starbucks, every Starbucks looks the same?

ZA:     No, no, no.

MR:     So it's nothing like that?

ZA:     No.

MR:     When you did the build out, did you have to follow any sort of Sea Town procedures?

ZA:     No.

MR:     So the build out, I think you had mentioned to Vinny, I think you said that there was a -- you got a loan though Sea Town or something?

122

FR-3143-14

ZA:     Yes.

MR:     How much was the loan for?

ZA:     Approximately $200.

MR:     Approximately $200,000?

ZA:     Yeah.

MR:     What was the terms of the loan?  Did you have to give them any money down?

ZA:     No, just make weekly payments.

MR:     Just make weekly payments, and how long was that loan for?  Is it a 10-year loan or 5-year?

ZA:     I believe it was a 5-year.

MR:     Was there a balloon payment at the end?

ZA:     No.

MR:     It was 5-year loan.  You were supposed to pay them weekly?

ZA:     Yeah.

MR:     What do you pay a week?

ZA:     $1,000.

MR:     $1,000 a week, and that loan -- do they have their own banks, or is it Sea Town that's giving you the money, do you know?

ZA:     It's Sea Town.

MR:     Do you know what the percentage is on that; the interest?

ZA:     I believe it's nine percent.

MR:     Did you guys apply for any other loans or you just went through Sea Town?

ZA:     Just went through Sea Town.

123

FR-3143-14

MR:     They gave you the loan for about $200,000?
        The deal was it was a 5-year loan, nine
        percent interest?

ZA:     Yes.

MR:     You needed to pay weekly?

ZA:     Yes.

MR:     It's $1,000 a week?

ZA:     Yes.

MR:     Who do you pay that to?

ZA:     To Sea Town.

MR:     Okay, to Sea Town.  Do you mail it to Frank's
        office, or is it another location?

ZA:     No, we usually deposit it in their account.

MR:     Oh, okay, it's like a direct deposit kind of
        thing?

ZA:     Yeah.

MR:     Are you paid to date with them?

ZA:     Yes.

MR:     Have you ever fallen behind in paying them?

ZA:     No.

MR:     Okay, cool.  What, does it go right from your
        bank account, I guess?  Is it like a business
        bank account?

ZA:     No, they have -- they give us deposit slips,
        and we make a deposit in the Chase account.
        They have a Chase account.

MR:     Oh, I see.  So basically, they give you the
        deposit slips, and you put it into their bank?

ZA:     Yeah.

124

FR-3143-14

MR:     So it doesn't go from your bank to their bank.
        They give you the deposit slips, and you put
        it into their bank.

ZA:     Yeah.

MR:     It's Chase Bank you said, right?

ZA:     Yep.

MR:     All right, cool.  The build out itself, did
        that $200,000 incorporate what you needed to
        build out the space, or did you spend out more
        than that?

ZA:     That $200,000 was for inventory which, you
        know, for the merchandise.

MR:     Okay.  Oh, for the merchandise.  Oh, I see.
        So was that to get you started basically?

ZA:     Yeah.

MR:     The $200,000 was for the merchandise to get
        you started to fill the store up?

ZA:     Yeah.

MR:     I see, and so you took out a loan to fill the
        store up in the beginning.  What about the
        actual build out itself?

ZA:     Well, my partner he put in $100,000.

MR:     Put in $100,000; that's Mohammed?

ZA:     Yeah.

MR:     Did he take out a loan; do you know?

ZA:     I don't know how he got it.  I would have to
        ask him.

MR:     I'll speak to him.  That's fine.  Did you put
        up any money?

FR-3143-14

ZA:     I put up $25,000.

MR:     Was that on a loan, or you had the money?

ZA:     No, that's -- I borrowed it from my brother.

MR:     Oh, okay.  Do you have any sort of agreement with him, or is it just because he's your brother?

ZA:     No, it's just because he's…

MR:     Have you paid him back?

ZA:     Not, yet, no.

MR:     Have you paid him any of it or just --

ZA:     No, I've been paying him.  I've paid most of it back.  I got like $10,000 left to it.

MR:     Owe him about another 10 grand, give or take?

ZA:     Yeah.

MR:     Did you guys take out any money on any credit cards to build out the business?

ZA:     What do you mean?

MR:     You had 25 grand.  He put in 100 grand.  Here's a better question.  Did you guys -- did that $125,000 cover the cost of the build out?

ZA:     Yeah.

MR:     Okay, that was it.

ZA:     Yeah, everything else we got on credit from the vendors.

MR:     From Sea Town?

ZA:     No, no, no.  We got the shelving from the company, and we were making payments to them, and we cleared everything up with them.  We don't owe them anything on that.

126

FR-3143-14

MR:     So, I see, when you said with Sea Town for the inventory, not only inventory, the shelving, too?

ZA:     No, no.  Sea Town's inventory, meaning merchandise that we got from them.

MR:     But the shelving you didn't get from them?

ZA:     No.

MR:     The shelving you got from a different company?

ZA:     Yeah.

MR:     I see.  So the shelving, who's the company you got the shelving from?

ZA:     It's called the Resinck.

MR:     All right. R-E-S --

ZA:     I-N-C-K.

MR:     I-N-C-K, Resinck.  What type of company are they?

ZA:     They're a fixture company.

MR:     A fixture company.  Did you just get the shelves from them, or you got other stuff from them?

ZA:     The shelves and the checkout counters.

MR:     How many checkout counters are there?

ZA:     Three.

MR:     So you got the shelves and the checkout counters from Resinck on a loan, I guess?  Was it a loan kind of thing?

ZA:     Yeah.

MR:     How much was the loan?

ZA:     I don't know exactly, or the exact amount?

127

FR-3143-14

MR:     Okay.  Was it $10,000, $100,000?  Let me ask you for an estimate.  If you don't know, you don't know.

ZA:     I don't want to give you the wrong number.

MR:     That's fine.

LR:     If you don't know what to say, say I don't know.

MR:     That's fine, exactly.

ZA:     I don't know.

MR:     Yeah okay.  So Resinck, I'm just going to make a note on the side.  Okay.  You're not sure what the loan is.  Have you satisfied that loan?

ZA:     Yes.

MR:     When did you satisfy that loan?

ZA:     The first year, I believe, that we opened.

MR:     Okay, first year that opened.  Do you have no outstanding balance with them?

ZA:     No.

MR:     So now you have Resinck with the loan for the shelving and the counters, merchandise with Sea Town, you and your partner put up the money.  What was the money for outside of that stuff?  Well, it was the $125,000 -- what went into -- what did you use the $125,000 for?

ZA:     Well, we had refrigeration, you know.

MR:     Refrigeration?

ZA:     For the equipment.

MR:     The equipment?

128

FR-3143-14

ZA:      Yeah.

MR:      Was there any other aspect of the store on loan?  You had Resinck, you had Sea Town, and you had your own money?

ZA:      Yeah, that's it.

MR:      That was it?

ZA:      That was it.

MR:      The $125,000 have you guys -- well, you paid -- you said paid up to $10,000 left with your brother.  Has Mohammed been paid back his $100,000?

ZA:      Well, that's what he invested into the store.

MR:      Okay.  Was there any sort of agreement or not sort of agreement, just we're going to invest this much and we're partners?

ZA:      That's it.  We had to pay off the debt on the store which was the shelving and the -- so that's what we did.

MR:      Okay.  The refrigerator --

ZA:      We paid off Sea Town.  We didn't have that much for Sea Town.

MR:      When you say we don't have much left for Sea Town, what do you mean?  Oh, you mean for the merchandise?

ZA:      No, the balance of the loan.  It was only like $75,000 left.

MR:      With Sea Town?

ZA:      Yeah.

MR:      You paid off the $125,000 of that $200,000?

FR-3143-14

ZA:      Yes.

MR:      You have a balance of $75,000?

ZA:      $75,000 right.

MR:      Got it, with Sea Town.  Did you have a "GC" on this job to build out, a General Contractor?

ZA:      Yes, we did.

MR:      Who is that?

ZA:      I don't have the number or the name of the company.  I would have to look for the card.

MR:      Okay.  Is the GC paid?

ZA:      Well they had -- one of them was, I believe, M&M Electrical.

MR:      Were they the electricians on the job?

ZA:      Yeah.  I don't remember the HVAC company.

MR:      Was there a General Contractor -- any subs or they ran these by the GC, right?  Was there a General Contractor on the job?

ZA:      Yeah.

MR:      So you had a General Contractor, and then you had an electrician --

ZA:      Just help with the painting and stuff like that.

MR:      Okay.  Then you had M&M Electrical?

ZA:      M&M Electrical.

MR:      What did they do?

ZA:      They did the electrical work.

MR:      You said all the electric for the place?

ZA:      Yeah.

MR:      You have an address for M&M Electrical?

130

FR-3143-14

ZA:     No, I don't.

MR:     All right.

ZA:     They're in Staten Island somewhere here, Staten Island.

MR:     Then the HVAC company you said there was right?

ZA:     Yeah, I don't remember the company name though.

MR:     Do you owe any of the contractors any money from the build out?

ZA:     No.

MR:     Any problems with your electric?

ZA:     No.

MR:     Any other renovation work since the original build out?

ZA:     No, it wasn't that long ago.  No, just minor stuff here and there.

MR:     You do any additional equipment, or is the equipment pretty much the same?

ZA:     The equipment is pretty much the same.

MR:     I know you did some additional lighting which we'll get to, the day of, or the day before, I believe it was, right.

ZA:     Mm hmm.

MR:     I think you said you had -- there's no -- you don't have stockholder's agreement, right, with your partner?

ZA:     No.

MR:     Any issues with Sea Town?

131

FR-3143-14

ZA:     No.

MR:     Do you know how many locations they do have in New York?

LR:     If you know.

ZA:     I don't know.

MR:     Okay.  You said they don't conduct any sort of quality control or any sort of inspections, right?

ZA:     No.

MR:     The building, who's the landlord?

ZA:     109-111 Port Richmond LLC.

MR:     Port Richmond, LLC.  Do you deal with a person?  Is there one person to deal with as far as the landlord?

ZA:     Well, I used to deal with a person named David, but I just found out that the day of the fire, when I met the actual person is in charge.

MR:     That actually is in charge?

ZA:     Yeah, and she told me that he was just a broker because when they took over the building, he made it seem like he was the owner.

MR:     Like he was the owner, I see.

ZA:     Because he came with the old landlord and said I'm the new owner of the building so I always assumed it was him.

MR:     We'll get into that.  I know you've made some comments with the old landlord, something that

132

FR-3143-14

he's across the street now or something, right.

ZA:     Yeah.

MR:     So the landlord now, you know as 109-111 Port Richmond LLC; is that who you pay your rent to?

ZA:     Port Richmond LLC, yes.

MR:     How long you've been paying your rent to them?

ZA:     Since I think -- I believe they took over in January of last year.

MR:     About and year and about a month?

ZA:     Yeah.

MR:     About 13 months ago, right?

ZA:     Yep.

MR:     You thought somebody else was the actual owner, a guy, David, but you learned later after the fire, he was a broker?

ZA:     Yeah.

MR:     Do you know David's last name?

ZA:     No.

MR:     You have a phone number for David?

ZA:     No, I don't have it on me.

MR:     Then you learned this other guy is somebody that is in charge?

ZA:     Yeah.

MR:     Do you know their address for the landlord?

ZA:     It's somewhere in Long Island.

MR:     Okay, no problem, and you learned this guy, David, was a broker.  What do you pay a month?

133

FR-3143-14

ZA:     $4,100.

MR:     Do you have to taxes here, too?

ZA:     No.

MR:     You have a lease agreement?

ZA:     Yes.

MR:     How long is the lease for?

ZA:     Originally, it was for 15 years, so there's 13 left on it.  We've got 13.

MR:     Do you have an option after that, if you wanted to?

ZA:     No.

MR:     Are you paid to date with the landlord?

ZA:     I owe him two months.

MR:     Two months?

ZA:     Yeah, that's because of the repairs, you know, with the roof leaking.

MR:     Yeah, you mentioned you had several roof leaks if I'm not mistaken, right?

ZA:     Yeah.

MR:     I want to talk to you about that, and we'll get to that in a minute, but you owed him two months?

ZA:     Yeah.

MR:     When did you fall behind and when did you stop making payment?

ZA:     January.

MR:     Of this year?

ZA:     Mm hmm.

134

FR-3143-14

MR:      Is that when you started having the roof leaks?

ZA:      No, we been having the roof leaks, but I kept calling and telling him about it, and they never did anything about it.

MR:      When did the roof leaks start?

ZA:      I don't recall exactly when, but it was during the time when the old landlord owned it.

MR:      With the landlord.  Did you ever complain to him about it?

ZA:      Yeah, and he never did anything about it.

MR:      He never did anything, and then you complained to this guy?

ZA:      Yeah.

MR:      Did you ever put anything in writing to him?

ZA:      To the old landlord, yeah.

MR:      To the old landlord?

ZA:      And the new -- well, David.  I thought it was David, but --

MR:      What did you do?  You put a letter saying hey, our roof's leaking, that kind of thing?

ZA:      No, I actually texted him on his phone, and I told him the roof's leaking or whatever.  He had originally when they sold the building, I was gonna hold back -- I wasn't going to pay him the rent.  I was gonna hold it back because of the roof leaks, so the new owner said don't worry about it.  Just give it to

135

FR-3143-14

him and we'll take care of it, and they never did.

MR:     They just never did?

ZA:     No.

MR:     You went a year with the roof continuing?

ZA:     Yeah.

MR:     Did you have some sort of issue, like a larger issue that made you say I'm going to stop paying rent?

ZA:     Yeah, well it was all over the store, it started just in different spots.

MR:     Prior to January, did you ever fall behind in the rent?

ZA:     Not that I recall.

MR:     Now, since you stopped paying rent here, has the landlord sent you any notices?

ZA:     No, no, no.

MR:     How did you leave off with him?  Was he going to come fix it?

ZA:     They were supposed to send somebody out to come fix it, but they never did.

MR:     Well, I mean, you said in the message by saying we're going to hold back your rent, I could appreciate that.  Did they say okay?

ZA:     No, well, somebody from the landlord's office called, and I told them, you know, I said can you send somebody out to fix the roof?  I said I'm not sending in the payment until I get

136

FR-3143-14

someone to fix it.  They said they would send somebody out, but nobody ever came out.

MR:    Who'd you speak to?

ZA:    It was a woman.  I don't know her name.

MR:    It was a woman from the office?

ZA:    It was a woman.  I don't know her name.

MR:    There was a woman from the office?

ZA:    Yeah.

MR:    From the landlord's office?

ZA:    Yeah.

MR:    When did you speak to her?

ZA:    I don't recall the exact date.

MR:    Was it after you stopped paying rent?

ZA:    Yeah.

MR:    I see.  So you didn't pay rent, and then she called you say to say, hey, you haven't paid rent kind of thing?

ZA:    Yeah, yeah.

MR:    Then you told her well, listen, we need to have our roof fixed?

ZA:    Yeah.

MR:    Then they said they would send somebody?

ZA:    Yeah.

MR:    So that's sometime between January and the fire, right?

ZA:    Yeah.

MR:    Which would be the end of February.  Was it a week before the fire?

137

FR-3143-14

ZA:     No, I don't remember exactly when it was, but I know it wasn't then.

MR:     But they did say they were going to come?

ZA:     Yes.

MR:     Did they ever send anybody?

ZA:     Nobody ever came out.

MR:     Okay.  All right, cool.

ZA:     The same thing with the sewer.  The sewer was backed up.  They never sent anybody to fix it. I hired a plumber, and I had to fix it because it ruined a lot of stuff in the basement.

MR:     I'm going to write that down, sewer.  When was that?

ZA:     I want to say December.

MR:     All right, so this past December.

ZA:     Mm hmm.

MR:     You had an issue with the sewer?

ZA:     Yeah.

MR:     What was the issue with the sewer?

ZA:     It was backed up.  It was clogged up from the church cause they throw parties in there. They were throwing food --

MR:     It backed up in your place?

ZA:     Yes.  It always -- because mine is the main line.

MR:     Yeah, it's going to go back to you.

ZA:     Yeah.

MR:     That was in December?  What exactly happened?

138

FR-3143-14

ZA:     It just started behind the deli.   The water started coming up in the basement.

MR:     In the basement or the first floor?

ZA:     The first floor and the basement.

MR:     **(INAUDIBLE)** keep diagrams because obviously, there's a lot of fire in there.   We're not going to figure it out.   This is just a sketch we put together here of the first floor, okay. Just take a look at that.   This here would be the entrance right here.   Where's the deli actually if you're looking at this?

ZA:     The deli would be in the back right here.

MR:     So I'm just going to write deli on this. Right back here, this is the deli?

ZA:     Yeah.

MR:     Then you had water getting back up here?

ZA:     Yeah, it was coming up from the drain in the floor.

MR:     In the drain in the floor, okay.   Anywhere else on the first floor?

ZA:     The bathroom.

MR:     The bathroom?

ZA:     Yeah.

MR:     I'm going to write bath.   That's the back corner.   I'm writing bath, all right?

ZA:     Mm hmm.

MR:     Anything in the basement or is that it on the first floor?

ZA:     That's it on the first floor.

139

FR-3143-14

MR:     All right, so the basement has been diagramed as well.  This is the stores going down from the interior side.  Where in the basement did you have the backup?

ZA:     In the last room.

MR:     The last room; so I'm going to call this last room.  What is this room called?  Do you have a name for it?

ZA:     That's where the motors are and everything -- the motor room you can call it.

MR:     Motor room.  I'm going to write motor room, so you have backing up in there.

ZA:     Mm hmm.

MR:     Anywhere else?

ZA:     That's it.

MR:     So what -- you called the landlord in December about it?

ZA:     Yeah, we told him about it.

MR:     Did you speak to him?

ZA:     I didn't speak to him.  Like I said, I spoke to the woman.

MR:     That same woman?

ZA:     Yeah.

MR:     You said you didn't know her name?

ZA:     No.  Also, I was told the Gyro guy called him also because his toilet was backing up, too.

MR:     Guy called as well.  Do you know his name?

ZA:     Roy.

FR-3143-14

MR:     Would you happen to have a phone number for Roy by any chance?

ZA:     No, I'm pretty sure I can get off the sign.

MR:     It's probably there.

ZA:     He still has it.

MR:     You called the landlord, you spoke to this woman; this is in December.  Was this around Christmastime or early December?

ZA:     I don't exactly what day it was.

MR:     Do you know the approximate, beginning or end?

ZA:     I don't remember.

MR:     Okay, that's fine.  All right, so was -- it happened and you called them and what did they say?  Did they say they were going to send somebody?

ZA:     They said they would send somebody out, but when I seen that nobody came out, I just took care of it myself.

MR:     So they said they would send someone out and then they didn't?

ZA:     No.

MR:     So you decided to take care of it yourself?

ZA:     Yeah.

MR:     Did you take care of it the same day you called or the next day or a week later?

ZA:     The same day I took care of it.  It was stinking.  It was stinking up all the stores. It smelled like shit, literally.

MR:     Yeah, I know.  Did you have to call a plumber?

141

FR-3143-14

ZA:     Yeah.

MR:     Do you know who you called?

ZA:     It's a guy.  His information is in the store.

MR:     Okay.

ZA:     He's a plumber that had to be used before.

MR:     Somebody you used before?

ZA:     Mm hmm.

MR:     What did he do, cleaned up the pipe to the main line or something?

ZA:     Yeah.

MR:     Because obviously you had it on the first floor and the basement, the two main areas?

ZA:     He came out and cleaned up the whole thing.

MR:     Was he able to do it that day?

ZA:     Yeah.

MR:     You have to close the store or anything?

ZA:     No, no, he was in the basement taking care of it.

MR:     What did he charge you, do you remember?

ZA:     Off the top of my head, no.

MR:     Did you pay him cash or by check?

ZA:     Cash.

MR:     Did the landlord ever send somebody?

ZA:     No.

MR:     Like after that?  They just said they were gonna send somebody and they didn't?

ZA:     Yeah.

MR:     Did you put anything in writing to them?

ZA:     No.

142

FR-3143-14

MR:        This was December?  Any other issues with the
           landlord?

ZA:        No.

MR:        Any other issues with the store?

ZA:        Just what I said, the leaks.

MR:        The water leaks, right?

ZA:        Mm hmm.

MR:        Okay, we'll get back to the water leaks.  I'm
           going to make that whole category on my thing
           here.  You're not responsible for any of the
           taxes here?

ZA:        No.

MR:        What about water?  Does he pay the water or
           you?

ZA:        Well, he pays the water.

MR:        He pays it?

ZA:        Well, it was supposed to be -- originally, I
           was paying it, but I never got a bill from
           them, from the landlord.  I guess when they
           took over, when they did change over, so I
           never got a bill from them.

MR:        Is the agreement originally that they would
           take care of the water?

ZA:        I don't know because I never got a bill from
           them.  They never sent me a bill saying that
           this what you owe on the water.

MR:        Were you ever on the water?

ZA:        Yeah, the old landlord use to -- he put sub
           meters in each place.

143

FR-3143-14

MR:     Okay.

ZA:     Whatever my bill was, I would pay it.  That was my bill.

MR:     So that would be your bill?

ZA:     Yeah.

MR:     Would you get billed directly by the water company or you'd get billed by the landlord?

ZA:     No, by the landlord.

MR:     So the prior landlord would bill you for water?

ZA:     Yeah.

MR:     Then when they changed ownership, you just never got a bill?

ZA:     Never got a bill.

MR:     I see, so at anytime, did they tell you that you owe them for water?

ZA:     No.

MR:     Okay.  How about the prior owner?

ZA:     The prior owner I had an issue with him, you know, because of the leaks.  I refused to pay him.  He charged me for the sub meter.  I said why am I getting charged for the sub meter.  That should be something from you.  It doesn't say nowhere in my lease that I'm responsible for that.  You want to charge me $400.

MR:     For the installation?

ZA:     Yeah.

144

FR-3143-14

MR:     Oh, I see, so the prior owner wanted to charge you $400 to install this meter, basically to monitor --

ZA:     Yeah.

MR:     Was that installed when you first took occupancy?'

ZA:     No, after.

MR:     So how was he charging you before, a percentage of the water?

ZA:     He was charging a percentage.

MR:     I see.  So before he put in this sub meter, he said you're responsible for what percentage of the water bill?

ZA:     He would basically charge me the majority of it, and I didn't know how?  I was paying the majority of it because he was charging me during the time when I was even -- when I wasn't even open.

MR:     So it was like I'm not even using water, and You're charging me for everything.

ZA:     Yeah.

MR:     With the prior owner, how long did the prior own the building then when you were an occupant so if January 2013 is when the guy took over, right?

ZA:     Yeah.

MR:     From November 2011 to January 2013, it's almost a year, a little more than a year?

ZA:     Yeah.

145

FR-3143-14

MR:     In that year period, when did he put the sub meters in, and when did he try to bill you for it?

ZA:     I would probably say sometime in 2012.  I don't exactly remember.  It would probably be maybe -- I don't want to say exact month, but I don't remember exactly what day.

MR:     No, I understand.  I'm not going to hold you to it.  Is it the middle sometime?

ZA:     Probably in the middle.

MR:     So before that you were paying him?

ZA:     Yeah.

MR:     And then he put this new meter in for $400 and you said …

ZA:     I told him I'm not paying it and the Gyro guy didn't pay it either.

MR:     Did you guys -- did he charge you at all for the water?  The fact that you didn't pay for the meter, did he still charge you for the water?

ZA:     He charged me an old bill, and he was trying to charge me -- which I thought it was too much so I told him I'm not paying all that amount.  You know break it down fairly.  The church uses a lot of water cause every Sunday they throwing parties or whatever in there so why should I have to pay the majority.

MR:     Okay, so did you ever pay the water?

146

FR-3143-14

ZA:     Yeah, yeah, I paid.  I used to give it to the landlord, the old landlord.  Yeah.

MR:     The old landlord so you paid, but you had a disagreement about that $400?

ZA:     Yeah.

MR:     Did you owe him anything other than that $400 for water?

ZA:     I don't remember how much the bill was -- the last bill for the water bill.  I told him I'm not pay it because of -- with the leaks in the roof and stuff.  You know, at the same time, also, I had a problem with the sewer backed up, again with him; and I told him --

MR:     This is the new landlord we're talking about?

ZA:     The old one.  I'm talking about the old one now.

MR:     So you had a problem with the old landlord with the sewer backing up?

ZA:     Yeah.

MR:     That's where I'm confused.

ZA:     Yeah, yeah; same thing with him.  I told him the sewer is backed up.  Everything got destroyed.  All my merchandise in the basement got destroyed.

MR:     It did?

ZA:     Yeah.

MR:     Did you put in an insurance claim?

147

FR-3143-14

ZA:     No.  We just ended up throwing it out.  It was a lot of shit all over it.  We just ended up throwing it out.

MR:     How much stuff did you have to throw out?

ZA:     I don't remember exactly how much it was but I know it was a quite a few that we threw out that's why we hardly keep that much stuff in the basement.

MR:     So this is now, we're still talking pass, now?

ZA:     Yeah.

MR:     We're talking about the pass guy, so he tried charging you for the $400?  You didn't pay him, but then you had water issues or sewage issues with him?

ZA:     Yeah.

MR:     I guess I'm just trying to figure out --

ZA:     I ended up taking care of it again.

MR:     The sewer issue?

ZA:     Yeah, and he refused to pay it, so I just told him, you know what, well, that's going to be towards the water bill.

MR:     I see.  So what happened, you stopped paying the water bill then?

ZA:     No, no.  After that, like I told you, the bill came, and I told him I'm not paying it cause I paid the guy to fix the back up.

MR:     The sewer?

ZA:     Yeah.

148

FR-3143-14

MR:     I see.  Did you have a balance with him, the old landlord?

ZA:     He's suing me.

MR:     He's suing you?

ZA:     Yeah, he's suing me and the Gyro guy.

MR:     Okay, I didn't know this.  All right, so you're in litigation with him?

ZA:     Yeah.  He's suing me, and he fixed the sidewalk right before he sold the building, and he's suing me for that which I'm not responsible for the sidewalk.

MR:     When did he file a suit against you, before he sold the building or after?

ZA:     After.

MR:     After he sold the building, he filed suit for what monies owed to him or something?

ZA:     Money for the -- he had a violation on the sidewalk before me, before I even took the building -- before I even rented it, but he couldn't sell the building until he cleared the violation.

MR:     Because the violation was there, I understand.

ZA:     So he fixed the sidewalk, and then he tried to sue me for it, trying to say that it was my responsibility.

MR:     I understand.  Did you have a lease with him, the old landlord?

ZA:     It's the same lease.

MR:     Oh, it's the same lease and not a new lease?

149

FR-3143-14

ZA:     No, no.  I never signed a new lease.

MR:     I see, so how much is he suing you for?

ZA:     It's $3,000 and change.

MR:     The total lawsuit is $3,000 and change?

ZA:     Yeah, I don't know the exact amount.

MR:     Is it in Small Claims?

ZA:     Small Claims.

MR:     Has it been a verdict on it?  Where you at with that?

ZA:     It keeps getting adjourned **(sic)**.  I go back in May.

MR:     When was the last time you went to court on that?

ZA:     I don't remember exactly.  I know it was …

MR:     Okay, so he's suing you for $3,000 for water and for the violation being repaired?

ZA:     Yeah, yeah.  He was -- also I got a -- he was about to get foreclosed on.

MR:     Okay.

ZA:     I got served with papers -- we all got served with papers from, I guess, whoever was foreclosing it, from their attorney so I had to give it to my attorney to read it, and the same thing, I had to submit it to Sea Town to have their attorney read it cause I didn't know what it was all about.

MR:     What it's all about.

ZA:     Yeah, I was told that that they were going to foreclose on the building for him.

FR-3143-14

MR:     I want to make a note.  Let's go back.  I'm sorry if I'm revisiting a lot, it's just that I'm trying to get through it.  So the water bill then with the current landlord, do you owe him any money?  Forget the old landlord, do you owe him any money?

ZA:     I never got a bill from him.

MR:     Never got a bill from him, okay; and he never turned around and say hey, you owe me for water?

ZA:     No, no.

MR:     Okay, so that's not such a bad thing so you have the rent.  The water, you don't know -- he's paying for it --

LR:     Can I interrupt you for a second?

MR:     Yeah, and this is Lance, go ahead.

LR:     These questions were asked at an initial thing.  Are we just revisiting these things again, or we just revisiting these things again, or is this all for the first time?

MR:     No, no.

LR:     Because I'm just trying to get a -- I mean I'm giving you a lot of latitude here, but I just don't see the connection between -- you know, the problems he's had with his landlord and the investigation of whether --

MR:     Well, no, the way it's -- I guess this where I'm -- from my perspective, what I'm trying to get a handle on is the water bill and if he

151

FR-3143-14

owed the landlord any water?  I'm trying to clarify -- because we are recording, I'm just trying to clarify if this is the old landlord or the new landlord and what is owed and what is now owed?

LR:     Well, just ask him.  Do you owe money on the water bill?

MR:     Yeah.

ZA:     I never got a bill.

LR:     Okay, the water bill comes to the landlord, correct?

ZA:     Correct.

LR:     And then he submits a bill to you, correct?

ZA:     Correct.

LR:     And there was a dispute over the water bill because you felt that he wasn't doing things that he was obligated to repair?

MR:     But that was the old landlord.  That's where it got confused.  That's where I got confused, but I got it now.  Bottom line is, you never got a bill and that's it?

ZA:     That's it.

MR:     Water's done.  You weren't responsible for it? As far as you are concerned, you weren't responsible for it?

ZA:     Yeah.

MR:     What about electric?  Does he pay the electric or you?

ZA:     I pay the electric.

152

FR-3143-14

MR:      Is that in the company name or in a personal name?

ZA:      The company name.

MR:      And the electric; is the electric paid to date?

ZA:      Yeah, we have an agreement with a payment plan with them.

MR:      Okay, payment plan; what is that?  In other words, do you pay like an estimated usage?

ZA:      No, it's whatever -- I don't remember the exact amount, but we're on a payment plan with them.

MR:      Did you ever fall behind with them, is that why you're on a payment plan?

ZA:      Yes.

MR:      Okay, so you fell behind with them, but then you -- when did you go on a payment plan with them?

ZA:      I think it was January.

MR:      January of this year?

ZA:      Yeah.

MR:      How much were you -- did you owe them when you went on the payment plan?

ZA:      I don't remember.

MR:      What is the payment plan then now?  What's in place now?

ZA:      It's -- I believe for six months or five months.  Five or six months.  You pay your current bill plus you pay whatever the

153

FR-3143-14

difference is from the old bill.  They split it apart over six months.

MR:      Oh, okay, so basically whatever the balance due was they're gonna spread it out over a period of time?

ZA:      Yeah.

MR:      So you owe them for the current bill plus a percentage of whatever the bill is into a five or six-month plan, you said?

ZA:      Yeah.

MR:      And you don't remember what that number is?

ZA:      No.

MR:      Okay, got it.  Did they ever turn off your electric?

ZA:      No.

MR:      Did they ever send you a notice that they were gonna turn it off?

ZA:      I don't recall.

MR:      This payment plan -- what is your monthly electric about to run this place?

ZA:      About $4,500, $5,000.

MR:      A month?

ZA:      Yeah.

MR:      Really.  That's a big number.  Forty-five hundred a month is what your typical electric bill is here?

ZA:      Yeah.

MR:      Okay, how about your gas?  Does the landlord take care if that or you?

154

FR-3143-14

ZA:     We take care of it.

MR:     And the gas, are you paid to date with the gas?

ZA:     Yeah, I believe so.

MR:     What do you have gas in here?

ZA:     Just the heat.

MR:     Just the heat.  What do you have in here?  I didn't see any heaters or anything?  Do you have a gas boiler in the basement?

ZA:     No, no.

MR:     Gas like suspended?

ZA:     It's a system that controls the heat and the AC together.

MR:     Like a furnace, okay; a combination system?

ZA:     Yeah.

MR:     All right.  So the gas is paid to date, right?

ZA:     Yeah.

MR:     Phone -- what's the phone number here?

ZA:     718-442-5444.

MR:     5444?

ZA:     Mm hmm.

MR:     Is there a fax line here, too?

ZA:     718-442-5446.

MR:     Any other numbers or that's it?

ZA:     There's an additional number, it's 5.

MR:     There's another one, like a two-line number or something?

ZA:     Yeah.

MR:     Okay.  The phone company, is it Verizon?

155

FR-3143-14

ZA:      Verizon.

MR:      Are you paid to date with Verizon?

ZA:      Yeah.

MR:      Cablevision?  Do you have cable here?

ZA:      No.

MR:      Are  there  any  other  utilities  that  I'm
         missing?

ZA:      No.

MR:      Any other phones?

ZA:      (No audible response).

MR:      Any problems with your gas service?

ZA:      Not that I know of, no.

MR:      I  understand.    You're  the  --  You opened,
         right?

ZA:      I opened, yeah.

MR:      It was Mohammed that left that night?

ZA:      Yeah.

MR:      Did you open that morning?

ZA:      No.  I was off that day.

MR:      Oh, you were off that day.  Did you guys ever
         smell any odors of gas in the store?

ZA:      Not that I know of.  I don't remember.

MR:      You don't remember anything specific?

ZA:      No.

MR:      You ever smell anything burning in the store?

ZA:      No.

MR:      All right.  Doors in and out.  I know we have
         the diagram here.  Let's talk about the doors
         a little bit if we can.  So the front of the

156

FR-3143-14

store is here, right? (referring to diagram). So we have two doors in and out; is that it, the front and the side?

ZA:     The side you can't go in from.

MR:     That's like an exit door?

ZA:     Yeah, you can only go out.

MR:     Like it has a panic bar, right?

ZA:     It has a push bar, yeah.

MR:     And this is double doors (referring to diagram) on the front?

ZA:     Yeah, sliding doors.

MR:     And they're sliding?

ZA:     Yeah.

MR:     Now, the doors, the sliders, how are they controlled? How are they locked? Is it a deadbolt lock?

ZA:     A key and lock, yeah.

MR:     A key that locks the two doors?

ZA:     Yeah.

MR:     Who has keys to those doors?

ZA:     We all do.

MR:     When you say we all do, who's we?

ZA:     Me, Mohammed, and the girl that opens up in the morning sometimes.

MR:     And her name?

ZA:     Zuleika.

MR:     You know how you spell that?

ZA:     Z-U-L-K-A (sic).

MR:     Zuleika also have keys?

157

FR-3143-14

ZA:     No, that's it.

MR:     Have the keys ever been lost?

ZA:     No.

MR:     You ever change the lock for any reason?

ZA:     Only when they broke into the store.

MR:     Okay, and when was that?

ZA:     That was in --

MR:     I know you mentioned -- that was talked a little bit about.

ZA:     That was in 2012.

MR:     Did they break into the front doors?

ZA:     Yeah.

MR:     At that time, you changed the locks?

ZA:     Yeah.

MR:     Did you have to fix the doors, too?

ZA:     Yeah.

MR:     So it's just the three of you have key's and the side door, there's no key for that?

ZA:     No.

MR:     Now, pull down covers.  I understand there's pull down covers?

ZA:     For the refrigeration.

MR:     For the refrigeration.  In front of the store, is there any pull down covers over the doors?

ZA:     Oh, the gates, you mean?

MR:     Yeah, the gates -- I'm calling them covers.

ZA:     Yeah.

MR:     The gates.  Now, who has -- those have padlocks on them, right?

158

FR-3143-14

ZA:     Those are padlocks, yeah.

MR:     Is it one key for all the padlocks?

ZA:     Yeah.

MR:     Who has those keys, the same people?

ZA:     Same people, one key for each.

MR:     Have they been changed?

ZA:     **(INAUDIBLE)** -- the burglary.

MR:     The burglary.  So the gates were down when they broke in?

ZA:     Yeah, they clipped the locks.

MR:     They clipped them?

ZA:     They clipped the two locks in the front.

MR:     And then they broke in?

ZA:     They broke in.

MR:     So you guys changed all the pad locks at that time?

ZA:     Yeah.

MR:     Okay, cool.  The keys we got, the padlocks. Well, you don't close, but when you open, is the door locks locked as well as the gates?

ZA:     No, we were having a problem with the inside doors, the sliding doors.

MR:     Oh, really.

ZA:     Yeah.

MR:     With inside doors, so you were' locking that?

ZA:     No.

MR:     When did you stop locking those doors?

ZA:     I don't remember exactly.

159

FR-3143-14

MR:     It wasn't a day before, right?  It was a period of time?

ZA:     Yeah, I don't remember the exact amount **(sic)**.

MR:     And the windows, are they covered by gates, too?

ZA:     Yeah.

MR:     How about the roof?  Did you have a skylight on the roof?

ZA:     No.

MR:     Now, cameras, I understand you have cameras, right?

ZA:     (No audible response).

MR:     I understand you have a camera -- I didn't see them, but these are --

ZA:     A camera pointing this way and a camera pointing this way (referring to diagram).

MR:     So covering each street?

ZA:     Yeah.

MR:     So one camera for each street, right?

ZA:     Yeah.

MR:     On the outside, and they record to the DVR inside?

ZA:     Yeah.

MR:     How many cameras are inside the store?

ZA:     I think it's 26.

MR:     That's a lot; and there some in the basement as well?

ZA:     Yeah.

160

FR-3143-14

MR:     So show me here on the diagram where the camera is?  Is the camera mounted right on the corner, both of them?

ZA:     Yeah, it's right there.

MR:     I think I see it underneath the metal.

ZA:     You could see it.  You could see both of them.

MR:     Oh, I see them.  I see the other one so they're both facing -- so we've got one camera here and one camera there.  (referring to diagram).  I'm throwing these on the diagram; and then you have 26 inside?

ZA:     Yeah.

MR:     Are the cameras visible inside?

ZA:     Yeah.

MR:     You have cameras in the basement?

ZA:     Yeah.

MR:     How many cameras in the basement, you know?

ZA:     It's basically one in each room and one in the meat room.

MR:     So one in the meat room, and the meat room would be -- which is meat room if you could just show me on the diagram?

ZA:     This is the basement (referring to diagram)?

MR:     Yeah, it's the last room, the motor room and these are the stairs coming down (referring to diagram).

ZA:     So if you're going this way -- this opening, this would be the meat room.

MR:     Okay, so it's inside the meat room?

161

FR-3143-14

ZA:     Yeah.

MR:     Is that where you keep all your meat?

ZA:     No, that's basically where they work and whatever?

MR:     Oh, they work in there?

ZA:     Yeah, when they cut the meat?

MR:     Meat cutting room?  I'm going to write meat room, right

ZA:     Mm hmm.

MR:     And there's cameras in each of the rooms?

ZA:     There is a camera in each room.

MR:     And by the stairs; is there on the stairs?

ZA:     Yeah, there's one pointing this way towards the stairs.

MR:     So if somebody went down stairs, the camera would pick them up?

ZA:     Yeah, yeah.

MR:     And is that visible as well?

ZA:     Yeah.

MR:     Now, the cameras record to the DVR.  Where is the DVR in the store?

ZA:     In the office.

MR:     Now, this is the office here, right (referring to diagram) this little room?

ZA:     Yeah.

MR:     The DVR would have been where in the office?

ZA:     It would be on the top shelf over there.

MR:     I'm going to draw an "x", right, DVR is that about right, give or take?

162

FR-3143-14

ZA:      Yeah.

MR:      Do you know the brand of the DVR by any chance?

ZA:      No, I don't.

MR:      Does it record remotely as well as a backup?

ZA:      I'm not too sure.

MR:      Okay, so you know it records the DVR, and is that DVR backed up?

ZA:      It's supposed to be on a DV -- I don't know if it has -- I really don't know to be honest with you.

MR:      Okay.  Do you know who would know?

ZA:      The person who installed it.

MR:      Who would that have been?

ZA:      Sky CC-TV.

MR:      CC-TV Sky, S-K-Y?

ZA:      Mm hmm.

MR:      Sky CC-TV; and the name of the guy there that you deal with?

ZA:      I think it's Mr. Kim.

MR:      Do you have a phone number for Mr. Kim?

ZA:      Not with me.

MR:      All right.  When was the camera system installed?

ZA:      I don't recall exactly when.  I know it was before we opened up the store.

MR:      Okay, so when you did the build out?

ZA:      Yeah, before we opened.

MR:      Any problems with the cameras?

163

FR-3143-14

ZA:     No.

MR:     So all the cameras worked?

ZA:     Mm hmm.  One camera was acting up.

MR:     Which camera was that?

ZA:     But we had basically -- it was two cameras in the same area.

MR:     Coverage so -- which camera would that have been on the diagram?

ZA:     It would be Aisle 2, this one (referring to diagram).

MR:     Okay, so Aisle 1 would be the far -- so Aisle 2.  Where is that camera about?

ZA:     I believe it was somewhere around here (referring to diagram).

MR:     Okay, I'm going to draw a circle or put a "C" and that's the camera -- that means the camera that was kind of -- what, was it like fuzzy or just not picking up?

ZA:     In and out.  It would come on and go off; come on, go off.

MR:     All right, camera, and that's Aisle 2?

ZA:     Mm hmm.

MR:     The DVR, how long did it record for?  Was it on 7-day cycle, 28-day cycle?

ZA:     I'm not too sure.

MR:     You're not sure how long?

ZA:     No, I'm not sure how long.

MR:     Have you ever had to retrieve data off of it?

ZA:     Yeah.

164

FR-3143-14

MR:     The break in?

ZA:     Yeah.

MR:     Okay, did it capture them?

ZA:     Yeah.

MR:     It did, and did you take the data --

ZA:     It capture them going in, but when they went out, I guess, you know, he broke it.  When he went inside the office, they broke it up or whatever.

MR:     Oh, really.

ZA:     But it caught them going in?

MR:     It did.  They broke the DVR?

ZA:     Yeah.

MR:     You had to get a new DVR?

ZA:     Yeah.

MR:     So the data was backed up?

ZA:     Yeah, I believe so, yeah, cause the detectives that's how they caught the guy.

MR:     Did they take the broken DVR or the --

ZA:     No, they took it off the DVR.  He basically pulled out the chords.

MR:     I understand, but the DVR itself, they were able to take the DVR?

ZA:     Yeah.

MR:     I understand, I understand.

ZA:     One of them was broken, but they got one of them to work because there's two DVRs.

MR:     Oh, there's two DVRs, and are they in tandem right there together?

165

FR-3143-14

ZA:      Yeah.

MR:      Okay, two DVRs, but Mr. Kim would know more about the DVRs, right?

ZA:      Yeah.

MR:      Okay.  Alarm system; when was the alarm system installed?

ZA:      The same guy that did the cameras.

MR:      The same time, I guess?

ZA:      Same time, yeah.

MR:      Same time by Mr. Kim, right?

ZA:      Mm hmm.

MR:      And it's central station monitored?

ZA:      Yeah.

MR:      And whose the central station?

ZA:      He would answer that better for you.  It's the company that he deals with.

MR:      Do you pay him for service and then he pays the central station or do you pay the company?

ZA:      No, we pay the company?

MR:      CCT, do you pay?

ZA:      Well, he comes and gives me the bill, and I give him the money, and then that's how that goes.

MR:      So he'll give you the bill for the central station monitoring?

ZA:      Yeah.

MR:      And then you'll pay him the money?

ZA:      Yeah.

166

FR-3143-14

MR:     Now, the bill from central station, is that with his name on it or the central station's name on it.  You understand, when you write the check, are you writing it to --

ZA:     I don't exactly remember because I sometimes pay him cash.  When they come in, I pay them cash.

MR:     I see.  I see.  What it cost for central station monitoring?

ZA:     I think it's 50 bucks something like that.

MR:     Is that monthly?

ZA:     Yeah, monthly.

MR:     Are you paid to date with him?

ZA:     Yeah.

MR:     Okay, good, to date.  Do you have a contract with him?

ZA:     Yeah.

MR:     The alarm system; has he ever come to repair any part of the system?

ZA:     Just during the burglary time.

MR:     What did he have to repair?  Do you remember?

ZA:     I believe they cut the wiring on the roof?

MR:     Oh, really.  On the roof?

ZA:     Yeah.

MR:     So they broke into the door and the roof?

ZA:     I guess they went on the roof.  They cut the phone line for the alarm.

MR:     I see.  I understand.  So the phone line would be up on the roof?

167

FR-3143-14

ZA:     Mm hmm.

MR:     I understand.  Did the alarm trip at the time that happened?

ZA:     No, they didn't -- because they had already -- I guess they cut it or whatever.

MR:     I understand.  When they cut the line, it didn't send anything -- did you get a phone a call that your phone line has been cut?

ZA:     No, no.

MR:     Now, since then, did they do any wireless?

ZA:     I installed wireless, yeah.

MR:     You did?  You installed wireless?

ZA:     Yeah.

MR:     After that incident for obvious reasons?

ZA:     After that incident, yeah.

MR:     Okay.  The alarm system, I understand it was motion, right?

ZA:     Yeah.

MR:     Were there contact protection on the doors as well?

ZA:     Yeah.

MR:     It's both set of doors had contact protection?

ZA:     Yeah.

MR:     Was there window break protection?

ZA:     Yes.

MR:     Do you know how many zones there were?

ZA:     I'm not too sure.

MR:     One zone, ten zones, somewhere in between?

FR-3143-14

ZA:    I don't know.   I don't want t give you the wrong number.   I don't know.

MR:    But there were multiple zones?

ZA:    Yeah.

MR:    Any problem with any of the zones?

ZA:    No.

MR:    You guys bypass any zones for any reason?

ZA:    No.

MR:    Have you ever had any false alarms?

ZA:    Yeah.

MR:    I know you mentioned some the day before or something, right?

ZA:    Usually when I go in, if I don't make it on time to the key pad, it goes off, and they'll call me.

MR:    Say, hey what's the password?

ZA:    Yeah.

MR:    How often has that happened?

ZA:    Well, plenty of times.

MR:    Plenty of times?

ZA:    Yeah.

MR:    So is your opening routine -- when you open -- yeah, tell me your open up routine, real quick.   I'm not going to spend a lot of time…

ZA:    I open up the gates, I go inside, I turn off the alarm.

MR:    That's what I wanted to ask you, you said if you don't touch the touch pad in time -- is the touch pad by the doors?

169

FR-3143-14

ZA:     It's right by the office.

MR:     By the office.  Okay, so you unlock the doors, you go over to shut off the alarm, I guess there's like a 30-second delay or something, some sort of time delay.

ZA:     Yeah, something like that, yeah.

MR:     And then you have to press in the code?

ZA:     Yeah.

MR:     What is the code?

ZA:     3487 and then you press 1 for off,

MR:     And then 1 for off, and that's your daily routine?

ZA:     Yeah.

MR:     So every day you come in, you unlock and you're shutting off the alarm?

ZA:     Mm hmm.

MR:     Sometimes you don't make it in time, and then the alarm company calls you?

ZA:     Yeah.

MR:     And the password is?

ZA:     Well, they ask me for my name and then the pass code is Allah, A-L-L-A-H.

MR:     A-L-?

ZA:     L-A-H.

MR:     Okay.  Now, at the time of the fire, did the alarm company call you?

ZA:     No.

MR:     Whose on the notification list?  Is it you and Mohammed?

170

FR-3143-14

ZA:     Me and Mohammed and Zuleika.

MR:     And Zuleika, Zuleika on it as well?

ZA:     Mm hmm.

MR:     Do you have openings and closings on the alarm system, and do you know what I mean by that?

ZA:     No.

MR:     In other words, does it record every time somebody turns on the alarm and turn it off at central station?

ZA:     No.  I'm not too sure.

MR:     You're not sure?

MR:     No.

ZA:     All right, so openings and closings you're not sure of.  You guys never bypass any aspect of the alarm you said, right?

ZA:     No.

MR:     Now, the alarm panel itself, not the touch pads.  Well, the touch pads, did you have one touch pad or multiple?

ZA:     One.

MR:     And the panel is also in the office, I understand?

ZA:     Yeah.

MR:     You wouldn't know the manufacturer, would you by any chance?

ZA:     No.

MR:     All right, that's fine.  Then you said no problems with the alarm, right other than the break for obvious reasons?

171

FR-3143-14

ZA:      No.

MR:      When you come in, it says you had beep a light to tell you that the alarm is going off and it clears with a green light when you press it, you know what I mean?

ZA:      Just as soon as you go in, you have to get to the box and just turn it off.

MR:      How do you know it turns off because the beeping sound is gone?

ZA:      The green -- the light.

MR:      It turns green?

ZA:      Yeah.

MR:      You ever had it come in and it not work?

ZA:      No.

MR:      Okay, so the alarm is always set and it's always worked?

ZA:      Yeah.

RL:      We have a contract.

MR:      Oh, you do.  Thank you Burke (SP?)  This is with the alarm company, Alarm Monitoring?  All right good.  Just for the recorder, this is Central Station Escort.  Does that ring a bell to you as the company?

ZA:      Mm hmm.

MR:      And it also -- this is good.  It gives zones and everything.  Do you have the alarm printout part?

BURT:     No.

172

FR-3143-14

MR:     This is just the service agreement.  Burt, what I'm going to do -- Burt, you know how it is.  I'll probably give you a list of things, and the alarm printout being one of them from the actual Central Station Company.  I'll let you know what we're going to need, okay?  Is the roof alarmed?  Well, there's no access.  You don't have any skylights or anything>?

ZA:     There's no access.

MR:     The only thing was the phone line but that's no longer there?  It's all wireless?

ZA:     Yeah.

MR:     Is there a siren associated with the alarm?

ZA:     Yeah.

MR:     Does the siren go off only when you don't get there in time?

ZA:     Yeah.

MR:     Where is the siren located?

ZA:     No, I don't.

MR:     We talked about that.  Actually, we're moving now.  Have you ever remotely logged into the cameras?

ZA:     No.

MR:     Do you know if it has that capability?

ZA:     I'm not too sure.

MR:     Lighting in the store.

ZA:     Mm hmm.

MR:     What kind of lighting did you have?  I think I half know this.  Were they fluorescents?

173

FR-3143-14

ZA:     Yeah.

MR:     That's usually.  When you open the doors, do you come in, do you turn on the lights when you open in the morning?

ZA:     Yeah.  First I turn off the alarm --

MR:     Turn off the alarm.

ZA:     -- go in the office, and I turn the switches on in the office for the life.

MR:     So where would those be inside the office?

ZA:     Inside the office.

MR:     Over here, over there.  I remember seeing switches, but…

ZA:     The door is over here, so it's behind the door.

MR:     Those switches control all the lights on the first floor?

ZA:     Yeah, except the refrigeration lights, they don't control.

MR:     But they control all the lighting fixtures for the store, except for the refrigeration?

ZA:     Yeah.

MR:     How are the refrigeration lights controlled?

ZA:     There are switches in each --

MR:     I'm just writing "S" for switch on the diagram behind the office door, but go ahead, I'm sorry.

ZA:     There are switches in the refrigeration units.

174

FR-3143-14

MR:      The individual units.  Where are the units?  I
         think I saw the refrigeration along here, is
         that right?

ZA:      We got the refrigeration here, which is the
         produce case.

MR:      All right, so -- does that go the whole
         distance?

ZA:      Yeah.

MR:      It looked pretty big.  Is it one unit or
         multiple tied together?

ZA:      That's multiple -- I believe it's multiple,
         tied together.

MR:      This is produce -- produce.  In the back is
         the meat case.  Does that go the whole way
         here to the deli?

ZA:      No, there's a beer case in between.

MR:      This other one's the beer case?

ZA:      Yeah.

MR:      So I'm going to write beer, and this is going
         to be meat.

ZA:      And the deli, of course.

MR:      Okay.  Is it like showcase refrigerated for
         the deli?  You know, you could see the cold
         cuts?

ZA:      Yeah, yeah, 12 feet.

MR:      Okay.

ZA:      Over here, you have the freezers.  You have a
         4-door freezer next to the deli.

175

FR-3143-14

MR:     So 4-door, and is that like ice creams or what is that for?

ZA:     That's for sea food.

MR:     Okay, I'm putting 4-door sea food.

ZA:     Then on this side you have a freezer going throughout --

MR:     So that side is all freezer.  I didn't know that.

ZA:     Yeah.

MR:     Okay, so it runs the whole thing.  Is that like a beverage?

ZA:     No, no, it's a freezer.

MR:     Freezer the whole way, like frozen foods.

ZA:     On this side, you have the whole dairy case that comes around like goes straight down.

MR:     There's a space in between sea food and --

ZA:     Yeah, there's a shelving there.  There's a black shelving.

MR:     Okay.

ZA:     And then there's the whole dairy case that comes up to probably **(INAUDIBLE)** over there. Then there's another shelving there.

MR:     All right, so this is dairy, dairy refrigeration, and so I'm going to put the shelf break, okay. (marking diagram)  There's another shelf break?

ZA:     Yeah, and you have another dairy that goes this way, another that comes this way.

MR:     So an "L", almost two dairies?

176

FR-3143-14

ZA:     Yeah.

MR:     And these had individual lights on them, you said?

ZA:     Yeah.

MR:     You have to turn them on by -- what do you -- walk around the store turning them on?

ZA:     Yeah.  You turn the switches on, but the only thing that didn't have a switch was the meat. That stayed on all the time.

MR:     The meat stayed on all the time, so I'm just going to put a star, stayed on all the time (marking diagram).  The only thing -- when you opened in the morning, the only thing that would have been on from the night before would have been the meat refrigerator, right?

ZA:     The lights --

MR:     The lights for the --

ZA:     There's a couple of spot lights on in the store.

MR:     Where would that be?

ZA:     On the top.  Somewhere on the top around here. I don't know exactly where, but it would be one somewhere in the top.

MR:     When you say spotlight, you mean like a recess light?

ZA:     A recess light, yeah.

MR:     Is it by the stairs over here?

ZA:     I'm not too sure.

MR:     How are they controlled?

177

FR-3143-14

ZA:     What the recess lights?  I guess they stay on.
        I don't know.  Even when you turn the switch,
        there's like one or two lights that will stay
        on.

MR:     And that's in the very back by the stairs over
        there in that general area?

ZA:     Yeah.

MR:     The two lights?

ZA:     I believe so, somewhere around here.

MR:     Somewhere around here, and that would be --

ZA:     Somewhere probably over here by the produce
        cases on the top, on the top.  There's like a
        molding, a white molding that was under the --

MR:     Oh, like a soffit light?

ZA:     Yeah.

MR:     And that soffit light is above the produce
        refrigeration?

ZA:     Yeah.

MR:     I understand.

ZA:     It was throughout the whole store.  We had the
        lights all throughout the whole store, but
        like I said, one or two of them stayed on.

MR:     That would be somewhere over by the stairs or
        somewhere over by the produce.

ZA:     I don't know exactly where the other ones
        were, but I remember one was by this area.

MR:     Okay, but those two are the ones that would
        stay on?

ZA:     Yeah, yeah.

178

FR-3143-14

MR:        The others were controlled when you turned switches off?

ZA:        Yeah, when you turned them off.

MR:        I understand.  Any problems with the lighting?

ZA:        No.

MR:        Now, what about the basement?  Had the basement had fluorescents as well?

ZA:        Yeah.

MR:        They were controlled by --

ZA:        West switch.

MR:        Where was that switch?

ZA:        At the top of the stairs.

MR:        At the top of the stairs; over here or over here?

ZA:        This side.

MR:        I'm going to do an "S" right here (marking diagram).  So those controlled all the lights in the basement?

ZA:        Yeah.

MR:        Any problems with that lighting?

ZA:        No.

MR:        Okay, cool.  No repairs, right, to the lights? I know you did the lighting --

ZA:        On the refrigeration, we changed the lights.

MR:        But the lighting in the store; any repairs with those?

ZA:        No.

MR:        Did they have covers over them, do you know; like plastic covers or were they exposed?

179

FR-3143-14

ZA:     You know, I don't remember to be honest with you.

MR:     Was there a suspended ceiling in that store or you were open to the roof?  You know, the ceiling tiles?  Did you have ceiling tiles in there?

ZA:     No, it was sheet rock.

MR:     Oh, it was just a flat, straight sheet rock?

ZA:     Sheet rock, yeah.

MR:     Oh, I see, and the fluorescents, were they mounted to the sheet rock?

ZA:     I believe they were hanging on the chains from the fixture.

MR:     They were hanging on the chains.  I got it. So you had a sheet rock ceiling, hanging fixtures?

ZA:     Yeah.

MR:     And you're not sure if there was a cover over them?

ZA:     I'm not too sure.  I don't remember.

MR:     Okay.  All right.  What if anything else -- would the credit card machines be left powered?

ZA:     What do you mean?

MR:     I'm trying to think -- what about equipment? You had the refrigerators.

ZA:     Well, equipment would just stay on.

MR:     Stay on.  How about at the cash register spots here or the counters whatever you call them?

180

FR-3143-14

I know at some stores, the credit card machines they stay on 24/7.

ZA: The only thing you shut down is the register's. You just power them off, the screens, the monitors.

MR: Oh, I see. You shut the power off on the monitor. Do they each have their own computer, meaning the --

ZA: Yeah, each one of them has their own system.

MR: It's like a station?

ZA: Yeah, you gotta go to each one and shut them down. The main one is in the office.

MR: Do you turn them back on? When you come in the morning, is that what you turn on?

ZA: Yeah, I turn those on in the morning.

MR: You turn all those on -- I understand; and so any credit card things tied into that?

ZA: Yeah.

MR: And the alarm system obviously is left powered, right?

ZA: Yeah.

MR: Lotto, is that left powered?

ZA: We don't have Lotto.

MR: Oh, you didn't have Lotto?

ZA: No.

MR: Did you ever have Lotto?

ZA: We had it in the beginning, but it just wasn't feasible for us.

MR: Just wasn't feasible?

181

FR-3143-14

ZA:     Yeah, it was too much headaches with the traffic because it's too small in the store, too much blocking the regular customers from shopping.

MR:     I see, so you had Lotto, and it was --

ZA:     It was too bulky, the machine that they had in the front.  It was free-standing machine that they had in the front.  It was too bulky, taking up too much space.

MR:     Where would that have been?

ZA:     In the front over here.

MR:     So to the right of your -- right opposite the front doors?

ZA:     Yeah.

MR:     Oh, I see, so it was like a free-standing machine?

ZA:     Yeah, it was a big machine.

MR:     Did somebody work at the machine, like hey I want these numbers 5, 7, 10?

ZA:     No, no, no.  It does it by itself.

MR:     Oh really?

ZA:     It's all -- it's a machine.  You play on your own.

MR:     Oh, I see, scratchers?

ZA:     Yeah.  No, it plays Lotto, also.

MR:     So it had scratching and the Lotto.

ZA:     And the Lotto.

MR:     You had that in the beginning.  At some point, you got rid of it?

182

FR-3143-14

ZA:     Yeah.

MR:     You got rid of it because it was blocking your traffic?

ZA:     Yeah.

MR:     So they removed the machine, I guess?

ZA:     Yeah.

MR:     Did Lotto own that machine?

ZA:     Yeah, that's theirs.

MR:     I see.  So they took it out.  You told them you didn't want it anymore, they took it out?

ZA:     Yeah.

MR:     I understand.  Anything else left powered?

ZA:     Yeah.  You got all the refrigerators.

MR:     Any neon lights or anything?

ZA:     Not that I know of.

MR:     You don't have any neon signs or displays or anything like that?

ZA:     No, no.

MR:     Okay.  I'm just trying to figure out if any power was left on?  What about in the basements or are all you lights are off; the motors maybe?

ZA:     The motors got to stay running.  You've got the refrigeration that got to stay running.

MR:     How many refrigeration?  I saw the meat room. Were there others?

ZA:     This the freezer.

MR:     This is the freezer, next to it (referring to diagram).  Running freezer, okay.

183

FR-3143-14

ZA:     This is where we kept the meat and the dairy products and produce.

MR:     So you had three walk in boxes basically?

ZA:     Well, you had one -- these are the main ones, and that's the meat cutting room.

MR:     I'm calling it walk in box.  This is the meat cutting room.  It's not a walk in.

ZA:     Then you have one upstairs behind the --

MR:     I didn't see a walk in.  Where up here?

ZA:     Right here.

MR:     Oh, behind the deli?

ZA:     Yeah.

MR:     So I'm going to put walk in up here (marking diagram).  It's my pen actually.  It's starting to go.  I gotta go to pen number two.  Hold, on.  I think it's because I'm on an angle.

ZA:     Here's a pen over here.

MR:     Okay, so in the basement, the only thing then that would have been the walk ins then.  Is that accurate -- and the motors, rather?

ZA:     And then you have like the "fly machine".

MR:     What's that actually?

ZA:     It's a blue light that flies go into.  It zaps them.

MR:     Oh, it kills the flies, smart.  Where is that actually.

ZA:     I believe there's one in the first room.

184

FR-3143-14

MR:     It would have been about -- just give me about --

ZA:     Probably about over here somewhere.

MR:     I'm going to put "F" for fly machine okay (marking diagram).

ZA:     And then in the last room.

MR:     And about there, where your finger is pointing?

ZA:     Yeah, yeah.

MR:     And those things are always on, right.

ZA:     Yeah.

MR:     Did you have issues with the flies?

ZA:     Yeah, that's why you have it; that's any business.

MR:     How about rodents?  Do you have any issues with that around here?

ZA:     No.  We had an exterminator every week.

MR:     You need to, I understand.  Who was the exterminator actually?

ZA:     I don't remember the company name.

MR:     They came weekly?

ZA:     Yeah, every Friday.

MR:     What did they charge you?  Did you have a contract with them, is it that kind of thing?

ZA:     No, no.  They came -- it was $35.

MR:     Thirty-five dollars each time?

ZA:     Yeah.

MR:     That's good.  You paid to date with him?

ZA:     Yeah.

185

FR-3143-14

MR:     Do you pay him cash as he comes, kind of thing?

ZA:     Yeah.

MR:     All right.  So we got through this pile.  No problems with the electric.  We talked about no odd odors, no odor of anything burning you said, right?  Nothing that you ever noticed?

ZA:     Not that I have noticed, no.

MR:     Now, electric.  You said that you went on a payment plan.  You don't remember if they ever sent you a notice for termination?

ZA:     No.  Like I said, I was on a payment plan with them.

MR:     Right.  I mean before though?

ZA:     Not that remember though.

MR:     If you  were $4,000 a month, how many months were you behind with them?

ZA:     I don't recall.

MR:     Was it more than one month?

ZA:     I don't remember.

MR:     You don't remember?

ZA:     I don't remember.

MR:     Bank; how many business bank accounts are there?

ZA:     We deal with one bank.

MR:     Who is the bank actually?

ZA:     Northfield.

MR:     Northfield.  Do you have like a separate payroll account or just one bank account?

186

FR-3143-14

ZA:     One bank account.

MR:     Well, any credit cards for the business?

ZA:     What do you mean?

MR:     Does the business have any credit cards?

ZA:     No.

MR:     Any business loans other than what we talked about?

ZA:     Just to Sea Town.

MR:     Now, employees.  I think you mentioned seven total?

ZA:     Mm hmm.

MR:     Seven total.  Now, the date before the fire, the fire was on that Monday, so it would have been Sunday, right?

ZA:     Yeah.

MR:     How many employees work that Sunday?

ZA:     It would be altogether three.

MR:     Three, and who would they have been?  Are they here now?  They're all here?

ZA:     Yeah.

MR:     All right awesome.  Obviously, we'll get their names in a moment.  What were their duties?  One was a deli guy, one was a -- what are their duties?

ZA:     Cashiers.

MR:     Oh, three cashiers?

ZA:     Two cashier, and my partner.

MR:     And partner?

ZA:     Yeah.

187

FR-3143-14

MR:      So when you say other employee, your partner meaning one of the employees?

ZA:      Yeah.

MR:      So there are two cashiers that worked that day?

ZA:      Yeah.

MR:      And your partner?

ZA:      Yeah, yeah.

MR:      And your partner?

ZA:      Yeah.

MR:      The cashiers, what are their hours?   When would they have left?

ZA:      The first girl that opens up which would be Zuleika, she opens and she usually works on Sundays until 11:30, 12 o'clock.

MR:      Sunday, what time did she open?

ZA:      8' o'clock.

MR:      Is that what time -- I didn't ask you your hours.  I think we talked about it last time.

ZA:      Yeah, 8 o'clock.

MR:      So she opens at 8; she leaves about 3:30 you said?

ZA:      No, no, no.  I said 11:30, 12 o'clock.

MR:      I'm sorry, my bad.   Yes, that is what you said, 11:30, 12 give or take, right?

ZA:      Yeah.

MR:      Does she always open up?

ZA:      Not all the time, but on Sundays she opens because I'm off on Sundays.

188

FR-3143-14

MR:     Is she -- is she a full-time employee?

ZA:     Part time.

MR:     Part time; so how many days a week does she open?

ZA:     It depends.  It depends on the week.

MR:     Okay.  All right, I'll speak to her more about it.  That's fine, so even employees.  What does the business gross estimate a week?

ZA:     Total sales?

MR:     Yeah.

ZA:     It varies.  Every week is different.

MR:     I understand.

ZA:     It varies between $1,000 and $40,000, you know what I mean, an estimate.  I'm not asking for a specific number?

ZA:     It depends I can't give you an exact number.

MR:     I'm not asking for an exact number.

ZA:     Every --

LR:     If you know it.  If you don't know it.

ZA:     That's why I said every week is different so I can't tell you an exact number.

MR:     I am not asking a number?

ZA:     The first two weeks were busy.  It's more business because it's a food-stamp are.

MR:     Right, right, and then the -- you mentioned that.  So how about a month then?  What's your gross estimate a month as a business owner?

ZA:     I'd probably say about 160.

MR:     Oh you do that much, about $160,000 gross?

189

FR-3143-14

ZA:     Yeah.

MR:     Okay, and that would be a month.  Like you said, the beginnings are busier.

ZA:     Yeah.  It depends on the time of the year, you now, Christmastime.

MR:     Is there a time of the year that's busier than slower?

ZA:     Well, of course, there's Thanksgiving and Christmas.  That's when people mostly shop for the holidays.  You know, Thanksgiving dinners and stuff like that.

MR:     Yeah, yeah.  So at the time of the fire, February, is that -- you consider that a slower time or busier time or just an average time.

ZA:     Normally, in any business, January and February is considered the slowest times because people are paying off their credit cards.

MR:     Not in my business.  My business is just starting -- my business is actually the busiest time.

ZA:     Retail I should say.

MR:     Okay.  January and February, typically in a retail business is the slower months?

ZA:     Yeah.

MR:     All right.  Okay, vendors?  I think you said that you have to buy all your stuff through Sea Town, right?

FR-3143-14

ZA:     You don't have to get everything through them. Well, there's certain things you go to…

MR:     What's that?

ZA:     You don't have to buy everything from them. They don't have everything.

MR:     Oh, I see.   What's the agreement with Sea Town?   What are you buying through Sea Town?

ZA:     Just whatever I need.   Like whatever I run short on or whatever I need, I order from them.   There's sometimes I buy stuff from other places that is cheaper than getting it through them.

MR:     So just rewind, and maybe I just misunderstood.   So the agreement with Sea Town, you don't have to pay a fee, but you're supposed to buy your stuff through them?

ZA:     Not everything.

MR:     Not everything?

ZA:     No.

MR:     Do you know what you're supposed to buying through them?

ZA:     Just like groceries, whatever I need, you know.   Their brand is called Krasdale Brand, a private label.

MR:     See, I didn't know that.   How am I spelling that?

ZA:     K-R-A-S-D-A-L-E.

MR:     D-A-L-E.   So their brand is Krasdale?

ZA:     Mm hmm.

191

FR-3143-14

MR:     Do you have to buy just Krasdale from them? You understand --

ZA:     Yeah, yeah, yeah.  You got to get from them the Krasdale brand.

MR:     I understand.  So does Sea Town only sale Krasdale brand?

ZA:     No, they have other merchandise, but I'm just saying that's their private label, Krasdale.

MR:     Understood.  So the agreement was with Sea Town, you don't' have to pay a fee.  You pay the weekly for advertising, but you have to buy their Krasdale product from them?

ZA:     Yeah, yeah.

MR:     But you are able to -- do you buy other things through them, or just the Krasdale?  You understand what I'm trying to ask?

ZA:     No.  I buy whatever I need.  Like if I find it somewhere cheaper, I go somewhere else, and I get it at that price.

LR:     If you like green-eyed asparagus, you know, in the can, you'd buy it from a different vendor. You don't have to buy it from them?

ZA:     Yeah, yeah.  I don't have to buy it from them, no.

MR:     I see, I see, but Krasdale wants you to retail their product?

ZA:     Yeah.

MR:     But you're okay to retail other products?

ZA:     Yeah, yeah.

192

FR-3143-14

MR:     Right, that's what I'm trying to understand. Okay, so you went to Krasdale for the Sea Town product?  Let me give you a better question. What percentage of your business do you buy your stuff from Krasdale?

ZA:     My business is mostly meat.  I sell a lot of meat in the store.

MR:     Is there a Krasdale meat?

ZA:     No.  They don't have a Krasdale meat.

MR:     So Krasdale is one of your vendors, then, correct?

ZA:     Yeah.

MR:     And that's Sea Town's brand, so it's actually Sea Town's the vendor, right?

ZA:     Yeah.

MR:     Sea Town, do you -- and you buy Krasdale.  Do you buy anything else from Sea Town or just Krasdale from them?

ZA:     No, that's it.

MR:     Krasdale, what is it?  Just food, various foods?  Do they do like medicine too?  Unlike CVS has like their own brands of a lot of things?

ZA:     No, no, no.  They don't have medicine.

MR:     So it's just food related?

ZA:     Yeah.

MR:     Do you have any outstanding balances with Krasdale?

ZA:     I just have the loan with them.

193

FR-3143-14

MR:     That original loan?

ZA:     Yeah, that's it.

MR:     Okay, do you continue to buy stuff from them, or you only bought in the beginning?

ZA:     No, I bought from them.  I continue to buy from them.

MR:     Oh, I see.  So the only thing -- money outstanding with them is the loan about 75 grand?

ZA:     That's it.

MR:     Anything else you've bought from them, you've paid for?

ZA:     No, I've paid for.

MR:     Right, so you have no outstanding balances with Krasdale?

ZA:     I've got no outstanding balances.  No, the only thing I have is the loan.

MR:     I understand.  Is that the same with all your vendors?  No outstanding balances with all of them?

ZA:     No, just whatever is current.  Whatever we buy for that current month or whatever.

MR:     Okay.  I get it now.  So Sea Town is your vendor.  You buy, you pay.

ZA:     Mm hmm.

MR:     There's no balances that are kept with them, right?

ZA:     No.

194

FR-3143-14

MR:      Does that hold true with all your other
         vendors, that you buy and you pay; there's no
         balances?

ZA:      Yeah.

MR:      Who are the other vendors?

ZA:      Ranchers Meat.

MR:      Ranchers, R-A-N-C-H-E-R-S Meat?

ZA:      E-R-S, mm hmm.

MR:      Before I get through with all your vendors,
         because you may have a lot; about how many
         vendors do you have, do you deal with?

ZA:      I don't.   I deal with vendors on a daily
         basis.   I can't really give you an exact
         number.

MR:      Right.

ZA:      It's whoever comes in.

MR:      So is he your primary meat vendor, Ranchers?

ZA:      Yes.

MR:      Primary meat, do you have any other meat
         vendors?

ZA:      No.  We only deal with them.

MR:      You only deal with them, okay.  And you have
         no balance with them, right?

ZA:      We're current with them.

MR:      You're current with them; and what is the
         current with them?  Is it a COD kind of thing?
         I know you pay your vendors cash.

ZA:      No, no, no.   You get credit.   You basically
         get credit.   You get four weeks credit.

195

FR-3143-14

MR:     Okay, so basically if you get something from them, you got to pay them in four weeks?

ZA:     Yeah.

MR:     If not, then you're passed due?

ZA:     Yeah.

MR:     But you're not passed due?

ZA:     No.

MR:     The credit, do you have a balance with them in this four-week window?  In other words, do you owe them anything?

ZA:     I don't know exactly how much.  Whatever it is, I don't know.

MR:     Do you know the last time you placed an order with them before the fire?

ZA:     I don't recall.

MR:     Did you have meat in the store?

ZA:     Yeah, we had a truck came in I believe on Friday.

MR:     Okay.  The truck came in on Friday.  This past Friday, you mean?  So the fire was on Monday or Sunday -- Monday morning.

ZA:     Monday.

MR:     You had a delivery on Friday?

ZA:     Yeah.

MR:     Where does the -- you said you don't put much in the basement, right because the flooding?

ZA:     The meat goes in the cooler.

MR:     By the deli?

FR-3143-14

ZA:     No, no, downstairs in the -- where I showed you.

MR:     The meat room?

ZA:     Yeah.  Not the meat room, this room right here (referring to diagram).

MR:     Which room?  Oh, the meat and deli, I'm sorry. So the meat goes in the meat and dairy room in the basement?

ZA:     Yeah.

MR:     The last delivery would have been on that Friday?

ZA:     Mm hmm.

MR:     Do you remember how much of a delivery it was?

ZA:     I don't remember.  I know it was a big order.

MR:     Do you typically get weekly deliveries from them?

ZA:     You can order every day from the meat company. They'll deliver every day.

MR:     That's good.  Do you call them every day?  I don't know if you move a lot of meat.

ZA:     Yeah, we sell a lot of meat.

MR:     Is it typical that they come once a week?

ZA:     No, they come more than once a week.

MR:     More than once a week, okay.  And Ranchers is all you deal with, right?

ZA:     (No audible response).

MR:     How about beverage?  Do you have a beverage vendor?

ZA:     We have Pepsi, Coke.

197

FR-3143-14

MR:     Anyone else?  I know like Pepsi, Coke have a lot of brands within the brands.

ZA:     They got a lot of good stuff.  I don't know. They're small vendors, but off the top of my head…

MR:     Who are you large beverage vendors?

ZA:     Pepsi and Coke.

MR:     And is it the same thing, they give you a four-week credit?

ZA:     No, we pay it out.

MR:     You pay what?

ZA:     We pay them.

MR:     As it comes?

ZA:     As it comes.

MR:     So it's C.O.D?

ZA:     Yeah.

MR:     Were you ever on a credit with them?

ZA:     No.

MR:     You never had a credit with Pepsi or Coke, and they're your major beverage vendors, right?

ZA:     Mm hmm.

MR:     Do they also supply your water?

ZA:     Yeah, they Acquafina and stuff like that.

MR:     Is that one of their brands?

ZA:     Yeah.

MR:     I know they all have different brands. Snapple, is that one of their brands?

ZA:     No, Snapple is different.  I don't know the company that distributes it.

FR-3143-14

MR:      I was going to say, do you like deal with a
         distributor for everything else, other than
         Coke and Pepsi product?

ZA:      Yeah.  There's vary -- it's different ones.

MR:      I understand.  You said you had a beer cooler,
         right?

ZA:      Yeah.

MR:      And the beer cooler, I guess you have a liquor
         license?

ZA:      Yeah.

MR:      When did you obtain your liquor license?

ZA:      I don't know the exact date.

MR:      Okay.  I'm not asking for an exact date.  Was
         it when you opened the store, you got it?  Did
         you have to apply?  Did you have to be here a
         certain amount of time?

ZA:      I applied for it, but it took a while before
         we got it.

MR:      Okay.

ZA:      I don't know the exact time when we got it,
         exactly.

MR:      When you got it, you're not sure, right?

ZA:      Yeah.

MR:      Did you just get it in recent time or you've
         had it for over a year or so?

ZA:      Probably over a year, but I don't know the
         exact time it came.

MR:      Over a year.  Any violations against that
         liquor license?

199

FR-3143-14

ZA:     No.

MR:     Did they look to revoke your license for any reason?

ZA:     No.

MR:     Any notices from them about problems with your liquor license?

ZA:     No.

MR:     No issues with the liquor license?

ZA:     No.  No issues with any of my licenses.

MR:     What other licenses do you have?  I apologize if I'm green.  I'm just not in the supermarket business.

ZA:     You have your WIC and your Agriculture license and your Food Stamp license.

MR:     So WIC, Agriculture and Food Stamps?

ZA:     Mm hmm.

MR:     I understand.  Those are for those public programs, I guess?

ZA:     Yeah.

MR:     The liquor license being one, you got more than a year ago, not issues with that?

ZA:     Mm hmm.

MR:     Do you have to pay fees to have a liquor license?

ZA:     Yes.

MR:     Are they continued fees or is like kind of one time kind of thing?

ZA:     Well, every time you redo it, you've got to pay a fee.

200

FR-3143-14

MR:     When is you renewal; do you know?

ZA:     Off the top of my head, no.

MR:     The WIC, what is the WIC actually?

ZA:     It's WIC program.

MR:     Do you know what it stands for?

ZA:     Pregnant people, pregnant women to get nutrition for the babies and stuff.

LR:     Mr. Russo, again, I'm giving you a lot of leeway here, but I mean, you're almost asking underwriting questions, you know.

MR:     All right. Yeah, you know what, it's my habit as an Investigator.

LR:     It may be your habit as an investigator, but I'm trying to give you a lot of leeway here, but I just don't see, you know, how this goes to the fire or these are questions that should have been asked if they wanted to write policy.

MR:     No, and my purpose is not from an underwriting perspective. He just mentioned -- I asked him about his liquor license, and he mentioned he has other licenses, and I'm just trying to learn what they are, and I don't know that the license are going to come into play or if they're not going to come into play to my investigation. I'm just trying to get a little more on them, and yeah, we can get away from me asking about WICs. I don't see that as so important either, I'm just trying to get

201

FR-3143-14

an understanding what it is.  So you said that you have no problems with WIC, and that's the pregnancy program, the Agricultural?  Is that a similar type program without getting specific on it? Do they require a license to do that?

ZA:     For what?

MR:     For WICs for Agriculture?

LR:     **(INAUDIBLE)**

ZA:     Yeah.

MR:     Okay, and Food Stamps the same thing?

ZA:     Yes.

MR:     For that license, could you get a violation against those licenses?

ZA:     I've never had any violation.

MR:     Right, okay, so no issue with any of the licenses?

ZA:     Right.

MR:     Vendors, we were just on the beverage, Pepsi, Coke, Ranchers Meat is your number one.  Who would you say your top three vendors are; the top four or five vendors are?  I don't know why -- is there a bread vendor?  Is that like a big vendor?  I know you said your meat is your big guy.

ZA:     Bread, we get in twice a week.

MR:     Okay.  So who's the bread vendor?

ZA:     Strohmans.

MR:     Strohmans, how am I spelling that?

202

FR-3143-14

ZA:     S-T-R-O --

LR:     S-T-R-O-H-M-A-N-S.

MR:     Okay, Strohmans that's the bread vendor.

ZA:     Yeah.

MR:     Is it a four-week thing or cash on delivery?

ZA:     No, no, cash.   They get paid the same time they deliver.

MR:     Has that always been like that?

ZA:     It's always been like that.

MR:     Okay, go ahead.

ZA:     You have Martin's Bread.

MR:     That's another bread?

ZA:     Yeah.

MR:     I don't need to go into anymore of your bread vendors, but are you all C.O.D. with the bread vendors?

ZA:     C.O.D.

MR:     Were you ever on a plan with them?

ZA:     Never.

MR:     What would your next big vendor be, produce?

ZA:     Produce, yeah.

MR:     Who's your produce vendor?

ZA:     Father and Sons Produce.

MR:     Father and Sons Produce?

ZA:     Yeah.

MR:     Is that a four-week or cash on delivery?

ZA:     That's a bill to bill.

MR:     What does that mean?

FR-3143-14

ZA:     You get the order in, the next order you get in --

MR:     You pay the last one?

ZA:     Pay the first.

MR:     I understand.  Do you have a balance with them currently?

ZA:     No.

MR:     Cigarette, who's your cigarette vendor?

ZA:     We didn't have cigarette.

MR:     Oh, you didn't retail cigarettes?

ZA:     No.  After the break in, we stopped selling cigarettes.

MR:     Oh, yeah, you did mention something about cigarettes.  They stole cigarettes that last time, right?

ZA:     Yeah, right.

MR:     Since then, you don't do--

ZA:     No.

MR:     Scratch offs, I know Burt had mentioned the scratch offs.  That Lotto machine did both, scratch offs and live play numbers?

ZA:     Mm hmm.

MR:     You didn't have any scratch offs, like behind the counter kind of scratch offs?

ZA:     We haven't had Lotto in a long time.

MR:     Right, right.   I mean at the time of the fire, you didn't have --

ZA:     No.

204

FR-3143-14

MR:     I understand.  Beverage vendors, you gave me most of them or the big ones.  The foreclosure you had mentioned before, tell me a little more about that.  I know you mentioned it last time, something that you had to look at something.  What was happening, the prior owner was being foreclosed on?

ZA:     Yeah.

MR:     He was being foreclosed on?

ZA:     Mm hmm.

MR:     Because he was being foreclosed on, you guys got involved?

ZA:     Everybody got served paperwork.

MR:     Because of the foreclosure?

ZA:     Yeah.

MR:     I understand.  So you were served the paperwork as well for this foreclosure?

ZA:     Mm hmm.

MR:     Was it foreclosed on or it wasn't?

ZA:     No.  Well, he sold it to the new owner.

MR:     Okay, sold to the new owner.  I understand, obviously, he sold it to the new owner, so the served paper says you gave it to Sea Town?

ZA:     Yes.

MR:     Did Sea Town have their attorneys look at it or anything?

ZA:     Yes.

MR:     Did anything come of that or it just kind of died?

205

FR-3143-14

ZA:     They just told me it's okay.  Don't worry about it.

MR:     What's your -- you told me what your gross and you're grossing you said about 160.  What's your monthly expenses estimate?

ZA:     I don't know off the top of my head.

MR:     Okay.  Was the business making money or losing money?

ZA:     No.  We were making money.  I paid off Sea Town $125,000.  That's why it's all frustrating with all this bullshit.

MR:     I understand.  Well, it's a big number.  You know, the insurance companies when they got big numbers, it's part of the process unfortunately.

LR:     Part of the process?

MR:     Well, the investigation, sure.  Do you owe any employees any money?

ZA:     No.

MR:     Now, you had mentioned something that you had an incident with a guy taking tuna fish or something?

ZA:     Yeah.

MR:     Did he threatened you in anyway?

ZA:     He didn't take it.  I wasn't there that day. The girl was there.  Then I approached him after I seen him in the street.  He's an older guy.  He's a crack head in the area so that's about it, you know.  He was stilling multiple

206

FR-3143-14

|       |                                                          |
|-------|----------------------------------------------------------|
|       | times, you know.  This wasn't the first time. I caught him before. |
| MR:   | So he's stolen before?  How long ago before the actual fire, you know?  Did the incident where you saw -- the tuna incident? |
| ZA:   | The last one -- yeah.  Maybe about a week, I think. |
| MR:   | About a week before?                                     |
| ZA:   | Yeah.                                                    |
| MR:   | When you said you saw him, did you confront him about it?  did you have words with him? |
| ZA:   | Yeah, I confronted him.  He started with his cane, I'll be back.  I just ran off. |
| MR:   | Oh, is that right?                                       |
| ZA:   | Yeah, I'm not going to -- he's an older guy. You know, I'm not going to hit him or anything. |
| MR:   | What'd you say, hey you stole from me?                   |
| ZA:   | I said listen don't come back into the store. I don't want to see you in the store no more. |
| MR:   | Okay.                                                    |
| ZA:   | That's it.  If I see you next time, I'm calling the cops. |
| MR:   | Did you call the cops this time when he stole?           |
| ZA:   | No.                                                      |
| MR:   | Or any other time?                                       |
| ZA:   | No.                                                      |
| MR:   | Have you been threatened by anyone?                      |
| ZA:   | No.                                                      |

FR-3143-14

MR:      Any problems with anyone?

ZA:      Just the people that we catch stealing, you know.  There's a lot of --

MR:      I could see that.  You're in the element.  You may have --

ZA:      Every day they have police at Family Dollar, every single day, so it' not like it's …

MR:      Do you guys prosecute if somebody does steal?

ZA:      Well, I never have.

MR:      You ever call the police?

ZA:      I call them, yes.

MR:      Okay.

ZA:      But there response time is a long time.

MR:      Is that right?

ZA:      Yeah, that's why it doesn't even make sense to even --

MR:      When's the last time, do you know?

ZA:      I don't know exactly.  I called up on a woman.  She had a knife in her pants.

MR:      Really?

ZA:      A crazy lady's that's always in this neighborhood.

MR:      She had a knife in her pants?

ZA:      Yeah, she would just come in and take a can a soda, open it and walk out.

MR:      Right, right.  I'm sure you see all kinds of shapes and sizes coming through.  The store, first floor, any gasoline of any kind stored in the store?

208

FR-3143-14

ZA:     What do you mean gasoline?

MR:     Meth gas, gasoline?

ZA:     No, we don't sell gasoline.

MR:     Just a question.

ZA:     It's a supermarket.

MR:     Do you sell gas cans?

ZA:     No.

MR:     Okay, any kerosene?

ZA:     No.

MR:     I know you said lighter fluid, right?

ZA:     Yeah.

MR:     And where was the lighter fluid stored?

ZA:     It would be next to the charcoal which was on top of the meat case.

MR:     I'm going to put LF for lighter fluid.  It was on top of the meat case?

ZA:     Mm hmm.

MR:     Were the -- just lighter fluid, anything else?

ZA:     No, that's it.

MR:     Okay.  Do you have case of it?  Did you have one or two of them?

ZA:     I don't remember how many were there, whatever was left over from the season?

ZA:     From the season.  You used to put it out front?

ZA:     We put in the front and then we move it to the back and put it on top of the …

MR:     On the meat case?

ZA:     Mm hmm.

209

FR-3143-14

MR:       I'm almost through guys.

BURT:     **(INAUDIBLE)** through a lot of paper.

MR:       That's why my pen died, Burt.

BURT:     It's not the first one I've seen you go
          through.

MR:       That's true.  Let's see.  Garbage, sanitation;
          do you have to do private sanitation, or is it
          private?

ZA:       It's private.

MR:       It's private, okay.  How often is the garbage
          pickup?

ZA:       Everyday.

MR:       They come daily?

ZA:       Daily, except for Sundays, they don't come; or
          Saturday into Sunday.  One of those days they
          don't come.

MR:       What do you do with the garbage for that day?

ZA:       It goes into the dumpster.

MR:       Oh, I didn't know you had a dumpster.

ZA:       The dumpster's on the side of the building.

MR:       On the sidewalk?

ZA:       Yeah.   There's one for cardboard, one for
          garbage.

MR:       Okay.  Who's the private company you use?

ZA:       Five Star.

MR:       Five Star.  Have you always been with Five
          Star?

ZA:       No.   I was originally with Gaeta then I
          changed cause Five Star gave me a better rate.

FR-3143-14

MR:     With Gator, G-A-T-O-R?

ZA:     Yeah, G-A-E-T-A.

MR:     G-A-E-T-A, and when did you leave Gaeta?

ZA:     I don't recall exactly.

MR:     Five Star, that's the current one, right?

ZA:     Yeah.

MR:     Do you owe them any money?

ZA:     No.

MR:     Did you ever fall behind with them?

ZA:     No.

MR:     Okay, good.  Any violations relating to sanitation?

ZA:     No.

MR:     I'm just about done.  I'm almost there guys. How did you learn of the fire?

ZA:     I was getting dressed that morning.  My brother called.  Well, my brother texted me. He said, "Where are you," and I called him.  I said, "Why, what happened?"  He usually doesn't call me in the morning and ask me where I am.  He's like there's a fire at your store.  Are you there?  I said, "No.  What do you mean there's a fire?"  He said it's on TV.

MR:     What time is this?

ZA:     Seven o'clock in the morning.

MR:     So you basically -- you just woke up from the night before?

ZA:     Yeah I was getting dressed.

211

FR-3143-14

MR:     Woke up from the night before.  What time did you go to bed the night before?

ZA:     I don't recall.  I know went early.

MR:     Early?

ZA:     I usually go to sleep around 10, 10:30.

MR:     I'm in bed by 9:00.  So maybe 10, 10:30 and then you slept through the night and you learned at 7 am when you got up to get dressed to go to work or you just get dressed for the day?

ZA:     No, I was coming to the store.

MR:     Oh, that's right.  I thought you were off. You were off the day before?  That's right.  I got confused.

ZA:     Yeah.

MR:     You were getting dressed to go to the store, and your brother called you?

ZA:     Yeah.

MR:     And your brother's name?

ZA:     Dayem, D-A-Y-E-M.

MR:     And Dayem's last name the same last name?

ZA:     Same last name.

MR:     Did he call you on your cell or your house phone?

ZA:     On my cell phone.

MR:     And your cell number?

ZA:     646-420-7126.

MR:     And your provider?

ZA:     Verizon.

212

FR-3143-14

MR:     Is it Verizon, okay.  And your brother's phone number?

ZA:     917-567-0811.

MR:     He called you and said he saw it was on fire? It was on TV?

ZA:     Yeah.

MR:     And I assume you came down?

ZA:     Yeah.

MR:     Was the fire department here when you got here?

ZA:     Yeah.

MR:     You make any calls to anybody after you learned?

ZA:     I don't remember who I called.

MR:     Did you run it by Mohammed?

ZA:     I called Mohammed.  I called Zuleika.

MR:     The fire department was here, you said, right?

ZA:     Yeah.

MR:     Was the street blocked off?

ZA:     Yeah.

MR:     Did you speak to a Fire Marshal?

ZA:     Yes.

MR:     Did they give you an indication what they think caused the fire?

ZA:     No.  From what I was told from the fire department.  It wasn't our fire marshal.  They said it looked like it started from the back.

MR:     Started from the back?

ZA:     Yeah.

213

FR-3143-14

MR:     Did they give you an indication of what caused
        it or just that it looked like it started in
        the back?

ZA:     No, they said it looks like it started from
        the back.

MR:     Okay, started from the back.  Have you ever
        experienced a fire before?

ZA:     No.

MR:     Now, you came here.  Where do you live?  I
        know -- are you the one who lives about a mile
        or is it Mohammed?

ZA:     That's Mohammed.

MR:     So yourself, you live where?

ZA:     In Brooklyn.

MR:     What's the address?

ZA:     843 53rd Street.

MR:     Is it an apartment or a house?

ZA:     A private house.

MR:     843 53rd Street.

ZA:     Mm hmm.

MR:     You own that house or you're renting?

ZA:     No, I don't own.  It's my mother's house.

MR:     Oh, your mother's house?

ZA:     Yeah.

MR:     You got the call and you said you were at your
        house getting dressed, right?

ZA:     Mm hmm.

MR:     You drive here?

ZA:     Yeah.

214

FR-3143-14

| | |
|---|---|
| MR: | What kind of car do you have? |
| ZA: | Nissan Maximum. |
| MR: | Color? |
| ZA: | White. |
| MR: | You now the year, do you remember it? |
| ZA: | 2011. |
| MR: | Do you know your license plate? |
| ZA: | It's FGX 1882. |
| MR: | Which route did you come when you came.  Did you go over the Barizano the Bell?  You wouldn't -- you just go over the Barizano. |
| ZA: | I just go over the Barizano straight to what is that the 440, and get off on Forest. |
| MR: | Forest, you take Forest in? |
| ZA: | Yeah. |
| MR: | You drove that car here that morning? |
| ZA: | Yeah. |
| MR: | Do you own any other cars? |
| ZA: | No. |
| MR: | Your wife own a car?  I don't even know if you're married; I should ask that first? |
| ZA: | No. |
| MR: | Are you married or not? |
| ZA: | No. |
| MR: | Okay.  Is your car a leased vehicle or is it owned? |
| ZA: | Leased. |
| MR: | Leased. |
| LR: | **(INAUDIBLE)**  need a time |

215

FR-3143-14

MR:       Okay, I'm just about done in a matter of a couple of minutes, but -- oh, I got to lock it.  You got it?  Who's your insurance broker?

ZA:       Eric Bell.

MR:       Eric, what's his last name?

ZA:       Bell.

MR:       B-E-L-L?

ZA:       Mm hmm.

MR:       Where's he out of?

ZA:       I believe he's somewhere in Manhattan.  I don't know exactly where his office is?

MR:       Is he a New York guy?

ZA:       Yeah.

MR:       Have you spoken to Eric before the fire for any reason?

ZA:       No.

MR:       Do you ever call to have your insurance changed for any reason?

ZA:       Not that I recall.

MR:       Has your insurance changed since the time you took occupancy?

ZA:       Still the same.

MR:       The same, okay.  Is your insurance premium paid to date?

ZA:       Yeah.

MR:       Do you know the last payment you made?

ZA:       I don't remember exactly when.

MR:       Was it the kind of thing like annually or semi-annually kind of thing?

216

FR-3143-14

ZA:     No, it was monthly.

MR:     Oh, you do, you pay monthly?

ZA:     I pay monthly.  I think -- I didn't owe them anything because I was up for renewal.

MR:     You were up for renewal?  When were you up for renewal?

ZA:     In this month, March.

MR:     Do you know when?

ZA:     I don't know exactly the date, no.

MR:     So you know it was up for renewal.  Did they send you a notice for renewal?

ZA:     Yeah.

MR:     When did they send you the notice for renewal?

ZA:     I don't remember exactly.

MR:     Did you renew with them?

ZA:     No.  The payment wasn't due yet.

MR:     Oh, I see.  They basically send you like a bill that says hey, we need to renew kind of thing, that your insurance is expiring?

ZA:     Yeah.

MR:     Did that come with your bill previously, or was it a separate notice?  Do you remember?

ZA:     I don't remember.

MR:     But you paid your last bill, correct?

ZA:     Yep.

MR:     And the insurance was up in March, but you don't know when?

ZA:     No.

MR:     You know when you got that notice?

FR-3143-14

ZA:     You just asked me that?

MR:     I did.  Oh, I'm sorry.  I'm sorry, what did you say?

ZA:     I don't remember.

MR:     You don't remember when you got the notice, but it was the month before?  Was it in the month of February that you got the notice?

ZA:     I don't remember exactly.

MR:     I know you don't remember exactly.

ZA:     I don't remember exactly.

MR:     Was it in the month of February, you remember that?

ZA:     I don't remember.

MR:     So it may have been before February?

ZA:     A lot of things happened.

MR:     Got it.  Understood.  You know how much insurance coverage you do have?

ZA:     I believe it's 725.

MR:     725, okay.  Now, you mentioned that the sewer thing that happened with the prior owner, it destroyed stock.  You said you didn't put in an insurance claim for that, right?

ZA:     No.

MR:     This time, did you destroy stock this past time?

ZA:     This past, the last one?

MR:     Yeah.

218

FR-3143-14

ZA:      I don't remember to be honest with you.  I think it had came on top of the water and stuff.

MR:      But I think you said you don't really keep as much stuff down there, right, since?

ZA:      No.

MR:      Do you have any personal loans, other than the business loans?

ZA:      No.

MR:      Just your lease, I guess?

ZA:      Well, the car is under my brother's name. It's not under my name.

MR:      And it's Dayem?

ZA:      Dayem.

MR:      Okay.  Do you own any properties?

ZA:      No.

MR:      I think we're almost there guys.

BURT:    You've been saying that for half an hour.

MR:      Burt, I know, I know.  I know you went over with Vinny, I don't know that we need to revisit it so much, but do you remember the last time the water leaked when you were working, you know through the roof?

ZA:      I wanna say within the same, probably like a week.

MR:      Maybe a week before, and I'm going to put you don't know, an estimate.

ZA:      Yeah.

219

FR-3143-14

MR:     Now, when the water leaks, is it dripping onto the floor is it just staining the ceiling?

ZA:     It's dripping.

MR:     Dripping down?  Did you have buckets set up or anything?

ZA:     Yeah.

MR:     You did?  Did you have them throughout the supermarket?

ZA:     Well, only where the leaks were.  We use to cover the charcoal and stuff, put a garbage on top of it because it used to leak from back there.  In the office, it used to leak in the office.

MR:     Show me in the diagram where it would leak.

ZA:     All right, you have the office.

MR:     We'll do stars, so in the office --

ZA:     You have right here (indicating on diagram).

MR:     Right at the front, star.  That's annoying.

ZA:     You had a --

MR:     Did you put a bucket there?  Would you put a bucket there?

ZA:     Yeah, a bucket.  We had to cover the register with plastic bags.

MR:     Which register is that, the first one?

ZA:     Number three.

MR:     Oh, number three.

ZA:     This would be three right here (referring to diagram).

MR:     Oh, so three, two, one it goes?

220

FR-3143-14

ZA:    Yeah.  Well, courtesy counter, one, two and three.

MR:    So "C" for courtesy counter; one, two, three. All right, okay.  So by number three, you used to have it covered?

ZA:    Yeah.  In the middle of the produce aisle --

MR:    I'm going to put stars there.

ZA:    Over here on this side somewhere.

MR:    Somewhere over here?

ZA:    On top of here.

MR:    When you say on top of here, on top of what?

ZA:    There's a landing.

MR:    Oh, all right, by the staircase?

ZA:    Yeah.

MR:    By the staircase?

ZA:    In the back right here?

MR:    By the meat, okay.

ZA:    In the back corner over here, and then we used to have paper towels and stuff on top of here.

MR:    Somewhere above the dairy refrigeration?

ZA:    Yeah.

MR:    So how many buckets would you have to lay out?

ZA:    Quite a few, as you could see.

MR:    Was it they always leaked after it rained, after it snowed?  You know, I'm trying to figure it out.  Was it all at once or hey, that one in the back's leaking and today this one's leaking?

ZA:    No, they used to always come like together.

221

FR-3143-14

MR:     Basically came at the same time?

ZA:     Yeah.

MR:     Right, right.

ZA:     Well, if you would have seen the ceiling, you would have seen the spots.

MR:     Have you guys ever had somebody to come look at the roof to repair it yourselves like you did with the sewer?

ZA:     I was going to have it repaired, but the only reason why I didn't is because what the previous landlord told me was I was responsible for half of the roof in the front which I never heard of.

MR:     Right, I understand.

ZA:     We did originally -- we had somebody -- we patched it up with the tart.

MR:     Originally?

ZA:     Yeah.

MR:     Patched originally.

ZA:     But still with the way the building goes, cause --

MR:     It slopes?

ZA:     It slopes down, we still can get it from the back, so whenever it's clogged up in the back, it comes down this way.

MR:     Okay.

ZA:     We had to clean up the garbage that's on the roof.

222

FR-3143-14

MR:     You mentioned that.  How do you get garbage on the roof?

ZA:     Well this guy, the old landlord has his truck parked in the driveway over there, and I don't know if he was doing in intentionally.  He used to throw stuff on top of there or whatever.

MR:     So you're assuming that he's the one that would put the garbage up there?

ZA:     Yeah.

MR:     Like garbage bags?

ZA:     Yeah, garbage bags and there's loose crap on top of there.  Every time we cleaned it up, we'd find more stuff on top of there.

MR:     When was the last time you had to clean the roof?

ZA:     I want to say in the summertime we cleaned it up.

MR:     Okay, in the summertime; and how did you access the roof?  Did you get a ladder?

ZA:     We got to go on the ladder from the side of the building where the Gyro guy is.

MR:     I understand.  It's a lower porch, right?

ZA:     Yeah.

MR:     So that was back in the summertime would've been the last time?

ZA:     Yeah.

223

FR-3143-14

MR:     Now, this landlord, you did tell me that --
        well, you're in this lawsuit with him for
        $3,000?  Are you in any other lawsuits?

ZA:     No.

MR:     This landlord, what's his name, the old
        landlord?

ZA:     Dennis.

MR:     Do you know Dennis' last name?

ZA:     Alalestra.

MR:     L-E-S --

ZA:     A-L-A-L-E-S-T-R-A.

MR:     I'm sorry.  L-E-S --

LR:     It's A-L.

MR:     Oh, L-A-L.  I'm sorry.  One more time.  Start
        from the beginning.

ZA:     A-L-A-L-E-S-T-R-A.

MR:     A-R-E?

ZA:     A.

MR:     A-R-E, right?

ZA:     A.

MR:     A-R-A?

ZA:     Yeah.

MR:     Alalestra?

ZA:     Yeah.

MR:     Alalestra, got it.

ZA:     Yeah.

MR:     Would you have a phone number for him?

ZA:     No.  He's right there on the corner.  You
        could take it off the sign.

224

FR-3143-14

MR:      Which is the corner, the furniture place?

ZA:      The vinyl furniture place.

MR:      The all one by -- all right.  Does he own that place as well?

ZA:      Yeah.

MR:      Okay.  Did he ever threaten you in anyway?

ZA:      Yeah, by taking me to Small Claims.

MR:      You said it keeps getting adjourned **(sic)**, right?

ZA:      It keeps getting adjourned **(sic)**.  Just every time he passes by, he puts up his middle finger and shit like that, a real prick.

MR:      Have you seen him since the fire?

ZA:      Yeah, he was the first one here talking to the fire investigators, the fire marshal.

MR:      Okay.  Did you have any conversation with him?

ZA:      No.

MR:      Are you aware of any other cameras on any of the properties around here?

ZA:      Well, I know he has a camera.

MR:      You mean the furniture store?

ZA:      Yeah, cause that's how we caught the guy leaving during the burglary.  He was leaving with the safe.

MR:      Oh, I see.  You outside came didn't pick him up, or you didn't have it then?

ZA:      No.  I told you he pulled up -- off of the DVRs.

225

FR-3143-14

MR:     Oh, he pulled that one from the DVR.  So they caught him on --

ZA:     They caught him from his camera cause his camera points this way.

MR:     I understand.  Are there any other cameras that you're aware of or is that it?

ZA:     I'm not too sure.  I know that the next door has a camera.

MR:     Is that right?

ZA:     Angel Properties.

MR:     Oh, okay, Angel, I see it.  Safe, do you have a safe in the premise?

ZA:     Yeah.

MR:     Is the safe kept locked when you're not here?

ZA:     Yeah.

MR:     What's kept in the safe?

ZA:     Whatever from the night before.

MR:     Okay, from the night before?

ZA:     Mm hmm.

MR:     As the person coming in -- now, when you're opening up, do you have to remove anything from the safe?  How does that work?

ZA:     No.

MR:     You guys make deposits at the bank like daily?

ZA:     Yeah.

MR:     So you as the guy opening, are you depositing money from the safe?

ZA:     No. Whatever I need to pay off the vendors, I leave the cash.  I pay off the cash with it.

226

FR-3143-14

MR:      Do you take the money out of the safe, or are you taking it from the cash registers?

ZA:      No, from the safe and from the registers. It's whatever I have, whatever I've made from the business.

MR:      I understand, okay.  Do you take from the safe, and the safe is in the office, I assume?

ZA:      Yeah.

MR:      Have you guys removed the safe since the fire?

ZA:      No, it's still there.

MR:      The safe is still in there?

ZA:      Mm hmm.

MR:      Where would the safe be?  I didn't see a safe (referring to diagram).

ZA:      Right in the office, right here (referring to diagram).

MR:      Somewhere over here?  I'm going to put "S" for safe.  So that safe right now should be in there, and it should be locked?

ZA:      Should be in there, and should be locked.

MR:      No police officers brought you in there?

ZA:      The Fire Marshal brought us in there, but we couldn't open it.  It was, I guess, jammed from the water or something because it's electrical.

MR:      It's electrically opened?

ZA:      Yeah.

FR-3143-14

MR:     So whatever monies in that safe would have been the proceeds from the night before, right?

ZA:     Yeah.

MR:     When was the last time you made a deposit in the bank?

ZA:     I don't remember.

MR:     Are you doing the deposits or is your partner?

ZA:     No, I do.

MR:     Yourself, do so I thought you did daily deposits?  You do or you don't do daily deposits?

ZA:     It's whatever we need.  Like if I have to, then I go.  If I don't have to --

MR:     So it's not like you're putting money in the bank all the time.

ZA:     Yeah, a small amount,  Mostly everything is credit card and food stamps that goes -- that's the majority of our business.

MR:     I understand.  Do you have a credit card -- I see, credit card and food stamps.  That's most of your business?

ZA:     Yeah.

MR:     All right, so it's not like at the end of the day, you've got $10,000 and you need to put it in the bank?

ZA:     No, no, no.

MR:     So at any given time, how much cash is in the safe?

228

FR-3143-14

ZA:     Off the top of my head, I don't know the exact amount.

MR:     Okay, so you don't know.  You open up, you go in there, you don't necessarily go into the safe, but if vendors come in, you need to take some money?  You either pay from one of the cash registers or you pay it from the safe, right?

ZA:     Yeah.

MR:     And you have three cash register, right?

ZA:     Mm hmm.

MR:     Is there a fourth, the courtesy counter does it have a cash register?

ZA:     Yeah.

MR:     What is the courtesy -- if you could just educate me?  Is that like a customer service kind of counter?

ZA:     Yeah.

MR:     I thought I was almost there.  We are.  Hold on, hold on.  You're usually napping by now.

BURT:   I should be.

MR:     No, I'm just kidding.  My wife wonders why I don't talk to her when I get home.  I say because I'm done talking for the day.

LR:     Are we done?

MR:     Almost.

LR:     You said that a half an hour ago.

FR-3143-14

MR:     I know.  So the two employees you said were --
        three employees that worked that day -- or two
        employees plus your partner worked that day?

ZA:     Yeah.

MR:     So there were cashiers, and which cashiers
        worked that day?

ZA:     Which ones?  I wasn't there that day?

MR:     Oh, I'm sorry.  I'm sorry.  Are they assigned
        a specific register or they have their own
        little work office, or they just kind of work
        on --

ZA:     Whatever **(INAUDIBLE)**.

MR:     Wherever he assigns them.  All right, before I
        turn off the recorder, you know, let me get
        some pedigree information here.  What's the
        phone number for you?  You gave me the cell.
        Is that your only number?

ZA:     Yeah, that's the only number.

MR:     Do you have a home number?

ZA:     No.

MR:     So your mother's house doesn't have a number?

ZA:     I only have a cell phone.  That's all I use.

MR:     Okay, does your mother live in the house?
        It's her house, and you live there?

ZA:     It's her house, and I live there.

MR:     Does she live there as well?

ZA:     No.

MR:     Okay.  Is there any phone line in that house?

ZA:     Not that I use, no.

230

FR-3143-14

MR:     Who else would use it?  Do other people live there?

ZA:     Yeah, my sister.

MR:     Okay.  So your sister lives there in the house, as well?  You don't know if there's a house phone?

ZA:     She has hers, but it's not mine.

MR:     Right, I understand.  Is it a cell phone that she has or she has a house phone?

ZA:     House phone.

MR:     What's the phone number at the house?

ZA:     718-435-3674.

MR:     You say you live there with your sister?

ZA:     Mm hmm.

MR:     And your sister's name?

ZA:     Maysa, M-A-Y-S-A.

MR:     And the last name?

ZA:     A-B-U --

MR:     A-B-U --

ZA:     H-A-M --

MR:     H-A-M --

ZA:     D-A.

MR:     Anyone else, or just you and your sister?

ZA:     Well, there's her husband and --

MR:     Okay.  There's a family there, okay?

ZA:     Yeah.

MR:     So her, her husband and children, I guess?

ZA:     Mm hmm.

MR:     You live here with your sister's family?

231

FR-3143-14

ZA:     Yeah.

MR:     Does anyone else live there?

ZA:     And my other sister.

MR:     And your other sister?

ZA:     Mm hmm.

MR:     Okay.  So there's two sisters, you and the one sister's family?

ZA:     Yeah.

MR:     Am I getting everybody?

ZA:     Yeah, that's it.

MR:     And your date birth?

ZA:     ███████████  1979.

MR:     And the last four digits of your Social Security number?

ZA:     7016.

MR:     7016, and actually, before I turn off the recorder, Vinny back there, do you have any questions before we finish up?

VP:     Just a few, in the front of the store, I noticed it was an ATM, is that your ATM or is that from a different company?

ZA:     That's a different company.

VP:     Where in the front?  Is it inside the store or outside?

ZA:     Inside the store.

VP:     Oh, that's right.

LR:     Wasn't that pulled already?

VP:     Yeah, I remember seeing an ATM there.

FR-3143-14

ZA:     The guy came the same day.  He pulled out his
        money.

VP:     He pulled out his money the same day?  Who's
        the guy for the ATM?

ZA:     His name is Sam, but I don't know exactly his
        --

VP:     Sam?  You don't know his name?

ZA:     No.

VP:     How long has he had the ATM there?

ZA:     For quite a while.  I don't exactly.

VP:     Is it the kind of thing with an ATM that you
        get a percentage of whatever the fees are for
        him to put it there?

ZA:     Yeah.

VP:     What is that percentage, do you know?

ZA:     Off the top of my head, no.

**1:52:13    (The    tape    ended    --    fluttering    noise    in
         background)**

J#002-01-957898


END OF STATEMENT

TRANSCRIBED BY: SDH\WWD
                MAY 20, 2014

   *This is to certify the above statement is a true
   transcription to the best of my ability.*

                    *********************

FR-3143-14

# RECORDED STATEMENT

| | | |
|---|---|---|
| RE: | INTERVIEWEE: | ALEX CHOY |
| | DATE OF LOSS: | FEBRUARY 24, 2014 |

Just for the recorder what had happened, I called MR: Choy again.  This is Michael Russo of T.J. Russo consultants.  This is another recorded interview on file number 3143-14.  It's pertaining to the fire at 107-109 Port Richmond Avenue, Staten Island, New York.  Today's date is Monday.  It's now about 10:05 a.m.  That's Monday, the 15th of March.

AC:  Hello?

MR:  Hi, Mr. Choy?

AC:  Yes.

MR:  Yeah Alex, how are you doing?  This is Mike Russo.  I'm one of the fire investigators over at that C-Town.

AC:  Oh, okay.  How are you?

MR:  Yeah, very good, very good.  Listen MR: Choy, I just got off the phone actually, with a Tammy over at central station and I just…

AC:  Yes?

MR:  Have a couple of questions.  They said to call you.  You might be able to clarify.  My question is

234

FR-3143-14

this.  I have a copy of the alarm monitoring service agreement.

AC:  Copy for what?

MR:  I have a copy of the service agreement for central station.

AC:  Yeah, yeah, yes.  Yeah, yeah, yes.  Yeah.

MR:  You know what I'm talking about, right?

AC:  Yep.

MR:  Yeah.  My question for you, I just need a couple of clarification and you might be able to help me.  Where it says signal type, okay, it says B.  What does that mean, b as in boy?

AC:  B and in boy?

MR:  Yeah.  What does that mean, signal…

AC:  B?

MR:  type B?

AC:  B?  B as in boy, you're right?

MR:  B as…

AC:  (INAUDIBLE) yeah, burglary.

MR:  That's for burglary?

AC:  Yeah.  It says burglary.

MR:  Oh, I see.  So anytime it says B, the signal type that would be…

235

FR-3143-14

AC:  Yeah.  Everything is burglary alarm (INAUDIBLE)

this one, no fire.

MR:  Oh, there's no fire?

AC:  Just (INAUDIBLE) burglary.

MR:  Oh, there's no fire…

AC:  No fire (INAUDIBLE).

MR:  on this one?

AC:  No.

MR:  Oh, okay.

AC:  Just (INAUDIBLE) burglary alarm, they will not

enter (SIC) (INAUDIBLE) burglary (INAUDIBLE).

MR:  Okay, alright.  So just burglary alarm, no

fire?

AC:  Yep.

MR:  Has it ever…

AC:  No fire.

MR:  Has it ever had fire or no?

AC:  No.

MR:  Alright, no problem.  Hey, another question.

We had the burglar alarm panel and we trying to

download the event log on it.  Question, did the

central station record openings or closings or no?

AC:  No.  No recording, just standard (INAUDIBLE).

MR:  Just what?  Say that again.

236

FR-3143-14

AC:  Yeah, just the standard sound (SIC) for signal (SIC) (INAUDIBLE).

MR:  Standard for signal?

AC:  Yes and (INAUDIBLE) they have the wireless sound for send it to signal to radio.

MR:  Oh, so they have a wireless radio?  Do they have phone and…

AC:  Yes.

MR:  wireless?

AC:  Yeah.  They have the wireless and wire on (SIC) both sides.

MR:  Oh, they have both?  They have both the wire and the wireless, correct?

AC:  Yes.

MR:  Okay.

AC:  Yeah, correct.

MR:  I understand.

AC:  (INAUDIBLE) they and this all was some guy (INAUDIBLE) wire for telephone line into their (SIC) house (SIC) (INAUDIBLE).

MR:  Yeah.

AC:  And then they want to put the one radio (INAUDIBLE).

MR:  Because the burglary they had a while back.

237

FR-3143-14

AC:   Yes.

MR:   Right.   So the wireless has been there what, about a couple years?

AC:   I (INAUDIBLE) remember sure, but maybe in (SIC) two years.

MR:   Maybe two years?

AC:   Three years ago.

MR:   Oh, okay.  Yeah.   That's about right.   That's right, MR: Choy.   Now, your first name is…

AC:   Yeah, yeah, yeah.

MR:   Your first name is Alex, right?

AC:   Yes.

MR:   Okay.   My question for you Alex, what's your email address?

AC:   Address?

MR:   Yeah, your email, your email?

AC:   My email?

MR:   Yeah.

AC:   Sky…

MR:   Yep.

AC:   CCtv…

MR:   CCtv?

AC:   Yeah, ny…

MR:   Uh-huh.

238

FR-3143-14

AC:  @gmail.com.

MR:  @gmail.com?

AC:  Yes.

MR:  Okay.  So, now…

AC:  Yeah.  I (INAUDIBLE).

MR:  You were…

AC:  Yeah.  You (INAUDIBLE) find for D-V-R and (INAUDIBLE) system.

MR:  Yeah.  The fire marshals have the D-V-R.

AC:  Yeah.  You have the D-V-R?

MR:  Yeah, yeah.

AC:  You have machine?

MR:  Yes.

AC:  I think record (INAUDIBLE) and some yeah, (INAUDIBLE) fire.

MR:  Say that…

AC:  But you didn't (SIC) (INAUDIBLE)…

MR:  Yes.

AC:  For D-V-R?

MR:  Yes, yes.  That's not why I was calling.  I was calling about the alarm itself, the alarm itself.

AC:  Oh, okay.  Okay.

MR:  Yeah.  Now question, while we're on the D-V-R, did that, did that record remotely or only on site?

239

FR-3143-14

AC:  Excuse me?

MR:  The D-V-R, did it…

AC:  (INAUDIBLE).

MR:  The D-V-R, it recorded in the store?

AC:  Yes.

MR:  Did it record…

AC:  Yeah.  (INAUDIBLE) they have the two D-V-R over there.

MR:  Yeah, in the store?

AC:  (INAUDIBLE) in store.

MR:  Alright.  Do they have any outside the store? Does it back up anywhere outside?

AC:  Yeah, outside the store too.

MR:  Where?

AC:  You put the outside camera and the inside camera, everything.

MR:  Oh, I see and when I'm talking about, the D-V-R, where it records, does that record to any other place but the store?

AC:  Yeah, sure.

MR:  Where does it record to other than the store?

AC:  In the office and they (INAUDIBLE) all camera.

MR:  Oh, I see.

AC:  (INAUDIBLE) I guess and three camera outside.

240

FR-3143-14

MR:  I understand.  I understand, but they don't have a D-V-R at their house or a D-V-R at another location, only in the store, right?

AC:  No, no, no, only store.

MR:  That's what my question is, if the D-V-R records somewhere else.  You understand?

AC:  Oh.

MR:  Now…

AC:  No, no.

MR:  Do you have a copy…

AC:  (INAUDIBLE).

MR:  Do you have a copy of the escort central station monitoring service agreement?

AC:  Yes, I have.

MR:  Can you do me a favor?  I'm going to give you my email address.  Would be to just…

AC:  Okay.

MR:  Can you just email a copy of that to me?

AC:  (INAUDIBLE) and only (INAUDIBLE), right?

MR:  Yes.

AC:  Central station (INAUDIBLE), right?

MR:  Yeah, the alarm monitoring service agreement.

AC:  Okay.  I send it to you.  Yeah.  (INAUDIBLE) by my email, your email address (INAUDIBLE).

241

FR-3143-14

MR:   Okay.

AC:   (INAUDIBLE).

MR:   Here's what I'm going to need.   Yeah.   What other documents do you have?   Do you have like, a contract with them?

AC:   No contract, just a (INAUDIBLE) for central station contract (SIC), right?

MR:   Yes, yes and that's it, right?

AC:   Yeah.   I never (INAUDIBLE).

MR:   Say that…

AC:   We don't make the contract.

MR:   Oh, so you have no contract with them?

AC:   No, just we contact with central station and not (INAUDIBLE) the other one.

MR:   I understand, so just central station, not for anything else, right?

AC:   No, not anything else.

MR:   Do you have any paperwork that shows what hardware was there like, what was installed?

AC:   I guess I have that for an invoice for a (INAUDIBLE).

MR:   Perfect, perfect and that will tell me what was installed, right?

AC:   Yeah.

242

FR-3143-14

MR:   Okay.  I'm going to put in the email that.

I'm going to ask for the invoice for installation as

well as a copy of the alarm monitoring service

agreement and MR: Choy, that's all I'm going to

need.  What's the business address, your business

address?

AC:   Excuse me?  (INAUDIBLE).

MR:  I'm going to email shortly.  What's the mailing

address for the company?

AC:   My company or what?

MR:  Yeah, for Sky CCTV.  What's the mailing

address?

AC:   Yeah.  This email I gave you, Sky CCTV…

MR:   Right.

AC:   ny@gmail.com.

MR:  No.  What's the physical address like, the

address the office is at?

AC:   Yeah, before I am 38.  Now I am 33 Vernon

Street in Plainview.

MR:   Oh, you're in Plainview?

AC:   Yes.

MR:   Plainview, New York?  What's the street, 33

what?

AC:   Vernon, v as in victory…

243

FR-3143-14

MR:  Yep.

AC:  O…

MR:  Yep.

AC:  N as in Nancy…

MR:  Yep.

AC:  O, n, Vernon, Vernon.

MR:  Oh, Vernon?  I got it.  Vernon Street?

AC:  Yeah, Vernon Street.

MR:  Is it at an office number or no?

AC:  Yeah.  My office is a house office.

MR:  Oh, it's a home office?  Okay, okay, okay.

AC:  Yeah, a home office.  Yeah.

MR:  Okay and the phone number I called you at is, I guess, your office cell?  The phone number…

AC:  (INAUDIBLE).

MR:  I called you at?  The 917 number I called you, is that your office number or a cell number or both?

AC:  (INAUDIBLE).

MR:  The 917 phone number, 392, is that your cell?

AC:  Yeah.  Yeah, 392-9 (INAUDIBLE) 3.  (INAUDIBLE)…

MR:  Is that your…

AC:  Mobile.

MR:  Oh.  It's your mobile and lastly, MR: Choy, what's your date of birth, lastly?

244

FR-3143-14

AC:   I don't understand.

MR:   Your birth date, your birth date?

AC:   Oh, my birth date?

MR:   Yes.

AC:   (INAUDIBLE) in ███████  1966

MR:   ███████  1966, correct?

AC:   Yeah.

MR:   Okay.  I'm going to send you an email in the next few minutes and then just send that back to me and I appreciate it.  I appreciate your time.  Okay?

AC:   Oh, no problem.

MR:   You have…

AC:   Can I…

MR:   Yes?

AC:   Can I send it to you (INAUDIBLE) this evening?  Because I am in the outside right now.

MR:   Oh, you want to email me back this evening?

AC:   Yeah.

MR:   Yeah.  That's fine.  That is fine.  It's a weekend, not a problem.

AC:   (INAUDIBLE) you may (INAUDIBLE).

MR:    I will.

AC:   (INAUDIBLE).

MR:   I (SIC), just send it (INAUDIBLE).

245

FR-3143-14

AC:   (INAUDIBLE).

MR:   Perfect, perfect.   Thank you, sir.   I'll talk to you soon.

AC:   No problem.

MR:   Oh, lastly.

AC:   Yes.

MR:   Hold on one last second.   The copy of the service agreement that I do have, was that given…

AC:   Oh, okay.

MR:   I have, but I can't really read it because it's a bad copy.   Did you…

AC:   Oh, okay.

MR:   Did you give a copy to the C-Town owners or their public adjuster?

AC:   Yes.   Yes.   I send it to you and all invoice or everything, I find it, I send it to you everything. Okay?

MR:   Oh, okay.   Thank you.   Thank you, sir.

AC:   No problem.

MR:   Okay.   Bye, bye now.

AC:   Bye, bye.

MR:   Okay, bye.

AC:   Okay.

246

FR-3143-14

MR: Bye. Okay. Just for the recorder… Hey, MR: Choy? I had just called MR: Choy who is the owner of Sky CCTV, New York, spoke to him and obtained the information pertaining to the actual alarm system. At this time, I want to turn off the recorder. I'm going send an email over to MR: Choy pertaining to the system.

END OF STATEMENT
TRANSCRIBED BY: EAS\WWD
                June 13, 2015

*This is to certify the above statement is a true transcription to the best of my ability.*

**********************

## RECORDED STATEMENT

| RE: INTERVIEWEE: | GLORIA, PORT RICHMOND PRODUCE |
|---|---|
| DATE OF LOSS: | February 24, 2014 |

The following transcript is from Wednesday, March 12th 2014 at approximately 3:15 pm. My name is Vincent Palmieri and I work as a Fire Investigator for TJ Russo Consultants. I conducted this interview via telephone with Gloria Hua Chamber who is the property manager for building ownership of 107 Port Richmond Avenue Staten Island NY.

GLORIA:   Yes, the check is issued, and you should
          be receiving it tomorrow between two and
          2:00 and 3:30 via courier.

247

FR-3143-14

VP:        Hello.

GLORIA:    Hi, who's this?

VP:        Gloria, hi, it's Vinny Palmieri.

GLORIA:    I was just...(laughs) I thought you were somebody else.  I'm sorry.

VP:        That's okay.  No problem.  I'm the fire investigator and I had mentioned to you that I'm working with C-Town out in Staten Island.

GLORIA:    Right.

VP:        I just wanted to go over a couple of things as far as management of the property.  Have you got a minute?

GLORIA:    And who are you related to this?  Because I've met a lot of people.

VP:        I know, I know.  You'd have to go back to the Monday, the first day and the insurance company.  Guard Insurance had hired me, and I do fire investigations, and Guard Insurance represents C-Town, the supermarket.  I met you Monday afternoon maybe right after the fire, 12 hours later, 14 hours later, out at the site. And then I worked with your fire

248

FR-3143-14

investigator Tom Ryan for about two or three weeks at the scene.

GLORIA:   Right.  So what can I help you with because you already have all the information?

VP:   I just wanted to get like a first-hand interview from you.  Tom had given us a bunch of the info, but I wanted to get it and make sure that it was accurate.  And a lot of it goes to the management of the property.  As you know, as Zaid and Mohammed have told me that the reason they're having some issues as far as not paying the last few month's rent was that there were leaks throughout the supermarket that they had reported.

GLORIA:   Really?  Really?

VP:   I know.  I know.

GLORIA:   Really?  That's what he's saying?  I can't listen to it.

VP:   Well, that's why I wanted to interview you because Tom had told me...

GLORIA:   Well...well, listen.

249

FR-3143-14

VP:        ...that you guys had no knowledge of any

           leaks or anything like that.  So I wanted

           to get it right from you.

GLORIA:    The only knowledge...

VP:        You know what I mean?

GLORIA:    The only knowledge that we...I checked the

           file.

VP:        Okay.

GLORIA:    The first thing you do...the first thing

           you do as a property manager when you have

           a situation like this that's a claim of

           liability from hell. [sic] Or the claim of

           liability.  I mean it just is anything in

           general is to check the file.  And I

           checked the file.  I checked his lease.  I

           checked everything.

VP:        Okay.

GLORIA:    There is no mention.  This is no letters.

           There's nothing indicating there was an

           issue of anything.  The only thing that I

           remember...that I, and I'm very good with

           critical things, was regarding the issues

           with his air conditioner.  Well, according

           to the lease, he's responsible for his air

250

FR-3143-14

conditioner.  And he didn't mention to me that he was doing renovations inside.  And I remember saying to him. Well, I don't have a Certificate of Insurance covering that contract or anybody else, and requesting it now.  And we left it that I was going to go meet with him, which we had scheduled the end of February...the end of January, but I got ill and was out for a week and a half.  And when I came back, I tried setting up a meeting with him, and before I know it, the fires occurred.

VP:       Okay.

GLORIA:   I think that you could notice, and you ask anybody else as well with the investigation or anything else that I'm very hands on.

VP:       I know.

GLORIA:   So, when...

VP:       I saw you were there plenty of times.  You know what I mean?

GLORIA:   I was there every day.

VP:       I know, I know, I know.

251

FR-3143-14

GLORIA:    But were there to have been a problem of

that sort, (a) I would have known about

it; (b) I would have done something about

it; and (c) I would have documented who

was responsible for what.

VP:    Okay.

GLORIA:    His lack of making payments has nothing to

do with us.  It does have to do with

probably him spending so much money on

renovations in January and February at

least two months **(INAUDIBLE).**

VP:    Right.  Well, he's telling me that he owes

you approximately two months in rent,

January and February.

GLORIA:    Yeah, he owes me December, January and

February because his December rent payment

bounced.  If I'm not mistaken, it bounced.

Not to mention that he was supposed to pay

his quarterly fees for water and sewer and

didn't.

VP:    So, would that be the first quarter of the

year or the last quarter of the year.

GLORIA:    No, that would be...no that would...he was

supposed to provide us with payment

252

FR-3143-14

history from the four quarters, three quarters at least minimum or three-quarters of the year.  Please remember that we purchased this unit, this asset and the closing was January 6th of 2013.  So we had requested from him his real payment after that point, and this is September and I'm still...I still have not received it.  Because we don't like to put our units or owners in default so quickly, and we had not had the...we were...we were putting him in default after we had our scheduled meeting.  If he didn't comply, we were going to take that route, we were really close at taking that route from him.

VP:       Okay.  So you hadn't really started any official eviction or in default or anything...

GLORIA:   No, but I had a right...

VP:       But it was close to that point?

GLORIA:   Well, he knew it because I told him.  I said, listen, I understand you're tied up, and I understand you're doing everything,

253

FR-3143-14

and I understand that, you know, you're trying to run a business especially in that area. I understand. I understand, but guess what, my patience is running thin. Okay.

VP:        Okay.

GLORIA:    We need to meet and when I come back you can't keep on cancelling, and I need to get this done or else, you know, you're...you're forcing my hand. I don't want to do this, but you're forcing my hand. Lo and behold, six weeks later I'm down there. I'm not doing any inspection of the building, but inspecting everything that we locked. [sic]

VP:        Right, right. Okay. So you guys began managing the property January 6, 2013.

GLORIA:    Yes.

VP:        He said that he couldn't remember exactly when the property changed hands. And again, maybe he wouldn't have remembered exactly when that occurred, but he said he had complained to a gentleman at your office about these leaks. So if someone

254

FR-3143-14

else at your management company, like I
just called your office and they said call
your cell phone right away.  You know,
that they know who you are.

GLORIA:   That's...that's...That's that norm.  You
know, what, that's the norm.

VP:   Yeah, and if remember last week you added
the area.  They told me that.  You know
what I mean?  And then you called me right
after that.

GLORIA:   And I even...and I even...I texted you.

VP:   I know.

GLORIA:   I am...you know what, I'm almost 50 years
old.  I have probably another 10 or 15
years in this industry.  And so far, my
reputation is twofold.  One I take assets
that are...that are having problems and
make the profitable as either sellable or
converting them into condos or co-ops.
And two, the other thing is that I am pain
in the ass hands-on.  Hands-on, right,
because if I am responsible for your
budget then I'm responsible for our
violations.  I'll be damned if I'm not

255

FR-3143-14

going to be responsible with who we hire,

what's happened, was this a legal notice,

were we summonsed to court.  This is it.

It's me.

VP:        I got you.

GLORIA:    I'm not going to **(INAUDIBLE)** but

(laughter) but I will be darned...I will

be damned at 50 years old I'm going to

change.  That's why when you call my

office, the first they'll tell you is

either she's out...The truth.  She's out

of town.  She won't be back until such and

such.

VP:        Yeah.

GLORIA:    Or...or, she's in town.  Talk to her.

VP:        So there's no way he would have called the

office, gotten somebody else and they

would have never put a notice in the file

about him....

GLORIA:    Nobody would have...

VP:        As to what's going on?

GLORIA:    Nobody would have even...nobody would have

even...not even entertained him.  They

would have said, I'm so sorry, but she's

256

FR-3143-14

is not here.  You could call her on her cell phone or send her text or send her an email.  I'm sorry, but we cannot help you.  She will get back to you.  She's very good in getting back to, or she's not in the country or she's not in the city, or she's not available.  Is...is there a number she could you from wherever she's at?

VP:        Right, right.  Okay.

GLORIA:    And they...and they would tell him if this is an emergency please contact the Fire Department.  If this is an emergency then you need to contact the emergency services.  Because in reality, we are triple net.  Unless the building's on fire, and we're not fire fighters, we're not supposed to be responsible for anything in this building other than paying the mortgage.

VP:        So as far as his responsibilities...

GLORIA:    **(INAUDIBLE)**

VP:        Right, other than paying the water bill and stuff like that.

GLORIA:    Everything and the problem is...

257

FR-3143-14

VP:       Did you inherit some of that?

GLORIA:   The water was going to me.  What?

VP:       Well, he was saying there was something with the previous owner as well.  Where the previous owner had split it...

GLORIA:   Absolutely...

VP:       And he owned money on the previous water to the previous owner, and then was some sort of claims court.

GLORIA:   We weren't able...No we were...we're ultimately under the New York State Charter of Business Corporation.  We are ultimately responsible for the usage of the water, sewer and anything that the property incurs even if we have lease because we are the title holder.  So the bills would have come to us.  We attempted to change the bills, and we were told that the bills were sent directly to him.

VP:       Okay.

GLORIA:   At which time I said to him, the bill should not be going directly to you.  Oh, they are coming directly to me.  I have to go each month and pay them.  Okay, then do

258

FR-3143-14

me a favor.  Give copies of your bills.  I submitted the change of name and everything else to the Department of Water and they were processing it, but at the closing we were given documents indicating that everything was paid.

VP:      Okay.

GLORIA:  So whether he owed the previous owner or not, that was not something that we could have actually collected because (a) we were not the previous owner and (b) according to the closing it was good.

VP:      Got you.

GLORIA:  So he was off the hook on that end.

VP:      Okay.  So, for three of the four quarters of 2013, he showed you copies of a bill that had to be paid?

GLORIA:  He showed me nothing that's why I have nothing, nothing, nothing, nothing, nothing, nothing, nothing, nothing.  That's why I

VP:      Oh, so, for all of 2013 as far as you know, the water bill might not have been paid for that business?

259

FR-3143-14

GLORIA:    That's correct.

VP:        Okay.

GLORIA:    Which means...which leads me into the question that I said to him, I am going to meet and I am going to sue you.  Because when I do you have to had more than ample time to rectify the situation.  Don't force me.

VP:        Yeah.

GLORIA:    I really don't like taking people to court through **(INAUDIBLE)** but, you know, because it's just people's livelihoods and their kids eat off of here.

VP:        Right.

GLORIA:    But and we had not been friendly, you know, because we were in the process of transferring everything over.  So it was a time what we call a **(INAUDIBLE)** with the city because we just purchased.  But that was coming to an end when, you know, we were coming to fourth quarter.

VP:        Right and...and in coming into the fourth quarter he hadn't shown you that he...

GLORIA:    Nothing.  Nothing.

260

FR-3143-14

VP:        Put anything towards whatever all you and
           I would worry about, a means of
           livelihood. [sic]

GLORIA:    That's right. That's right.  So that's
           when I put the pressure on him, and I said
           to him, listen, you know, what's the
           story?  And then at a later time,
           **(INAUDIBLE)** came in he's not there.  [sic]
           Not to mention that, you know, when you
           pay late you're supposed to have a fine or
           a fee.  I didn't even hit him with any of
           that.  Because, you're in the beginning
           stage and you're trying to get on the
           right track.  And, you know, it is a
           difficult are.  So he took a chance every
           thing that he possibly, but here comes
           December and that's when I started ramping
           and raging at him, but you know, not
           unprofessionally.  But listen, you're
           running out of time.  What do you want to
           do?  You know.

VP:        So you're almost at that point forcing you
           to take some sort of action.

GLORIA:    Yes.

261

FR-3143-14

VP:        Is there anyway you could check and make
           sure that the December rent payment had
           bounced?  Is there a possibility to get a
           copy of that bounced check?

GLORIA:    I will do it.  I...I would...  As you
           know, I just came back.

VP:        I know...I know you were away, and thank
           you for taking the time to take care of
           that.

GLORIA:    No, no, no.  I was away for two and a half
           weeks.  Then came back and was here for
           five days and had to go to Florida on
           properties that, you know, we manage in
           Florida and I just came back.  I don't
           have a problem with tomorrow get it for
           you, but it's not going to be today.

VP:        No, no, I know, at any point in the next
           week or two is perfect.  You know, we're
           just trying to substantiate that...I don't
           know if he paid the water bill or not, but
           it appears he probably didn't.

GLORIA:    Well, I have an issue with him.

VP:        And I don't know he cost you rent.  And
           the reason he's telling me that he didn't

262

FR-3143-14

pay two months rent is because of the leak that the leak was an ongoing issue with the previous...

GLORIA:   But that wouldn't have been enough...but that wouldn't have been enough...

VP:       Owner, with your owner...

GLORIA:   If that would have been an issue, let me ask you something.  If that would have been an issue, wouldn't you really start complaining in the months that the rainy season comes in?  Rainy season for the City of New York is March, April and May.

VP:       All, I know...I know...

GLORIA:   Hurricane...hurricane...hurricane season...hurricane season ends in October.

VP:       No, that's fine.

GLORIA:   You're going to renovate your place when you have leaks.  He renovated the place. You're going to renovate a place when have leaks?

VP:       I know, it doesn't make any sense.  If I would have had problems with a building ownership, and I owned a supermarket and the roof was leaking, I'd hired a roofer

263

FR-3143-14

myself at some point and just fix it, and then look to the...get the bill back from the owner.  You know what I mean?  I don't see how he's running a supermarket if there were that many leaks or if there was that big of a problem.

GLORIA:    Especially with the Health Department. The Health Department would have shut him down.

VP:    Yeah, I...I again, just going by what he was explaining to me, as far as leaks in different areas of the store, as far as notifying the owners, as far as adapting and correct it, and that was the reason he chose...why he chose to withhold rent for two months.

GLORIA:    Uh-huh.

VP:    And that's why I wanted to get it from you yourself as the property manager.

GLORIA:    It wasn't two months.  [sic]

VP:    Right, they were all...all the time I saw it was two.  That's why I'm saying if it's three because of the check in December

264

FR-3143-14

bounced.  You know, then he's saying, you know, he's going to...

GLORIA:    I want to double check that.

VP:        Yeah, yeah.

GLORIA:    I want to double check that because my frame, my head, you know, I want to double check that. I don't want to get the wrong person.

VP:        Right.

GLORIA:    I don't want to misspeak, but for January and February there was nothing there and the water bills and the sewer bills were still outstanding.  Not to mention that he had 33% of the tax bills, which he also failed to supply the previous.  You know, he also failed to mention.  Give me up to what he paid up to December of 2012. Then let's work fresh from 2013, but at least I need to know what was paid so I know where we're at.  2012 nothing, water bills, sewer or taxes.

VP:        Okay.

GLORIA:    Then charges that are for the other thing, nothing.  So, you know, it got to the

265

FR-3143-14

point where, you know, I had an issue. Now, I'm going to need you to do me a bog favor because I'm speaking to you regarding this gentleman...

VP:      Yeah.

GLORIA:  Out of the charges of Professional that I have and the ethics requires me.  So if you could send me a text message of who you are...

VP:      Sure.

GLORIA:  And representative of where and who you represent because honestly I shouldn't be doing this.

VP:      Well, if you want I could send you an email, text message.  Whatever is easier. I didn't have a good email for you.  I just had the phone number, but that was it.

GLORIA:  Would you be so kind as to do it because I really... Although I stand by everything I say, I've got a lot of calls from the **(INAUDIBLE)**

VP:      No, I know.  Well, would it be easier to email it.

266

FR-3143-14

GLORIA:     Let me give you my email.

VP:         Give me your email address.  Go ahead.

GLORIA:     George **(INAUDIBLE)** ghp071513@gmail.com

            [sic]

VP:         Okay. George-Hector-Tom--071513@gmail.com.

GLORIA:     That's right.

VP:         Okay.  And again, I can assure you, you
            met me.  It was that Monday.  It was early
            afternoon.  At that time, you didn't even
            know who the insurance company was
            representing.  I wasn't sure who I was
            representing.  It was till early in the
            game.

GLORIA:     Did I look kind of confused?

VP:         Yeah, because you thought I had
            represented...you thought I was there for
            your insurance company, but I had...

GLORIA:     But I just thought they were there.

VP:         Right.  I know.  I had gotten there
            actually before your own insurance
            company.  They got there the next day.
            Yeah, no problem and I'll send you the
            email and if you could check on that
            December check and just get back to me on

267

FR-3143-14

actually how many months he did own you

and just reiterate, you know, that, you

had no knowledge of a leak, you know.

GLORIA:    No, nothing about a leak.  Are you being

an adjuster for them or you're an

insurance broker for them?

VP:    An insurance company which is Guard

Insurance hires my firm.  We're a fire

investigations firm.  So I'm not an

insurance agent.

GLORIA:    Oh, you have your **(INAUDIBLE).**  Can you

give me his agent's information?

VP:    His insurance agent information?

GLORIA:    Yes.

VP:    Or do you mean his company?

GLORIA:    I need to confirm.  Yes, I need to confirm

this.  I need to confirm, not you.

VP:    Right.

GLORIA:    I need to confirm the information I have

in my office to make sure that...

VP:    Guard Insurance is the insurance company.

GLORIA:    Okay.

FR-3143-14

VP:        His insurance agent.  I don't have an
           agent for him.  I'd have to look through
           my files for a specific agent.

GLORIA:    No, no, not the agent.  Just the company
           itself.  Because I kept asking him who is
           your agent or who's your broker or who's
           your adjuster and, you know, I'm not
           getting it.

VP:        Yeah.

GLORIA:    I know who...I know who his adjuster is,
           but...

VP:        See, I never got into who his adjuster
           was.  I don't know.  Do you mean his
           public adjuster?

GLORIA:    New York...New York Insurance.

VP:        New York Insurance is his public adjuster.
           I was told they represent your building
           ownership as well.

GLORIA:    Yeah, we all have that adjuster.

           **(INAUDIBLE)**

VP:        I know.

GLORIA:    That's a conflict of interest, but at the
           time we weren't sure that he was going to
           be signing up and it was a mess.  But

269

FR-3143-14

sometimes it's good and sometimes it's bad, because at least when I hit him, with, you know, the lawsuit or half of the cost for everything that, you know, I had to remove out of that store, they want to **(INAUDIBLE)**.

VP:       I know you guys paid for the clean up and everything.  I know.

GLORIA:   Yeah.  So I'm going to get the money out of his ass.

VP:       (laughs)  All right.  In the email I'll include that insurance and the name of the agent that's handling it for you.

GLORIA:   Thank you.

VP:       So you'll have an idea of who you need to contact.

GLORIA:   Have you been in touch with the Fire Department?

VP:       Yes, on numerous occasions.

GLORIA:   Lately?

VP:       Not in the past week.  I would say no.  I know last week yes, not...not...you know, today is Monday and not this week.

GLORIA:   You should.

270

FR-3143-14

VP:       Okay.

GLORIA:   Soon.

VP:       Okay.  I'll call them again.  I've been in
          constant contact with them.

GLORIA:   I know but I...I can't tell you.  I can't
          really cross the line and tell you why but
          call them.

VP:       I will.  Thank you so much.

GLORIA:   You're welcome sir, bye-bye.

VP:       Have a great day.  I'll send you an email
          in about five minutes.

GLORIA:   Thank you.

VP:       All right, have a great day.  Bye.

GLORIA:   Bye-bye.

END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
               July 1, 2015
  *This is to certify the above statement is a true
  transcription to the best of my ability.*

**********************

## RECORDED STATEMENT

| RE:  INTERVIEWEE:   | **MOHAMMAD JABER** |
|---|---|
| DATE OF LOSS:   | **02-24-2014** |

This is Michael Russo of T.J. Russo Consultants. I

am the fire investigator retained on behalf of Guard

271

FR-3143-14

Insurance Company pertaining to a fire which occurred at 107-109 Port Richmond Avenue, Staten Island, New York on or about Monday February 24, 2014. Today's date is March 13th, that's a Thursday. The time is about 3:30 P.M. and in the car is Mohammed who is one of the partners actually in the business as well as his attorney Lance who was here with the last one. [INAUDIBLE] the Public Adjuster as well as Vincent Palmieri from my office.

MWR:    At this time we are going to get going with the statement. Do me a favor Mohammad, spell your first and last name for the recorder.

MJ:     M-O-H-A-M-M-A-D.

MWR:    M-M-A-D. Yep.

MJ:     J-A-B-E-R.

MWR:    J-A-B-E-R?

MJ:     Right. Last name.

MWR:    Okay and just for the recorder, I know that, you know, we had spoken and you had spoken to Vinnie about a lot of stuff and I just finished speaking with Ziad for a period of time and you had just explained

FR-3143-14

to me that Ziad is the one that takes care of the business.

MJ:       Yeah, he take care of the business.  He is the  [INAUDIBLE].   He  deal  with  the salesmans.  He deal with all the bills.

MWR:      Alright  so  just  for  the  recorder,  if  I repeat what you say a little bit it's just because  the  recorder  may  not  pick  up  on some of your accent.  So he takes care of all the vendors?

MJ:       Right.

MWR:      All the bill, paying of the bills?

MJ:       Right.

MWR:      Okay and what is your responsibility?

MJ:       I come in after 3:00 o'clock after pick up my kids in school…

MWR       Okay.

MJ:       I come close. Stay from 3:00 to 9:00.

MWR:      So 3:00 to 9:00 P.M.?

MJ:       Yes.

MWR:      So basically your, your, and I understand that you have a verbal agreement with him as a partner in the business?

MJ:       Yeah.

273

FR-3143-14

MWR:    And what is that agreement?

MJ:     Is a part.  He have two third, I have one third.

MWR:    Okay.

MJ:     And agreement is you know he take care of the business. Whatever the share, we split it out end of the month.

MWR:    I understand.  So basically, he's the guy who ru-, runs and operates the business. You're there so you can kind of pick up the slack kind of thing um and for that you get a third of the business.  Right?

MJ:     Right.

MWR:    And how much money did you invest in the beginning?

MJ:     $100,000.00.

MWR:    $100,000.00.  Now that money, was that a loan you took out?

MJ:     Yeah my sister from back home she gave me $70,000.00 and I got $30,000.00 on, on me.

MWR:    Okay. And your sister, did you have any sort of formal agreement with her?  Or because she is your sister..

MJ:     No this is my sister.

274

FR-3143-14

MWR:    I understand.  Have you paid her back?

MJ:     Yes I did pay her back a little while later, you know?

MWR:    Was she paid back completely?

MJ:     No, not completely. No.

MWR:    Okay.  What do you owe her now?

MJ:     I owe her like $35.

MWR:    Owe her $35, and her name?

MJ:     Rawy.

MWR:    And that's $35,000.00 obviously, right?

MJ:     Yeah, back home, it's not from here.

MWR:    And where is back home?

MJ:     Jerusalem.

MWR:    Okay yeah. I, I did hear that.  Jerusalem. And $35 and the spelling of her name.

MJ:     Rawy.

MWR:    R?

MJ:     Uh, exactly Rawy. Uh let me see, okay hold on O-A, yeah, R-A-W-Y.

MWR:    And her last name?

MJ:     Jaber. Same thing.

MWR:    Same last name.  Alright so you owe, you paid her back almost half.  A little more

FR-3143-14

than, oh, almost half.   And you owe her about $35,000.00?

MJ:     Right.

MWR:    Were you on sort of any monthly plan with her or you just paid her as your got it?

MJ:     No, no, whatever I-, she told me whenever you have, whatever you got throw it to me.

MWR:    I   understand.      But   from   your understanding,   are   there   any   loans, outstanding loans with the business right now?

MJ:     Ali   have   a   loan   I   know   of   [INAUDIBLE] $75,000.00.

MWR:    Crazedale?

MJ:     C-Town, same thing Crazedale.

MWR:    I   am   saying,   and   that's   where   I   got   a little   confused   actually   before.     So   C-Town is Craz-, Crazedale.

MJ:     Crazedale, yeah.

MWR:    It's the same thing?

MJ:     Same thing.

MWR:    I   understand.    So you guys still have a balance with them for $75,000.00?

MJ:     Right.

276

FR-3143-14

MWR:    What's the agreement with them. Is, you pay them weekly, monthly?

MJ:    Weekly I think thousand dollars.

MWR:    Okay and you guys paid to date with them?

MJ:    Yeah, he always do.  He's doing it.

MWR:    Alright, he's the one taking care of it?

MJ:    Yeah.

MWR:    Okay so that's the only loan that you know that's out there?

MJ:    That's all I know, yeah.

MWR:    Okay. And you said you come in at 3:00?

MJ:    Yeah.

MWR:    And where is it that you live Mohammad?  I know you are close but where?

MJ:    I'm at 366 Van Name Avenue.

MWR:    Van.

MJ:    Name.

MWR:    Name?

MJ:    Yeah.

MWR:    One word or two words?

MJ:    Two words.  Van and a Name.

MWR:    N-A-M-E?

MJ:    Right. Avenue.

MWR:    Avenue. In Staten Island?

277

FR-3143-14

MJ:        Right.

MWR:       Is that a home or an apartment?

MJ:        Home. Home. One family home.

MWR:       Do you own the home?

MJ:        Yeah.

MWR:       Okay. And how is it that you get here, do

           you take a bus, do you drive a car?

MJ:        No, I drive.  I drive.

MWR:       Drive a car and what car?   What is your

           car?

MJ:        Toyota Sienna.

MWR:       A Toyota Sienna and the color?

MJ:        Beige.

MWR:       Beige. Year?

MJ:        2009.

MWR:       Do you know the license plate on it?

MJ:        Not really because I just got in car

           accident three days ago.

MWR:       Oh no.

MJ:        Yeah. [INAUDIBLE]

MWR:       Do you still have the car?

MJ:        Yeah I still have, it's in the shop.

MWR:       In the shop?

MJ:        Yeah.

FR-3143-14

MWR:     Now where you live, is it just you or, or are you married, children?

MJ:      Married with nine kids.

MWR:     Nine?

MJ:      Yeah.

MWR:     Wow.   I have two young ones and I don't know how you do nine…

MJ:      Uh huh.

MWR:     …because the one young ones make me crazy.

MJ:      I used to, I used to be ten but one of them passed away…

MWR:     Oh, I am sorry to hear that.

MJ:      …six years ago.

MWR:     I am sorry to hear that.   Are your children all grown now or?

MJ:      Yeah.   All of them [INAUDIBLE], the younger one three years old.

MWR:     Oh, the youngest is three years old?   Oh so you do have a young one.

MJ:      Yeah.

MWR:     Okay. Does your, cars in the household, how many cars are there in the household?

MJ:      The one.

FR-3143-14

MWR:    So one car and that's just the beige one you were talking about?

MJ:     Yeah.

MWR:    Okay. So 3:00 P.M. you came here and that would have been on Sunday?

MJ:     No, Sunday I come 12:00 because the cashier go home early on soon, [INAUDIBLE].

MWR:    I am sorry, what's that?

MJ:     She leave at 12:00 on Sunday.

MWR:    And that's the cashier?

MJ:     Yeah.

MWR:    Well you know what, I forgot to ask you, here we go.  This here, I did a diagram, you know I meant to have him sign the diagram, not a big deal.  We are going to use a fresh one here.  So Sue left at 12:00.  When you arrived, what, I am sorry, let me backtrack.  You arrive here about noon because, cause somebody left early.  Do you normally come at 3:00 at Sunday?

MJ:     No. Sunday 12:00.  Always 12:00.

MWR:    So you normally come at, at noon?

280

FR-3143-14

MJ:        Yeah.

MWR:       Okay.   For your shift, are there new employees or the same employees working [INAUDIBLE]?

MJ:        Same, same people.

MWR:       So same people.  So who was working when you got there?  Who was working when you got there at noon?

MJ:        Just me and Sue and uh, what's his name, the cashier, uh Alyson.

MWR:       Alyson? Is that the woman we are going to see?

MJ:        Yeah the one, the, the skinny lady, Alyson.

MWR:       I, I don't know what that means.  Who is the woman that went to go pick up her child?

MJ:        Sue. The, the girl that leave at 12:00 o'clock.

MWR:       Oh that's Sue.

MJ:        Sue.

MWR:       Oh, I had a different name for her.  Okay.

MJ:        Alright.

FR-3143-14

MWR: So when you arrived there, it was, it was, was your, oh so it was just Sue, I, I'm sorry. I, I think I understand now. They were three people when they opened, right?

MJ: Right.

MWR: And Sue left home early?

MJ: She left 2:00 o'clock. I mean 12:00 o'clock.

MWR: She left at 12:00 o'clock. So, who else was here other than Sue?

MJ: Just me. Me and Alyson and one kid. He go to school. He come in on Sunday.

MWR: Okay, Alys-, what's Alyson's last name?

MJ: I don't even know.

MWR: Okay. Has she been with you guys for a long time?

MJ: Couple of months.

MWR: Couple of months. And Sue?

MJ: She been for since we opened.

MWR: Since opened. And she left uh, at noon that day. And then there was a boy you said?

282

FR-3143-14

MJ:     Yeah, boys come and cover for the, the, the, like somebody take a day off on the weekend, he come.

MWR:    Okay.  Is he like a teenager or?

MJ:     Teenager.  Yeah. He go to the high school.

MWR:    And you know his name?

MJ:     His name Mohammad too.

MWR:    Oh, he is a Mohammad as well?

MJ:     Uh.

MWR:    So then it would have been yourself, Alyson and Mohammad…

MJ:     Right.

MWR:    …that worked and Sue went home early.

MJ:     Right.

MWR:    Right? And which cash register is the teenage boy on?  Which one did he work at? I understand that…

MJ:     The boy?  No, the boy don't work no register.

MWR:    Oh, I am sorry.  You know we had the…

MJ:     He's doing…

MWR:    …service desk one.

MJ:     This is, yeah, yeah, yeah.  He was, this is the register was open.

283

FR-3143-14

MWR:    Which register?

MJ:     Number one.

MWR:    Number one.  That's where he worked or no?

MJ:     No the girl, the girl, the Alys-.  The, the boy doesn't work on a register.  He just maintenance. The cleaning.

MWR:    Oh I understand like use him like a handyman?

MJ:     Yeah.

MWR:    Yeah, I understand.  Help out kind of thing.

MJ:     Uh.

MWR:    So Alyson worked at one?

MJ:     Yeah.

MWR:    And where did Sue work before she left?

MJ:     Same register.

MWR:    So they both worked one register together?

MJ:     Yeah. Yeah.

MWR:    Okay.  Was it, that was the only register that you guys…

MJ:     No open on Sunday.

MWR:    On Sunday.

MJ:     Yeah because it quiet a little bit on Sunday.

284

FR-3143-14

MWR:      Okay.  So just her and Alyson worked one register together?

MJ:       Right.

MWR:      And the boy kind of went around?

MJ:       Yeah sweeping and cleaning.

MWR:      And, and you, you would've been where? In the office?

MJ:       In the office.  Yeah.

MWR:      Okay. Okay. Do you know the phone number for Alyson?

MJ:       Not really, he have it. Sue.

MWR:      Okay and, and, and Sue we are going to try and see her right?  We are going to try and see if we can get this done today.

BURT:     Yes we are.

MWR:      We will go by her house. Just for the recorder, they were here but they both had to leave because we were taking some time. So I don't know.  Do you know Sue's number or your don't know Sue's number?

MJ:       No. No.

MWR:      Okay and yourself, you worked in the office.  Uh, that day, anything out of the

285

FR-3143-14

ordinary that day?  Anything unusual that day?

MJ:     Nothing happened. Only 3:00 o'clock, the people came to put the light we talk about a million time already from Kennedy [INAUDIBLE] came 3:00 o'clock, left 8:30.

MWR:    Well Nick came at 3:00.

MJ:     Yeah and left 8:30.

MWR:    8:30.

MJ:     Yeah.

MWR:    And did you work basically in the office that day?

MJ:     Yeah I was in the office.

MWR:    Any problems with the computers in the office that day?

MJ:     I don't see nothing. No problems.

MWR:    Any flickering lights that day?

MJ:     No, I don't even see anything.  I be honest with you.

MWR:    The cameras, any, you notice any shoplifters that day.

MJ:     No, the day was, we find a lot of shoplifters…

MWR:    I know.

286

FR-3143-14

MJ:     …but that day, you know, the day was no…

MWR:    Oh I know that your um, so you had mentioned that, that you know sometimes you get a lot of…

MJ:     Every day. A lot of shoplifting in this neighborhood. It's very poor neighborhood.

MWR:    So do you stay in the office and you are monitoring the staff cameras?

MJ:     Yeah. I, I look at the cameras you know, because it's two like TV.

MWR:    It's two TV's.

MJ:     I watch, yeah.

MWR:    And no shoplifters that day right?

MJ:     No.

MWR:    Alright. Now Sunday is the slower day.  On the other days, are you guys operating all cash registers?

MJ:     I, uh, he open two registers.  If he open in the morning with him.  I uh, but you know, but me, I come in afternoon.  I work with one register.

MWR:    So usually you work one register?

MJ:     Yeah.

287

FR-3143-14

MWR:    He opens with two and you usually work one?

MJ:    I think he open with two.

MWR:    Okay. Okay.

MJ:    He's the one really in charge of everything.

MWR:    Oh I understand. I understand. So talk to me a little bit about the 3:00 o'clock. So these people that came for the lighting.

MJ:    Came in and [INAUDIBLE].

MWR:    Vinnie knows a little more about than I do so I may revisit that a little bit.

MJ:    Just came to me and telling me you know, well you have an appointment. We are supposed to be hook up the lights and the think [INAUDIBLE] on Sunday say, my partner I called him and he said yes.

MWR:    Okay. Is this the first time they came into the store?

MJ:    For me. Yeah, first time but he is saying he came before at earlier time changed the thermostat for the Welcome Box.

MWR:    He said that?

288

FR-3143-14

MJ:      He's told me like before one of them came

         changed you know like the thermostat for

         the Welcome Box in the basement.

MWR:     Yeah. Yeah.

MJ:      So when you open the door, it stop

         working.

MWR:     Okay, so that would have been in the

         basement.  Which, which welcome box would

         that have been?

MJ:      I don't even know. He knows because we

         have a, like two welcome boxes downstairs.

MWR:     It wouldn't have been the uh, not the meat

         room, the other two welcome boxes.

MJ:      The other two welcome boxes.

MWR:     So one of the welcome boxes not the meat

         room was this thermostat thing?

MJ:      Yeah, he say something like he changed,

         you know [INAUDIBLE] with the fan.

MWR:     Right.

MJ:      Because when you opened the door, the fan

         stopped working like safe electric or

         something.

MWR:     Right. I understand. I understand.

MJ:      But I no saw them.  I never saw them.

289

FR-3143-14

MWR:    You, you never saw them before?

MJ:     No.

MWR:    How many guys came that day?

MJ:     Like six, seven guys came. A lot of guys and all of them talk Spanish.

MWR:    Oh is that right?

MJ:     With the accent yeah.

MWR:    And which, uh, do you know which units they worked on?  Did they work on all of them or?

MJ:     They work on the produce.

MWR:    The produce.

MJ:     Meat.

MWR:    Okay.

MJ:     And uh one with the cheese and eggs.

MWR:    Cheese and eggs.  Now is that in the dairy?

MJ:     In the dairy, yeah.

MWR:    Area.  Dairy is over here.

MJ:     Yeah, you know, it's, it's one line like the dairy here.

MWR:    Okay.

MJ:     Another refrigerator here and another frigerator here.

290

FR-3143-14

MWR:     So all three dairies.

MJ:      You talking about this is the milk.

MWR:     Okay.

MJ:      And this is where you put the yogurts and juices.

MWR:     Just for the recorder, I am going to put it on here, we are writing right on the diagram.  Milk.

MJ:      Milk.

MWR:     Okay.

MJ:      And this is for juice and yogurt.

MWR:     Juice and yogurt. I am writing right on the diagram.

MJ:      And this is for the you know like cheeses and eggs.

MWR:     Cheeses and eggs.  So they worked on all of these?

MJ:      Yeah and work on the produce one.

MWR:     The produce on the other side.

MJ:      Yeah other side.

MWR:     And what is that produce?  Like fruits and stuff?

MJ:      Fruits yeah.  Big open case.

MWR:     Fruits open case. Okay.

291

FR-3143-14

MJ:        And the meat case.

MWR:       So they basically were working on the produce, dairy…

MJ:        And the meat.

MWR:       …and meat.

MJ:        Right.

MWR:       Okay and that was, that was their job that they were to install all new lights?

MJ:        Yeah. New light and what you call that thing that, that change in the black one…

MWR:       A transformer?  Or ballast?

MJ:        Transformer.  Ballast.  Yeah, the long little black one.

MWR:       Okay. Now did they remove the old and put in the new?

MJ:        Yeah.  All of them new.

MWR:       And the purpose of doing that?

MJ:        Say save lots some, some power, like, like the bill would become less. Save money like on electric bill.

MWR:       To save money on the electric?

MJ:        Yeah, would be 30%, the [INAUDIBLE] would be 70%.

MWR:       When you say paid, paid to have it put in?

292

FR-3143-14

MJ:     Sure, you know, the ca-, like we pay, like from 100%, the store pay only 30%.

MWR:    Alright so they need to have it installed?

MJ:     Yeah.

MWR:    I understand and uh, you know I didn't, I didn't speak to um Ziad about it.  I know we spoke about a lot of things uh, when did you guys decide to bring these people in?

MJ:     He's, he's talked to them.  I don't even know. I just have a phone call, like when these people walked in…

MWR:    Yeah.

MJ:     …so I want to make sure these people right, I call Z, Z and he told me yeah, you know?  I want to change it, you know, to save electric, you know electric.

MWR:    Right.

MJ:     You know the electric bill will be less money.

MWR:    Right.

MJ:     I say "okay. Fine with me".

MWR:    Okay.

MJ:     That's it.

FR-3143-14

MWR:     Okay. Okay. Okay. So yeah, fine with you. Now did they finish?

MJ:      Yeah finish and take all the garbage out

MWR:     So they took out the old and put in the new?

MJ:      Yeah.

MWR:     Did they test them?

MJ:      They say that they was good, yeah.   He showed me you know everything.   He showed me the curtains like all the thing and after that, we shut off the switches.

MWR:     Okay.

MJ:      And this guy left after, they left like three, three minute to five minute. I shut down the light. I close the computer for the day and I put the [INAUDIBLE] I left. That's it.

MWR:     So let me go back to if I can.   So, we did the dairy which would be the three refrigerators.   We did the meat. We did the produce.

MJ:      Uh.

MWR:     After they worked you, you shut them off because you were leaving?

294

FR-3143-14

MJ:     Yeah.

MWR:    Okay and the meat, does the meat stay on
        or they shut off?

MJ:     The top one stay on but the bottom one, it
        was off.

MWR:    The, the bottom one is the one, that's the
        one they replaced?

MJ:     They replace the top and the bottom.

MWR:    Okay but the top one stays on.   How is
        that controlled, you know?

MJ:     Because    was    like    the    first    week
        [INAUDIBLE]have no switch.

MWR:    It has no switch?

MJ:     Nope.

MWR:    Oh I see, so it kind of works off the unit
        itself. It's like wired into it.

MJ:     [INAUDIBLE]wired into it, yeah.

MWR:    Okay. What about in the basement? Did they
        do any work in the basement [INAUDIBLE]?

MJ:     No, he just, he went downstairs in the
        basement.   He bought a sign and a box.
        You know was the I[INAUDIBLE] breaker and
        the switches.

MWR:    Oh, in the circuit breaker room?

295

FR-3143-14

MJ:     Yeah, he go in there he put like a sign. I don't know what sign. He say he have to hang it.  When he finish, he say "I am going back to pick it up."

MWR:    Probably, it probably is to say that they are working.

MJ:     Yeah, I know.  Whatever.

MWR:    They like to protect themselves kind of thing.  Alright, so they left about 8:30. What time do you normally close?

MJ:     We close like on Sunday 7:30, 8:00 o'clock.  Depends on the business.

MWR:    Now did Alyson stay to the end?

MJ:     [INAUDIBLE]no.  No.  No.  No.  All, I stay with them.  Everybody left like 7:20, 7:30.

MWR:    And that's the boy as well?

MJ:     Yeah.

MWR:    Mohammad and Alyson?

MJ:     Yes. Yes. Yes. Yes.

MWR:    They left 7:30?

MJ:     Yeah because uh, yeah, because you know why?  These people put the box all over in

FR-3143-14

the aisles.    I don't want [INAUDIBLE]to
trip.

MWR:       [INAUDIBLE]

MJ:        Yeah, I don't want no, I don't want nobody
to get hurt.

MWR:       I understand.

MJ:        And be, and because these people over here
very poor neighborhood and everybody wanna
be have lawsuit…

MWR:       Yeah. I know.

MJ:        …for little stupid shit.   You know what I
mean?

MWR:       I understand. I do.

MJ:        And this is very fast people to do that.

MWR:       Yeah I understand.

MJ:        So basically, I tell everybody to leave
and close the door, you know, the gate,
put the gate down because I tell them
let's go.  Finish work. Cleaning your mess
and these people work finish all the
lights, cleaning the mess, put it in a
container.

MWR:       Right.

FR-3143-14

MJ:      Even the Fire Department saw it. You saw it probably right?

MWR:     Right.

MJ:      So after that, I took me like three to five minute sho-, you know [INAUDIBLE].

MWR:     Alright so hold on, uh, because I'm gonna go through that.  I think you said that. Just to say us all time I mean.  So the girl Alyson and Mohammad left about 7:30ish?  Right?

MJ:      Yeah 7:20, 7:30 yeah.

MWR:     7:20. 7:30.  Do they punch out?

MJ:      Yeah, yeah. Alyson punch out. Mohammad doesn't punch out.

MWR:     Alyson. Okay. Now, is Al-, nah, don't worry about it. Um, well do you pay the boy cash or do you pay him?

MJ:      No, I a pay him cash for one day only.

MWR:     Okay.  I understand.  Alyson the same?

MJ:      No, Alyson, yeah, she get paid cash too.

MWR:     Does anyone get paid on payroll or is everyone paid cash?

MJ:      Some of them I don't know, he is doing it?

298

FR-3143-14

MWR:    Alright.  No problem.  So 7:20, 7:30, so you are in there with these six or seven guys and they leave at what time?

MJ:     Uh, left 8:30, 8:35. This [INAUDIBLE]and left.

MWR:    8:30. 8:35 max?

MJ:     Max. Yeah.

MWR:    So after they took all their stuff out, you said they cleaned up after themselves?

MJ:     Yeah, that's why I was watching and my, I, I went them around uh, aisles.

MWR:    Okay.

MJ:     Make sure no boxes no lights in the floor. No garbage.

MWR:    Right.

MJ:     And these people did it.

MWR:    And they did it?

MJ:     Like, yeah, they did it. Clean everything.

MWR:    Good.

MJ:     Put everything in a container.

MWR:    Which way did they go out?  Through the front or through the side?

299

FR-3143-14

MJ:      Yeah, front door.  Like I was parked in like the same place, place he was parking behind me with a white truck.

MWR:     Okay. So he went out first?

MJ:      They went out first.

MWR:     They went out first.

MJ:      Sure.  Have to go first.

MWR:     Now, your closeout procedure.  When they leave, um, I know you shut off all the refrigerators, right?

MJ:      Uh hmm.

MWR:     With the exception of the meat?

MJ:      The meat stay on all the time.

MWR:     Stay one.  Any of the lights stay on all the time?

MJ:      No.

MWR:     Okay.  So then what do you do after you shut off?  Is that your procedure?  Is that the first thing you do?  You walk around the store and shut off the refrigerators?

MJ:      Yeah that's what we do.

MWR:     The back door, do you check to ensure it's closed?

300

FR-3143-14

MJ:      Door is closed.

MWR:     Okay. Okay.

MJ:      Because nobody use it.

MWR:     Okay. Nobody uses it. So then you come, then you come back to the front, and explain to me what the next step is. [INAUDIBLE]

[CROSS TALK]

MJ:      [INAUDIBLE]next step, I went to the office. I went to click and close for the day on the computer.

MWR:     On the computer. Went to the office. Closed the day on the computer.

MJ:      Right.  I put the switches down.

MWR:     Uh huh.

MJ:      And I put, press 3487 for the alarm.

MWR:     Okay.

MJ:      And I walk out.

MWR:     So the office, you closed the computer. Do you shut off the computer or do you leave it running?

MJ:      No, I shut off the computer.

MWR:     Okay.  Do you need a password to get into the computer? Or does it [INAUDIBLE].

301

FR-3143-14

MJ:     Yeah, you need a password, yeah.

MWR:    You do, and what is the password for the computer?

MJ:     Okay.  I know the first one 0393. Okay hold on, yeah, first you have to go 3540.

MWR:    3540. Yep.

MJ:     And 03, I believe 93.

MWR:    0393?

MJ:     Yeah because I, I keep it in a [INAUDIBLE] for an [INAUDIBLE].

MWR:    I understand.  For a [INAUDIBLE] okay.  And is that computer back up outside of here do you know?

MJ:     No, it shut off after you know, you…

MWR:    No I mean back up. In other words, is that where everything is stored on that computer or is it stored somewhere else outside the store?

MJ:     I don't know.

MWR:    You don't know okay.

MJ:     No. No. No.

MWR:    Okay.  So you shut off the computer.

MJ:     Uh huh.

302

FR-3143-14

MWR:    Right. Um, the next thing you do, well do you have to, the cash…

MJ:     The next thing I do…

MWR:    …the cash register, do you have to count out cash?  Do the cash, do the cashiers do that?

MJ:     Uh.

MWR:    How does it work?

MJ:     I count the cash.

MWR:    Out of the cash register?

MJ:     Yeah.

MWR:    And when do you do that?  Before you close?

MJ:     Before I close.

MWR:    As part of your procedure?

MJ:     Yeah because most of the, the, the money is like uh, you know most of the business here.

MWR:    Yeah.

MJ:     Like food stamp and the credit card, not you know.

MWR:    Right, you don't get as much cash?

MJ:     Cash, no. Not much cash.

303

FR-3143-14

MWR:        Okay. But as part of your close out procedure, did you count out the cash registers that day?

MJ:         Yeah I counted.  I leave $200.00 in the drawer.

MWR:        Okay.

MJ:         And I have $190.00.  I took it to my pocket because we got robbed [INAUDIBLE]before here.  The [INAUDIBLE]took the safe.

MWR:        Yeah, I heard that.

MJ:         With the hand truck.

MWR:        Yeah.

MJ:         So we no leave no money in the register really.

MWR:        Okay.

MJ:         Only $200.00 for the change in the morning when the girl come.

MWR:        Okay. Okay. And which cash register is that?

MJ:         Same cash register I told you.

MWR:        Alyson, where Alyson worked?

MJ:         Yeah, number one.

304

FR-3143-14

MWR:  Okay. Um, and you took the cash with you when you left.  Credit cards, do you have to do anything with the credit cards or this automatic?

MJ:  No it automatically go to the bank.

MWR:  And the food stamps, do you have to do anything or is that automatic?

MJ:  No. No. No. Automatically too.

MWR:  Okay.  How do food stamps work?  I understand that they are now cards or something?

MJ:  I don't know, you swipe it like it was a credit card.

MWR:  It is a credit card.

MJ:  Like a debit.  You have to have, every, every customer have a PIN number.

MWR:  I heard that and they don't all get like physical things.

MJ:  No. Nobody can use.  You have no PIN number, nobody can use it.

MWR:  I understand. I understand. Alright, so you shut off the computer, you count out the cash register. Um, what else you

305

FR-3143-14

doing?   Then you said you turn on the alarm?

MJ:      Yeah.

MWR:     You shut the lights off?

MJ:      First the light.

MWR:     And where do you shut the lights off?

MJ:      Inside the office.

MWR:     What about the basement?  Are the basement lights off?

MJ:      No, those off.

MWR:     They are off?

MJ:      Yeah.

MWR:     Okay.

MJ:      When the guy went up, up, when he went to go back to the basement…

MWR:     Yeah.

MJ:      …to get his sign [INAUDIBLE].

MWR:     Yeah.

MJ:      So when he left, I, I, I put the light down.

MWR:     You shut the lights?  And that shuts off all the lights in the basement?  By the stairs?

MJ:      Basement. By the stairs, yeah.

306

FR-3143-14

MWR:    And the ones by the office, do you shut those lights off?

MJ:     Yeah. Yeah, I shut that off when we leave.

MWR:    When you leave?

MJ:     Right.

MWR:    Okay.    Uh do you shut, do you shut the lights off before you set the alarm or after?

MJ:     No, before the alarm definitely.

MWR:    Okay, so then you set the alarm and how do you set the alarm?

MJ:     Is, is just a box in, in, in, in the office door.

MWR:    The touchpad? The touchpad.

MJ:     Yeah, the touchpad. You open the box, you put 3487 enter [INAUDIBLE]number two.

MWR:    And then enter number two.

MJ:     Yeah.

MWR:    What's the number two?

MJ:     It's like the alarm is on.

MWR:    Oh, so you do 39 or 3487?

MJ:     Right.

MWR:    Right and then press…

MJ:     You press number two.

307

FR-3143-14

MWR:    …press two and that like arms it?

MJ:     Yeah.

MWR:    I understand. Number two.

MJ:     When in the morning, the girl comes, she will press the same thing 3487 press number one.

MWR:    And that disarms it?

MJ:     Yeah.

MWR:    I understand so you are telling him here's the code, I want to arm it, here's the code, I want to disarm it.

MJ:     Yeah.

MWR:    Understood. Okay, and that's what you do every night when you close?

MJ:     Yes. Every night for the last two years. Same routine.

MWR:    Have you ever not turned on the alarm for any reason?

MJ:     No.

MWR:    Okay.

MJ:     Used to it. That's it.

MWR:    What's that?

MJ:     Used to it every day.

FR-3143-14

MWR:     You're used to it.  You are doing it every day.

MJ:      [INAUDIBLE] Yeah.

MWR:     Okay so you set the alarm that night.  Uh, does it tell you it's armed when you set it?

MJ:      Yeah, it's telling you it's on.  You can tell from the green light.

MWR:     Okay. Okay. Did um, when you leave, which way do you leave?

MJ:      From here.  The door here my car here.

MWR:     Where are you, the front?

MJ:      Yeah, this the front door and then my car park it right here.

MWR:     Okay so you are parked across the street?

MJ:      Yeah.

MWR:     Uh facing west?

MJ:      Yeah, it's this way.

MWR:     That way. Across the street facing west and that's your card and you took your car that evening?

MJ:      Yeah.

MWR:     Okay.

BURT:    Is that west?  Isn't that south?

309

FR-3143-14

MJ:      No. No. I, I, no I go [INAUDIBLE].

MWR:     I got turned around.

MJ:      …what I do, I go from here, this block.

MWR:     So you make a left on Bennett?

MJ:      Bennett and I go to the [INAUDIBLE].  It's
         easy for me on Van Name because over here,
         if I go over there, a lot of lights.

MWR:     I see.

MJ:      A lot of like I hit the [INAUDIBLE]a lot
         of light and Forest is busy.

MWR:     Right.

MJ:      So I got off to go on [INAUDIBLE], I hit
         the Van Name.

MWR:     So let's, let's talk about it. SO you are
         across the street.

MJ:      Mmhmm.

MWR:     Your car is facing, that's south guys?
         Where we are facing right now?

BURT:    I believe so. I believe so yeah.

MJ:      Mmhmm.

MWR:     Okay, so then you'd make a left turn on
         Bennett?

MJ:      Right.

310

FR-3143-14

MWR:    And then what?  You go one block, make another left?

MJ:     One block I am park…

MWR:    Uh huh.

MJ:     …make another left.

MWR:    Okay.

MJ:     Straight down to Terrace.

MWR:    To Terrace.

MJ:     And then at Terrace, you make another left.

MWR:    Okay.

MJ:     I go straight to my house. That's it.

MWR:    And then straight to your house.

MJ:     There's no traffic. It's empty always.

MWR:    Right.

MJ:     The Terrace is empty. So it's easy.

MWR:    Quick run. Quick run.

MJ:     Right fast, all that.

MWR:    Yeah.

MJ:     Because if I am going from here with the Mexican cars double parked and, and the Forest Avenue, I'll be [INAUDIBLE].

MWR:    It's going to take time.

MJ:     It's going to take time, yeah.

311

FR-3143-14

MWR:     It's going to take time. Okay. Uh any problems with anyone that night?

MJ:      Honestly, no. I have no problem.

MWR:     And how did you learn of the fire?

MJ:      My partner call me.

MWR:     Who was that?  Uh Ziad called you?

MJ:      Yeah. Yeah.

MWR:     When did he call you?  What time.

MJ:      Seven something. 7:10, like 7:15.  I know it was when I was driving my kids to school.

MWR:     Uh.

MJ:      And he tell me "you know what happened?" I said "no" he's screaming.  I said "well how you find out [INAUDIBLE] the fire? Was, was it maybe people lying to you".  I was thinking…

MWR:     Yeah. Yeah.

MJ:      …somebody fake phone calls, you know?

MWR:     Yeah.

MJ:      He said, "No, no, no.  My brother saw it on TV".

MWR:     Wow. So this is about 7:10, 7:15?

MJ:      Yeah.

FR-3143-14

MWR:    And you are just driving your kids to school?

MJ:     Yeah.

MWR:    Okay. So the, when you left the store at 8:30, you went right home?

MJ:     Straight home.  I never went nowhere.

MWR:    You make any phone calls to anyone for any reasons?

MJ:     Nope. Yeah.

MWR:    Okay.  When did you go to sleep that night about?

MJ:     Sleeping about 10:30, 11:00 I believe.

MWR:    10:30 or 11:00 and then you woke up about what time?

MJ:     I wake up exactly 6:00 o'clock because I have to drop my, my daughter to first grade, you know.

MWR:    [INAUDIBLE] Yeah, sounds familiar.

MJ:     And my oldest daughter, she in high school.

MWR:    Okay.

MJ:     Because I drive three different schools. That's the problem.  My kids go different, different, different.

313

FR-3143-14

MWR:      Are they all private over here?

MJ:       No, in public schools but different schools.

MWR:      But they are spread out.

MJ:       Yeah.

BURT:     It's just nine of them, they can't all be in the same school.

MWR:      Yeah that happened on Long Island where they are separating a lot like that and I have friends you know kids of that age, and they are like it's crazy. You, you're driving the kids to three different schools, you know?

MJ:       Yeah I do.  That's why I come in in afternoon.

MWR:      Right because you take care of the kids' stuff.

MJ:       The kids, I got to go pick them up…

MWR:      Right.

MJ:       …and then I come in here.

MWR:      Right. Okay.  So you went to bed about 10:30, 11:00. You woke up about 6:00 A.M. and you learned about 7:10, 7:15?

MJ:       Right.

314

FR-3143-14

MWR:    Did you get any phone calls in the middle of the night about the fire?

MJ:     No. No. No.

MWR:    Were there any calls at all?

MJ:     My phone doesn't ring period.

MWR:    Okay.

MJ:     Zero.

MWR:    And did he call you on your cell phone?

MJ:     Yeah, he called me on my cell phone.

MWR:    And what's your cell phone number?

MJ:     (917)

MWR:    Okay.

MJ:     335

MWR:    Okay.

MJ:     0180.

MWR:    8-0. And is that Verizon your provider?

MJ:     No, MetroPCS.

MWR:    I am sorry what's that?

MJ:     MetroPCS

MWR:    Much?

BURT:   Metro.

MWR:    Oh Metro.

MJ:     Metro. Metro. Metro.

MWR:    Okay, MetroPCS. PCS.

315

FR-3143-14

MJ:      I got nine kids, I can't afford [INAUDIBLE].

MWR:     Eh, tell me about it. I, I don't know how you deal with nine kids. That's just, that's amazing to me.

MJ:      Uh, I love them. You know.

MWR:     That's great I mean that's what this is all about I guess, what we are doing.  Um, do you have a house phone number?

MJ:      House phone number yeah.

MWR:     What's that?

MJ:      (718)

MWR:     Okay.

MJ:      420

MWR:     Okay.

MJ:      0921.

MWR:     Alright so when you learned of the fire, had you dropped your kids off yet or not yet?

MJ:      I was dropping my first…

MWR:     Uh huh.

MJ:      …my first one and the second one, I was ready to drop them when he called me.

MWR:     Okay and then you came here after?

316

FR-3143-14

MJ:      Yeah, I came here after that?

MWR:     When did you get here about?  What time?

MJ:      Uh, around, since I drop them, about 7:30, 7:35, something like that.

MWR:     7:30.

MJ:      I didn't even look at the time to be honest with you.

MWR:     I know.  Fire Department, were they here?

MJ:      Everybody here. The Fire Department, the police, the air, the whole mess here.

MWR:     Yeah. Yeah.

MJ:      Because they, they doesn't want to let me get in anyway.

MWR:     Did you speak to a Fire Marshall?

MJ:      Yeah, I speak to a million people.  I don't know, I speak to millions of people?

MWR:     Did anyone give you an indication of what they think caused the fire?

MJ:      Nobody [INAUDIBLE] honestly to God, asked me if you guys got leaks, we have a heavy leaks…

MWR:     Right.

MJ:      …in the roofs…

MWR:     Right.

FR-3143-14

MJ:     …all the time. We've got problems with the first landlord. We have second problem with the landlord. Nobody fixed the leaks.

MWR:    Right.

MJ:     And we showed them where's the leak. We show them everything. These people want to collect the rent and doesn't want to fix.

MWR:    Yeah. Yeah.

MJ:     That's the problem. You know what I mean?

MWR:    Yeah. Yeah.

MJ:     They, you know, they own these old buildings.

MWR:    Yeah. I understand. So, so nobody gave you in-, any indication of what caused the fire?

MJ:     No, nobody told me nothing.

MWR:    Okay. Um, have you ever experienced a fire before?

MJ:     I have no experience with fire before.

MWR:    Okay.

MJ:     Business never.

FR-3143-14

MWR:    You know I went to go over the break in um, but we didn't go over it.  Are you familiar with the break in that happened here at one time, you had the break in?

MJ:    Break in?

MWR:    Yeah.

MJ:    The store, yes.

MWR:    Yeah.

MJ:    Somebody break in.  Went through the roof. This guy cut the wires.

MWR:    Yup.

MJ:    You know.

MWR:    Right.

MJ:    We saw it in the camera that, that the old landlord…

MWR:    Right.

MJ:    …got recorded.

MWR:    Yeah.

MJ:    And he cut, this guy went in the, in the roof, cut the wires, the alarm wires, the phone wires.

MWR:    Yeah. Yeah.

MJ:    And he clicked the thing and then he opened the gate. Him and couple of guys.

319

FR-3143-14

MWR:      Right.

MJ:       He took the safe. Break the [INAUDIBLE].


MWR:      Did they, yeah, I was going to say, what else did they do?  They took safe. Anything else?

MJ:       Circle all the money, milk, cigarette, we used to have like baby milks, cigarettes.

MWR:      He took milk and cigarettes out?

MJ:       Yeah and money.

BURT:     Baby milks you said.

MJ:       Baby milks.

MWR:      Baby milk.

MJ:       Baby milk very expensive. Baby milk you know.

MWR:      Oh.

BURT:     Enfamil.

MJ:       Like yeah, a case like $90.00, $100.00 a case.

MWR:      Oh, I see. I see. Um, so did you guys put in an insurance claim?

MJ:       Yes. Same day.

MWR:      Do you remember what the amount of the claim was?

320

FR-3143-14

MJ:      I don't even know.

MWR:     About?

MJ:      He was doing it.

MWR:     Okay  but  there  was  a  claim?   Same insurance company do you know?

MJ:      Same insurance. Same guy. Yeah.

BURT:    Not me.

MJ:      No, you don't know was the claim with you?

BURT:    It's with my office but not me.

MJ:      Oh.

MWR:     Oh, okay. Bird do you know how much of a claim it was back then?

BURT:    Excuse me?

MWR:     Do you know how much of a claim it was?

BURT:    I have no idea.

MWR:     Alright.  It was Rigio you said?

BURT:    Rigio is handling it.

MWR:     Is that still ongoing that claim do you know?

MJ:      I don't even know.  I don't know if its [INAUDIBLE]

BURT:    Uh, I [INAUDIBLE]

MWR:     Okay.  Do you know Burt?

321

FR-3143-14

BURT: Yeah, I think because, yeah, I think there's some kind of confusion about documentation for that and a different claim, so it's, it's uh, it's got very confused.

MWR: Okay. Okay. So we don't know then what the status is of that claim? I mean obviously the insurance company should know.

BURT: I think it's, I think it's still active.

MWR: Okay.

BURT: But uh…

MWR: Okay.

BURT: …or it may have just been closed. I don't know which one it is.

MWR: Okay. Okay.

BURT: Ri-, Rigio could tell you what you need to know.

MWR: Okay. Okay. Before you close, did you go downstairs for anything?

MJ: Nope. [INAUDIBLE]

MWR: Do you know the last time you went downstairs?

322

FR-3143-14

MJ:      I went down the stairs to check, you know,

         when the guy went…

MWR:     Yeah.

MJ:      …went with him.

MWR:     The panel right?

MJ:      Yeah.

MWR:     And what time was that about?

MJ:      This is like before he leave.  Couple of

         minute.

MWR:     Okay. Okay.

MJ:      Because I want to sure of that, make sure

         the light is off like…

MWR:     Did he go into another rooms or just?

MJ:      No. No. No. He went straight. I don't know

         honestly.

MWR:     To the circuit breaker panel?

MJ:      The circuit breaker and went back. Yeah.

MWR:     Okay.  Now do you smoke Mohammad?

MJ:      No.

MWR:     Were you guys burning any incense in the

         store for any reason?

MJ:      No. No. No. No. No.

MWR:     Any candles for any reason?

MJ:      No. No. No. No.

323

FR-3143-14

MWR:     To smell or anything?

MJ:      For what?

MWR:     I don't know. Yeah, I've heard some pretty wild things is why.

MJ:      Nah.

MWR:     Do you have any thoughts of what might have caused the fire?

MJ:      I don't even know I be honest with you.

MWR:     Yeah.

MJ:      Uh.

MWR:     Okay, no candles. No incense.

MJ:      No. Nothing like that.  Nobody deserve to smell good to anyone in this neighborhood [INAUDIBLE].

MWR:     And you definitely shut the lights, right?

MJ:      Yeah.

MWR:     Alright Vinnie, all because I am not. I don't want to have to thumb through everything here again.  Is there anything you wanna ask?

VINNIE:  Um, as far as like the store and the employees on Sunday, do you have anybody behind the deli counter if somebody wants

324

FR-3143-14

to get cold cuts?   Or would the kid go back there?   Who would help somebody?

MJ:       Like me and the kid.   The kid go and help the customer but you know this is uh machine, slice machine. This is not a…

VINNIE:   So nobody stands behind the deli counter all day on Sunday?

MJ:       No. No. He's moving around.

VINNIE:   Okay and outside of the store, there's like those sidewalk doors that lean into the cellar, do you ever use those or are those kept locked?

MJ:       We use [INAUDIBLE] delivery not on Sunday.

VINNIE:   So they are locked then?

MJ:       Locks. Yeah 100%.

MWR:      How are they locked. Is there a padlock on the outside?

MJ:       It's like a, it doesn't have no keys, you just slide it up and [INAUDIBLE].

MWR:      Oh so you have to open it from inside?

MJ:       Inside.

MWR:      Okay. So it's closed. It's locked.

MJ:       Right.

325

FR-3143-14

MWR:      Nobody come in the street unless somebody inside opens up.

MJ:       No. Won't benefit them right.

MWR:      Okay.

VINNIE:   I don't think it's locked, it's just a slide bolt.

MJ:       Slide. Yeah, you know lock it.

MWR:      Right. Right.

VINNIE:   So you can't open it from the outside?

MJ:       But you can't even have no keys.    It doesn't have no keys.

VINNIE:   That's what I am saying.

MJ:       That's what I am saying. Yeah.

VINNIE:   [INAUDIBLE]

BURT:     It's like a dead bolt that locks it from inside.

MWR:      Right. From inside.

MJ:       I think the door is still there.

MWR:      Yeah.

VINNIE:   No it's there.

BURT:     I know in the past um they had said that you did have like a barbeque for customers, or do you have a barbeque?

FR-3143-14

MJ:      Yeah this last, like last summer.  We did
         barbeque outside right there for last, you
         know, for the, you know for the customer.
         We did free barbeque over there by the
         door over there.  Yeah, this is like a
         year ago.

BURT:    So it wasn't that, the weekend that the
         fire happened?  You hadn't done any
         barbeques that weekend?

MJ:      No. No it's too cold.  We don't want to do
         barbeque in this frozen weather.

BURT:    I don't know.

MJ:      [INAUDIBLE]. That's a crazy question.  I,
         I would never make nobody barbeque in this
         weather.  I only making my kids in this
         weather.  I make it in the summertime…

BURT:    I would do it to them as well.

MJ:      …[INAUDIBLE]warm up one month.

MWR:     Right.

MJ:      And we throw them barbeque.  Hot dog and
         hamburgers is free for the customers, you
         know?

MWR:     Right.

327

FR-3143-14

MJ:      Which you know for the community because all of them complaining "oh, we are poor. We got this" we say let me [INAUDIBLE].

BURT:    [INAUDIBLE] Ziad might know more but Mohammad, have you fired any employees recently?

MJ:      Not really.  [INAUDIBLE] fire anybody.

MWR:     Any problems with anybody?

MJ:      Not really.

MWR:     Okay.

MJ:      Let me tell you something, this neighborhood is, is, is you know, people over here, when this day say hello to you the next day doesn't know you. Something you know, I don't know, I have no problem with nobody.

MWR:     I understand. I understand.  Any police responses to the store for any reason?

MJ:      No.  Polices all the time here but for other reason. Not for us.

MWR:     Not for you guys.

MJ:      The Family Dollar all the time.

MWR:     Yeah.

FR-3143-14

MJ:       And if the Family Dollar [INAUDIBLE] every

          day, not for us.

MWR:      Right. Vin?

VINNIE:   Just  business  related  to  when  other

          supermarkets opened.  I know that there a

          [INAUDIBLE].

MJ:       Not  really.   Honestly,  he  no  hurt  us.

          Maybe,  maybe  where  he  hurt  us  like  in  the

          grand  opening  you  know,  because  you  have  a

          big  sale,  but  he  can't  do  grand  opening

          every  day,  you  know?   Only  one  week  or  two

          like  in  August.    This  is  last  year.    But

          after  that,  back  to  normal,  you  know?

MWR:      The  profit  sharing,  you  said  you  get  one

          third,  he  gets  two  thirds.  Is  that  done  at

          the  end  of  the  year?

MJ:       No. No. What it was, was our plan to build

          the  credit  first.

MWR:      Right.

MJ:       Like,  we  can,  we  can  get  like  $2,000.00,

          $3,000.00  each,  me  and  him,  to  use  it  for

          [INAUDIBLE]  because  I  used  to  shop  here

          for  free  you  know  for  my  kids.

MWR:      Right.

329

FR-3143-14

MJ:     But our plan like to, to [INAUDIBLE] all the [INAUDIBLE], Crazedale, C-Town also because almost $200,000.00.

MWR:    Yeah. Yeah. Yeah.

MJ:     We knock it down to $75, you know?

MWR:    Right.

MJ:     We need to push to clean it up and after that, to be live comfortable you understand?

MWR:    Right. Right.

MJ:     Yeah. That's what it was we are looking for.

MWR:    So your goal is once you pay off the debt then you would…

MJ:     Yes. That's why almost, almost done.

MWR:    Right.  Do you guys draw a salary from the business?

MJ:     Huh?

MWR:    A salary?  Do you both draw a salary?

MJ:     Yeah we draw salary.

MWR:    And what are the salaries?

MJ:     Between $2,000.00 to $3,000.00 a month.

MWR:    $2,000.00 or $3,000.00 a month?

MJ:     Yeah.

330

FR-3143-14

MWR:      You each take?

MJ:       Yeah. Yeah.

MWR:      Okay.   So there is no profit sharing
          because you now, you want to pay the debt
          of first?

MJ:       Yeah first that's the agreement.  We have
          to build it up.

MWR:      Okay.

MJ:       And almost, almost we are done.

MWR:      You're almost there.  Vinnie, do you have?

MJ:       That's fucked up, we almost done and…

VINNIE:   Uh, do you own the home where you live?

MJ:       Yeah I own home.

VINNIE:   That's it.

MWR:      Do you have a mortgage on that home?

MJ:       Yeah I got mortgage.

MWR:      Mortgage paid to date?

MJ:       Yeah it be.

MWR:      Good.   What a date of birth for you
          Mohammad?

MJ:       ███████ 1967.

MWR:      ████████ '67.

MJ:       Yeah.

FR-3143-14

MWR:      And the last four digits of your social
          security number?

MJ:       7914.

VINNIE:   How about the DVR?  Have you ever had any
          problems with the system working while you
          were in the store?

MJ:       NO. No. Sometimes it switch, you know, how
          you call like…

VINNIE:   Records over.

MJ:       Over, right?  You know, it's like it take
          a couple of minute.

MWR:      Right.

MJ:       Shut off and or go back on alone.

MWR:      So it reset.

MJ:       I know, a reset right.

MWR:      Right. It resets.

VINNIE:   Do you have to do anything when it's
          reset?

MJ:       No. No. I leave it alone, it come back.

VINNIE:   It does it all alone?

MJ:       [INAUDIBLE]. I don't touch nothing.

VINNIE:   Do you know how long its cycle is?  Some
          do it a week, some do for a month.

FR-3143-14

MJ:        Sometime, you  know, it had been

           [INAUDIBLE] once a month.

MWR:       Okay. [INAUDIBLE].

[CROSS TALK]

MJ:        I don't really, I don't really write

           everything down, you know?

MWR:       Yeah. Yeah. Yeah. Yeah.

BURT:      Good.

MWR:       I'm just waiting on Vinnie. You done?

VINNIE:    I'm done.

MWR:       Okay.

MJ:        Alright.

MWR:       Alright with that Tom, I am going to turn

           off the recorder.  I really do appreciate

           your time and I wish you the best. Now

           look, before we go, uh how can we find out

           from, what's her name, Sue?

MJ:        You have to take [INAUDIBLE]…

MWR:       Go to her house?

MJ:        …the, yeah, the Sue, you have to ask him.

MWR:       Oh, so [INAUDIBLE] he's still here.

[CROSS TALK]

MJ:        Yeah, still in my store.

BURT:      We will ask Ziad.

333

FR-3143-14

MWR:      Ziad.

MJ:       Ziad. Yeah. Yeah. Yeah.

MWR:      I keep on pronouncing his name wrong.

          Alright, with that I am going to turn off

          the recorder.  We will ask him because

          then if we could at least get Sue out of

          the way um, then we get to decide if we

          are going to do the last employee but

          she's the one I, I'd want to speak to.

          Okay?

MJ:       Okay. No problem.

VINNIE:   Alright let's go uh.


END OF STATEMENT


TRANSCRIBED BY: CM\WWD
               MAY 13, 2014

   *This is to certify the above statement is a true
   transcription to the best of my ability.*

                **********************


| RECORDED STATEMENT |
| --- |

| RE:   INTERVIEWEE: | TAMMY, EMPLOYEE 20 |
| DATE OF LOSS: | UNKNOWN |

This  is  going  to  be  an  attempted  (SIC)  phone

interview  with  the  central  station  which  is  escort

334

FR-3143-14

central station at telephone number 718-939-2700.

Okay. This is going to be on file number 3143-14.

This is Mike Russo T.J. Russo Consultants. I'm one

of the fire investigators retained on behalf of

Guard Insurance pertaining to a fire which occurred

at 107-109 Port Richmond Avenue, Staten Island, New

York on or about Monday, the 24th. I was given the

central station service agreement from the insured

public adjuster with the contact information. At

this time, I'm going to attempt to speak with them

just for further clarification relating to the

service agreement and such. So, let's see. Here's

what we're going to do. Okay. Again the telephone

is 718-939-2700.

T:    (INAUDIBLE).

MR: Yeah. Hi. Is this escort?

T:    Yes.

MR: Yeah, hi. I'm calling on behalf of account

number 7336 C-Town.

T:    C-Town? Yeah. How may I help you? Yeah.

MR: Yeah, yeah. I have in front of me a copy of

the service agreement and if I could, I just need a

little clarification. Do you have it there?

335

FR-3143-14

T:   Yeah, but (INAUDIBLE) about you got to call your (INAUDIBLE).   This is (INAUDIBLE) central station service.

MR:  No, no.  I understand that.  I have a form from you.  It's the escort central station.  Well, here's my question.  You may or may not be able to help me. Do we have fire or we only have burglary?  It shows here the second…

T:   Only burglary, no fire.  Yeah.

MR:  There's no fire, only burglar?

T:   Right.

MR:  Oh, okay and I see here.  I'm looking at the paperwork.  Okay.  You may know.  You may not know. We have for low battery monitoring, correct?

T:   Yes, correct.  Yeah.

MR:  A/C power fail?

T:   Yes.

MR:  Okay and then the rest are burglar type for doors and such?

T:   Now what's that?  I don't get it.

MR:  No, no.   The rest are different zones for burglar protection?

T:   Yeah.  (INAUDIBLE), yes.

336

FR-3143-14

MR: Yeah, but there's definitely no fire protection, right?

T:   No, no fire.

MR: And there's never been fire?

T:   No.

MR: Okay.  Alright:  If I could and I will, I'm going to call the installer.  What's your name, ma'am, for…

T:   Tammy.

MR: Tammy?

T:   Yes.

MR: And Tammy, do you have like, an employee number or a last name?

T:   20.

MR: Yep.

T:   20.

MR: Oh, employee 20?  Okay, Tammy.

T:   Uh-hm.

MR: Now escort, I have the phone number 718-939-2700.  What's your guy's actual mailing address?

T:   Mailing address, 171-42…

MR: Yep.

T:   I'm sorry, 62 46 Avenue.

MR: Oh, 62 forty se… 47th Avenue?

337

FR-3143-14

T:    Okay.  Let me repeat that.

MR:   I'm sorry.

T:    171-62…

MR:   Yep.

T:    46th Avenue.

MR:   46th Avenue in Brooklyn or Staten Island?

T:    Flushing, Flushing.

MR:   Oh, you're in Flushing?

T:    Uh-hm, Flushing, New York 113 (INAUDIBLE).

MR:   Okay, great.  Tammy, you have an email address?

T:    Yeah.  We have it, yeah.

MR:   What's the email address?

T:    Escortsecurityinc@hotmail.com.

MR:   So, Escortsecurityinc…

T:    Inc, yes.

MR:   @hotmail.com?

T:    Yeah, h o t.

MR:   Okay.  What I'm going to do, Tammy, is going to send you a quick email, just to verify our conversation that there is no fire protection. Okay?

T:    Okay.  Oh, who is calling…

MR:   If you could just reply.

T:    me?

338

FR-3143-14

MR:   Yeah.

T:    Who is calling me?

MR:   I'm one of the fire investigators over…

T:    Okay.

MR:   At the loss location.

T:    Uh-hm.

MR:   Yeah.

T:    Okay.

MR:   So, I'm going to shoot you an email now just saying hey, Tammy as per our conversation I want to verify that our protection is only burglar, that we do not have fire and then if you could just respond, yes, that is accurate?  Okay?

T:    I show this to my boss.

MR:   Oh, perfect:  Who is your boss actually?

T:    Mr. Lee (SP?).

MR:   Oh, Mr. Lee?  Oh, is Mr. Lee…

T:    Yes.

MR:   from CCTV, Sky?

T:    No, no.  Sky is the installer.  Our boss is, but we (INAUDIBLE) with the central station.

MR:   Oh, okay.  Oh, I see.

T:    We installer for this (SIC) place (SIC).

FR-3143-14

MR:  Oh, I understand.  I understand.  Okay.  So, basically… Yeah.  What's (SIC) Mr. Lee?  Should I address it to Mr. Lee?

T:   Say again.

MR:  The email, should I send it to Mr. Lee?

T:   Oh, you send that email address, I'm going to give it to him and also, I think (INAUDIBLE) this one, I think you better (SIC) contact the installer, not us.

MR:  Right, righT:

T:   Okay?

MR:  Okay.  I can…

T:   (INAUDIBLE).

MR:  (INAUDIBLE) the installer.  Now, I have it as Sky CCTV.  Do you have a phone number for them?

T:   Yeah, sure.  One second.

MR:  Okay.

T:   Sky CCTV 917…

MR:  Okay.

T:   392…

MR:  Okay.

T:   9223.

MR:  And do you know his name?  I just had it as Mr. Lee.  Do you know his name?

FR-3143-14

T:   (INAUDIBLE) Mr. Choy.

MR: Oh, Mr. Choy?

T:   Yes.

MR: Okay, Tammy listen, I do appreciate your time. That's all I'll need.  I'll give a call to Mr. Choy.

T:   Okay.

MR: Alright, thank you ma'am.

T:   Okay.  You're welcome.

MR: Okay.  Bye.

T:   Bye, bye.

MR: Bye now.  Okay.  At this time I'm going to attempt to call Mr. Choy at 917-392-9223.  Today's date is actually the 15th.  It's Saturday morning about nine o'clock.  Yes, it's Saturday the 15th. The time is approximately 9:55 a.m.  At this time I'm going to turn off the recorder.

END OF STATEMENT
TRANSCRIBED BY: EAS\WWD
               June 13, 2015

  *This is to certify the above statement is a true transcription to the best of my ability.*

**********************

FR-3143-14

---

| RECORDED STATEMENT |
|---|

| RE:   INTERVIEWEE:   ZULEIKA D. WALLACE LOWE & ALLISON S. BAKAL |
|---|
| DATE OF LOSS:   02-24-2014 |

Today is Friday, March 21, 2014.  It's approximately 11:30 am.  My name is Vinny Palmieri.  I'm the Fire Investigator for T.J. Russo Consultants, T.J. Russo File No. FR 314314 for Guard Insurance.  I don't have the claim number in front of me, but it's for a fire loss which occurred on February 24, 2014 at 107-109 Port Richmond Avenue.  Their insured is SI Meat Village Inc. d/b/a Sea Town.  It's a Sea Town supermarket on the corner of that location.  I am present in the offices of Randall Lazzaro Law Firm -- is it the Lazzaro Firm.

RL:     Lazzaro Law firm, yeah.

VP:     It's at 360 Court Street in Brooklyn, New York. Present for the interview is Zuleika , Z-U-L-E-I-K-A, D. Wallace, W-A-L-L-A-C-E, Lowe resigning at 853 Post Avenue in Private Homes (SP?), Downs, New York 10310; date of birth, ███/75.  She presented me with a New York State drivers license No. 865085115; contact cell phone

342

FR-3143-14

number 718-419-8327.  Is there a private phone number at the home as well, a land line kind of?

ZL:    Yeah, but it all goes to the same.  It goes to my cell phone.

VP:    What is the land line number?

ZL:    718-447-1177.

VP:    I have the same thing where it's voice over IP phone system, and it forwards to my cell phone.  Nobody really answers the home phone.

ZL:    Knowing my teenagers, they won't pick up the phone.

VP:    I hear you.  Also present for the interview **(INAUDIBLE)** -- most of my questions will be for Ms. Zuleika -- is Allison S. Bakal, B-A-K-A-L, 5 North Street, Apartment A, Downs, New York 10302, New York State ID 616394709; date of birth, ███/58.  (Phone ringing)  You want us to stop it?

RL:    No.

VP:    All right.  I wrote out like a list of questions just so it moves along a little

343

FR-3143-14

bit smoother. I already have your name and address, ID, cell phone, home phone. I didn't get Allison's cell phone number or contact number for yourself?

AB: 347-488-2453.

VP: And that's your cell?

AB: Mm hmm.

VP: Is there a home number as well?

AB: No, that's it.

VP: All right. First, Zuleika, how did you get the job at Sea Town?

ZL: I walked in.

VP: Just as walk in. When was that? Do you remember when it was?

ZL: Two weeks before the store opened.

VP: Was there signs in the window? Did you go to an employment agency?

ZL: No, there was just a line outside, and I was curious to see what it was, and I got in the line and applied.

VP: Did you know the owners prior to that Neotoziad (SP) or Mohammed (SP?) ?

ZL: No, neither one.

VP: Do you remember who you interviewed with?

344

FR-3143-14

ZL:     Ziad.

VP:     When did you find out you were hired for the position?

ZL:     I filled out the application, went home, got my resume, came back, showed it to him, and came back maybe two days later.

VP:     Two days later?

ZL:     Mm hmm.

VP:     When did you start working for the Sea Town?  Was it before they opened?  I understand their Grand Opening was March of '012 or something?

ZL:     Yeah, I don't remember the exact date, but it's been two years.  I want to say maybe a week and a half before they started.

ZL:     The full Grand Opening?

VP:     Yeah, because I had to train the girls, yeah.

RL:     Zuleika, that's what I was telling you.  Just listen to the question.  He asked you when you started, just tell him that.  You don't have to say you went there to train people.  He'll ask you the questions.

345

FR-3143-14

VP:     Do you have previous experience in a supermarket or a deli?

ZL:     Yes.

VP:     Where had you worked before that?

ZL:     Western Beef.

VP:     Is that the Western Beef that is on Forest Avenue in Stanten Island?

ZL:     Yes.

VP:     When did you work there?   When did you start or a period of two years approximately?

ZL:     From 1995 to 2007.

VP:     Why did you leave?

ZL:     I moved.

VP:     Different part of the island?

ZL:     I moved to Atlanta.

VP:     When did you move back into New York City? When did you get a job?

ZL:     I moved back 2008.

VP:     Before you got the job with Sea Town, were you employed anywhere before that?

ZL:     I was in school.

VP:     So you weren't working right before you went to Sea Town?

346

FR-3143-14

ZL:      No.

VP:      You saw the sign, you went down, applied and you started working before that (sic)?

ZL:      Yeah.

VP:      What were you hired as?

ZL:      Front End Manager.

VP:      Front End Manager, and were you a Front End Manager at Western Beef?

ZL:      Yes.

VP:      The whole time that you were there or a portion of the time?  In other words, did you start as a cashier and work your way up to Front End Manager?

ZL:      I started as a cashier, and I worked my way up.

VP:      How long were you a Front End Manager for Western Beef, a year, six months?

ZL:      I was a cashier for three months, and for the rest of that, I was the Front End Manager.

VP:      Okay, so for almost the whole time there. When you were hired by Ziad to be a Front End Manager for Sea Town, did you sit in

347

FR-3143-14

on any other employee interviews or any other hirings?

ZL:     Yeah, I was there with other people.

VP:     Did you make any recommendations as to whom they should hire?

ZL:     I'm from the neighborhood so if I saw someone that I didn't think was or someone that worked for me prior that I knew was a bad person, I would say no.

VP:     Are there any employees that you knew as a friend or someone you'd worked with in the past, and you said, "hey, maybe you'd want to come work here?"

ZL:     Ooh you're talking two years, now.

VP:     I know.  If you remember; if not, you don't remember.

ZL:     I really -- it's two years.

VP:     What were your hours of work?

ZL:     I opened.

VP:     You opened, and what is that from; what time til?

ZL:     It varies; either 7 to 12; sometimes 8 to 12 or 8 to 3.

348

FR-3143-14

VP:     Well, let's say Monday through Friday, is it a certain set of hours?  Saturdays are different; Sundays are different?

ZL:     Every week was different.

VP:     So the schedule is set weekly?

ZL:     Yes.

VP:     Are you almost always working in the morning hours?

ZL:     Yes.  I always work in the morning.  I don't close.

VP:     You're not assigned later in the day or closing?

ZL:     No, I don't.

VP:     Are you a salaried employee, or do they pay your hourly?

ZL:     He pays me salary.

VP:     A salary; and what do you earn?  Is it based annually, or is it based weekly?

ZL:     It's based by the amount of hours that I work.  That's something that you've got to talk to him about.  I don't really like to discuss my private…

349

FR-3143-14

VP:     Well, it's how much you receive.  Are you paid like $10 an hour, or are you paid $500 a week?

ZL:     Yeah, $10.  I would say $10 an hour.

VP:     Okay.  Are you paid to date by the company?  Do they owe you any employee salary for work or anything that you've done?

ZL:     No.

VP:     You're not owed any overtime or any outstanding balances or anything?

ZL:     No.

VP:     Are you paid via check or cash?

ZL:     Cash.

VP:     Approximately on the average, how many hours do you work a week?  Is it 20?  Is it 50?

ZL:     Sometimes it can be 15.  Sometimes it could be 25.

VP:     Fifteen being the least amount, 25 being the most amount you would work in a week?

ZL:     Yeah.

VP:     Did you -- were you responsible for opening the business from when you first

350

FR-3143-14

started from the Grand Opening time, or is that something you started doing later on?

ZL:     Later on.

VP:     All right.    Do you remember when you started opening?

ZL:     I want to say maybe two months.

VP:     Two months meaning January of '14, February of '14?

ZL:     Yeah, I don't know exactly.   I want to say --

VP:     Was it before Christmas that you started opening?

ZL:     That I don't remember, sir.   It's been two years.

VP:     Oh, no, no, no.   I thought you meant this year, two months before the fire?

ZL:     No, no, no, no.   No, no, no.

RL:     No, she said two months after she worked.

VP:     Two months after you started working is when you started helping with the openings, okay?

ZL:     Mm hmm.   Yes.

VP:     So that would be sometime in 2012.   What is your typical opening routine?

351

FR-3143-14

ZL:     I open up the gates.  I have the keys.

VP:     You have a key for the front gates?

ZL:     We open the gates, open the door, I run,
        enter the alarm, start up the computers.

VP:     Does the key open all the locks on all of
        the gates?

ZL:     Yes, it does.

VP:     And the front door; is the front door
        usually locked and on some sort of sliding
        glass type door?

ZL:     It's an automatic lock.

VP:     Automatic, so is that something that you
        have to push open -- unlock and push open?

ZL:     No, once you open you the gates, the senor
        is there.

VP:     Those doors will automatically open for
        you and then you got to the key pad?

ZL:     Mm hmm.

VP:     And you enter a code?

ZL:     Yes.

VP:     That deactivates the alarm system?

ZL:     Yes.

VP:     What is the code that you were assigned?

ZL:     3487.

352

FR-3143-14

VP:     That seems -- that's the same code then that Ziad uses?

ZL:     I don't know.

VP:     You don't know anyone else codes?

ZL:     No, I don't.   I just know what I was assigned.

VP:     Have you ever had a problem with the alarm going off where you didn't make it through the key pad in time?

ZL:     Yeah.

VP:     What happens then?

ZL:     The alarm company will call.

VP:     What, did they ask you if there was a password?

ZL:     Usually, they'll ask is there something wrong?   I give them my name, and I tell them everything is fine.

VP:     Did they ask you for a pass code or anything?

ZL:     They just usually take my name.

VP:     The alarm company knows who you are? You've been put on, I guess, with the central station and you're told if you don't make it to the keypad in "x" amount

353

FR-3143-14

of time, it goes off, just give them your info, they know it's you, and then everything is okay?

ZL:     Yes.

VP:     Once the system is then off, you conduct your regular business, have you ever had to reset it before you left?  Have you had to close at anytime, and I know you don't stay until five or whenever the store closes, but has there ever been a point in time where you had to shut the store and you would reactivate the system and lock up?

ZL:     No.

VP:     All right.  Have you had any problems with the burglar alarm system since you've been there?

ZL:     Meaning?

VP:     Like, during the day it goes off or during the middle of the night it goes off and you get a phone call, hey your alarm system activated.  Can you come down and check on it?

ZL:     That happened twice.

354

FR-3143-14

VP:        That it went off in the middle of the
           night?

ZL:        And early in the morning like, I think
           around 4 o'clock in the morning.

RL:        They called you Zuleika?

ZL:        Yeah, they'll either call either one of
           our phones -- closer.

VP:        Logistically from the start, I think
           you're only a couple blocks away, within
           walking distance?

ZL:        Mm hmm.  That's right.

VP:        On those occasions, did you have to
           respond to the store?

ZL:        Mm hmm.

VP:        On any one of them, did you find that the
           store had been broken into or any --

ZL:        Yes, we had got broken in once before.

VP:        Okay.  Did you handle that matter?   In
           other words, waiting for the police to
           come?

ZL:        Yes.

VP:        Identifying what was taken?

ZL:        No.  As far as identifying what was taken,
           no.  I did call the police.

355

FR-3143-14

VP:     So when you got to the store the time you found it broken in, what was broken in or how was it broken into?

ZL:     I did not go in.

VP:     No, but from the outside, could you see how it got broken into?

ZL:     The registers were all popped open.

RL:     He asked you a simple question.  Listen to his question, "From the outside, could you see how the store was broken into?"

ZL:     Yes.

RL:     It's either yes or -- what did you see?

ZL:     The registers were all pried open.

RL:     You could see that from the street?

ZL:     You could see it from the street.

VP:     Did they break the gates down, like pull them down?  Did the cut locks?  How did they get into the store?  Were you able to tell that from outside?

ZL:     The gates were still pulled down, but you could see that the door was wide open.

VP:     The sliding door was wide open?  So the gate, the roll down gate in front of the sliding door was down?

356

FR-3143-14

ZL:     Whoever broke into the store, cut the lock.

VP:     Okay.

ZL:     Took whatever they took and was nice enough to pull the gates.

VP:     Do you know what other items were stolen?

ZL:     The took the entire safe.

VP:     The took the entire safe.  Since that time, did the locks get changed?

ZL:     Yes.

VP:     Did you put new locks on?

ZL:     Yes.  I didn't put -- the owners did.

VP:     Someone had new locks put on, new keys?

ZL:     Yes.

VP:     No other break ins?

ZL:     No.

VP:     The other time the alarm went off, you went down and the store was safe and secure?

ZL:     Mm hmm.

VP:     On the day of the burglary, were you the one that called 911 or did central station call?

ZL:     I did.

FR-3143-14

VP:     Do you know if anybody was ever arrested for that?

ZL:     I don't know.

VP:     At that time, was there a video system at the store?

ZL:     Yes.

VP:     During the burglary?

ZL:     Mm hmm.

VP:     Did it capture anything?

ZL:     That you'll have to talk about with them.

VP:     So the opening routine, you make sure that the drawers are set up for the cashiers? How many drawers --

ZL:     No, I didn't say that.  I don't make up the drawers that are set.  Once I come in, the drawers are already set.  All I have to do is count my drawer.

VP:     So the drawer is already set from the night before?

ZL:     Mm hmm.

VP:     And part of your job is to work a register as well?

ZL:     Yeah, I work the register.

FR-3143-14

VP:     Okay.  How much is in your drawer when you open?

ZL:     Two hundred.

VP:     Is that always the same amount?

ZL:     Two hundred.

VP:     Would that be the same amount in each drawer?

ZL:     Yes, it should be.

VP:     It's just a sketch of the first -- I just want to know which register do you work. This is Port Richmond Avenue.  I tried to do the best.  Again I'm not a sketch guy, but this is the sliding glass doors, three registers, there's some sort of counter in front of the office.

ZL:     Okay.

VP:     Which register.

ZL:     If this is -- this is supposed to be the office here (referring to sketch)?

VP:     That's the office, and then there's like this step up area.  There's a long counter.  I'm guessing that's like a courtesy counter.

359

FR-3143-14

ZL:     Okay.  So I'd either work here or here (pointing to sketch) either one of them.

VP:     Okay.  On the day of the fire, what register were you working; do you remember?

ZL:     The day of the fire was on Monday?  I didn't even --

VP:     It was a Sunday.

ZL:     It was a Sunday?

VP:     Sunday night into Monday morning.

ZL:     Well, I worked Sunday morning, so I wouldn't --

RL:     He's asking you on Sunday, which register did you --

ZL:     Sunday, it would be this one (pointing to sketch).

VP:     On that morning, was there $200 in the drawer?

ZL:     Yes.

VP:     Do you know if there is a fire alarm system attached to the burglar alarm system?

ZL:     That I don't know.

FR-3143-14

VP:     Anytime during the days, have you ever had any problems with the fire alarm system activating?

ZL:     No.

VP:     So in the time that you've been in, there's never been a false activation of a smoke alarm or anything like that?

ZL:     No.

VP:     Are you also familiar with the video system for this store?

ZL:     As far as?

VP:     Are you responsible for making sure that it's on when you come in, in the morning?

ZL:     Oh, no.

VP:     Do you ever touch the video system at all?

ZL:     No.

VP:     Do you have any passwords or codes to activate the system?

ZL:     No.

VP:     Do you know when it's on or when it's off?

ZL:     I mean we have a -- display a screen. I can't tell you it's on, I can just see the TV. I can see the whole store throughout the TV.

361

FR-3143-14

VP:     Is part of your job to monitor those TVs to see if anybody's shoplifting or anything like that throughout the store?

ZL:     Yeah, I work the register as well as do loss prevention, yeah.

VP:     From the registers that you're assigned, those first two, you could see those monitors?

ZL:     It's a big screen on the wall.  Yeah, you can see every aisle.

VP:     Does it also show the basement?

ZL:     Just the aisles.

VP:     Do you know if, while you could see that stuff, if it's being recorded?

ZL:     That, I don't know.

VP:     On the day of the fire, were you monitoring the system, the video system?

ZL:     At anytime I work in the store, I watch that camera.

RL:     First of all, when you same camera, you mean the screen?

ZL:     The screen, yes.  The screen on the wall.

VP:     It's multiple cameras throughout the store?

362

FR-3143-14

ZL:     Yeah, it's a flat screen, yeah.

VP:     Does it show more than one camera at a time?  Is it like 26 little boxes, 10 little boxes?

ZL:     It shows -- every -- more like, 12.

VP:     Okay.  On the -- have you ever monitored the system and caught somebody shoplifting?

ZL:     Many times.

VP:     Do you know the last time you observed somebody shoplifting and brought it to either Ziad's attention or Mohammed's or another store employees?

ZL:     The day before I went on vacation.

VP:     Do you know when that was?

ZL:     Tuesday -- the Tuesday before everything happened.  The Sunday was my first day back to work.

VP:     So Tuesday before the fire?  Sunday was your first day?

ZL:     Mm hmm.

VP:     Sunday, meaning the day of  -- the day before the night of the fire?

ZL:     Yeah.

363

FR-3143-14

VP:     Okay.   The  last  person  that  was  caught

        shoplifting  that  Tuesday,  was  it  regular

        person that you caught shoplifting?

ZL:     A regular customer.

VP:     A  regular  customer,  and  whatever  happened?

        Did  the  police  get  called  and  respond?

        Was he arrested?

ZL:     No, I took care of it myself.

VP:     Do  you  know  who  that  customer  is,  like  a

        name?

ZL:     Sarge.

VP:     Sarge?

ZL:     Mm hmm.

VP:     Is that a nickname or his name?

ZL:     That's  the  only  thing  we  know  him  from.

        He's from the neighborhood.

VP:     It's a man?

ZL:     Yeah.

VP:     Do  you  remember  what  he  was  trying  to

        steal?

ZL:     Tuna and Vienna sausages.

VP:     Is he a homeless person that you believe -
        -

364

FR-3143-14

ZL:     No, he's not homeless.    He lives two blocks away from the store.

VP:     Did he threaten you or make any threats to the store?

ZL:     He told me to keep my mouth shut.

VP:     Did he say anything else like I'm going to get you Zuleika?

ZL:     No.    I mean you catch people stealing, they do make threats, but I'm not afraid.

VP:     Did you see him in the store at all on Sunday, the Sunday that you were back from vacation?

ZL:     No.

VP:     That Sunday before the fire, when you returned from vacation, did you catch anybody shoplifting that day?

ZL:     No.

VP:     What were your hours on that Sunday?

ZL:     I left at 11:45.

VP:     What time did you open that morning?

ZL:     From 8 am to 11:45.

VP:     Did you open by yourself?

ZL:     Yeah, I opened myself.    The kids came and opened the gates for me.

365

FR-3143-14

VP:     So, someone physically helped you lift the gates, but they're not responsible to deactivate the alarm system or anything like that?

ZL:     No, that's all me.

VP:     Who was that?

ZL:     He's the kid.  One of their friends kid.

VP:     Do you know his name?

ZL:     I think he's Mohammed.  I'm not sure. They're all called Mike.  I'm going to be honest with you.

VP:     You refer to them as Mike as a nickname?

ZL:     Yeah.

VP:     Is he someone that has been at the store before to help?

ZL:     He'll come and he'll open the gate sometimes, yeah.

VP:     Does he stay in the store throughout the day and helped do any kind of work?

ZL:     If he stayed, I don't know.  I left at 11:45.

VP:     When you left at 11:45, was he still there?

366

FR-3143-14

ZL:     That one, you're going to have to ask
        Allison.

RL:     He asked you, so -- if you know --

VP:     All right.  I don't want to ask Allison
        any questions.  I'm trying to just pretend
        like she's not there, and then I'll speak
        to her.

ZL:     But, I don't know, honestly.

VP:     Pretend like she's not there, and then
        I'll speak to her.

ZL:     I don't know.

RL:     So you don't know, and that's your answer?

RL:     Yeah.

VP:     I'm going to just call him Mike.  Like,
        how old is he, 15?  Is he like a teenager?

ZL:     He's a teenager.  I don't know.

VP:     All right.  Have you ever been in the
        store when there was a power outage?

ZL:     No.

VP:     Lighting in the store -- when you enter
        the store, do you have to turn on the
        lights, are they already on?

ZL:     I have to turn the lights on.

VP:     Where are the switches located?

367

FR-3143-14

ZL:      In the office.

VP:      Is the store completely dark and you have to throw the lights on to put the light on, or is there like one or two emergency lights left on?

ZL:      There's a couple lights still on by the meat cases.

VP:      Could you show me where those are?  Would you be able to just put an "x" where those lights are?  If you could best understand my diagram?  This is like the deli.

ZL:      I want to say they're over here (referring to the diagram).

VP:      Are these your meat cases?

ZL:      Yeah.

VP:      Something in this area?

ZL:      Yeah, and then there's -- I think the -- yeah.

VP:      I'll just write night lights.

ZL:      Yeah.

VP:      Is there anything else anywhere else in this store that you remember?

ZL:      Not that I can remember.

368

FR-3143-14

VP:    So the light switch is for all of the other lights?

ZL:    All the other lights.

VP:    Which it's in -- you're saying it's in the office somewhere?

ZL:    Yeah, behind the door.

VP:    All the lights go on?

ZL:    Mm hmm.

VP:    And it's behind the door, okay.  Lighting for the basement as well?  Do you know if there were any night lights in the basement?

ZL:    I don't know.

VP:    Do you ever go down into the basement?

ZL:    I've been down there, but I don't know if there's any night lights?

VP:    When you open up the store, you don't have to do and turn any lights on in the basement?

ZL:    I don't go in the basement, no.

VP:    Have there been any problems with any of the lighting in the main area of the supermarket lately?

ZL:    Not that I know of.

369

FR-3143-14

VP:      Lights flickering or lights going out?

ZL:      Not that I know of.

VP:      Any problems like when you throw a switch,

         the light doesn't go on?

ZL:      No.

VP:      Have there been any bulbs replaced in the

         store that you know of?

ZL:      Not while I was there.

VP:      Who else worked Sunday, the day before the

         fire with you?

ZL:      When I was leaving, Mike came in and

         Allison took over my register.

VP:      Mike being Mohammed, the owner?

ZL:      Mm hmm.

VP:      Allison takes over your exact register,

         and you're not sure if the other Mike, the

         helper, was there at that time, so it was

         just the two of them?   Well, when you

         left, had he electricians arrived yet?

ZL:      No.

VP:      Did you know that the electricians were

         going to come that day?

ZL:      No.

FR-3143-14

VP:     Did you know that there was going to be a program, that electricians were going to change some lighting in the store?

ZL:     Yes.

VP:     Do you know if those electricians had ever come to the store while you were working?

ZL:     Yes.

VP:     Do you remember when that was?

ZL:     They came a couple of times.

VP:     Do you know the name of the company?

ZL:     No.

VP:     Did they speak with you in regards to what they were going to do or what the program was or how it was going to work?

ZL:     Yes.

VP:     What kind of a program was it?

ZL:     They told me they worked with Conn Edison.

VP:     Okay.

ZL:     They were going to install energy savers.

VP:     Where were they going to install the energy saving lighting?

ZL:     All throughout the store.

VP:     All the old head fixtures in the aisles?

371

FR-3143-14

ZL:     Throughout the whole store, the freezers, everything.

VP:     Had they done any of that work when you had seen them in the store?

ZL:     They came before when I was there.

VP:     What work did they do in the store then?

ZL:     When I was there, he changed the sliding doors on the freezers to plastic.

VP:     So is it like that plastic that hangs in front of the freezers?

ZL:     Mm hmm.  Yes.

VP:     Where are the freezers in the store that you're talking about?

ZL:     The freezers are throughout the whole store.

VP:     Well, these are the meat cases (referring to diagram).

ZL:     This is produce, and this is dairy (referring to diagram).

VP:     He put the plastic in produce as well?

ZL:     He put one on the dairy to show how it was going to look.

VP:     Where's the dairy?

372

FR-3143-14

ZL:     This would be the dairy portion (referring to diagram)

VP:     This whole corner here (referring to diagram)?

ZL:     Mm hmm.

VP:     So he put plastic in front of the dairy and produce, or no?

ZL:     Not yet?

VP:     Okay.  Just to show how it was going to look, and is the purpose of that to keep the cold in, reduce the energy cost so some or like hanging plastic that blocks it that people just reach through, grab their item, and go away?

ZL:     Yeah.

VP:     They didn't do any lighting at that time?

ZL:     Not while I was there.

VP:     Do you remember when that was, just a ballpark figure, Christmas, after Christmas?

ZL:     I want to say after Christmas.

VP:     So maybe January, approximately, and was that just one visit that they were able to do that?

373

FR-3143-14

ZL:      No, they came like three times.

VP:      Well, just to hang the plastic around the dairy cases?

ZL:      No.  There's different steps.  They have to explain the program to you, then they come and then they show you what they're going to do, and they come back again and they set up a date when they're going to come to do it.

VP:      How did you find out about this kind of program with Conn Ed?  Did they just show up at the store one day?

ZL:      They showed up to the store.

VP:      Did you call them?  They just showed up. You don't remember the name of the company?

ZL:      No.

VP:      Was it the same representative or workers that you met those three different occasions?

ZL:      Two different people.

VP:      Were you responsible for making the decision to go forward with that program?

ZL:      No.

374

FR-3143-14

VP:     Was it something that Ziad had to discuss with them and/or Mohammed?

ZL:     Yeah, that they had to because they had to sign the contract.

VP:     Okay.  So the owners signed the contract?


ZL:     (No audible response).

YP:     Did you know or were there dates in the contract as to when they were going to come back to do like this much work on this day, this much on this day, this much work on this day?

ZL:     That, I don't know.

VP:     Did you ever see a contract?

ZL:     The real contract, that's something that they would have had to spoke --

VP:     Did you ever see a contract?

ZL:     Yeah, I signed the paper as far as them coming back.  I signed that, but the real contract, if anything, if they did sign it, it would be them, it wouldn't be me.

VP:     Okay.

ZL:     He authorized me to just…

FR-3143-14

VP:     Were there any problems with the plastic that they had hung over the dairy case as far as it falling off?

ZL:     No.

VP:     No.   Were there any problems with the lighting in those cases after they hung the plastic?

ZL:     Not as far as I know.

VP:     The lightning in the cases throughout the store, is it on when you come in and open up or is it off?

ZL:     Some of them are off.

VP:     Which ones are off?   Which ones are on, if you remember?

ZL:     Yeah, that I can't tell you.   The only ones that I usually take care of is the produce ones to turn on.

VP:     So you have to turn on the lights in the produce?

ZL:     I turn on the produce.   I don't go around and turn on the other.

VP:     And that's most of this wall?

ZL:     Yeah, I can't go around and turn on the other stuff because you gotta understand

376

FR-3143-14

that I'm there.  This is the front of the store.  Anyone can walk in at anytime so I can do produce because I can still see the front door, and I come back here to my register.

VP:      Where is the switch to turn on the produce lighting?

ZL:      On the case.

VP:      It's inside the case?

ZL:      Yeah, right on the case.

VP:      Is it in front of the case?

ZL:      No, it's actually in the case.  It's the little switch.

VP:      Okay.  Is it close to the Port Richmond Avenue entrance here, or is it way in the back?

ZL:      This is the produce space.  There's like two switches.  It's just two little buttons.  It's right there.

VP:      And that lights the entire case lighting **(INAUDIBLE)** then that's on.

ZL:      That switch lights this case.  The other switch there, lights that.

377

FR-3143-14

VP:     The switches are side by side or next to each other so that you standing in one spot and your 12-volt switch is on?

ZL:     No.

VP:     You have to walk from one to another?

ZL:     Yes, sir.

VP:     How far apart are they?

ZL:     The produce case is maybe a little bit longer than this table.  One switch is at one end, and the other switch is right there like in the middle of the case.

VP:     Okay.  Have you had any, or have you noticed any problems with the lighting in the casing?

ZL:     No.

VP:     Did you have any problems in the store with an outlet not working?  An employee will go to plug something and say hey, Zuleika that outlet don't work?

ZL:     No, no one's ever told me that.

VP:     No problems with any of the appliances in the deli counter?

ZL:     No one's ever told me anything.

VP:     Who typically works in the deli area?

378

FR-3143-14

ZL:      We have a deli worker.  We have Cindy.

VP:      Do you know her last name?

ZL:      No.

VP:      When does she work in the deli area?

ZL:      In the mornings.

VP:      Was she working Sunday with you?

ZL:      No.

VP:      Who would have been working in the deli area on that Sunday?

ZL:      I don't know who was scheduled.  Like I told you, I was on vacation that week, so I really don't know who was supposed to be there.  That you have to find out from them.

VP:      When you opened up, who were the other employees that are working with you?

ZL:      The kid came in and was working with me.

VP:      The kid, Mike?

ZL:      Mike, and he stayed with me.  I was there, just me and him.

VP:      That's it?  Nobody's working the deli counter until 11:45?

ZL:      I didn't -- it was just -- well, if anything, I would say Michael, but that

379

FR-3143-14

morning, we opened up at 8.  I left at 11:45.  I don't remember even doing anything in the deli.

VP:     Nobody has to stock out the shelves, and nobody was stocking out the shelves?

ZL:     They're supposed to do that during the day.

VP:     Meaning, after you leave the shelves would be stocked?

ZL:     During the day, yeah.

VP:     Throughout the day?

ZL:     Yeah.

VP:     So you were at the front register here, and Mike?

ZL:     Mike stayed with me here.

VP:     Mike stayed in the front?

ZL:     He stayed with me.

VP:     In your area of the office?

ZL:     No, not in the office, right here with me.

VP:     Okay.  Have there been any problems in the store with flooding?

ZL:     We do have leaks.

VP:     I didn't mean leaks.  I mean floods like during Super Storm Sandy; did the store

380

FR-3143-14

flood, that kind of thing?  A sewer backs up outside, starts flooding into basement?

ZL:   I know something happened with the basement as far as -- but I don't know to what extent, but the water did come in the base.

RL:   During Sandy.

VP:   During Sandy?

ZL:   During Sandy, yes.

VP:   Do you know if there was any water into the basement at any other time other than Sandy?

ZL:   Yeah, it happened before with the sewer.

VP:   How many times was there a problem with the sewer backing water up into basement?

ZL:   That I know of, I want to say maybe twice.

VP:   How much water ended up backing up?  Do you know?

ZL:   I didn't go downstairs.

VP:   Who resolved that problem?  Was that something that you call Ziad?

ZL:   Yes, and they'll call someone to come take care of it.

381

FR-3143-14

VP:     After either Sandy or the two times that there was some water backing up into the basement, was there any problems with any of the lighting in the store or any of the outlets in the store?

ZL:     No, not that I know of.

VP:     Do you ever work in the basement at all?

ZL:     No.

VP:     So you never go down in the basement so you wouldn't know if there was a problem with lighting down there?

ZL:     No, I wouldn't know.

VP:     Do you know who works in the basement?

ZL:     Well, the meat guy.

VP:     When -- well, who is the meat guy?

ZL:     Well, they have like different ones.

VP:     Different meat persons?

ZL:     Yeah, like they'll come by and cut meat from time to time.

VP:     So if one of the meat persons had a problem with lighting or electric in the basement, would they notify you while you were the manager?

382

FR-3143-14

ZL:     Well, they would have told me or they would tell him, but no one's ever told me anything.

VP:     In this cold winter, is there a heating units that you have to turn on as well when you come in in the morning?

ZL:     No.

VP:     Are they left on an automatic thermostat?

ZL:     Yes, there's a thermostat.

VP:     Where is the thermostat located?

ZL:     They should be in the back on the back wall.

VP:     By this door and bathroom?

ZL:     By the bathroom.

VP:     On this wall here (pointing to diagram)?

ZL:     Yeah.

VP:     What kind of heating is in the business? Is it like overhead hanging heaters or -- you don't know?

ZL:     I don't know about that.

VP:     You just know you go to the thermostat?

ZL:     I don't go to the thermostat.  I don't touch a thermostat.  It's automatic.

383

FR-3143-14

VP:     So it's preset.  You don't ever have to adjust it like on cold days when it's 10 degrees; 5 degrees, you don't have to increase the temperature?

ZL:

ZL:     I don't.

VP:     Are there any portal heaters located throughout the store?

ZL:     No, I don't have any portable heaters.

VP:     Now, this store you said had some leaks. Do you know when the store had a leak last?

ZL:     We've been having many leaks.

VP:     Many leaks.  Did the leaks stop when you first opened?

ZL:     A little bit later down the line.

VP:     Have they been continuous, or have they been repaired and then it started again?

ZL:     It's been continuous.

VP:     Are the leaks in the same spot, or are they at different times?

ZL:     Different; different spots.

VP:     Different spots.  Would you be able to -- on the diagram, show me where the leaks

384

FR-3143-14

are again?   Bennett, Port Richmond.   Just put an "L" I guess for the leaks.

ZL:   Where's the office (referring to diagram)? Is this --

VP:   This is the office. (referring to diagram) If you want, I'll label it.   If you want to help me label it, it will be easier.

ZL:   This is the office, right?   (pointing to Diagram)

VP:   Yeah, and this is some sort of counter.

ZL:   That's the courtesy counter.

VP:   Courtesy, all right.

ZL:   If it rains, snows, it pours in the office.

VP:   If it rains, you have an actual leak over the office?

ZL:   Yeah, I have to cover the computer.

YP:   Just going to put "Ls" for leak.

ZL:   By the front door?

VP:   Right by the front entrance, there's a leak?

ZL:   Yeah.

VP:   Okay.

ZL:   Back here (referring to diagram).

385

FR-3143-14

VP:     Are you saying it leaks down the wall, or
        it leaks into the dairy case?

ZL:     I want to say it leaks down the wall and
        back here.

VP:     Okay, and this is the dairy counter here?

ZL:     Yeah.

VP:     So it leaks onto the floor, onto the deli
        case or the back table here?

ZL:     The whole -- the wall, the whole area.

VP:     Do you have to put a bucket here or
        anything to capture it?

ZL:     Well, that would be them.  Like I told you
        -- I deal with -- I'm in the front --

VP:     Whoever works in that area takes care of
        it?

ZL:     -- on the register at all times.

VP:     All right.  So we have a leak at some
        point in this dairy area.

ZL:     Mm hmm.

VP:     We have a leak along the wall?  We have a
        leak over the office?  You have to cover
        the computer?

ZL:     I have to.

386

FR-3143-14

VP:     Do you also have to cover the alarm system?

ZL:     Well, --

VP:     In other words, you have water coming down in the office that contains some computers?

ZL:     Yeah, the modem is --

VP:     It contains the monitor --

ZL:     -- the monitor.

VP:     -- that you can see all of your cameras?

ZL:     That's up on the wall.

VP:     So is the water affecting that monitor? The alarm system is on that wall.

ZL:     That, I'm sorry --

VP:     Do you have to cover those items?

ZL:     I have to cover our monitor, our computer screen, the modem, just basically the whole middle area of the office.

VP:     Does the water leak onto the safe as well?

ZL:     The whole entire thing, yeah.

VP:     Is that something you put a bucket under and try and capture it, or is it just so much water?

ZL:     I have to put plastic.

387

FR-3143-14

VP:     Over everything?

ZL:     Over everything.

RL:     I'll call you back.  I'm in a meeting now.

VP:     This  leak  here  that's  in  the  main entrance, is this --

ZL:     Bucket?

VP:     -- bucket?

ZL:     Sometimes  depending  on  the  leakage,  it might  leak  here.   I  have  to  cover  this register, too.

VP:     Which register would you cover? Is that --

ZL:     This one here (pointing to diagram).

VP:     So are they -- numbered the registers?  Is there  a  one,  two,  three  or  an  "A",  "B", "C"?

ZL:     Okay, three.

VP:     That's three; two in the middle -- one.

ZL:     Mm hmm.

VP:     So you'll man -- I'm sorry.  You'll use one and two?

ZL:     Mm hmm.

VP:     Sometimes  the  leak  from  this  area  is  so bad you have to cover --

ZL:     Cover register three.

FR-3143-14

VP:     Has anyone ever come out to fix any of the leaks?  Have you called a company, a roof company?   Has the owners called a roof company?

ZL:     That would be them.

VP:     Have you ever been there when a roofing company comes to fix the leaks?

ZL:     No.

VP:     So it's been leaking on and off for over two years?

ZL:     Yeah, it's been bad.

VP:     Did you ever complain to the building owner?

ZL:     Not me.  I know that Dave spoke.

VP:     How about when it leaks, the days that it's leaking, have you had problems with any of the lighting when any of the electrical equipment in the area?

ZL:     Not that I know of.

VP:     Do you remember the last time that you saw it leak?  Was it --

ZL:     When the snow was melting not too long ago.  It was leaking in the office and in the front of the store.

389

FR-3143-14

VP:     In the office in the front of the store; a week before the fire, two weeks before the fire?

ZL:     Maybe two weeks before fire.

VP:     At that time, you said it was just leaking in the office in the front of the store, meaning the entrance way?

ZL:     In the front of the store, yeah; and by my register three.

VP:     After that leak, did you have any problems with your alarm system when you tried to open it in the morning it wouldn't work right or something?

ZL:     No.

VP:     Did you have any problems with the register?

ZL:     No.

VP:     You were able to cover it so it didn't get affected?

ZL:     Mm hmm.

VP:     On that occasion, did you have to put the bucket there?

ZL:     Yes.

390

FR-3143-14

VP:     No other problems with any of the electric in this area after that leak or anything?

ZL:     No.

VP:     Are any of the other doors used, like the side door here in the back by the bathroom?   Is that used while you are working?

ZL:     No, we use the front door.

VP:     You only use the front door?   None of the employees go in or out?

ZL:     (Negative response).

VP:     Do you know when this door would be used?

ZL:     Usually all the orders and stuff come through the front door.

VP:     All of your deliveries come through the front door, so this door stays locked and unused while you're working?

ZL:     Yes, when I'm working, it stays --

VP:     If somebody was to open this door while you were working, would there be a beep or would the alarm system notify you?

ZL:     No.

FR-3143-14

VP:     Is there a camera in this area while you're working?  Are you able to see if somebody comes in or out that door?

ZL:     Well, I'm able to see the bathroom so, it's right close to it, yeah. I'll be able to see.

VP:     Would you also be able to see if somebody goes up or down the stairs to the basement?

ZL:     I can see this whole area right here (pointing to diagram).

VP:     You can see the whole area where the door is, the bathroom and the staircase leading to the basement?

ZL:     Mm hmm.

VP:     Sunday that you were working, the day before the fire, did you notice anybody come in or out of this door?

ZL:     No.

VP:     No; or go down the basement?

ZL:     No.

VP:     Do you smoke?

ZL:     No.

392

FR-3143-14

VP:     Do you know if that kid, Mike, that was with you smokes?

ZL:     No.

VP:     Do you know if Ziad smokes?

ZL:     No.

VP:     Now, are there any of the employees that you are aware of that smoke?

ZL:     Not that I know of.

VP:     So none of the employees in the store smoke?

ZL:     No, I didn't say that.  I said I'm not --

VP:     None of the employees that you know smoke?

ZL:     You can't smoke in the store.

VP:     So there's no smoking the store?

ZL:     No.

VP:     Okay.  Have you ever caught any of the employees smoking in the store?

ZL:     No.

VP:     Is there any candle used anywhere in the store?

ZL:     No candles.

VP:     Do you sell candles in the store?

ZL:     Yes, we do.

393

FR-3143-14

VP:     Where do you sell them?  Do you know which
        aisle or where they are?

ZL:     I would say right here.

VP:     Do you refer to the aisles as a number or
        anything like that?

ZL:     All right, produce.  Let's call this aisle
        L2, 3.  I would say, yeah, yeah.

VP:     Is that how you refer to them as 1, 2, 3?

ZL:     Yeah.

VP:     Opposite the register numbering?  So the
        registers are 1, 2, 3  this way?

ZL:     Yeah, Aisle-1, 2, 3, 4.

VP:     And this one I tried to draw -- one side
        is cold casing, and one side is shelving.

ZL:     Mm hmm.

VP:     So is that 5 or no?

ZL:     Yeah.

VP:     So the candles are on the floor somewhere?

ZL:     I would -- in front --

VP:     In front of -- the middle of 5?

ZL:     Yeah, I would say here.

VP:     Is any incense used in the store?

ZL:     No incense.

VP:     Do you sell incense?

394

FR-3143-14

ZL:     No.

VP:     How about charcoal?  Is there any charcoal or lighter fluid sold in the store?

ZL:     Yes.

VP:     Where are those items stored?

ZL:     We have some here, and we have some here, and we have on top of the case.

VP:     On top of the meat casing?

ZL:     Mm hmm.

VP:     What is up there?  Is it the charcoal, or is it the lighter fluid?

ZL:     Everything is up there.

VP:     And also in the front?

ZL:     Yeah, I think we had a few there.

VP:     How about health care products, like peroxide, band aids, that kind of stuff, rubbing alcohol?

ZL:     Courtesy counter.

VP:     All that stuff is at the courtesy counter?

ZL:     Courtesy counter.

VP:     And is that -- that somebody would have to ask for those items to get them, or they could just grab them off the shelf?

ZL:     Yes, you have to ask for it.

FR-3143-14

VP:     Okay.  Why are you open on the Sunday day before the fire morning?  Did you get any deliveries?

ZL:     No.

VP:     In the past, have you gotten deliveries on Sunday?

ZL:     Usually vendors don't come out on Sunday.

VP:     Typically, you don't get deliveries on a Sunday while you're there.  How busy is the store on Sundays?  Is it your busiest day, the slowest day?

ZL:     It's half and half.

VP:     How has business been when you first opened?  When the store first opened, was it very crowded?

ZL:     It's been the same to me.

VP:     So when the business first opened til the week or the day of the fire, the traffic in the store has been the same amount?

ZL:     To me, yeah.

VP:     Compared to Western Beef, is it busier than Western Beef or not as busy as Western Beef?

396

FR-3143-14

ZL:     Western Beef is a huge supermarket. Sea Town is small, more like a **(INAUDIBLE)**. You really can't compare.

VP:     I've never been in Western Beef, but the supermarket, Sea Town, I'm guessing is like 5,000 square feet?

ZL:     You're talking with Sea Town, five aisles; Western Beef, we have 20 aisles. It's two different things.

VP:     Okay, so it's four times the size of this store?

ZL:     Yeah.

VP:     All right. How often do you get deliveries at Sea Town? Is it every few days?

ZL:     It can be every other day.

VP:     How often does Sea Town or Craze Dell (SP?) come with the truck?

ZL:     That one, you have to speak with them.

VP:     Do you know when you were working the last time Craze Dell made a delivery?

ZL:     No, offhand I don't. I usually deal with the small vendors.

FR-3143-14

VP:     Do you pay the small vendors when they make a delivery?

ZL:     Yes.

VP:     How do you pay them?

ZL:     Out the drawer.

VP:     So it's cash out of the drawer to the vendors?

ZL:     Mm hmm.

VP:     Do you know if any vendors are owed money?

ZL:     That I don't know, sir.

VP:     Do they provide you a receipt for what they delivered and what you paid?

ZL:     Yes.

VP:     And is that a running balance on that receipt or you pay the full amount on that receipt?

ZL:     Most vendors, little vendors that come out are usually C.O.D.

VP:     So whatever they brought that day, you pay them cash for?

ZL:     (No audible response).

VP:     Which is your -- which is the biggest vendor that you pay?

398

FR-3143-14

ZL:     It all depend on the order that you place.
        It varies.

VP:     Which small vendor do you see the most
        frequent?  Is it meat deliveries at the
        Boar's head guy?  Is it milk?

ZL:     Meat comes out the most often, but I don't
        pay them.  They take care of the meat.

RL:     Vin, how much longer do you have with her?
        We're going into areas that are really for
        -- if you guys want to do an examination
        under oath, I mean, she's here.  You're
        doing a fire examination so I'm giving you
        latitude, but how much longer do you have.
        I want the questions now to be confined to
        that day cause that's strictly the only
        reason why she should be here.

VP:     Okay.  Okay.

RL:     How much longer do you have with her?

ZL:     Maybe about 15 minutes.

RL:     Okay.

VP:     So no vendors came that day?

ZL:     (No audible response)

VP:     What business transacted that day?  Was it
        mostly credit card sales?  Was it cash

399

FR-3143-14

sales?    Was  it  federal  government  type
programs?

ZL:      I had both.

VP:      Both cash and government programs?

ZL:      Mm hmm.

VP:      When    you    turned    the    drawer    over    to
         Mohammed  and  Allison,  do  you  remember  how
         much  was  in  the  drawer?    Do  you  have  an
         idea of how much was in the drawer at that
         time?

ZL:      No, we don't do spot checks.

VP:      When  the  drawer  reaches  a  certain  amount,
         do  you  drop   money  into  the  safe  on  that
         day?    Did   the   drawer   reach   a   certain
         amount that you would drop money into the
         safe?

ZL:      No,  I  opened  up  at  8:00,  and  I  left  at
         11:45.

VP:      So  whatever  you  sold  would  have  been  in
         the drawer when you left?

ZL:      In the drawer.

VP:      That Sunday, did you have, or did anyone
         have  any  problems  with  the  ATM,  and  the

400

FR-3143-14

ATM is right in the front as soon as you walk in?

ZL:     Not that I can remember.

VP:     Do you remember seeing anybody use the ATM that Sunday?

ZL:     I don't remember.

VP:     That Sunday, were there any unusual odors in the store? Did you like smell something burning?

ZL:     No.

VP:     Any odors of natural gas?

ZL:     No.

VP:     Did any of the workers or any of the employees -- any of the people shopping that day complain to you of any odors?

ZL:     No.

VP:     Let me just double check.  Any spills on Sunday in any of the aisles of any products or anything?

ZL:     No.

VP:     How did you become aware of the fire?

ZL:     My husband called me around I want to say 6 something in the morning and told me he went to get coffee on his way to work and

401

FR-3143-14

someone told him Sea Town was on fire.  I called one of the workers, Cindy, because she lives like a little closer, you know. She told me she didn't see anything, she didn't hear anything.  I went back to bed. I'm not gonna lie.

VP:     So that was sometime in the middle of the night?

ZL:     No, not in the middle of the night.  That was 6 something in the morning.

VP:     Okay.

ZL:     My son calls me, ma, hurry up, get up; Sea Town's on the news.  The minute I seen it, I picked up my phone.  I called "Z". After I spoke with "Z", I called Mike, put my clothes on, hopped in a cab, went straight to the store.

VP:     Okay.  Were you scheduled to work that Monday?

ZL:     I was supposed to open up at 8, 8 o'clock.

VP:     When you get to the store, is the fire department already there?

ZL:     They're there.

402

FR-3143-14

VP:     And they're set up, operating, pumping water into the store?

ZL:     No, there was no fire when I got there.

VP:     So when you got there, the fire was already out.  The fire department is still there?

ZL:     Mm hmm, they're still there.

VP:     Okay.  Did you speak to anyone from the fire department?

ZL:     Yes.

VP:     Do you remember if it was a chief wearing like a light hat?

ZL:     They came to my home, the fire marshals.

VP:     Okay.  When you got to the store that morning, did you see any of the other employees?

ZL:     Me and Cindy.

VP:     You and Cindy, and did you end up seeing Ziad or Mohammed?

ZL:     Yeah, they came shortly after.

VP:     Did Ziad and Mohammed say anything to you when you saw him outside the Sea Town the day of the fire?

ZL:     Say something like what?

403

FR-3143-14

VP:     Like if you knew anything?

ZL:     Ziad came out the car, and he had a tear in his eye and truly and honestly I just walked away from him.

VP:     Okay, just too emotional, you don't want to speak at that point.

ZL:     I can't see a man cry.  I'm going to be honest with you.  I walked away from him for a minute.

VP:     And Mohammed when he arrived?  Did they arrive together?

ZL:     No.

VP:     What did he say to you?  Did he say anything?

ZL:     After he arrived, then I remembered that's when they came -- I don't know if they were detectives or fire marshals that came and they got everyone, and they took me in the van to talk.

VP:     Okay, and you currently have a job?

ZL:     No.

VP:     That's basically, it and just a few questions for Allison.

ZL:     Thank you.

404

FR-3143-14

VP:     All right, Allison, so you're a cashier?
        You started that day, Sunday, around
        11:45?  Keep it to just day, right?

RL:     Yeah.

VP:     11:45?

AB:     Mm hmm.

VP:     You took over Zuleika's drawer, Register
        1, she had indicated?

AB:     Yes.

VP:     When you change over drawers, do you now
        count the drawer?

AB:     No.

VP:     So you just assume the position and check
        people out?

AB:     Correct.

VP:     Do you have any other responsibilities?

AB:     Just straightening up the front end.  I
        can't leave far from the register.

VP:     Through the rest of the day, are you the
        only register?

AB:     Yes.

VP:     You're the only cashier, let's say working
        the registers?

AB:     Yes.

405

FR-3143-14

VP:     Who else was in the store throughout the
        day?  What hours did you work until,
        11:45?

AB:     Til I'm going to say 7:30ish.

VP:     Who else worked with you that day?

AB:     Mike was there, and the young man that she
        was talking about, Mike whatever his name
        is.  I'm not sure.

VP:     And Mike, the first Mike, you're saying
        Mohammed, the owner?

AB:     Correct.

VP:     And the other Mike is some helper?

AB:     Yeah.

VP:     Throughout the day, you stayed through the
        time you were working, and you stayed in
        the front of the store?

AB:     Correct.

VP:     Did you ever have to go in the back to
        work the deli counter?

AB:     No.

VP:     How about the basement?  Did you go into
        the basement that Sunday?

AB:     No.

FR-3143-14

VP:     Did anybody complain to you about any
        unusual odors that day or smelling
        something burning?

AB:     Nothing.

VP:     Gas leak?

AB:     No.

VP:     Did you see anything unusual with the
        lighting in the store, any of the electric
        in the store on that Sunday?

AB:     Unusual, no none just that they were
        working on the new lighting fixtures

VP:     Yeah, the company came sometime on that
        Sunday.  Do you know what time they came?

AB:     I don't recall, no.

VP:     Was it in the afternoon?

AB:     Oh yeah, it was definitely in the
        afternoon.

VP:     Do you know where they were working when
        they came?

AB:     I believe they started in produce.  After
        that, I think they went towards the meat.

VP:     Were they actually changing the lighting
        fixtures on Sunday?

AB:     As far as I could tell, they were, yeah.

407

FR-3143-14

VP:     Do you know if they had to shut any of the
        circuits in the store so that they could
        work?

AB:     I don't know that, no.

VP:     At any time, did you have a problem with
        the register where it would like shut off
        automatically or go back on automatically?

AB:     No.

VP:     Do you also watch the alarm -- I'm sorry,
        not the alarm system.  Do you, also, from
        where you work, do you also monitor the
        video system to see if anybody is
        shoplifting?

AB:     Sure, it's right there above the courtesy
        counter.

VP:     Did you watch it while you were working
        that day?

AB:     Whenever I could, yeah?

VP:     Were you able to see the different aisles
        and the different areas of the store?

AB:     Mm hmm, yeah.

VP:     Did you notice anybody shoplifting that
        day?  Did you catch anybody shoplifting?

AB:     Not that day, no.

FR-3143-14

VP:     Do you know if the electricians went into
        the basement?

AB:     I do not.

VP:     Did any of the electricians say anything
        to you, like hey, during while the time
        that we're working, we might lose power or
        you might have to take some of the items
        out the cases cause they could get warm?

AB:     No, they didn't.  I really didn't deal
        with them at all.

VP:     So the electricians mostly dealt with
        Mohammed?

AB:     Yeah.

VP:     Do you smoke?

AB:     I do.

VP:     Okay.  When you need to smoke, where do
        you smoke?

AB:     Go out the door and to the corner.

VP:     Which door do you go out?  Are you talking
        about the front door?

AB:     The front door.

VP:     So you stand over by the corner of Bennett
        and Port Richmond Avenue?

AB:     Yes.

FR-3143-14

VP:     On Sunday, did you smoke that day?  Did
        you go outside and take some breaks and
        smoke?

AB:     I'm sure I did.

VP:     Okay.  Have you ever -- on Sunday, did you
        see anybody smoking in the store, any of
        the shoppers?

AB:     No.

VP:     At any point in the day or before you
        close, so you have to take money out of
        the door and drop it into a safe or give
        it to Mohammed?

AB:     No, it just stays in the drawer.

VP:     The entire proceeds from while you're the
        cashier stay in the drawer?

AB:     Mm hmm.

VP:     Do you know if Mohammed takes any of that
        out and puts it in the safe, or is it left
        in there overnight?

AB:     I think that the evening, we end shift,
        and I hand him the drawer.

VP:     So you're not responsible to count any of
        the money?

AB:     No.

410

FR-3143-14

VP:     What time did you close on Sunday?  What time did you close the register and hand Mohammed the drawer, do you remember?

AB:     It was approximately 7:30.

VP:     Were the electricians still in the store at that time?

AB:     Yeah.

VP:     Did you hand the drawer to Mohammed?

AB:     Mm hmm.

VP:     At that point, as the store closed, does he pull down the gates or lock the front door?

AB:     Yes.  The side and left doors were closed, and the front gate was down.

VP:     Then did you have to stay while the electricians continued to work, or were you done for the day?

AB:     No, that was it.  As soon as I end shift, I clock out and leave.

VP:     Seven thirty?  Did you actually clock out on that day?

AB:     I did.

FR-3143-14

VP:     How do you leave the store?  Do you go out

        the front door?  Do you come you the side

        door?

AB:     Yeah, push open the doors, pull up the

        gate, and then pull the gate back down.

VP:     Other than the electricians, who else was

        in the store when you left?

AB:     At that time, it was just Mohammed and the

        electricians.

VP:     Was Mike, the helper, still there?

AB:     No, I believe he left before I did.

VP:     Before you left, do you remember if the

        video system was still operating?

AB:     The screen that I can see was, yeah.

VP:     And you could see the different aisles?

AB:     Mm hmm.

VP:     And you were here on Register 1?

AB:     Register 1, right.

VP:     Did anybody forget any packages as you

        were closing that day?

AB:     No.

VP:     And if someone had left a package and it

        contained cold type products, would you be

412

FR-3143-14

responsible to put them back?  Would you have Mike put them back?

AB:  I would put them back.

VP:  Did anybody leave any packages at all that day while you were working?

AB:  No, they didn't.

VP:  At any point while you were working that day, did you have to go into the deli area to cut any cold cuts or take care of any customers?

AB:  No.

VP:  Do you know if anybody did service any customers in the deli area that day?

AB:  It could have been that kid, Mike.

VP:  So he would help someone if they need to get cold cuts, possibly Mike?  Do you know a last name or phone number for Mike?

AB:  I do not.

VP:  When did you start working for the supermarket?

AB:  In December.

VP:  December of 2012 or '13?

AB:  '13.

FR-3143-14

VP:     So you were working there approximately three months before the fire?

AB:     Yeah, not long.

VP:     Are you owed any salary from the business?

AB:     No.

VP:     Are you currently working?

AB:     I am not.

VP:     How did you become aware of the fire?

AB:     I got a text message from my girlfriend early in the morning that said she saw on the news that there was a fire at Sea Town.

VP:     Were you due to work that Monday?

AB:     I was.

VP:     And what hours would you have worked?

AB:     I don't know remember exactly right now. It was anywhere between 1 and 3.

VP:     You get the text message from your girlfriend, do you then go to the store or do you call anyone?

AB:     I tried to text the -- I think I said something like, what happened?  Was there a fire, and I didn't get a response from him, and then I got up and I just -- I

414

FR-3143-14

live close to the store, so I walked over there to see what was happening.

VP:     When you get to the store, is the fire department still there?

AB:     Oh, yeah.

VP:     Is the fire still burning?

AB:     No, it was sometime between 10 and 11.

VP:     Did you speak to anyone from the fire department?

AB:     No.

VP:     Since that time, have you spoken to anyone from the fire department?

AB:     Yeah, the fire marshals came banging on my door.

VP:     When you get to the store that morning, did you see Ziad and Mohammed?

AB:     I did.

VP:     Both of them?

AB:     Yeah.

VP:     Did they say anything to you?

AB:     Mike just said hi.  I saw "Z".  He just looked at me, and all I could say was oh, my God, I'm sorry.  Everybody was walking around stunned.

415

FR-3143-14

VP:     Were most of the other employees there at
        that time?

AB:     At that time, no I didn't see any other
        employees.

VP:     Did you see Zuleika when you got there?

AB:     No, I spoke to her later on.  She said she
        was there, but I did not see her.

VP:     At that time, there was a lot of people in
        the street?

AB:     Yeah.

VP:     That Sunday, the day of the fire, did you
        see or did you notice if the gyro place
        next door was open?

AB:     That Sunday?

VP:     Yeah, the Sunday, the day of the fire?

AB:     I don't recall.  I don't think I looked.

VP:     Do you know if there was anybody in the
        **(INAUDIBLE)**?  Did you see -- did they come
        in and shop at all?  Would you have known
        them?

AB:     Maybe, I'm not really sure.

VP:     As far as Sundays go, was that a regular
        Sunday as far as the amount of customers
        in the store?

416

FR-3143-14

AB:     It was about average.

VP:     Any deliveries at times that you were working that Sunday?

AB:     I think we might have gotten chips, but that could have been the day before.  I don't remember exactly.

VP:     Where are the chips located in store?

AB:     Hang on a second.

VP:     Okay.  Office, dairy, Port Richmond Avenue?

AB:     So they're right about here (referring to diagram).

VP:     Is there like a little shelving area in front of aisle 5?

AB:     There are a bunch of shelves there.

VP:     So I'll just write chips right here.

AB:     There you go.

VP:     I'm just going to put a date on this right, 3/21.

RL:     But we're not sure if that was that day was on a Saturday.

AB:     It could have been the day before.

VP:     Okay, so other than that were there any other deliveries that day?

417

Case 1:14-cv-07324-FB-VMS    Document 24    Filed 02/26/16    Page 422 of 494 PageID #: 840

FR-3143-14

AB:     I can't remember any, no.

VP:     The electricians, were they going in and
        out through the front?  Were they going in
        and out through the side door?  How did
        they come in that day?

AB:     They came in the front door.

VP:     And throughout the times that they were
        working, did they come back and forth
        through the front door?

AB:     I wasn't paying much attention to them.

VP:     Are you responsible to operate any of the
        alarm systems?

AB:     No.

VP:     Like activating them or that they not
        working?

AB:     Just the register.

VP:     That day that you were working, did the
        smoke alarms activate at all?

AB:     No.

VP:     Anybody caught shoplifting that day?  I
        don't know if I asked that of you yet?

AB:     Yeah, you did.  No.

VP:     No shoplifting caught -- no one caught
        while you were working?

418

FR-3143-14

AB:     Right.

VP:     Did anybody come in on that Sunday -- did

        anybody come in threatening you or get

        into a fight with you?

AB:     No.

VP:     Did anybody get into a fight with Mohammed

        while you were there?

AB:     No.

VP:     Did you see any problems with the

        electricians where they working and maybe

        something would short out or were you not

        aware?

AB:     I'm really not aware, no.  If they did,

        they didn't say anything.

VP:     You know if there were any candles used on

        Sunday?

AB:     Oh, no candles, no.

VP:     Any incense used in this store?

AB:     No.

VP:     Any problems with the ATM that day?

        Anybody using that with an issue?

AB:     I don't really recall.  The only thing

        people complain about is it's slow.

VP:     It works, but it just works slow?

419

FR-3143-14

AB:        Yeah.

VP:        That's basically it.

LR:        Okay.

VP:        All right.  Thank you for your time.

J# 002-01-957899

END OF STATEMENT

TRANSCRIBED BY:      SDH\WWD
                    MAY 15, 2014

*This is to certify the above statement is a true transcription to the best of my ability.*

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

---

## RECORDED STATEMENT

---

| RE:  INTERVIEWEE:    Associated Produce (Demetri) |
|---|
| DATE OF LOSS:    February 24, 2014 |

The following transcript is from a recorded phone interview taken by Vincent Palmieri on Friday, April 4th 2014 at approximately 2:15 pm. This interview was with a representative of Associated Produce who was a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue Staten Island NY.

INT:        Hello.

VP:        Sorry--sorry, good afternoon.

INT:        Hi, how are you?

420

FR-3143-14

VP:     Good.    I'm  trying  to  find  out  any
        outstanding  balances  owned  to  you  by  C-
        Town on Port Richmond Avenue.

INT:    Yes, yes, they own me close to $3,000.

VP:     And is this Associated Produce in the
        Bronx, New York?

INT:    Yes.

VP:     Okay.

INT:    And who is this?

VP:     My name is Vinny Palmieri, and I am a fire
        investigator hired by Guard Insurance
        Company...

INT:    Okay.

VP:     Which is a company that insures SI Meat
        Village or C-Town at 107 Port Richmond
        Avenue.  The point I was...

INT:    The name of your company again?

VP:     The company...the company that insures
        them is Guard Insurance Company.

INT:    Guardian?

VP:     No, just Guard, G-U-A-R-D.

INT:    Just Guard?

VP:     Yeah.

INT:    Okay.

421

FR-3143-14

VP:     Guard Insurance Company.

INT:    Uh-huh.

VP:     So, I'm going over a list of their vendors trying to determine the different amounts that they owe each vendor.

INT:    Got you, and do you...do you think, you know, like what, you know, what steps should I take?

VP:     Well, I don't know if you're aware that there was fire at the supermarket so it's currently closed.

INT:    Uh-huh.  I was aware, yeah.

VP:     Oh, okay.  You've just got to contact the owners Zaid or Mohammed and try to determine how or which way they want to resolve their bills.

INT:    I can't go through the insurance?

VP:     Well, we haven't...we haven't paid the claim yet.

INT:    Yeah.

VP:     We haven't paid the claim.  We're in the process of trying to settle this with them.

INT:    Uh-huh.

422

FR-3143-14

VP:      So I don't know exactly what they told
         you.  That's one of the reasons I called,
         just to find out.

INT:     Yeah.

VP:      And this is over a period of time?  This
         wasn't just a recent deliver, right?

INT:     Right.  This is a long time ago.
         I'm...I'm not going to get money anyway
         probably.  So they've--they've been in
         trouble for a long time.  This is
         my...it's probably intentional, to tell
         you the truth.

VP:      Really.

INT:     Yeah.  Yeah, yeah, they gave us...you
         know, they kept promising, disappearing
         and there actually...there was supposed to
         be C.O.D. delivery.  They bounced the
         checks, and they actually put stops on the
         checks before...before we were able to
         deposit it.  And then, we've been trying
         to follow up.  I could tell you the date
         of the purchases.  Let's see one...

VP:      Yeah.

423

FR-3143-14

INT:      I would not be surprised if they...I...I

          would bet money on it.

VP:       So they had owed you some money.  You put

          them on C.O.D. and then when your company

          made a delivery, they would write a check.

          And then before the guy was able to bring

          the check back and you could physically

          cash the check, they put a stop payment on

          the check?

INT:      Exactly.

VP:       And that happened more than once?

INT:      Uh, no that happened once.  It was the

          last delivery.

VP:       Okay.

INT:      And then they...you know, we were trying

          to collect that.  I would send people

          there everyday to try to collect.  They

          gave another check that also, that didn't

          go through.  I'm not sure if that one was

          stopped.  It was for $1,000 of the bill,

          you know.  I said at least give me

          something.  So, that check also...I'm not

          sure if it was stopped or...or what, but

424

FR-3143-14

it...it didn't go through.  I still never

got a penny more for that delivery.

VP:     So that was...that was the last delivery?

Do you know?

INT:    The last delivery was August 2nd.

VP:     Of 2013?

INT:    Yes.

VP:     Okay.  Would you be willing to fax any of

those documents to my corporation?

INT:    The delivery, the sign up?

VP:     Yeah, any of the information as far as

bounced checks or any outstanding balance,

invoices, or anything like that?

INT:    Yeah, yeah, no problem.  Let me get

your...

VP:     Is it easier for you to fax something like

that or email?

INT:    Uh, give me both.  It's going to have to

on Monday.

VP:     Okay, whenever you get around to it.  It's

not something like right this second.

INT:    Yeah, yeah.  Go ahead.  Give me your info.

VP:     Okay.  My name is Vincent Palmieri, that's

P as in Peter, A-L-M-I-E-R-I.

425

FR-3143-14

INT:       Uh-huh.

VP:        And I'm with Russo Consultants.   The fax

           number is 5-1...

INT:       Russo?

VP:        Russo, yeah.   R-U-S-S-O.

INT:       Consultants.   Okay.

VP:        Our fax number is 516-747-1009.

INT:       Okay, and email, please.

VP:        Okay, it's V for Vincent.

INT:       Uh-huh.

VP:        And then it's just my last name. P-A-L-M-

           I-E-

           I@TJ...Thomas, John--Russo, R-U-S-S-O.com.

INT:       Okay.   I'll send you the bounced check,

           the signed ...well, I think we have a

           couple of bounced checks.   And the sign up

           that shows the original date so...

           Alright, whatever I can do.   They

           obviously did it intentionally.   Um, I

           mean to me...

VP:        And kind of just not to pay their bills?

INT:       Obviously, they did not want to pay their

           bills.

FR-3143-14

VP:      They were just trying to...to go buy as much product and just not pay you?

INT:     Exactly, exactly.  Because even the order before that, I was having a hard time to collect.  We were trying to take the order back.  Then they finally gave a check, and I think we had to redeposit it also.  I think it bounced, and the...they kind of caught us off guard at the last.

VP:      At the last shipment?

INT:     Yeah, yeah.

VP:      I'm sorry to hear that.

INT:     Yeah.

VP:      What is your name?

INT:     Demetri.

VP:      Demetri, thank you very much.  Any help you could provide is greatly appreciate on this.

INT:     Alright.  I'll send it over.

VP:      Thank you.  Have a good day.

INT:     You, too.

VP:      Bye.


END OF STATEMENT

FR-3143-14

TRANSCRIBED BY:     LDM\WWD
                    JULY 1, 2015

*This is to certify the above statement is a true transcription to the best of my ability.*

**********************

## RECORDED STATEMENT

| RE:   INTERVIEWEE: | Consolidated Supermarket |
|---|---|
| DATE OF LOSS: | February 24, 2014 |

The following transcript is from a recorded phone interview taken by Vincent Palmieri on Friday, April 4th 2014 at approximately 11:37 am. This interview was with a representative of Consolidated Supermarket who was a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue Staten Island NY.

F:   Give me one second.

VP:  Thanks.

F:   Good morning.  How can I help you?

VP:  Hi. Good morning.  I'm trying to find out if there's an outstanding balance on an account.

F:   Sure.  One moment.

VP:  Okay.

M:   Credit.

VP:  Hi, good morning.  I'm trying to find out an outstanding balance on an account.

M:   Okay.

428

FR-3143-14

VP:    If I gave you a number, would you be able to
       tell me if there is any?

M:     Sure, sure, go ahead.

VP:    041-507.

M:     Okay, and who am I speaking to?

VP:    Um, my name is Vinny Palmieri.

M:     Okay, and...?

VP:    Oh, I'm conducting an investigation on…about a
       fire, which occurred at this location.

M:     Okay, hold on one moment.

VP:    It's a Food Town Supermarket for SI Meat
       Village.

M:     Hold on for a second.  Let me get you Sharay
       [sp?]  She handles the account, okay.

VP:    Thank you so much.

M:     Okay, hold on.

S:     Good morning Credit.

VP:    Hi, good morning.  My name is Vinny Palmieri.
       How are you?  I was transferred to you.

S:     Good.  How are you?

VP:    Good.  I was transferred to you and I'm trying
       to find out if there's an outstanding balance
       on a particular account.

S:     On what account?

429

FR-3143-14

VP:   I show that it's your account…it's 041-507.

S:    To whom am I speaking with?

VP:   My name is Vinny Palmieri.

S:    And you're calling from where?

VP:   I'm a fire investigator hired by Guard

      Insurance for SI Meat Village.

S:    Okay.  Um, yes, there is an outstanding

      balance.

VP:   Okay.

S:    But, let me transfer you to the Marc Mendlecom

      (sp?) because he would have, like, an actual

      amount or an ending amount on, you know, what's

      actually due on the whole entire account.

      Okay?

VP:   Okay.  So was it like a rolling balance that's

      now due?

S:    Yeah, we have actually a balance on an AR and

      also a note balance as well.

VP:   Okay.

S:    Because they had a loan with us.  Okay?

VP:   Okay.

S:    Hold on.

VP:   Thank you.

MM:   Hello.

430

FR-3143-14

VP:   Hi.  Good morning.  How are you?

MM:   Okay.

VP:   I was just transferred to you by Sharay.  My name is Vinny Palmieri, and I'm a fire investigator hired by Guard Insurance Companies, and I'm trying to…

MM:   You're…you're…

VP:   I'm sorry.

MM:   You're with what now?

VP:   I'm a fire investigator, and I'm trying to find out an account balance on a particular customer of yours.

MM:   Who might that be?

VP:   It's Customer Account No. 041-507 and it's SI Meat Village, Incorporated.

MM:   We've already spoken to the New York City Fire Investigation Department.

VP:   Right, the New York City Fire Marshals.

MM:   Right, and that…that's all we're going to talk to.

VP:   Okay, well, I'm a private fire investigator hired by the insurance company that insures this property.

431

FR-3143-14

MM:   Well, I would need some documentation and verification of that.

VP:   Okay.  I can send you an email from my firm.

MM:   Okay.

VP:   A copy of the policy if you want.

MM:   All right.  I'm just going to need something verifying as to who you are.

VP:   Okay.

MM:   You're calling me out of the blue and…

VP:   No, I understand that.  I just would need an email address to send that to.

MM:   All right.  It's marcm-M-A-R-C-M@alpha--A-L-P-H-A 1--the number marketing.com.

VP:   Okay.  So, it's Mark--M-A-R-K?  I'm sorry.

MM:   It's MarcM@alpha1marketing.com. That's M-A-R-C-M, not M-A-R-K.

VP:   I see M-A-R-C-M@alpha, the number 1, marketing.com.

MM:   Correct.

VP:   Okay.  I'll send you an email with the attached insurance policy.

MM:   Okay.

VP:   Thank you very much.

MM:   Thanks.

FR-3143-14

VP:  Have a good day.
END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
            July 1, 2015

   *This is to certify the above statement is a true
   transcription to the best of my ability.*

              ********************

## RECORDED STATEMENT

| RE:  INTERVIEWEE: | Father Son Produce - MOHAMMED |
|---|---|
| DATE OF LOSS: | February 24, 2014 |

The following transcript is from a recorded phone
interview taken by Vincent Palmieri on Friday, April
4th 2014 at approximately 2:35 pm. This interview was
with a representative of Father & Son Produce who
was a vendor for SI Meat Village (dba C-Town
Supermarket) located at 107 Port Richmond Avenue
Staten Island NY.

INT: Hello.

VP:  Yes, hi.

INT: Yes, hi.  Actually, I have to go through my
     records because those are **(INAUDIBLE)** and I'm
     not sure.

VP:  Okay.

INT: Um, I have to look through my computer and by
     Monday can I contact you at this number or
     would you like to call me back on Monday?

433

FR-3143-14

VP: Um, yeah, if you want or if you want I could give you my email address.

INT: Okay.

VP: If you want to email it.

INT: Okay, give me one second.  What is it?

VP: Well, I tried to call like an officer number, but I couldn't get a good working office number.  So that's why I called this number on the invoice.

INT: Okay.

VP: But, my email address is V as in Vincent.

INT: V?

VP: V as in Victor.

INT: V.

VP: So it's just one V to start out the email address.  Sorry about that.

INT: It's all right.  So it's one V?

VP: Yeah, just one V for my first name and then it's my last name, Palmieri.  That's P as in Peter.  A as in...

INT: P.

VP: A as in apple.

INT: A.

VP: L as in Lincoln.

434

FR-3143-14

INT: L.

VP:  M as in Mary.

INT: M.

VP:  I as in Ida.

INT: I.

VP:  E as in Eddie.

INT: E.

VP:  R as in Robert.

INT: R.

VP:  I as in Ida again.

INT: I.

VP:  And then it's @--

INT: At.

VP:  T--T as in Tom.

INT: Tom, T.  Okay.

VP:  J as in John.

INT: J.

VP:  And then the name Russo, R-U-S-S-O.

INT: Okay, Russo, R-U-S-S-O.  Okay.

VP:  .com.

INT: Okay, I got it so it's V.

VP:  For my first name.  The last name is Palimeri
     and it's at TJRusso.com.

INT: At...V-P-A-L-M-I-E-R-I@tomRusso.com.

435

FR-3143-14

VP:  No, at T-J Russo.com.  It's a--it just an abbreviation.  T-J.

INT: Oh, I'm sorry.

VP:  That's okay.

INT: TJ Russo.com.

VP:  Yeah, it's T for Tom.  It's not the actual name.

INT: That's the longest...

VP:  I know.

INT: I'm writing the longest email address I've ever heard.

VP:  I know.  I want to get rid of it.  I hate it.

INT: Okay.  All right.  I'll contact you Monday, okay?

VP:  Okay.  What is your name?

INT: My name is Mohammed.

VP:  Okay, and is that--there's definitely an outstanding balance?

INT: Well, I don't know at this moment because I have a lot of accounts.

VP:  Okay.

INT: You know, and I actually have to go through my computer and I have to find out.

436

FR-3143-14

VP:  Okay.  Alright.  Well, you have address so it would be 107-109 Port Richmond Avenue?

INT: Yeah, let me write that 107-109 Port Richmond Avenue, Richmond and that was a C-Town, right?

VP:  Yeah, it was a C-Town.

INT: Okay.  I'll find out and I'll definitely let you know by Monday.

VP:  Okay.  Alright.

INT: Okay.

VP:  Alright.

INT: I definitely will send you an email.

VP:  Alright, if you want you can have my cell phone number as well.

INT: Okay, what's your cell?

VP:  718-

INT: 718-

VP:  619-

INT: 619-

VP:  3277.

INT: 3277.  Okay, thank you, Vinny.

VP:  Thank you.

INT: Alright, take care.

VP:  Have a good day.

END OF STATEMENT

437

FR-3143-14

TRANSCRIBED BY: LDM\WWD
            July 1. 2015
   *This is to certify the above statement is a true
   transcription to the best of my ability.*

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## RECORDED STATEMENT

| RE:   INTERVIEWEE: | JULIE CESTARO, FOOD NATION |
|---|---|
| DATE OF LOSS: | February 24, 2014 |

The following transcript is from a recorded phone interview taken by Vincent Palmieri on Friday, April 4th 2014 at approximately 10:40 am. This interview was with a representative of Food Nation who was a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue, Staten Island NY.

OP:      Good morning, Food Nation.

VP:      Yes, hi.  I'm trying to reach extension

         7261.

OP:      Sure

JULE:    Food Nation.

VP:      Hi, good morning.  I'm trying to reach

         Julie Cestaro, I believe your name is.

JULIE:   That's my name.

VP:      Okay. Hi.

JULIE:   How can I help you.

FR-3143-14

VP:      Good morning.  My name is Vinny Palmieri,
         and I'm a fire investigator, and I came
         across some paperwork for one of your...I
         guess one of your customers or one of your
         clients--it's called--for C-Town in Staten
         Island.  It's called SI Meat Village,
         Inc., and I could give you like a...

JULIE:   Yes, it's on...

VP:      I'm sorry.  You know where it is, right?
         It's on 107...

JULIE:   Yes.

VP:      Port Richmond Avenue.

JULIE:   Yeah, C-Town 107.  Hold on.  I'm sorry.

VP:      Yeah, CT-107.

JULIE:   Yeah, Port Richmond Avenue.

VP:      Okay, basically what I'm just trying to
         determine is if they have an outstanding
         balance with you at this time?

JULIE:   Yes, actually what happened is they had
         given us a check.  I'll tell you exactly
         when.  The check they gave us on 3/7 and
         it bounced on 3/17.

VP:      All right, is that...

JULIE:   So it's a bounced check.

439

FR-3143-14

VP:      3/7 of this year, March 7th of 2014?

JULIE:   Uh-huh.  When was the fire?

VP:      And it bounced...I'm sorry what date did it bounce on...3/17?

JULIE:   The 17th.

VP:      So St. Patrick's Day it bounced?

JULIE:   Oh, yeah.

VP:      Okay, how much...

JULIE:   When actually was the fire?

VP:      Um, the fire occurred in February, late February.

JULIE:   Late February?

VP:      Uh-huh. The end of February.

JULIE:   Okay.  Oh, because we did...I'm sorry, what do you need?

VP:      I...I'm just trying to find out how much was that check they sent you for?

JULIE:   $3,000...

VP:      Okay.

JULIE:   $3,053.98.

VP:      And is that just for the month's delivery for the...?

JULIE:   It's for one delivery.

VP:      Okay.

440

FR-3143-14

JULIE:    And the delivery was on 2/21.

VP:       And what...

JULIE:    Do you need a copy of it?

VP:       What kind...what kind of product was
          delivered?

JULIE:    Uh, we sell meat.

VP:       Okay.

JULIE:    Meat and chicken.

VP:       Okay.  Do they owe you any other monies
          other than this one delivery?

JULIE:    That plus there was a $25 bounce fee
          because the check bounced.

VP:       Okay.  Did they own you any other money
          for previous outstanding balances?

JULIE:    Just that.

VP:       Just that.

JULIE:    Just the bounced check.

VP:       Okay.  Would it be possible for you to fax
          me or email me a copy of that?

JULIE:    Sure.  How about if you email me what you
          need and I could send that to you?

VP:       Okay.

JULIE:    Is that okay?

VP:       Sure.  I don't know your email address.

441

FR-3143-14

JULIE:     Sure it's J C-E-S, as in Sam, -T-A-R-

           O@foodnation.com.  No, .net.  I'm sorry,

           .net.

VP:        (laughs)

JULIE:     No, no, .U-S.  God.

VP:        .U-S?

JULIE:     Foodnation.us.  I'm sorry.

VP:        So it's your first initial J for Julie?

JULIE:     Uh-huh.

VP:        And your last name @foodnation.us?

JULIE:     Correct.

VP:        Okay, and...

JULIE:     And you said it was Vinny?

VP:        Yeah, my name is Vinny.  I'm a fire

           investigator for the insurance companies.

JULIE:     Okay.  Well, then I could send you...I

           could even send you a copy of the check if

           you need that.

VP:        Sure.

JULIE:     That bounced.

VP:        And in the past is that the way it's done,

           you send them the delivery and they pay it

           every month?

FR-3143-14

JULIE:     Well, they're...they...they're bad
           players.  It takes them a long time to
           pay.  They got this order on 2/21 and the
           post-dated the check until 3/7.  So we put
           the check in on 3/7 like it said.  We
           honored what it said, of course, and it
           bounced because we heard there was a fire.

VP:        Very interesting.

JULIE:     And that's the reason they said it
           bounced.

VP:        Okay.  Alright.  Alright, so I'll send you
           an email out and anything you could
           provide would be of a huge help to us.

JULIE:     Okay, and I'll send you whatever you need.

VP:        Thank you so much.

JULIE:     And I have just another question?

VP:        Yes.

JULIE:     Are they having trouble with money? [sic]

VP:        (laughter)  I don't know.  I don't know.
           You'd have to take that up with the owners
           of the corporation.

JULIE:     Okay.

VP:        I guess they're not...

443

FR-3143-14

JULIE:      Are they going to open...I mean how big

            was the fire?  I mean, you know.

VP:         Oh, you're not familiar with the extent of

            the fire?

JULIE:      No, no, I know nothing.  I just heard

            there was a fire.  That's all.

VP:         Uh, the building almost basically burned

            to the ground.

JULIE:      Oh.

VP:         Yes, so as far as when they're going to be

            able to reopen, and whether they're going

            to be able to re-establish the business, I

            don't know.  You kind of have to ask them.

JULIE:      Okay.

VP:         So I guess that might be why the check

            might have bounced because of when the

            fire happens, and they probably didn't

            have the access to the funds at the time.

JULIE:      Right.

VP:         You know what I mean?

JULIE:      All right, the...thank you so much.

VP:         All right.  I'll send you an email

            shortly.

JULIE:      Okay, thank you.

444

FR-3143-14

VP:      Have a good day.  Bye.

JULIE:    Bye-bye.  Thank you.

END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
          July 1, 2015
     *This is to certify the above statement is a true*
     *transcription to the best of my ability.*

          _____

| **RECORDED STATEMENT** |
|---|

| RE:   INTERVIEWEE: | **JULIE CESTARO, FOOD NATION** |
|---|---|
| DATE OF LOSS: | **February 24, 2014** |

The following transcript is from a recorded phone interview taken by Vincent Palmieri on Friday, April 9th 2014 at approximately 4:00 pm. This interview was with a representative of Food Nation who was a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue, Staten Island NY.

JULIE:    ...from us all the time.

VP:      Okay.

JULIE:    Now, like the last order that he got was

          from...Hold on one second, Vinny.  I'm

          sorry.

VP:      No problem.

JULIE:    The last order that he got from us was on

          2/21.

445

FR-3143-14

VP:        Right.

JULIE:     And he post-dated that check, and we put
           it in.  That's the check that bounced if
           you remember this...

VP:        Yes, absolutely.

JULIE:     conversation.

VP:        It was on St. Patrick's Day.  Yes.

JULIE:     Okay.  So now, prior to that, he got an
           order on 1/8 and he paid for that on 2/21
           when we sent him his last delivery.  That
           was it for 2014.

VP:        Okay.

JULIE:     Now, I'm going back and before that his
           last two orders were on August 30th.

VP:        Okay.

JULIE:     And he paid for them in October.  Now, do
           you want me to go back from that?

VP:        Well, if he paid for those in October,
           there was no issue.  There was no
           outstanding balance...

JULIE:     No.

VP:        ...to bring forward for him?

JULIE:     It just takes him forever.  It took him
           forever to pay.

446

FR-3143-14

VP:       Okay.

JULIE:    He didn't have checks.  Come back.  We had

          a salesman that was working on his

          account, but it wasn't that great of an

          account.  He no longer works there.

VP:       Okay.

JULIE:    But do you need me to go back further than

          that.

VP:       Well, what would be---

JULIE:    August of last year.

VP:       August of last year would have been only

          like two orders back.  Would the order be

          a few months before that?

JULIE:    Before that?  Hold on.  I'll go back

          further.

VP:       I'm just trying to see...

JULIE:    Sure, sure.

VP:       Inability to pay or how long it took him

          to pay.  Like that August order, it took

          him almost two months to pay.  And I don't

          know the amount of the order.  I would

          think...

JULIE:    It was $680 something dollars.

447

FR-3143-14

VP:      Right.  So you would think that that could

         be paid within a week of delivery, not two

         months.

JULIE:   Sure.

VP:      So...

JULIE:   I didn't have any checks.  Come back.

         Prior to that, $687, he purchased on 8/16

         and I got paid on 9/26.

VP:      Okay.

JULIE:   And he won't...

VP:      So I guess you could tell from that 8/16

         bill with the check a copy of the check

         when it was paid prior to the last one,

         which was the balance from February 21st.

         [sic]

JULIE:   Do you want a copy of each check?

VP:      Yes, because it will show the date that it

         was paid, and the date the check cleared.

JULIE:   Okey-dokey.  Now do you want us to go back

         behind 8/16?

VP:      I don't think that would be necessary

         right now.

JULIE:   Okay, until 8/16 is good.

VP:      Yes.

448

FR-3143-14

JULIE:      So that would give you one, two, three,

            four, five orders.

VP:         Right.  Those five orders and they would

            show a history of how they were paid, when

            they were paid.  What the **(INAUDIBLE)** are.

JULIE:      And give you the checks also with that.

            Okay, no problem.

VP:         And if any of those checks that he had

            written in that time bounced, if there is

            anything like that.

JULIE:      Oh, just the last one.

VP:         Just one bounced?

JULIE:      Yeah.

VP:         Okay.

JULIE:      Oh, and I actually called yesterday to see

            if he would pick up his cell phone.

VP:         No answers.

JULIE:      And I played dumb basically.

VP:         Right.

JULIE:      You know, I said, Oh, how's everything

            nah-nah-nah.  He said, oh.  I said are you

            open yet?  He said, oh, no, my store is

            burned to the ground or something like

            that.

449

FR-3143-14

VP:      Right, right.

JULIE:   So...

VP:      Oh, boy did you say...

JULIE:   You know, I have to say what I have to

         say.

VP:      Did you ask him about the bounced check or

         anything like that?

JULIE:   I...I said, you know, when will we get

         payment.  He said he was working on that?

VP:      Okay.

JULIE:   But no real details.  So I didn't want to

         be pushy.

VP:      Well, I understand, but you said he owes

         you over $2,000 right now.

JULIE:   Yes.

VP:      Okay.

JULIE:   Just that check that bounced and the fee.

VP:      From...from the orders that you're going

         to send me like those last five orders,

         that he made was the last order on...that

         was delivered February 21st, larger than

         usual?  Could you tell?  Like is it three

         times what it normally is or...?

450

FR-3143-14

JULIE:      Yes, yes.  Well, okay, let me go back and
            see.

VP:         I mean it's hard...it's hard.  Maybe a few
            adjustments since he's not a steady
            customer.  So you might...

JULIE:      Right, and it was also a different
            salesman handling it because the prior
            salesman is gone.

VP:         Okay.

JULIE:      So, you know, different salesmen work
            differently.

VP:         Okay, okay.

JULIE:      Some, you know, push more than others.  Do
            you know what I mean?

VP:         Right.  So we can't read too much into it
            if the last order being bigger than any of
            the others.

JULIE:      It was bigger than the rest, but who
            knows.

VP:         Who knows.

JULIE:      Yeah, the last order was $3,053.

VP:         Okay.

JULIE:      But it has a lot of stuff on it, and prior
            to that was $1,747 and there were two

451

FR-3143-14

little invoices for $800...$687, and then prior to that was the one we just spoke about, $2,700.

VP:      Okay.

JULIE:   So I guess he used us sporadically.

VP:      Right yeah.

JULIE:   Prior to that was $1,100, $900 and we're going back to June and then prior to that was January of 2013.

VP:      Okay.

JULIE:   And he started with us it looks like the 6th...6/12.

VP:      Okay.

JULIE:   That was our first payment.

VP:      Okay.

JULIE:   Okay, so I'll put...

VP:      Yeah, if you want to...if want to...if want to, you've got my email address, right.  Are you able to email that to or...

JULIE:   Yeah, I'm going to apply to that.

VP:      Thank you so much.

JULIE:   No, no, thank you

VP:      Have a great day.

452

FR-3143-14

JULIE:      You, too.

VP:         All right. Bye.

JULIE:      Bye-bye.

END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
                    July 1, 2015
    *This is to certify the above statement is a true
    transcription to the best of my ability.*

                    **********************

| RECORDED STATEMENT |
| --- |

| RE:   INTERVIEWEE:          Porky's |
| --- |
| DATE OF LOSS:       February 24, 2014 |

The following transcript is from a recorded phone
interview taken by Vincent Palmieri on Friday, April
4th 2014 at approximately 1:45 pm. This interview was
with a representative of Porky's who was a vendor
for SI Meat Village (dba C-Town Supermarket) located
at 107 Port Richmond Avenue Staten Island NY.

VP:         So SI Meat Village, Staten Island, New

            York

INT:        Okay, you want to know how much in total

            you owe?

VP:         Yeah, the total outstanding balance.

INT:        Okay, within the couple of weeks you have

            here, the week endings, you have a total

453

FR-3143-14

> of $7,215.37.  That's everything put together.

VP:     Okay, $7,215.37 is the total outstanding balance.

INT:     Right.

VP:     All right.

INT:     Yes, that's the total.

VP:     Okay.

INT:     Okay.

VP:     All right, thank you very much.

INT:     You're welcome.

VP:     Have a good day.

INT:     All right, you, too.

END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
             July 1, 2015
   *This is to certify the above statement is a true
   transcription to the best of my ability.*

********************

## RECORDED STATEMENT

| RE: | INTERVIEWEE: | Rancher's Best |
| --- | --- | --- |
| | DATE OF LOSS: | February 24, 2014 |

The following transcript is from a recorded phone interview taken by Vincent Palmieri on Friday, April 4th 2014 at approximately 2:05 pm. This interview was

454

FR-3143-14

with a representative of Rancher's Best who was a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue Staten Island NY.

VP:     (Music playing) The Branch is just past Wholesale Meats.

INT:    Which C-Town is this?

VP:     This is...It's SI Meat Village.  It's at 107-109 Port Richmond Avenue on Staten Island.

INT:    Oh, okay.  Hold on a second.  (Music playing)  Hi.

VP:     Hi.

INT:    Okay, so your...your remaining balance is $9,348.37.

VP:     Okay, and that's for all past due orders and everything?

INT:    Uh, yes.  The last order was February 24th and it's going...your invoice is going back to, um, January 21st.

VP:     Of '14?

INT:    Uh-huh.

VP:     Okay.

INT:    All right?

VP:     Thank you very much.

455

FR-3143-14

INT:      Thank you.

VP:       Have a great day.

INT:      Bye.

END OF STATEMENT

TRANSCRIBED BY: LDM\WWD
                July 1, 2015
     *This is to certify the above statement is a true
     transcription to the best of my ability.*

                **********************

┌─────────────────────────────────────────────────────┐
│                **RECORDED STATEMENT**                 │
└─────────────────────────────────────────────────────┘

┌─────────────────────────────────────────────────────┐
│ **RE:  INTERVIEWEE:     Richmond Town Provisions (Boars Head)** │
│ **     DATE OF LOSS:      February 24, 2014**         │
└─────────────────────────────────────────────────────┘

The following transcript is from a recorded phone
interview taken by Vincent Palmieri on Friday, April
4th 2014 at approximately 2:00 pm. This interview was
with a representative of Boars Head who was a vendor
for SI Meat Village (dba C-Town Supermarket) located
at 107 Port Richmond Avenue Staten Island NY.

VP:       Yes, sorry.  I'm trying to reach Richmond

          Town Provisions.

INT:      This is it.

VP:       Can you tell me an outstanding balance for

          an account?

INT:      Sure.  Hold on one second.  Where are you

          calling from?

456

FR-3143-14

VP:     Um, I'm calling...well, my name is Vinny
        Palmieri, and...

INT:    Okay.

VP:     I'm calling from Russo Consultants.  We're
        a fire investigation firm.

INT:    Okay.

VP:     And I'm calling on behalf of Guard
        Insurance Company.

INT:    What is it called?

VP:     Guard Insurance Company.

INT:    Okay.

VP:     And we're doing an investigation into a C-
        Town Supermarket that you supply Boar's
        Head cold cuts to.

INT:    C-Town.  Which one?

VP:     It's 107-109 Port Richmond Avenue.

INT:    Port Richmond Avenue.  Okay, one moment.

VP:     Its real name is SI Meat Village doing
        business as C-Town Supermarket.

INT:    Okay, Port Richmond.  Now, what are you
        looking for, the outstanding balance?

VP:     Right the outstanding balance, anything
        that they might owe you.

FR-3143-14

INT:    I think they have quite a few bills.  Can
        I have a number, and I'll get them
        together and I can give you a call back in
        a little bit?

VP:     Yeah, Sure.

INT:    Okay.

VP:     718-

INT:    Okay.

VP:     619-

INT:    619.

VP:     3277.

INT:    3277.

VP:     And if you want, I could give you an email
        address if it's easier if you just want to
        email me the balance or...

INT:    Okay, if you want to give me that, too,
        I'll see which way will wind up easier.

VP:     Sure.

INT:    Okay.  Go ahead.  What is it.

VP:     V as in Vincent.

INT:    Uh-huh.

VP:     And then it's my last name Palmieri, P as
        in Peter A-L-M-I-E-R-I.

INT:    E-R-I.  Okay.

458

FR-3143-14

VP:      And it's @T, as in Tom, J, as in John, and then Russo, R-U-S-S-O.com.  So, it's just my name, my first initial VPalmieri@TJRusso.com

INT:     Okay. Okay, no problem.  It's going to take me a little while because I've got to pull out all their old bills.

VP:      Absolutely.

INT:     Okay, and what do you want?  Do you want the date of the invoice, the amount and an invoice number?  What do you need?

VP:      Yeah, exactly.

INT:     Copies of the...of the bills or...?

VP:      If you have copies of the outstanding balance, bills and stuff like that, that would be helpful.

INT:     Okay.  Okay.

VP:      All right?

INT:     All right, thank you very much.

VP:      Thank you so much.  Have a good day.

INT:     You, too, bye-bye.

VP:      Bye.

END OF STATEMENT
TRANSCRIBED BY: LDM\WWD
           July 1, 2015

459

FR-3143-14

*This is to certify the above statement is a true transcription to the best of my ability.*

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

This interview was conducted on Friday, April 4, 2014 at approximately 2:45 p.m. via the telephone.

**INTERVIEWED**

      **A representative of Manhattan Beer, a vendor for SI Meat Village (dba C-Town Supermarket) located at 107 Port Richmond Avenue, Staten Island, New York**

**NOTE:**      The representative who answered the phone (a female) was reluctant to speak with us; however, she did relate the following:

      The associate of Manhattan Beer related that SI Meat Village was a customer under Customer No. 81410.  She stated that the account was assigned with their attorney for collections in January 2014 due to the outstanding balance.

**NOTE:**      The associate communicated that they were unable to see the amount of the balance owed since the record was in "the hands of the attorney."

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

The following interview was conducted on Friday, April 4, 2014 at approximately 2:30 p.m. via the telephone.

**INTERVIEWED**

      **A representative of Vel-Mac Foods, a vendor for SI Meat Village**

      The representative of Vel-Mac Foods related that SI Meat Village was a customer of theirs and owed them approximately $3,500.00 for products previously delivered to the store. The representative further indicated that they were in the process of turning the matter over to their attorney so that they could be named in any settlement with the insurance company in regards to the claim from the fire.

**NOTE:**      The representative related that we would need to speak with their attorney for any further information.

8/20/15              **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

460



**T.J. Russo** Consultants

Fire Investigation and Analysis Services

# SCENE ILLUSTRATION

PORT RICHMOND AVE.

ELECTRIC ROOM

CAMERA

MEAT ROOM

FREEZER

STORAGE ROOM

UP

PREP/ STORAGE ROOM

CAMERA

GARBAGE CAN

PAPER TOWEL HOLDER

BENNETT STREET

TWO SHELF RACK

4'6"

LIGHTS

STORAGE/ MOTOR ROOM

THREE SHELF RACK

MEAT AND DAIRY

15'6"

UP

COLUMN

CANNED GOODS

20'6"

11'2"

11'

LIGHT SWITCHES

"CLOTHING" RACK

NOT TO SCALE (measurements are approximate)

 Area of Fire Origin

**File Number:**       FR- 3143-14
**Description:**       Overall of the cellar



**Fire Investigation and Analysis Services**

## SCENE ILLUSTRATION

NOT TO SCALE (measurements are approximate)

 Area of Fire Origin

**File Number:**        FR- 3143-14
**Description:**        **Overall of the cellar**

Exhibit "B"



T.J. **Russo** Consultants

Fire Investigation and Analysis Services

## SCENE ILLUSTRATION

### PORT RICHMOND AVE.

*(Scene illustration / floor plan diagram of the first floor, showing labeled areas including CAMERA, COVER, GATE, ALARM SYSTEM TOUCHPAD, LIGHT SWITCHES, FRONT ENTRANCE, ATM, CANNED GOODS, FRUIT, SIDEWALK COVERS, CHECK-OUT AREA, CUSTOMER COUNTER, OFFICE, DAIRY, DVR FOR CAMERA SYSTEM, JUICES/DAIRY/YOGURT, WATERS, FREEZERS, DAIRY, PRODUCE, BENNETT STREET, CELLAR LIGHT SWITCHES, EXIT DOOR, BATHROOM, MEATS, WALK-IN, BEER, DELI, SEAFOOD, with fire damage markers and irregular burn patterns. Measurements noted: 12', 11', 8', 4', 4', 4, 4', 5', 6', 24', 7', 55', 60')*

NOT TO SCALE (measurements are approximate)

  Fire damage at floor level

| | |
|---|---|
| **File Number:** | FR- 3143-14 |
| **Description:** | Overall of the first floor |

  Irregular burn patterns



## SCENE ILLUSTRATION



NOT TO SCALE

 Fire damage at floor level

**File Number:**     FR- 3143-14
**Description:**     Overall of the first floor (3D)

Exhibit "C"

3143

# Fire Department New York
# Incident Report

| Incident Reviewed By | |
|---|---|
| Reviewer | 900011 - CALDERONE JOHN A. Battalion Chief |
| Date | 02/27/2014 |

| Incident | |
|---|---|
| Incident # | 3-0006-0 |
| Status | Closed |
| Incident Date/Time | 02/24/2014 03:05:29 |
| Incident Type | 111 - Building fire |
| Box# | 0756 |
| Address | 131 BENNETT ST 1 floor Staten Island |
| Floor | 1 floor |
| Borough | 3 - Staten Island |
| Action Taken1 | 11 - Extinguishment by fire service personnel |
| Rescued (civilians) | 0 |
| Evacuated (civilians) | 12 |
| Property Use | 500 - Mercantile, business, other |

| Resources | |
|---|---|

| Unit Responsible for Report: BC22 | |
|---|---|
| Unit Type | 92 - Chief officer car |
| Action Taken1 | 81 - Incident command |
| Dispatch Date/Time | 02/24/2014 03:05:45 |
| Enroute Date/Time | 02/24/2014 03:06:20 |
| Arrival Date/Time | 02/24/2014 03:20:06 |
| Cleared Date/Time | 02/24/2014 07:00:39 |
| Unit Report By | 900011 - CALDERONE JOHN A. Battalion Chief |
| Narrative | Incident Narrative<br>Incident number 02/24/2014-3-0006-0<br>On Monday, February 24, 2014 at 03:05 hours the following units were dispatched to a report of a building fire. The incident location is street address 131 BENNETT ST Staten Island NY, 10302.<br><br>Primary incident actions taken are as follows:<br>Actions taken - extinguished<br><br>The Times for Incident #02/24/2014-3-0006-0 are as follows: |

Incident Report: 3-0006-0

| Unit Responsible for Report: BC22 | |
|---|---|
| | Signal: Time: By Order Of:<br>10-75 03:08 E157 Lt. Jensen<br>U.C. 06:01 DC 8 DC Hodgens<br>Total Time of Incident - 17:43:46<br><br>Upon arrival found heavy smoke pushing from all openings in the building. Units operated as follows:<br><br>DC08 arrived at 03:19 hours and cleared at 07:43 hours.<br>Actions taken - incident command<br><br>BC22 arrived at 03:20 hours and cleared at 07:00 hours.<br>Actions taken - incident command until relieved by Division 8, then Exposure 2 sector<br><br>BC21 arrived at 03:18 hours and cleared at 06:48 hours.<br>Actions taken - Exposure 4 Sector<br><br>BC23 was dispatched at 03:13 hours and cleared at 06:37 hours.<br>Actions taken - Assigned as Safety Battalion . Reported into Command post, assigned to monitor the collapse zone and assisted the Safety Battalion upon arrival<br><br>BC33 arrived at 04:49 hours and cleared at 06:55 hours.<br>Actions taken - Exposure 3 sector. Directed 2-1/2" line controlled by E-161 and E -154. L-80 also operated at this location for a short time.<br><br>BC40 arrived at 03:37 hours and cleared at 06:42 hours.<br>Actions taken - supervised operations on Exposures 1 and 4<br><br>BC42 arrived at 03:31 hours and cleared at 06:53 hours.<br>Actions taken - operated as the Resource Unit Leader<br><br>BC43 arrived at 04:22 hours and cleared at 06:14 hours.<br>Actions taken - Operated as Staging Area Manager<br><br>BC58 was dispatched at 09:43 hours and cleared at 10:01 hours.<br>Actions taken - assigned as Air Recon Chief<br><br>RB01 was dispatched at 03:13 hours and cleared at 05:57 hours.<br>Actions taken - assisted with exterior operations<br><br>SB01 arrived at 03:50 hours and cleared at 06:47 hours.<br>Actions taken - Monitored radio and HT communications enroute. Reinforced collapse zone Observed company operations, checked with EMS for injured members.<br><br>BC04 arrived at 07:17 hours and cleared at 11:29 hours.<br>Actions taken - Assigned for relief purposes. Operated with E-7 and L-15 to perform search, within the limits of safety, from the Tower Ladder basket and surrounding exposures. Used hand lines and Tower Ladder stream for final extinguishment. Relieved by B-22.<br><br>E157 arrived at 03:08 hours and cleared at 09:05 hours.<br>Actions taken - transmitted a 10-75 and gave an additional address of 131 Bennett St due to heavy smoke pushing from that structure. |

08/20/2014 - Page 2

Incident Report: 3-0006-0

---

| Unit Responsible for Report: BC22 | |
|---|---|
| | Stretched a 2-1/2" line up Bennett St (Exposure 4) and was awaiting forcible entry completion when a back draft occurred. Repositioned line to the Exposure 1side to protect members operating in the vicinity of the back draft. Operated on theExposure 1 side (Port Richmond Ave), extinguishing fire from the exterior and pockets of fire from the entranceway of the C-Town Market.<br><br>E156 arrived at 03:11 hours and cleared at 07:28 hours. Actions taken - Assist E157 stretching a 2-1/2" hose line then, E156 stretched 12 lengths of 2-1/2" hose and operated the into the rear restaurant as well as the C-Town supermarket. Shut down line and used it to supply a multi-versal set up by E155. Assisted moving and repositioning the multi-versal. Supplied E163 and TL77.<br><br>E163 arrived at 03:12 hours and cleared at 06:41 hours. Actions taken - Stretched and operated 2-1/2" line into Exposure 4 occupancy then continued exterior operations.<br><br>E158 arrived at 03:14 hours and cleared at 07:52 hours. Actions taken - Supplied TL86. Stretched a 2-1/2" handline -to the roof of Exposure 2 via L83's aerial. Operated handline for the duration of the fire from this location.<br><br>E159/ST5 arrived at 03:25 hours and cleared at 07:39 hours. Actions taken - Set up the manifold in front of the fire building and supplied TL 79, Multi-versal operated by E 155 and 2-1/2" hand lines.<br><br>E166 arrived at 03:16 hours and cleared at 07:19 hours. Actions taken - Assisted E163 stretching a 2-1/2" line to Exposure 4 side of fire building. Backed up E-163 as they operated line into Exposure 4. Relieved E-163 and operated line into Exposure 4.<br><br>E155 arrived at 03:13 hours and cleared at 07:28 hours. Actions taken - Stretched 3-1/2" line to supply TL86 operating on the Exposure 4 side then operated under the direction of Batt.21 operating a Multi-versal into the Exposure 4 side.<br><br>E160 arrived at 03:33 hours and cleared at 07:28 hours. Actions taken - supplied TL86<br><br>E153 arrived at 03:27 hours and cleared at 07:01 hours. Actions taken - Set up multi-versal nozzle on Exposure 1. Stretch a supply line to TL-79. Stretch a line to the 2nd floor of Exposure 2. Stood by on the 2nd floor then took up.<br><br>E154 arrived at 04:23 hours and cleared at 06:48 hours. Actions taken - assisted E161 stretching line into Exposure 3<br><br>E152 arrived at 04:25 hours and cleared at 06:45 hours. Actions taken - Stretched a 1-3/4 line to Exposure #2.<br><br>E161 arrived at 04:29 hours and cleared at 07:53 hours. Actions taken - Stretch a 2-1/2" line into Exposure 3 and operated into the fire building.<br><br>E165 arrived at 04:31 hours and cleared at 07:53 hours. |

---

08/20/2014 - Page 3

Incident Report: 3-0006-0

| Unit Responsible for Report: BC22 | |
|---|---|
| | Actions taken - assisted taking up lines |
| | E246 arrived at 04:42 hours and cleared at 06:14 hours. Actions taken - assigned as Communications Support Unit |
| | E167 was dispatched at 05:20 hours and cleared at 05:21 hours. Actions taken - watchline |
| | E162 arrived at 05:32 hours and cleared at 07:11 hours. Actions taken - watchline |
| | E007 arrived at 07:14 hours and cleared at 11:18 hours. Actions taken - watchline |
| | E318 arrived at 10:11 hours and cleared at 14:05 hours. Actions taken - watchline |
| | E154 arrived at 12:52 hours and cleared at 16:00 hours. Actions taken - watchline |
| | E155 arrived at 15:47 hours and cleared at 19:05 hours. Actions taken - watchline |
| | E167 arrived at 18:36 hours and cleared at 20:49 hours. Actions taken - watchline |
| | L080 arrived at 03:08 hours and cleared at 07:13 hours. Actions taken - Inside Team cut roll-down gates and proceeded into "Gyro Shop". Visible fire was noticed immediately upon entering the and also noticed fire darken down followed by the fire lighting up again. Chauffeur cut gates on Exposure 1. Roof cut the roof. |
| | L079 arrived at 03:09 hours and cleared at 07:38 hours. Actions taken - performed forcible entry, cutting gates and doors. Roof FF performed roof ventilation with partner saw. Inside team began search using search rope but were forced to with-drawl from the building, due to impending signs of back-draft. L-79 then operated master stream from tower ladder bucket for several hours. |
| | L083 arrived at 03:14 hours and cleared at 07:03 hours. Actions taken - assigned as FAST Truck. Placed aerial to roof of Exposure 2 |
| | L086 arrived at 03:16 hours and cleared at 07:19 hours. Actions taken - operated stream from tower-ladder. |
| | L078 arrived at 03:22 hours and cleared at 06:31 hours. Actions taken - Operated in the rear of Exposure #3 performing ventilation and monitoring conditions for BC Callery. Checked for occupants in Exposure #3A and evacuated tenants on the 1st and 3rd floors. |
| | L077 arrived at 03:50 hours and cleared at 07:15 hours. Actions taken - operated stream from tower-ladder |
| | L084 arrived at 04:39 hours and cleared at 06:14 hours. |

08/20/2014 - Page 4

Incident Report: 3-0006-0

| Unit Responsible for Report: BC22 |
|---|

Actions taken - stood fast

L015 arrived at 07:17 hours and cleared at 12:15 hours.
Actions taken - assigned for relief purposes. Set-up Tower Ladder on Exposure 4 side and provided fire watch and fire suppression of small, isolated pockets of fire.

L172 arrived at 10:11 hours and cleared at 13:28 hours.
Actions taken - watchline

RS05 arrived at 03:19 hours and cleared at 05:20 hours.
Actions taken - assisted cutting roll-down gates and forcing entry

SQ01 arrived at 03:28 hours and cleared at 06:03 hours.
Actions taken - assisted in searches of Exposure 2. Checked for extension to Exposure 3 private dwelling.

RA05 was dispatched at 03:10 hours and cleared at 07:37 hours.
Actions taken - established rehab area

FC01 arrived at 03:51 hours and cleared at 06:15 hours.
Actions taken - Assisted RUL in organizing Command Board. Exterior operation ordered by I/C. FC operated the ECB with some positive but also less then optimal results. A memo will be forwarded to ADC Pfeifer. Monitored all radio communications, transmitted requests for higher alarms as well as special calls and progress reports. Took up when the I/C transmitted the under control signal.

TS02 arrived at 04:01 hours and cleared at 05:44 hours.
Actions taken - provided scene lighting

CT01 arrived at 04:10 hours and cleared at 06:18 hours.
Actions taken - documented scene and coordinated with EOC

MK01 arrived at 05:12 hours and cleared at 07:25 hours.
Actions taken - exchanged depleted cylinders

On Scene:
OEM Behan #624
Con Ed Amaya #87558
Nat. Grid Gomez
DEP Sgrizzi
EMS DC Gulligan
NYPD Det. DiMare #2833
BFI FM Hesselberg #153

Injuries:
FF Mezzano E156 shoulder
FF Loennecker L79 wrist
FF Thompson L80 knee/shoulder
FF Tegano L80 burns

Chief Officers on Scene:
CWTC Pfeifer
Div. 8 Hodgens
Batt.22 Calderone

Incident Report: 3-0006-0

| Unit Responsible for Report: BC22 | |
|---|---|
| | Batt.21 Callery<br>Batt.23 Crowe<br>Batt.40 Wing<br>Batt.42 Belovin<br>Batt.43 Murphy<br>Batt.33 Howard<br>Batt.58 Mundy<br>Res.Batt. Wylie<br>Safety DeRubbio<br>Safety Marinetion<br><br>Reporting Member: 900011 JOHN A CALDERONE<br>Unit Responsible: BC22 |

| Fire | |
|---|---|
| Buildings Involved | 2 |
| Cause of Ignition | 5 - Cause under investigation |
| Case | 50030 |
| Area Of Origin | UU - Undetermined |
| Heat Source | UU - Undetermined |
| Item First Ignited | UU - Undetermined |
| Type Of Material First Ignited | UU - Undetermined |
| Condition on Arrival | 2 - Smoke only Showing |
| Factor Contributing To Ignition1 | UU - Undetermined |
| On Site Material1 | 110 - Food, other |
| On Site Material Storage Use1 | 3 - Packaged goods for sale |
| Equipment Involved Type | UUU - Undetermined |
| Equipment Involved Power | UU - Undetermined |
| Equipment Involved Portability | 2 - Stationary |
| Mobile Property Involved | None |

| Structure | |
|---|---|
| Structure Type | 1 - Enclosed building |
| Building Type | 3 - Non-Fireproof Structure |
| Building Status | 2 - In normal use |
| Floors Above Grade | 1 |
| Floors Belows Grade | 1 |
| Building Length | 75 |
| Building Width | 100 |
| Story of Fire Origin | 1 |
| Fire Spread | 4 - Confined to building of origin |

Incident Report: 3-0006-0

| Structure | |
|---|---|
| Building Type | 3 - Non-Fireproof Structure |
| Stand Pipe System Present | No |
| Detector Presence | 1 - Present |
| Detector Type | U - Undetermined |
| Detector Power | U - Undetermined |
| Detector Operation | U - Undetermined |
| AES Presence | N - None Present |
| Stories Minor Flame | 0 |
| Stories Significant Flame | 0 |
| Stories Heavy Flame | 0 |
| Stories Extreme Flame | 1 |
| Stories Extreme Smoke | 1 |
| Stories Extreme Water | 1 |

## Fire Service Casualty (4)

DATE _8/20/2014_
...IFY THAT THIS IS A TRUE COPY OF
...AL FIRE DEPT RECORD, KEPT IN THE
...T COURSE OF BUSINESS

BUREAU FIRE PREVENTION

Exhibit "D"

50030

Date Printed: Wednesday, August 20 2014



# FIRE INCIDENT REPORT

## BUREAU OF FIRE INVESTIGATION, FDNY

### 9 MetroTech Center, Brooklyn, NY 11201

| BFI JOB NUMBER | 50030 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arrest | N | Highest Alarm | 3rd Alarm | Photos Taken | Y | Juvenile Involved | N | DNA |
| Incident Location | 107-109 PORT RICHMOND AVENUE, , Staten Island | | | | | | | |

| Incident Date | Incident Time | Incident Borough | | C.B. # | BFI Command Reporting |
|---|---|---|---|---|---|
| 02/24/2014 | 0305 | Staten Island | | 01 | CITYWIDE SOUTH |

| F.D. Box No. | Batt.Responsible for Reporting | Incident Precinct | Complaint No. | Day of Week | Notifications |
|---|---|---|---|---|---|
| 0756 | 22 | 121 | 01460 | Monday | Other | Y |

| Response Code | | Weather |
|---|---|---|
| 10-41 | 10-45 | COLD |

| Incident Classification | |
|---|---|
| Occupied | Commercial Structure |

### VEHICLE INFORMATION

| Plate No. | State | VIN Number | Make | Type | Year |
|---|---|---|---|---|---|
| | | | | | |

| Owner of Vehicle | | Company |
|---|---|---|
| Address | | |

### STRUCTURAL INFORMATION

| Stories | 1 | Material | NON F.P. | Size | 100X75 |
|---|---|---|---|---|---|

| Owner of Structure | Address of Owner |
|---|---|
| HUACHAMBER, GLORIA | 111 EAST JERICHO TURNPIKE MINIOLA, New York 11501 |

| Occupant or Tenant of Incident Location | Occupied/Used As | Company Name |
|---|---|---|
| ABDELDAYEM ZIAD | Store | 109-PORT RICHMOND LLC |

| Date of Arrival at Incident | Time of Arrival | Fire Marshal Assigned |
|---|---|---|
| 02/24/2014 | 0600 | Cox, Robert J |

| Numerical Cause Code | Cause of Fire |
|---|---|
| 100 | Incendiary |

| Description (Specify if Accidental) | Multiple Points of Origin |
|---|---|
| | Y |

### ORIGIN AND EXTENSION

Physical examination showed fire originated in the above subject premises, in two separate and distinct locations.

Fire number one originated inside subject premises, on the ground floor, approximately (6) six feet east of the west wall, approximately (15) feet south of the north wall, at the floor level in the vapors of an ignitable liquid introduced thereto. Fire extended to the floor. Fire further extended to all four walls, ceiling and entire contents throughout. Fire was confined and thereto extinguished.

Fire number two originated in the basement, in the center storage room, approximately (3) three feet north of the south wall and approximately (6) six feet east of the west wall, at the floor level in the vapors of an ignitable liquid introduced thereto. Fire further extended to all four walls, ceiling and entire contents throughout. Fire was confined and thereto extinguished. At no time did the two fires combine.

SFM GIAMPAOLO PRESENT
CMDR RIGNOLA PIC

RECORD ROOM

SEP 10 2014

FIRE MARSHAL

COPY

| Signature of Assigned Investigator | Fire Marshal Tax Registry No. | Investigator Assisting |
|---|---|---|
| | 916338 | Cox, Robert J |

| SFM Name Printed | SFM Signature | Date | CASE CLOSED |
|---|---|---|---|
| Giampaolo, Richard A | Richard Giampaolo | 9/7/2014 | Y |



EXHIBIT "E"

Fire Investigation and Analysis Services

THOMAS J. RUSSO, SR., C.F.I.
MICHAEL W. RUSSO, C.F.I.

PAMELA J. RUSSO
OPERATIONS MANAGER

JOSEPH BANAHAN, C.F.I
RICHARD R. BLOETH, C.F.I.
PETER M. CATAL, C.F.I.
MICHAEL K. CUMMINGS, C.F.I.
DOUGLAS E. LEIHBACHER, C.F.I.
VINCENT PALMIERI, C.F.I.
KEVIN S. PARRETT, C.F.I.
GENE PIETZAK, C.F.I.
SALVATORE J. SALVATO, C.F.I.

HARRY T. HANSEN, C.F.E.I.
DIRECTOR NEW JERSEY
REGIONAL OFFICE

GERARD E. LEDWITH, C.F.I.
DIRECTOR HUDSON VALLEY
REGIONAL OFFICE

STEPHEN M. WENK, C.F.I.
DIRECTOR FLORIDA
REGIONAL OFFICE

DOUGLAS J. MOLLO, ESQ

NEW JERSEY REGIONAL OFFICE
344 LAFAYETTE ROAD
HARRINGTON PARK, NJ 07640
TEL: 201-750-1948 - FAX: 201-750-8789

HUDSON VALLEY REGIONAL OFFICE
3590 ROUTE 9
COLD SPRING, NY 10516
TEL: 845-809-5245 – FAX: 845-809-5098

FLORIDA REGIONAL OFFICE
P.O. BOX 1376
ZEPHYRHILLS, FL 33539
TEL: 813-788-3240 – FAX: 813-788-3280

99 HILLSIDE AVENUE
WILLISTON PARK, NY 11596
TEL: 516-294-8644
FAX: 516-747-1009

E-MAIL: OFFICE@TJRUSSO.COM
WWW.TJRUSSO.COM

OUR FILE NO.: FR-3143-14

April 4, 2014

**Loss:**  107-109 Port Richmond Avenue
Staten Island, NY

**Date of Loss:** February 24, 2014
Monday

**Claim No:** SIBP408182

**Insured:** SI Meat Village Inc.

Mr. Mohammad F. Jaber
366 Van Name Avenue
Staten Island, NY  10303

Mr. Ziad Abdeldayem
843 53rd Street
Brooklyn, NY  11220

Lance Lazzaro, Esq.
Lazzaro Law Firm
360 Court Street
Brooklyn, NY  11231

S I Meat Village Inc.
107-109 Pt. Richmond Avenue
Staten Island, NY  10302

Gentlemen:

In the furtherance of our inquiry regarding the above-captioned loss, kindly furnish this firm with the information requested below:

1.  **Signed** copy of the Articles of Incorporation for S I Meat Village Inc.
2.  Copies of any and all documents relating to S I Meat Village Inc.'s loan with C-Town (Krasdale), to include but not limited to the loan application, loan agreement, statements, correspondences relating to the loan, etc.
3.  Full name, address and contact number of the C-Town representative for S I Meat Village Inc.

1

FR-3143-14

4.  Copies of any and all paperwork pertaining to S I Meat Village Inc.'s loan with Resnick, to include but not limited to the loan agreement, correspondence relating to the loan being satisfied (paid off), etc.

5.  Full name, address and contact number for the landlord

6.  **Signed** copy of the lease

7.  Copies of any and all correspondence from the landlord relating to the non-payment of rent

8.  Copies of any and all correspondence sent to the landlord relating to the roof leaks

9.  Copies of any and all correspondence sent to the landlord relating to the sewer back-ups

10. Full name, address and contact number for "David" who you believe was the landlord up until the day of the fire

11. Full name, address and contact number for the plumber who repaired the sewage back-ups (for both incidents)

12. Copies of the invoices for the sewage back-up repairs (for both incidents)

13. Any and all correspondence relating to the litigation with the prior landlord, to include but not limited to the complaint, response, any orders from the court, rulings, etc.

14. Copies of the electric bills for C-Town supermarket for the period covering September 2013 through February 2014

15. Any and all paperwork pertaining to SI Meat Village Inc.'s payment plan with Con Edison

16. Copies of any and all notices received from Con Edison, to include but not limited to any notices of service termination, non-payment, etc.

17. Copies of the gas bills for C-Town supermarket for the period covering September 2013 through February 2014)

18. Copies of the phone bills for the business telephone for the past six months (September 2013 through February 2014)

19. The **original** LUDs (Local Usage Details) for all telephone and fax lines in the store, which must be obtained from the telephone service provider, for the months of December 2013, January 2014, February 2014 and March 2014

20. The **original** long distance (Tolls) calls for all telephone and fax lines in the store, which must be obtained from the long distance provider, for the months of December 2013, January 2014, February 2014 and March 2014

21. Full name, address and contact number (with contact person) for Sky CCTV

22. Any and all paperwork pertaining to the installation, maintenance and hardware for the surveillance camera system, to include but not limited to invoices, contracts, a schematic, etc.

23. Any and all paperwork pertaining to the installation, maintenance and hardware for the alarm system, to include but not limited to invoices, contracts, a schematic, etc.

24. Copies of the alarm print-outs from the alarm company central station from the date of installation until the date of this letter

25. Copies of any and all paperwork pertaining to the repairs and additions to the alarm system following the break-in

26. Copy of the Police Report pertaining to the prior break-in

2

FR-3143-14

27. Copies of S I Meat Village Inc.'s alarm system central station monitoring bills covering the period from September 2013 through February 2014

28. Any and all paperwork pertaining to the request for Lotto to remove their machinery, to include but not limited to any correspondence requesting removal, cancellation of service, etc.

29. Copy of the Liquor License for SI Meat Village Inc.

30. Copies of S I Meat Village Inc.'s licenses and/or agreements relating to all "public assistance programs", i.e. food stamps and WICKS

31. Full name, address and contact number for SI Meat Village Inc.'s business accountant

32. Copies of the past two years' corporate tax returns

33. Copies of the bank statements for the business account (including copies of checks) as well as all bank account statements (if separate) dedicated to federal programs for the period covering September 2013 through February 2014

34. Copies of the last six statements (invoices) with Krasdale

35. List of store vendors with full names, addresses, account numbers and contact numbers

36. Copies of S I Meat Village Inc.'s last three statements (invoices) with all store vendors

37. Full name, address and contact number (with account number) of S I Meat Village Inc.'s sanitation contractor

38. Copies of the last three statements (invoices) of S I Meat Village Inc.'s sanitation vendor

39. The **original** bills with call detail for Ziad's cellular telephone number (646-420-7126) for December 2013, January 2014, February 2014 and March 2014

40. The **original** bills with call detail for Mohammad's cellular telephone number (917-335-0180) for December 2013, January 2014, February 2014 and March 2014

41. The **original** LUDs (Local Usage Details) for both Ziad's home telephone number (718-435-3674) and Mohammad's home telephone number (718-420-0921), which must be obtained from your telephone service provider, for the months of December 2013, January 2014, February 2014 and March 2014

42. The **original** long distance (Tolls) calls for both Ziad's home telephone number (718-435-3674) and Mohammad's home telephone number (718-420-0921), which must be obtained from your long distance provider, for the months of December 2013, January 2014, February 2014 and March 2014

43. Copies of both Ziad's and Mohammad's EZ-Pass statements (record of usage) for the months of January 2014 and February 2014

44. The full name, address and contact number for the ATM vendor

45. Copies of any and all notices and/or correspondence from the insurance company received in January 2014 and February 2014, to include but not limited to coverage expiration, coverage renewal, etc.

46. Any and all paperwork pertaining to the electrical fixtures that were changed on the day prior to the fire, to include but not limited to invoices, estimates, contracts, etc.

47. Full name, address and contact number for SI Meat Village Inc.'s insurance broker

3

FR-3143-14

48.    An **original, signed** copy of the alarm company service agreement (the one that was provided when we spoke was partially illegible and had information crossed out on the document)

Please do not wait until all requested documentation is received.  As data is received, kindly forward same to the undersigned so as not to delay this investigation.  In addition, if you are having problems gathering any of the information, please indicate, in writing, your reasons why.

Your prompt response to this request will be greatly appreciated.  Please note that additional information and documentation may be required at a later date.

Very truly yours,

T J RUSSO CONSULTANTS INC.

*Vincent Palmieri*

Vincent Palmieri, CFI
Fire Investigator

VP/cg
cc:  Paul Prislupsky
     Chris Ryan
     Bert Sarmiento

4

EXHIBIT "F"

LAW OFFICES

# Lazzaro Law Firm, P.C.

360 COURT STREET
SUITE 3
BROOKLYN, NEW YORK 11231

TELEPHONE: (718) 488-1900
TELECOPIER: (718) 488-1927
EMAIL: LAZZAROLAW@AOL.COM

LANCE LAZZARO
RANDALL LAZZARO *

JAMES KILDUFF *
JAMES KIRSHNER
ROGER GREENBERG

* ADMITTED IN NY & NJ

April 21st, 2014

Sent via email: vpalmieri@tjrusso.com

Vincent Palmieri, CFI
T.J. Russo Consultants
99 Hillside Avenue
Williston Park, NY 11596

Re:    Location:      107-109 Port Richmond Avenue, Staten Island, NY
       Date:          February 24, 2014
       Claim No.:     SIBP408182
       Insured:       SI Meat Village Inc.

Dear Mr. Palmieri:

Enclosed please find the following requested items for the above referenced matter:

- Signed copy of the lease

- Copy of 2012 Corporate tax returns

- Copy of the Liquor License for SI Meat Village Inc.

Please be advised that a lot of the items that you are looking for were lost due to the fire. My client is working diligently to get you all of the paperwork that they still have in their possession. Thank you for your attention herein. If you have any questions and/or concerns with regards to the above please do not hesitate to contact the undersigned.

Lance Lazzaro, Esq.
Lazzaro Law Firm, P.C.

P586—Assignment of lease by tenant, with assumption, plain English format; 11-93          BlumbergExcelsior Inc. PUBLISHER NYC 10013

## ASSIGNMENT AND ASSUMPTION OF LEASE

the parties agree as follows:

**Date:**
February 2, 2012

**Parties:**
Assignor:    ATA F. JABER
Address:     366 Van Name Avenue, Staten Island, New York

Assignee:    S.I. MEAT VILLAGE, INC.
Address:     107 Port Richmond Avenue, Staten Island, New York, 10302

If there are more than one Assignor or Assignee, the words "Assignor" and "Assignee" shall include them.

**Lease assigned:**
The Lease which is assigned herein is identified as follows:
Landlord    DEBJO REALTY LLC
Tenant      ATA F. JABER
Date        October 10, 2011    Premises:    107 PORT RICHMOND AVENUE, STATEN ISLAND, NY

(This Lease was recorded on                        in the office of the
of the County of                    in liber            of conveyances, at page                .)

The Lease is Amended as follows:

In the event the Tenant defaults under this Lease, all notices shall be sent to C.T. Stores Inc. 65 West Red Oak Lane, White Plains, NY 10605 C.T.Stores, Inc. C.T.Stores Inc. has the right to correct any default, whereupon C.T.Stores, Inc. will then have the right to direct and Assignment of the Lease to a new Tenant, provided the Assignment complies with the terms of the Lease.

**Consideration:**
Assignor has received
TEN & 00/100 – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – ($ 10.00    ) dollars
and other good and valuable consideration for this Assignment.

**Assignment:**
Assignor assigns to the Assignee all the Assignor's right, title and interest in  a) the Lease and  b) the security deposit, if any, stated in the Lease.

**Assumption:**
Assignee agrees to pay the rent promptly and perform all of the terms of the Lease as of the date of this Assignment. Assignee assumes full responsibility for the Lease as if Assignee signed the Lease originally as Tenant.

**Indemnity:**
Assignee agrees to indemnify and hold Assignor harmless from any legal actions, damages and expenses, including legal fees that the Assignor may incur arising out of the Lease.

**Benefit to landlord:**
Assignee agrees that the obligations assumed shall benefit the landlord named in the Lease as well as the Assignor.

**Assignor's statements:**
Assignor states that Assignor has the right to assign this Lease and that the premises are free and clear of any judgments, executions, liens, taxes and assessments.

**Assignee's statement:**
Assignee states that Assignee has read the Lease and has received the original or an exact copy of the Lease.

**Successors:**
This assignment is binding on all parties who lawfully succeed to the rights or take the place of the Assignor or Assignee.

**Margin headings:**
The margin headings are for convenience only.

**Signatures:**
The Assignor and Assignee have signed this Assignment as of the date at the top of the first page.

LANDLORD:                                    ASSIGNOR
DEBJO REALTY LLC
By: _____                  _____
DEBORAH ALESTRA, Member                       ATA F. JABER

WITNESS                                       ASSIGNEE
                                              S.I. MEAT VILLAGE, INC.
_____                       By: _____
ZIAD ABDELDAYEM, Personal Guarantor           ZIAD ABDELDAYEM, President

7/04

## STANDARD FORM OF STORE LEASE
### The Real Estate Board of New York, Inc.

**Agreement of Lease**, made as of this _13_ day of _Oct_ the year 2011 , between

DEBJO REALTY LLC, a limited liability company
party of the first part, hereinafter referred to as OWNER, and

ATA E. JABER residing 366 Van Name Avenue, Staten Island, New York,
to be assigned to a corporation or party of the second part, hereinafter referred to as TENANT,
limited liability company;

**Witnesseth:** Owner hereby leases to Tenant and Tenant hereby hires from Owner

in the building known as 107 PORT RICHMOND AVENUE
in the Borough of Staten Island , City of New York, for the term of FIFTEEN (15) YEARS

(or until such term shall sooner cease and expire as hereinafter provided) to commence on the
1st day of OCTOBER in the year 2011 , and to end on the
30th day of SEPTEMBER in the year 2026 , and
both dates inclusive, at the annual rental rate of SEE RENT SCHEDULE ATTACHED

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any setoff or deduction whatsoever, except that Tenant shall pay the first _____ monthly installment(s) on the execution hereof (unless this lease be a renewal).

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributes, executors, administrators, legal representative, successors and assigns, hereby covenant as follows:

**Rent:**
1. Tenant shall pay the rent as above and as hereinafter provided.

**Occupancy:**
2. Tenant shall use and occupy the demised premises for a supermarket

and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner, shall not violate Article 37 hereof, and shall keep show windows and signs in a neat and clean condition.

**Alterations:**
3. Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant, at Tenant's expense, may make alterations, installations, additions or improvements which are non-structural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved in each instance by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof, and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner, and Tenant agrees to carry, and will cause Tenant's contractors and sub-contractors to carry, such worker's compensation, commercial general liability, personal and property damage insurance as Owner may require. If any mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have been done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within 30 days thereafter, at Tenant's expense, by payment or filing a bond as permitted by law. All fixtures and all paneling, partitions, railings and like installations, installed in the demised premises at any time, either by Tenant or by Owner on Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to relinquish Owner's rights thereto and to have them removed by Tenant, in which event, the same shall be removed from the demised premises by Tenant prior to the expiration of the lease, at Tenant's expense. Nothing in this article shall be construed to give Owner title to, or to prevent Tenant's removal of, trade fixtures, moveable office furniture and equipment, but upon removal of same from the demised premises or upon removal of other installations as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the demised premises to the condition existing prior to any such installations, and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed by Tenant at the end of the term remaining in the demised premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the demised premises by Owner at Tenant's expense.

**Repairs:**
4. Owner shall maintain and repair the public portions of the building, both exterior and interior, except that if Owner allows Tenant to erect on the outside of the building a sign or signs, or a hoist, lift or sidewalk elevator for the exclusive use of Tenant, Tenant shall maintain such exterior installations in good appearance, shall cause the same to be operated in a good and workmanlike manner, shall make all repairs thereto necessary to keep same in good order and condition, at Tenant's own cost and expense, and shall cause the same to be covered by the insurance provided for hereafter in Article 8. Tenant shall, throughout the term of the lease, take good care of the demised premises (including, without limitation, the storefront) and

the fixtures and appurtenances therein, and the sidewalks adjacent thereto, and at its sole cost and expense, make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted. If the demised premises be or become infested with vermin, Tenant shall at Tenant's expense, cause the same to be exterminated from time to time to the satisfaction of Owner. Except as specifically provided in Article 9 or elsewhere in this lease, there shall be no allowance to the Tenant for the diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant or others, making or failing to make any repairs, alterations, additions or improvements in or to any portion of the building, including the erection or operation of any crane, derrick or sidewalk shed, or in or to the demised premises or the fixtures, appurtenances or equipment thereof. It is specifically agreed that Tenant shall be not entitled to any set off or reduction of rent by reason of any failure of Owner to comply with the covenants of this or any other article of this lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this Article 4 with respect to the making of repairs shall not apply in the case of fire or other casualty, which are dealt with in Article 9 hereof.

**Window Cleaning:**
5. Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the New York State Labor law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance:**
6. Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders, rules and regulations of the New York Board of Fire Underwriters or the Insurance Services Office, or any similar body which shall impose any violations, order or duty upon Owner or Tenant with respect to the demised premises, and with respect to the portion of the sidewalk adjacent to the demised premises, if the demised premises are on the street level, whether or not arising out of Tenant's use or manner of use thereof, or with respect to the building, if arising out of Tenant's use or manner of use of the demised premises or the building (including the use permitted under the lease). Except as provided in Article 29 hereof, nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has by its manner of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant shall not do or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner, or

Feb 01 12 04:18p    Microsoft                    718 556-5503                p.11

which shall or might subject Owner to any liability or responsibility to any person, or for property damage. Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article. If the fire insurance rate shall, at the beginning of the lease, or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant, to comply with the terms of this article. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or the demised premises issued by a body making fire insurance rates applicable to said demised premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to said demised premises.

**Sub-ordination:** 7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which the demised premises are a part, and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

**Tenant's Liability Insurance Property Loss, Damage, Indemnity:** 8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of, or damage to, any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause or whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building, or caused by operations in construction of any private, public or quasi public work. Tenant agrees, at Tenant's sole cost and expense, to maintain commercial general liability insurance in standard form in favor of Owner and Tenant against claims for bodily injury or death or property damage occurring in or upon the demised premises, effective from the date Tenant enters into possession of the demised premises and during the term of this lease. Such insurance shall be in an amount and with carriers acceptable to the Owner. Such policy or policies shall be delivered to the Owner. On Tenant's default in obtaining or delivering any such policy or policies or failure to pay the charges therefore, Owner may secure or pay the charges for any such policy or policies and charge the Tenant as additional rent therefore. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys' fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agent, contractors, employees, invitees, or licensees, of any covenant or condition of this lease or by the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire, and Other Casualty:** 9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner, and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the demised premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the demised premises shall have been repaired and restored by Owner (or sooner reoccupied in part by the Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within 90 days after such fire or casualty or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the demised premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the demised premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other

☞ Rider to be added if necessary

casualty. Notwithstanding anything contained to the contrary in subdivisions (a) through (e) hereof, including Owner's obligation to restore under subparagraph (b) above, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible, and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery with respect to subparagraphs (b), (d) and (e) above, against the other, or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the demised premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant, and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:** 10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding, and Tenant shall have no claim for the value of any unexpired term of said lease. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment, provided Tenant is entitled pursuant to the terms of the lease to remove such property, trade fixtures and equipment at the end of the term, and provided further such claim does not reduce Owner's award.

**Assignment, Mortgage, Etc.:** 11. Tenant, for itself, its heirs, distributes, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate tenant or the majority interest in any partnership or other legal entity which is tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the assignees consent in writing of Owner, to any further assignment or underletting.

**Electric Current:** 12. Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation, and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no way make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:** 13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to any portion of the building or which Owner may elect to perform, in the demised premises, following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this lease, or for the purpose of complying with laws, regulations and other directions of governmental authorities. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes, ducts, and conduits therein, provided they are concealed within the walls, floors or ceiling, wherever practicable. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction, nor shall the Tenant be entitled to any abatement of rent while such work is in progress, not to any damages by reason of loss or interruption of business or otherwise. Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants, and may, during said six months period, place upon the demised premises the usual notice "to Let" and "For Sale", which notices Tenant shall permit to remain thereon without molestation. If Tenant is not present to open and permit an entry into the demised premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible, by master key or forcibly, and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render owner or its agents liable therefore, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of the term Tenant shall have removed all or substantially all of Tenant's property therefrom, Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation, and such act shall have no effect on this lease or Tenant's obligations hereunder. Owner shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefore, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other

public parts of the building, and to change the name, number or designation by which the building may be known.

**Vault, Vault Space, Area:** 14. No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building, is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the building. All vaults and vault space and all such areas not within the property line of the building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability, nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault area shall be paid by Tenant.

**Occupancy:** 15. Tenant will not at any time use or occupy the demised premises in violation of Articles 2 or 37 hereof, or of the certificate of occupancy issued for the building of which the demised premises are a part. Tenant has inspected the demised premises and accepts them "as-is", subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the demised premises, and Tenant agrees to accept the same subject to violations, whether or not of record.

**Bankruptcy:** 16. (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant (or a guarantor of any of Tenant's obligations under this lease) as the debtor; or (2) the making by Tenant (or a guarantor of any of Tenant's obligations under this lease) of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the demised premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) It is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant, as and for liquidated damages, an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination, and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four percent (4%) per annum. If the demised premises, or any part thereof, be re-let by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be deemed to be the fair and reasonable rental value for the part or the whole of the demised premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages, by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:** 17. (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; or if the demised premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property, whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under Section 365 of Title 11 of the U.S. Code (Bankruptcy Code); or if Tenant shall have failed, after five (5) days written notice, to redeposit with Owner any portion of the security deposit hereunder which Owner has applied to the payment of any rent and additional rent due and payable hereunder, or if Tenant shall be in default with respect to any other lease between Owner and tenant; or if Tenant shall fail to move into or take possession of the demised premises within thirty (30) days after the commencement of the term of this lease, of which fact Owner shall be the sole judge; then, in any one or more of such events, upon Owner serving a written fifteen (15) day notice upon Tenant specifying the nature of said default, and upon the expiration of said fifteen (15) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said fifteen (15) day period, and if Tenant shall not have diligently commenced curing such default within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written five (5) days notice of cancellation of this lease upon Tenant, and upon the expiration of said five (5) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such five (5) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner, but Tenant shall remain liable as hereinafter provided.

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforesaid; or if Tenant shall make default in the payment of the rent reserved herein, or any item of additional rent herein mentioned, or any part of either, or in making any other payment herein required; then, and in any of such events, Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of the demised premises, and remove their effects and hold the demised premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

**Remedies of Owner and Waiver of Redemption:** 18. In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent, and additional rent, shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, (b) Owner may re-let the demised premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease, and may grant concessions or free rent or charge a higher rental than that in this lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner, as liquidated damages, for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease. The failure of Owner to re-let the demised premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, reasonable attorney's fees, brokerage, advertising and for keeping the demised premises in good order, or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements, and/or decorations shall not operate or be construed to release Tenant from liability. Owner shall in no event be liable, in any way whatsoever, for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws.

**Fees and Expenses:** 19. If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under, or by virtue of, any of the terms or provisions in any article of this lease, after notice if required, and upon expiration of any applicable grace period if any, (except in an emergency), then, unless otherwise provided elsewhere in this lease, Owner may immediately, or at any time thereafter, and without notice, perform the obligation of Tenant thereunder, and if Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorney's fees, in instituting, prosecuting or defending any actions or proceeding, and prevails in any such action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within ten (10) days of rendition of any bill or statement to Tenant therefore, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages.

**No Representations by Owner:** 20. Neither Owner nor Owner's agent have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation, or any other matter or thing affecting or related to the demised premises, except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise, except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition, and agrees to take the same "as-is", and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant, and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**End of Term:** 21. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, "broom-clean", in good order and condition, ordinary wear excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday, unless it be a legal holiday, in which case it shall expire at noon on the preceding business day.

**Quiet Enjoyment:** 22. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 33 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:** 23. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants, or if the demised premises are located in a building being constructed, because such building has not been sufficiently completed to make the demised premises ready for occupancy, or because of the fact that a certificate of occupancy has not been procured, or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that the Owner is able to deliver possession in the condition required by this lease. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified at the commencement of the term of this lease, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease, except the obligation to pay the fixed annual rent set forth in page one of this lease. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:** 24. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach, and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed in acceptance of a surrender of the demised premises and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of the demised premises prior to the termination of this lease, and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the demised premises.

**Waiver of Trial by Jury:** 25. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of, or in any way connected with, this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of the demised premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commence any proceeding or action for possession, including a summary proceeding for possession of the demised premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding, including a counterclaim under Article 4, except for statutory mandatory counterclaims.

**Inability to Perform:** 26. This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no way be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease, or to supply, or is delayed in supplying, any service expressly or impliedly to be supplied, or is unable to make, or is delayed in making, any repair, additions, alterations or decorations, or is unable to supply, or is delayed in supplying, any equipment, fixtures or other materials, if Owner is prevented or delayed from so doing by reason of strike or labor troubles, governmental preemption or restrictions, or by reason of any rule, order or regulation of any department or subdivision thereof of any governmental agency, or by reason of the conditions of which have been or are affected, either directly or indirectly, by war or other emergency, or when, in the judgment of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

**Bills and Notices:** 27. Except as otherwise in this lease provided, any notice, statement, demand or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this lease) and shall be deemed to have been properly given, rendered or made, if sent by registered or certified mail (express mail, if available), return receipt requested, or by courier guaranteeing overnight delivery and furnishing a receipt in evidence thereof, addressed to the other party at the address hereinabove set forth (except that after the date specified as the commencement of the term of this lease, Tenant's address, unless Tenant shall give notice to the contrary, shall be the building), and shall be deemed to have been given, rendered or made (a) on the date delivered, if delivered to Tenant personally, (b) on the date delivered, if delivered by overnight courier or (c) on the date which is two (2) days after being mailed. Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demand or other communications intended for it. Notices given by Owner's managing agent shall be deemed a valid notice if addressed and set in accordance with the provisions of this Article. At Owner's option, notices and bills to Tenant may be sent by hand delivery.

☞ Space to be filled in or deleted

**Water Charges:** 28. If Tenant requires, uses or consumes water for any purpose in addition to ordinary lavatory purposes (of which fact Tenant constitutes Owner to be the sole judge) Owner may install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Owner for the cost of the meter and the cost of the installation thereof, and throughout the duration of the Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meter, as and when bills are rendered. Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the demised premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent. If the building or the demised premises, or any part thereof, be supplied with water through a meter through which water is also supplied to other premises, Tenant shall pay to Owner as additional rent, on the first day of each month.

☞ _____% $_____ of the total meter charges, as Tenant's portion. Independently of, and in addition to, any of the remedies reserved to Owner hereinabove or elsewhere in this lease, Owner may sue for and collect any monies to be paid by Tenant or paid by Owner for any of the reasons or purposes hereinabove set forth.

**Sprinklers:** 29. Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office, or any bureau, department or official of the federal, state or city government, require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or for any other reason, or if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said Exchange or by any fire insurance company, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required, whether the work involved shall be structural or non-structural in nature. Tenant shall pay to Owner as additional rent the

☞ sum of $_____ on the first day of each month during the term of this lease, as Tenant's portion of the contract price for sprinkler supervisory service.

**Elevators, Heat, Cleaning:** 30. As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall, if and insofar as existing facilities permit, furnish heat to the demised premises, when and as required by law, on business days from 8:00 a.m. to 6:00 pm. and on Saturdays from 8:00 a.m. to 1:00 pm. Tenant shall at Tenant's expense, keep the demised premises clean and in order, to the satisfaction of Owner, and if the demised premises are situated on the street floor, Tenant shall, at Tenant's own expense, make all repairs and replacements to the sidewalks and curbs adjacent thereto, keep said sidewalks and curbs free from snow, ice, dirt and rubbish and maintain said sidewalks in a reasonably safe condition in compliance with requirements of law. Tenant shall pay to Owner the cost of removal of any of Tenant's refuse and rubbish from the building. Bills for the same shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due and payable when rendered, and the amount of such bills shall be deemed to be, and be paid as, additional rent. Tenant shall, however, have the option of independently contracting for the removal of such rubbish and refuse in the event that Tenant does not wish to have same done by employees of Owner. Under such circumstances, however, the removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the judgment of Owner, are necessary for the proper operation of the building.

**Security:** 31. Tenant has deposited with Owner the sum of $3500.* as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent, or any other sum as to which Tenant is in default, or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this lease, including but not limited to, any damages or deficiency in the reletting of the demised premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner. In the case of every such use, application or retention Tenant shall, within five (5) days after demand, pay to Owner the sum so used, applied or retained which shall be added to the security deposit so that the same shall be replenished to its former amount. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this lease, the security shall be returned to Tenant after the date fixed as the end of the lease and after delivery of entire possession of the demised premises to Owner. In the event of a sale of the land and building or leasing of the building, of which the demised premises form a part, Owner shall have the right to transfer the security to the vendee or lessee and Owner shall thereupon be released by Tenant from all liability for the return of such security; and Tenant agrees to look to the new Owner solely for the return of said security; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the security to a new Owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and that neither Owner nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

*non-interest bearing

**Captions:** 32. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision thereof.

**Definitions:** 33. The term "Owner" as used in this lease means only the Owner, or the mortgagee in possession, for the time being of the land and building (or the Owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales or conveyance, assignment or transfer of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties and the purchaser, grantee, assignee or transferee at any such sale, or the said lessee of the building, that the purchaser, grantee, assignee or transferee at any such sale, or the said lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonable delayed.

**Adjacent Excavation-Shoring:** 34. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, a license to enter upon the demised premises for the purpose of doing such work, as said person shall deem necessary, to preserve the wall or the building of which the demised premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:** 35. Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing, upon Owner, within fifteen (15) days after giving of notice thereof. Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, as against any other tenant, and Owner shall

not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

**Glass:** 36. Owner shall replace, at the expense of Tenant, any and all plate and other glass damaged or broken from any cause whatsoever in and about the demised premises. Owner may insure, and keep insured, at Tenant's expense, all plate and other glass in the demised premises for and in the name of Owner. Bills for the premiums therefore shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rent.

**Pornographic Uses Prohibited:** 37. Tenant agrees that the value of the demised premises and the reputation of the Owner will be seriously injured if the demised premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the demised premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the demised premises, nor permit use of the demised premises for nude modeling, rap sessions, or as a so called rubber goods shop, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the demised premises. This Article shall directly bind any successors in interest to the Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct. Pornographic material is defined for purposes of this Article as any written or pictorial matter with prurient appeal, or any objects of instrument that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in Penal Law §235.00.

**Estoppel Certificate:** 38. Tenant, at any time, and from time to time, upon at least 10 days prior notice by Owner, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, stating whether or not there exists any defaults by owner under this lease, and, if so, specifying each such default and such other information as shall be required of Tenant.

**Successors and Assigns:** 39. The covenants, conditions and agreements contained in this lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributes, executors, administrators, successors, and except as otherwise provided in this lease, their assigns. Tenant shall look only to Owner's estate and interest in the land and building for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) against Owner in the event of any default by Owner hereunder, and no other property or assets of such Owner (or any partner) member, officer or director thereof, disclosed or undisclosed, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under, or with respect to, this lease, the relationship of Owner and Tenant hereunder, or Tenant's use and occupancy of the demised premises.

**RIDER ATTACHED HERETO**

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

Witness for Owner:

DEBJO REALTY LLC

_____

BY: _____
DEBORAH ALESTRA, Member

Witness for Tenant:

_____

ATA F. JABER

**ACKNOWLEDGEMENT**

STATE OF NEW YORK,

    SS.:

COUNTY OF

On the _____ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

Feb 01 12 04:23p    Microsoft                                   718 556-5503              p.15

## GUARANTY

The undersigned Guarantor guarantees to Owner, Owner's successors and assigns, the full performance and observance of all the agreements to be performed and observed by Tenant in the attached lease, including the "Rules and Regulations" as therein provided, without requiring any notice to Guarantor of nonpayment, or nonperformance, or proof, or notice of demand, to hold the undersigned responsible under this guaranty, all of which the undersigned hereby expressly waives, and expressly agrees that the legality of this agreement and the agreements of the Guarantor under this agreement, shall not be ended, or changed by reason of the claims to Owner against Tenant of any of the rights or remedies given to Owner as agreed in the attached lease. The Guarantor further agrees that this guaranty shall remain and continue in full force and effect as to any renewal, change or extension of the lease. As a further inducement to Owner to make the lease, Owner and Guarantor agree that in any action or proceeding brought by either Owner or the Guarantor against the other on any matters concerning the lease or of this guaranty, that Owner and the undersigned shall and do waive trial by Jury.

Dated: . . . . . . . . . . . . . . . . . . . . . . . In the year . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Guarantor

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Witness

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Guarantor's Residence

Business Address . . . . . . . . . . . . . . . . . . . . . .

Firm Name . . . . . . . . . . . . . . . . . . . . . . . . .

STATE OF NEW YORK          )
                           )  ss.:
COUNTY OF                  )

On the            day of            in the year
before me, the undersigned, a Notary Public in and for said State, personally appeared
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Notary

☞ **IMPORTANT – PLEASE READ** ☜

### RULES AND REGULATIONS ATTACHED TO AND MADE A PART OF THIS LEASE IN ACCORDANCE WITH ARTICLE 35.

1. The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress to and egress from the demised premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Owner. There shall not be used in any space, or in the public hall of the building, either by any tenant or by jobbers, or others in the delivery or receipt of merchandise, any hand trucks except those equipped with rubber tires and safeguards.

2. If the demised premises are situated on the ground floor of the building, Tenant thereof shall further, at Tenant's expense, keep the sidewalks and curb in front of said premises clean and free from ice, snow, etc.

3. The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed.

4. Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in the demised premises, or permit or suffer the demised premises to be occupied or used in a manner offensive or objectionable to Owner or other occupants of the building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein.

5. No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or fixed by Tenant on any part of the outside of the demised premises or the building, or on the inside of the demised premises if the same is visible from the outside of the demised premises, without the prior written consent of Owner, except that the name of Tenant may appear on the entrance door of the demised premises. In the event of the violation of the foregoing by Tenant, Owner may remove same without any liability and may charge the expense incurred by such removal to Tenant. Signs on interior doors and directory tablet shall be inscribed, painted or affixed for Tenant by Owner at the expense of Tenant, and shall be of a size, color and style acceptable to Owner.

6. Tenant shall not mark, paint, drill into, or in any way deface any part of the demised premises or the building of which they form a part. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Owner, and as Owner may direct. Tenant shall not lay linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of the demised premises, and, if linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall

be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

7. Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the demised premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Owner. Owner reserves the right to inspect all freight to be brought into the building and to exclude from the building all freight which violates any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.

8. Owner reserves the right to exclude from the building between the hours of 6 P.M. and 8 A.M. and at all hours on Sundays and holidays all persons who do not present a pass to the building signed by Owner. Owner will furnish passes to persons for whom Tenant requests same in writing. Tenant shall be responsible for all persons for whom it requests such pass, and shall be liable to Owner for all acts of such person.

9. Owner shall have the right to prohibit any advertising by Tenant which, in Owner's opinion, tends to impair the reputation of Owner or the building's desirability as a building for stores or offices, and upon written notice from Owner, Tenant shall refrain from or discontinue such advertising.

10. Tenant shall not bring or permit to be brought or kept in or on the demised premises, any inflammable, combustible, or explosive, or hazardous fluid, material, chemical or substance, or cause or permit any odors of cooking or other processes, or any unusual or other objectionable odors, to permeate in or emanate from the demised premises.

11. Tenant shall not place a load on any floor of the demised premises exceeding the floor load per square foot area which was designated to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant at Tenant's expense in such setting sufficient in Owner's judgment to absorb and prevent vibration, noise and annoyance.

12. Refuse and Trash – Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash. Tenant shall pay all costs, expenses, fines, penalties or damages that may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this Building Rule 12, and, at Tenant's sole cost and expense, shall indemnify, defend and hold Owner harmless (including reasonable legal fees and expenses) from and against any actions, claims and suits arising from such non-compliance, utilizing counsel reasonably satisfactory to Owner.

Address

Premises

DERJO REALTY LLC

TO

MOHAMED IDRIS

STANDARD FORM OF

Store Lease

The Real Estate Board of New York, Inc.
Copyright 2004. All rights Reserved. Reproduction in whole or in part prohibited.

Dated

Rent Per Year

Rent Per Month

Term From To

in the year

Drawn by

Checked by

Entered by

Approved by

## RIDER TO LEASE

Landlord:·    DEBJO REALTY LLC·

Tenants:      ATA. F JABER, to be assigned to a corporation

Dated:        OCTOBER 13, 2011

Premises:     107 PORT RICHMOND AVENUE, STATEN ISLAND, NEW YORK.

THIS IS A NET/NET LEASE.

1.  RENT SCHEDULE: The Tenant agrees to pay monthly rent as follows:

| Years | | Per month | Annually |
|---|---|---|---|
| 1st  | 10/1/11 – 9/30/12 | $3,500.00 | $42,000.00 |
| 2nd  | 10/1/12 – 9/30/13 | $3,987.00 | $47,844.00 |
| 3rd  | 10/1/13 – 9/30/14 | $4,107.00 | $49,284.00 |
| 4th  | 10/1/14 – 9/30/15 | $4,230.00 | $51,760.00 |
| 5th  | 10/1/15 – 9/30/16 | $4,357.00 | $52,284.00 |
| 6th  | 10/1/16 – 9/30/17 | $4,531.00 | $54,372.00 |
| 7th  | 10/1/17 – 9/30/18 | $4,712.00 | $56,544.00 |
| 8th  | 10/1/18 – 9/30/19 | $4,900.00 | $58,800.00 |
| 9th  | 10/1/19 – 9/30/20 | $5.096.00 | $61,152.00 |
| 10th | 10/1/20 – 9/30/21 | $5,300.00 | $63,600.00 |
| 11th | 10/1/21 – 9/30/22 | $5,565.00 | $66,780.00 |
| 12th | 10/1/22 – 9/30/23 | $5,843.00 | $70,116.00 |
| 13th | 10/1/23 – 9/30/24 | $6,135.00 | $73,620.00 |
| 14th | 10/1/24 – 9/30/25 | $6,442.00 | $77,304.00 |
| 15th | 10/1/25 – 9/30/26 | $6,764.00 | $81,168.00 |

Security deposit shall be increased each year to be equal to the current year's rent increase.

The above rent is intended to be increased after the second year as follows:
3rd – 5th  - increase of 3% each year over prior year's rent;
6th – 10th  - increase of 4% each year over prior year's rent;
11th – 15th  - increase of 5% each year over prior year's rent;

However, Landlord shall credit Tenant SIX (6) months rent in consideration for Tenant completing the existing construction as provided in Schedule "A" attached hereto. Accordingly, Tenants first monthly rent payment shall be April 1, 2012.

SECOND RIDER TO LEASE

Landlord:   DEBJO REALTY LLC

Tenants:    ATA. F JABER, to be assigned to a corporation

Dated:      OCTOBER &, 2011

Premises:   107 PORT RICHMOND AVENUE, STATEN ISLAND, NEW YORK.

-------------------------------------------------------------

1. Tenant has a right to sub-lease the demised premises, with written consent of Landlord, which consent shall not be unreasonably withheld and as per conditions in Paragraph 8 of the first Rider, however, Tenant cannot sub-lease to a restaurant.

2. Tenant has a right to post signs, except said signs cannot extend past the top of archways on front and side of building.

3. Tenant has the right to select the internal construction, design and decoration of the demised premises, provided Tenant obtains whatever permits and approvals are required.

DEBJO REALTY LLC, Landlord

By: _____
DEBORAH ALFSTRA, Member

_____
ATA F. JABER, Tenant

SCHEDULE "A"

The Tenant shall be liable to complete the following work on the demised premises at Tenant's expense:

1. Install ceiling, install separate water line and meter and separate gas meter, install lighting fixtures, install flooring;

2. Complete all existing electrical work and HVAC installation and undertake to pay the balance due of approximately $12,280.00 and $5,500.00 to M&M Wiring and Empire Mechanical, see attached specs of work to be completed.

3. Complete all plumbing work, plus $1,000.00 for copper pipes, reinstall copper pipes on roof;

4. Tenant shall comply with the existing NYC Building Code and obtain all required signoffs and approvals.

5. Tenant shall be required to install sprinkler system, if required by New York City Department of Buildings and/or New York City Fire Department.

In the event this work is not completed within six (6) months of execution of lease, then Landlord can cancel lease, provided the delay is not caused by City of New York or its departments, agents or employees or something beyond Tenant's control, whereupon Tenant will be liable to Landlord for costs to complete the above work.

6. Tenant to maintain Builder's Risk and Workmen's Compensation Insurance naming Landlord as insured for the above work, or obtain Insurance Certificates insuring Landlord for same from third parties.

DEBJO REALTY LLC, Landlord

By: _____
DEBORAH ALESTRA, Member

_____
ATA F. JABER, Tenant

In the event the rent is late, being paid beyond five (5) days, the Tenant shall pay a THREE HUNDRED ($300.00) DOLLAR late charge, plus reasonable attorney's fees that the Landlord may be compelled to expend in the enforcement of the terms of this lease.

2. TERM OF LEASE:    15 YEARS

    (a)    Commencement date:   OCTOBER 1, 2011

3. In addition to the lease rent the Tenant shall pay the following when due as additional rent:

    (a)    52% of any increase real estate taxes over the 6/30/11 and 7/1/12 tax year;

    (b)    100% of water/sewer charges

4. Tenant shall be responsible to maintain outside area of the building and keep same free of debris and broom clean, up to 18" into the street. Tenant is also responsible for all of its own utilities, exterminating, garbage removal, snow removal in front of premises and up to beginning of 134 Bennett Street.

5. Tenant shall be responsible for removing all violations, ECB liens, mechanics liens, sanitation liens, or any other lien, caused by Tenant or its agents or employees that are placed against the demised premises.

6. LIABILITY INSURANCE: The Tenant agrees to carry public liability insurance with limits of $2,000,000.00 and $500,000.00 property insurance against Tenant's improvements, insuring the Landlord, which said insurance policy will name the landlord as well as the tenants as insured parties. The tenant agrees to furnish the original policy to the landlord and pay the premiums and other charges in connection with same. Tenant shall also maintain plate glass insurance.

7. Tenant shall be responsible for all structural and non-structural repairs to the demised premises, interior and exterior. Tenant is responsible to maintain roof over it's part of the building.

8. This lease cannot be assigned without Landlords consent in writing, which consent shall not unreasonable withheld. However the unsatisfactory credit or financial statements of any new Tenant in Landlord's opinion shall be considered a reasonable refusal to assign. All assignments must be reviewed by Landlords attorney, and Tenant shall pay Landlord's attorney $1500.00 for said review.

All assignments shall require the deposit of two (2) additional months security from the new Tenant at the then present rent.

9.    Tenant must obtain all permits and business-licenses it requires to operate in demised premises.

10.    Landlord makes no representation as to the use of the demised premises, other than that it is a legal use as a supermarket.

11.    Tenant must get Landlords consent in writing before be commences any work requiring a New York City Building Department filing. All plans must be approved by the Landlord and New York City Building Department before any work is commenced. Tenant shall, at its costs, file to approve all plans and may be required to post an escrow with Landlord, to insure completion of the work.

11(a).    Tenant must get Landlord's consent to post signs. Such consent not to be unreasonably withheld. In the event the Landlord does not respond, after thirty (30) days consent shall be deemed granted.

12.    Tenant shall pay all legal fees of Landlords attorney, for collection of rent from Tenant, including but not limited to an eviction proceeding. Said legal fee shall be considered additional rent under the lease if adjudicated by the Court of proper jurisdiction. and there shall be mutual responsibility of attorney's fees.

13.    A Chapter 7 bankruptcy filing by Tenant shall automatically terminate this lease.

14.    Tenant shall execute whatever papers are necessary for Landlord to obtain financing or refinancing on the demised premises, including but not limited to estoppel certificates, and subordination agreements.

15.    Notwithstanding anything contained in this lease to the contrary parties agree that the Tenant shall have TEN (10) days to cure any default by Tenant under this lease, after notice of default is given to Tenant by Landlord.

If said default is not cured within TEN (10) days period then this lease at option of Landlord shall be canceled and come to an end.

16.    All notices under the lease shall be by certified mail, return receipt requested to Tenant or Landlord, at the address for the Tenant and Landlord stated in this lease.

17.    Tenant is responsible for all work done to space and for any permits needed to complete same, or any Certificate of Occupancy letter of completion or NYC Building Department approvals required for Tenant's business or use.

18    Landlord is not responsible for any environmental violations or cleanup, if required, unless caused by Landlord, its agents or assigns.

19.    Premises may not be used for illegal purposes as defined by New York City or New York State statute.

20.    The payment and acceptance of rent by anyone other than the Tenant shall not create a Landlord/Tenant relationship with the said person or party.

21.    If Tenant bounces a check, all future checks, at Landlord's option, shall be certified or bank checks. If Tenant bounces three (3) checks in one year and/or is late in rent payments three (3) times in one year, then Landlord, at its option, can cancel this Lease by giving Tenant notice as specified herein

22.    Tenant's use of demised premises shall not interfere with the use of other Tenants in the shopping center.

23.    If Landlord has to pay any obligations of Tenant under this Lease, said payment shall be considered additional rent due to the Landlord at the next rent installment.

DEBJO REALTY LLC, Landlord

By: _____
DEBORAH ALESTRA, Member

_____
ATA F. JABER, Tenant